Rec 0617628

ORIGINAL

FILED
JAN 31 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AVOCENT REDMOND CORP., a Washington corporation,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

COMPLAINT FOR UNAUTHORIZED USE OF PATENTED INVENTIONS

08-69 C

Plaintiff, Avocent Redmond Corp. ("Avocent"), brings this action for unauthorized use of the inventions claimed in U.S. Patent No. 5,884,096 ("the '096 patent"), U.S. Patent No. 6,112,264 ("the '264 patent"), U.S. Patent No. 7,113,978 ("the '978 patent"), and U.S. Patent No. 6,345,323 ("the '323 patent") pursuant to Title 28 U.S.C. § 1498(a). Plaintiff alleges the following facts upon actual knowledge with respect to itself and its own acts and upon information and belief as to all other matters.

**THE PARTIES**

1. Plaintiff, Avocent, is a corporation organized and existing under the laws of the State of Washington, having its principal place of business in Redmond, Washington. Avocent, a wholly-owned subsidiary of Avocent Corporation, and formerly known as Apex PC Solutions, Inc. and Apex Inc.

2. Avocent develops and markets computer hardware devices and systems, including Keyboard, Video, Mouse ("KVM") switches that enable workstations to communicate with, and switch between, remote computers.

3. Rose Electronics is a Texas general partnership that has two general partners, Peter Macourek and Darioush Rahvar, and has its principal place of business in Houston, Texas. Rose Electronics and the two partners of Rose Electronics are referred to hereafter collectively as "Rose".

4. Rose is in the business of developing, making, using, importing, selling, offering to sell, marketing, and/or distributing, directly or through their agents or affiliates, KVM switch products that enable workstations to communicate with, and switch between, remote computers ("Rose products").

## FACTUAL BACKGROUND

5. Avocent sued Rose and its two general partners, Messrs. Macourek and Rahvar, for infringement of the '096 patent, the '264 patent and the '978 patent in the United States District Court for the Western District of Washington at Seattle (Case No. 06-1711 MJP) ("the Seattle action".) The Seattle action is pending but temporarily stayed due to the U.S. Patent Office's decision to grant Rose's reexamination requests for those three patents. Other defendants are named in the Seattle action.

6. In the Seattle action, Avocent discovered that Defendant, the United States, has accepted delivery of Rose products purchased under the GSA Schedule. For example, Rose products were delivered to Defendant under Contract No. GS-35F-0345J. Upon information and belief, Rose offers for sale and sells its entire KVM switch product line to the United States including the products Avocent has accused of infringing the '096 patent, the '264 patent, and the '978 patent in the Seattle action. Those products include Rose's UltraView, UltraView Pro, UltraView Remote, MultiVideo, QuadraVista, ServeView Pro, UltraConsole, UltraConsole Remote, UltraMatrix E, UltraMatrix X, UltraMatrix Remote, Vista, and Xtensys

products. In the Seattle action, the Rose defendants asserted 28 U.S.C. § 1498 as a defense to limit Avocent's right to recover damages for sales to the United States.

7. In 2001, Avocent (then known as Apex Inc.) asserted the '096 patent and the '264 patent against Raritan Computer, Inc. in the U.S. District Court for the Southern District of New York, case number 01-CV-4435. On appeal, the U.S. Court of Appeals for the Federal Circuit reversed the district court's grant of summary judgment of non-infringement and remanded the case for further action by the district court. The Federal Circuit's decision is reported at *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364 (Fed. Cir. 2003). *See* Exhibit 1 hereto. On remand, the district court broadly construed the claims in a claim construction order dated March 11, 2005. A copy of the claim construction order, *Avocent Redmond Corp. v. Raritan Computer, Inc.*, 2005 U.S. Dist. LEXIS 4017 (S.D. N.Y. 2005), is attached hereto as Exhibit 2. The Raritan litigation settled shortly thereafter on about May 13, 2005.

**JURISDICTION AND VENUE**

8. This is an action for unauthorized use of patented inventions under 28 U.S.C. § 1498(a). This Court has jurisdiction over the subject matter of this action and venue is proper in this Court pursuant to 28 U.S.C. § 1498(a).

**COUNT ONE – THE '096 PATENT**

9. Plaintiff re-alleges and incorporates by reference paragraphs 1-8 above.

10. Avocent is the owner, by assignment, of all right, title and interest in the '096 patent, which was duly issued on March 16, 1999 by the U.S. Patent and Trademark Office.

11. Defendant has accepted delivery of Rose products that employ and embody the subject matter of Claims 1, 6, 7, 10, 11, 20, 26, and 32 of the '096 patent. Attached hereto as

Exhibit 3 are exemplary claim charts showing Avocent's preliminary analysis of how the Rose QuadraVista products infringes at least some claims of the '096 patent.

12. Defendant's acceptance of Rose products constitutes unauthorized use of the invention claimed in the '096 patent.

13. As a result of Defendant's unauthorized use of the '096 patent, Avocent has been damaged and is entitled to reasonable compensation under 28 U.S.C. § 1498(a).

## COUNT TWO – THE '264 PATENT

14. Plaintiff re-alleges and incorporates by reference paragraphs 1-8 above.

15. Avocent is the owner, by assignment, of all right, title and interest in the '264 patent, which was duly issued on August 29, 2000 by the U.S. Patent and Trademark Office.

16. Defendant has accepted delivery of Rose products that employ and embody the subject matter of Claims 1-10, 14, and 16 of the '264 patent. Attached hereto as Exhibit 4 are exemplary claim charts showing Avocent's preliminary analysis of how the Rose QuadraVista products infringes at least some claims of the '264 patent.

17. Defendant's acceptance of Rose products constitutes unauthorized use of the invention claimed in the '264 patent.

18. As a result of Defendant's unauthorized use of the '264 patent, Avocent has been damaged and is entitled to reasonable compensation under 28 U.S.C. § 1498(a).

## COUNT THREE – THE '978 PATENT

19. Plaintiff re-alleges and incorporates by reference paragraphs 1-8 above.

20. Avocent is the owner, by assignment, of all right, title and interest in the '978 patent, which was duly issued on September 26, 2006 by the U.S. Patent and Trademark Office.

21. Defendant has accepted delivery of Rose products that employ and embody the subject matter of Claims 1-23, 25-32, 34, 38, 41, and 42 of the '978 patent. Attached hereto as Exhibit 5 are exemplary claim charts showing Avocent's preliminary analysis of how the Rose QuadraVista products infringes at least some claims of the '978 patent.

22. Defendant's acceptance of Rose products constitutes unauthorized use of the invention claimed in the '978 patent.

23. As a result of Defendant's unauthorized use of the '978 patent, Avocent has been damaged and is entitled to reasonable compensation under 28 U.S.C. § 1498(a).

## COUNT FOUR – THE '323 PATENT

19. Plaintiff re-alleges and incorporates by reference paragraphs 1-8 above.

20. Avocent is the owner, by assignment, of all right, title and interest in the '323 patent, which was duly issued on February 5, 2002 by the U.S. Patent and Trademark Office.

21. Defendant has accepted delivery of Rose products that employ and embody the subject matter of at least Claims 1-3 of the '323 patent, including the Xtensys KVM switch system.

22. Defendant's acceptance of Rose products constitutes unauthorized use of the invention claimed in the '323 patent.

23. As a result of Defendant's unauthorized use of the '323 patent, Avocent has been damaged and is entitled to reasonable compensation under 28 U.S.C. § 1498(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Avocent prays that the Court enter a judgment against Defendant as follows:

A. A decree that Defendant has used without authority the inventions claimed in the '096 patent, the '264 patent, the '978 patent, and the '323 patent;

B. An accounting by Defendant of all Rose products that it has accepted, and any other products that it has used, which embody the inventions claimed in the'096 patent, the '264 patent, the '978 patent, and/or the '323 patent;

C. An award of damages against Defendant sufficient to compensate Avocent for Defendant's unauthorized use of the inventions claimed in the '096 patent, the '264 patent, the '978 patent, and the '323 patent in an amount not less than Avocent's lost profits and/or a reasonable royalty, pursuant to 28 U.S.C. § 1498(a).

D. An award of prejudgment interest, pursuant to 35 U.S.C. § 284, from the date of each act of infringement of the '096 patent, the '264 patent, the '978 patent, and the '323 patent by the Defendant to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid;

E. An award of reasonable attorneys' fees against Defendant pursuant to 35 U.S.C. § 285, and Avocent's costs of suit against the Defendant, pursuant to 35 U.S.C. § 284, based on Defendant's infringement of the '096 patent, the '264 patent, the '978 patent, and the '323 patent; and

F. Such other and further relief as this Court deems just and appropriate.

DATED this 31st day of January, 2008.

James D. Berquist
DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
4300 Wilson Blvd, Suite 700
Arlington, Virginia 22203
Tel. 703-894-6400
Fax. 703-894-6430

Attorneys for Plaintiff Avocent Redmond Corp.

*Of Counsel:*

J. Scott Davidson
Donald L. Jackson
Grace Obermann
DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
4300 Wilson Blvd, Suite 700
Arlington, Virginia 22203
Tel. 703-894-6400
Fax. 703-894-6430

# Exhibit 1

LEXSEE 325 F3D 1364

**APEX INC., Plaintiff-Appellant, v. RARITAN COMPUTER, INC., Defendant-Appellee.**

**02-1303**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

***325 F.3d 1364; 2003 U.S. App. LEXIS 6321; 66 U.S.P.Q.2D (BNA) 1444***

**April 2, 2003, Decided**

**SUBSEQUENT HISTORY:** As Corrected April 8, 2003. Rehearing denied by, Rehearing, en banc, denied by *Apex Inc. v. Raritan Computer, Inc., 2003 U.S. App. LEXIS 11896 (Fed. Cir., May 29, 2003)*
US Supreme Court certiorari denied by *Raritan Computer, Inc. v. Apex, Inc., 2003 U.S. LEXIS 9003* (U.S., Dec. 8, 2003)

**PRIOR HISTORY:** **[**1]** Appealed from: United States District Court for the Southern District of New York. Senior Judge Milton Pollack. *Apex Inc. v. Raritan Computer, Inc., 187 F. Supp. 2d 141, 2002 U.S. Dist. LEXIS 3466 (S.D.N.Y., 2002)*

**DISPOSITION:** Vacated and remanded.

**LexisNexis(R) Headnotes**

**COUNSEL:** James D. Berquist, Nixon & Vanderhye P.C., of Arlington, Virginia, argued for plaintiff-appellant. With him on the brief were J. Scott Davidson and Donald L. Jackson.

John F. Ward, Ward & Olivo, of New York, New York, argued for defendant-appellee. With him on the brief were John W. Olivo, Jr. and David M. Hill.

**JUDGES:** Before NEWMAN, RADER, and GAJARSA, Circuit Judges.

**OPINIONBY:** GAJARSA

**OPINION:** **[*1367]** GAJARSA, Circuit Judge.

Plaintiff-Appellant, Apex Inc. ("Apex"), seeks review of the final judgment by the United States District Court for the Southern District of New York holding that *United States Patent Nos. 5,884,096* ("the '096 patent"), 5,937,176 ("the '176 patent"), and 6,112,264 ("the '264 patent") (collectively "the patents") were not infringed and dismissing all of Defendant-Appellee's, Raritan Computer, Inc. ("Raritan"), counterclaims without prejudice. *Apex Inc. v. Raritan Computer, Inc., 187 F. Supp. 2d 141 (S.D.N.Y. 2002)*. Because the district court erred as a matter of law in the construction of the disputed claim limitations of the patents, we **[**2]** vacate and remand for further proceedings consistent with this opinion.

I. BACKGROUND

Apex markets and sells computer switching systems for connecting computer workstations to remote computers. Apex is the owner, by assignment, of the patents at issue. Raritan also markets and sells computer switching systems for connecting computer workstations to remote computers. Raritan's MasterConsole MX4, SMX, II, and MXU2 products ("the MasterConsole products"), and its Paragon products (collectively "the accused products") are at issue.

The '096, '176, and '264 patents are all continuations of a patent application filed on November 12, 1997 that ultimately issued as *United States Patent No. 5,721,842* ("the '842 patent"). The '842 patent is not asserted by Apex in this action.

The patents in this action disclose and claim computerized switching systems, known in the art as keyboard, video, mouse ("KVM") switches, that allow

centrally located network administrators to operate multiple server computers without requiring a complicated wiring scheme. '096 patent, col.1, ll. 49-65. Figure 1 from the '264 patent provides a general overview of the KVM switches disclosed and claimed in the patents. [**3]

[SEE FIG. 1 IN ORIGINAL]

[*1368] The computerized switching system allows for a number of server computers 52, 54, 56 to be coupled to a number of workstations 62, 64, 66. Each workstation includes a video monitor 63, a keyboard 65, and a cursor control device such as a mouse 67. Signals from the keyboard 65 and the mouse 67 are received by a signal conditioning circuit or pod 70. The pod transmits the keyboard and mouse signals over a communication link 72 to a programmable, or central crosspoint, switch 60. After being routed through the switch, the keyboard and mouse signals are retransmitted through another communication link 74 to a pod 76, which is coupled to the remotely-located server computer 52. The pod 76 supplies the keyboard and mouse signals through appropriate connectors to keyboard and mouse input ports of the remote computer, just as if the keyboard 65 and mouse 67 were directly coupled to the keyboard and mouse input ports. '096 patent, col. 3, ll. 1-18. An important aspect of the invention relates to the use of an on-screen programming display feature that allows the user to select any particular server from any particular workstation. At the user's request, the switch [**4] displays a menu of services on the screen of the user's monitor. The user then can select a particular server from the visual menu using a cursor control device or the keyboard.

Apex asserts Raritan's MasterConsole products and Paragon products infringe claims 1, 6, 7, 10, 11, 20, 26 and 32 of the '096 patent and claims 1-10, 14,m and 16 of the '264 patent. Apex also asserts Raritan's Paragon products infringe claim 1 of the '176 patent. Of the claims asserted, claims 1, 6, 10, 11, 20, 26, and 32, of the '096 patent, claim 1 of the '264 patent, and claim 1 of the '176 patent are independent claims.

Before the district court, the parties disputed fourteen claim limitations within various claims of the patents in this action. Each of the contested limitations from the respective patents and claims is reproduced below.

The '096 patent

Claims 1, 11, 20, 26

a programmable switch for routing keyboard and cursor control signals from the workstation to a selected computer and for routing video signals from the selected computer to the video monitor of the workstation;

a first interface circuit for receiving keyboard and cursor control device signals from the workstation; [**5]

an on-screen programming circuit that produces video signals for display on the video monitor;

a second interface circuit disposed between the programmable switch and the selected computer for supplying the keyboard and cursor control device signals routed through the programmable switch to the selected computer

Claim 1

a programmed logic circuit coupled to the first interface that transmits the keyboard and cursor control device signals to the programmable switch and controls the on-screen programming circuit to produce the video signals upon the detection of a predefined input from a user of the workstation, the programmed logic circuit further operating to detect keyboard or cursor control device signals received while the on-screen programming circuit is producing video signals on the video monitor and to control the programmable switch in response to the keyboard or cursor control device signals detected;

Claims 6-7, 10 and 32

[*1369] producing overlaid video signals for display on the video monitor of the workstation;

The '176 patent

[*1370] a plurality of first signal conditioning units coupled to the workstations for receiving [**6] electronic signals produced by the keyboard and mouse and for creating a

> serial data packet that includes the electronic signals;
>
> a central crosspoint switch including a number of bidirectional inputs and outputs, said central crosspoint switch receiving the serial data packets from an input and routing the serial data packet to one or more of said outputs;
>
> a plurality of second signal conditioning units coupled to the remote computer systems, for receiving the serial data packets transmitted on one of the plurality of second communication links switch and for supplying the data packets to a keyboard and mouse input of the remote computer, the plurality of second signal conditioning units receiving video signals produced by the remote computer systems and transmitting the video signals to the central switch on one of the plurality of second communication links;

The '264 patent

> a computer-side interface for simultaneously physically connecting to independent, dedicated cables of respective keyboard and analog video outputs of plural computers;
>
> a user-side interface for physically connecting to a first set of independent, dedicated cables [**7] of a first keyboard and an analog video input of a first monitor;
>
> an analog video overlay image generating circuit, disposed between the computer-side interface and the user-side interface, for producing an analog overlay video signals internal to the switching system; and an analog video overlay circuit, disposed between the computer-side interface and the user-side interface, for combining (1) a portion of the analog video signals received by the analog video receiving circuit and (2) the analog overlay video signals generated internally to the switching system to form a combined analog signal that is output to the first monitor via the user-side interface.

After a seven-day bench trial, the district court construed all fourteen of the disputed limitations as follows.

Means-plus-function limitations

The district court held that the limitations including the terms "first interface circuit," "on-screen programming circuit," "programmed logic circuit," "second interface circuit," "first signal conditioning unit," "second signal conditioning unit," "computer-side interface," "user-side interface," "analog video overlay image generating circuit," and "analog video [**8] overlay circuit" were all means-plus-function limitations. *Apex, 187 F. Supp. 2d at 160*. Despite Apex's contentions that the disputed limitations contained additional adjectives that, as a whole, further qualify and describe the particular structure recited, *id. at 158*, the district court determined that the claim limitations "using the words 'circuit,' 'interface,' and 'units' do not simply by the use of these words connote sufficient structure to perform the relevant functions recited in the element." *Id. at 160-63*.

"Serial data packet"

The district court interpreted the terms "overlay" and "overlaid" as "one that can, but need not, include both keyboard and mouse signals." *Id. at 161*. As support for this interpretation, the district court first looked to the language of the claims which stated as follows:

> a plurality of first signal conditioning units coupled to the workstations for receiving electronic signals produced by the keyboard and mouse and for creating a serial data packet that includes the electronic signals.

*Id. at 154*; '176 patent, col. 13, ll. 59-62. The district [**9] court then looked to the written description which it contended supported this interpretation with the statement:

> The CPU 80 then reads the digitally buffered keyboard and mouse signals from the keyboard mouse interface 82 and converts the signals into a data packet that is transmitted to the remote computer.

*Apex, 187 F. Supp. 2d at 155.* Lastly, the district court looked to the prosecution history relying on the examiner's reasons for allowance which stated:

> The prior art of record does not teach nor fair [sic] suggest the system arrangement as claimed with circuitry for creating serial data packet from keyboard and mouse electronic signals, and crosspoint switch for connecting keyboard/mouse/video monitor from a number of workstations to plurality of remote computer systems.

*Id.*

"Overlay" and "overlaid video signals"

The district court interpreted the terms "overlay" and "overlaid video signals" to "require the ability to place two separate images (or video signals) on top of one another such that they would both be at the same spot on the screen at the same time." *Id. at 156.* As support for this interpretation, [**10] the district court relied on the prosecution history of the '842 patent (the first patent in the priority chain of the patents). Specifically, the district court relied upon the preamble of a claim in the Second Preliminary Amendment in the '193 application on January 14, 1997 which recited a "circuit for producing video signals over video signals that are produced by a remote computer." *Id.* The district court held "without question, this indicates that Plaintiff understood that 'overlay' means having the ability to physically place one signal over another." Id.

In light of its claim construction, the district court found that none of the accused products infringes any of the asserted claims in the patents literally or under the doctrine of equivalents. The district court simply stated that there is no infringement of the patents because "the accused devices do not, but must, embody every element of any of the claims as properly interpreted." *Id. at 170.* Apex timely appealed the district court's final judgment and we have jurisdiction over this appeal pursuant to *28 U.S.C. § 1295(a)(1).*

II. DISCUSSION

A. Standard of Review [**11]

A determination of infringement requires a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted . . . [and second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed. Cir. 1998)* (en banc) (citations omitted). Step one, claim construction, is a question of law, *Markman v. Westview Instruments, Inc., 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed. Cir. 1995)* (en banc), aff'd, *517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)*, that we review de novo, *Cybor, 138 F.3d at 1456, 46 USPQ2d at 1172.* "Whether the language of a claim is to be interpreted according to *35 U.S.C. § 112*, P 6, i.e., whether a claim limitation is in means-plus-function format, is a matter of claim construction and is thus a question of law, reviewed de novo." *Kemco Sales, Inc. v. Control Papers Co., Inc.,* [*1371] *208 F.3d 1352, 54 USPQ2d 1308, 1312 (Fed. Cir. 2000).*

Step two, comparison of the claim to the accused device, requires a determination that [**12] every claim limitation, or its equivalent, be found in the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997).* Those determinations are questions of fact, *Bai v. L & L Wings Inc., 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed. Cir. 1998)*, reviewed for clear error, *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co., 204 F.3d 1360, 1363, 53 USPQ2d 1892, 1895 (Fed. Cir. 2000).* "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Amhil Enters. Ltd. v. Wawa Inc., 81 F.3d 1554, 1562, 38 USPQ2d, 1471, 1476* (quoting *United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948)).*

B. Claim Construction

When construing the claims, we begin with an examination of the intrinsic evidence, i.e., the claims, the other portions of the written description, and the prosecution history (if any, and if in evidence). *Gart v. Logitech, Inc., 254 F.3d 1334, 1339, 59 USPQ2d 1290, 1293-94 (Fed. Cir. 2001).* [**13] Additionally, dictionary definitions may be consulted in establishing a claim term's ordinary meaning. *Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202, 64 USPQ2d 1812, 1818 (Fed. Cir. 2002).* In analyzing the intrinsic evidence, we start with the language of the claims and engage in a "strong presumption" that claim terms carry their ordinary meaning as viewed by one of ordinary skill

in the art. *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc., 279 F.3d 1357, 1369, 61 USPQ2d 1647, 1656 (Fed. Cir. 2002)*; *CCS Fitness Inc. v. Brunswick Corp., 288 F.3d 1359, 1366, 62 USPQ2d 1658, 1662 (Fed. Cir. 2002)* (stating there is a "heavy presumption" that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art). Courts may also review extrinsic evidence to assist them in comprehending the technology in accordance with the understanding of skilled artisans and as necessary for actual claim construction. *Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309, 51 USPQ2d 1161, 1168 (Fed. Cir. 1999)*. Extrinsic evidence may not be relied upon, however, to vary or **[**14]** contradict the clear meaning of terms in the claims. *Markman, 52 F.3d at 981, 34 USPQ2d at 1331*.

1. Means-plus-function limitations

Title 35, *section 112*, paragraph 6 of the United States Code provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*35 U.S.C. § 112*, P 6 (2000). Such limitations are generally known as "means-plus-function" or "step-plus-function" limitations. Through use of means-plus-function limitations, patent applicants are allowed to claim an element of a combination functionally, without reciting structures for performing those functions. *Envirco Corp. v. Clestra Cleanroom, Inc., 209 F.3d 1360, 1364, 54 USPQ2d 1449, 1452 (Fed. Cir. 2000)*.

It is well settled that "[a] claim limitation that actually uses the word 'means' invokes a rebuttable presumption that *§ 112*, P 6 applies. By contrast, a claim **[**15]** term that does not use 'means' will trigger the rebuttable presumption that *§ 112*, P 6 does not apply." *CCS Fitness, 288 F.3d at 1369*, **[*1372]** *62 USPQ2d at 1664*. "The term 'means' is central to the analysis." *Personalized Media Communications v. Int'l Trade Comm'n, 161 F.3d 696, 703, 48 USPQ2d 1880, 1886 (Fed. Cir. 1998)*.

From a procedural standpoint, this presumption "imposes on [Raritan] the burden of going forward with evidence to rebut . . . the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." *Fed. R. Evid. 301*. Raritan can rebut this presumption "if it demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites a 'function without reciting sufficient structure for performing that function.'" *CCS Fitness, 288 F.3d at 1369, 62 USPQ2d at 1665* (quoting *Watts v. XL Sys., Inc., 232 F.3d 877, 880, 56 USPQ2d 1836, 1838 (Fed. Cir. 2000))*. This burden must be met by a preponderance of the evidence. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1045, 22 USPQ2d 1321, 1332 (Fed. Cir. 1992)* **[**16]** ("In civil cases litigants are generally required to prove facts by a preponderance of the evidence.") If the party who must bring forth evidence fails to proffer sufficient evidence to meet its burden, the presumption, either for or against the application of *§ 112*, P6, prevails.

This presumption can collapse when a limitation lacking the term "means" nonetheless relies on functional terms rather than structure or material to describe performance of the claimed function. *Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1257, 52 USPQ2d 1258, 1263 (Fed. Cir. 1999)*. Conversely, when a claim uses the term "means," the focus is on whether the claim term recites no function corresponding to the means or recites sufficient structure or material for performing that function. *Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294, 1302, 50 USPQ2d 1429, 1434 (Fed. Cir. 1999)*.

"To help determine whether a claim term recites sufficient structure, we examine whether it has an understood meaning in the art." *Watts, 232 F.3d at 880-81, 56 USPQ2d at 1838*. As an aid in making this determination, this court inquires into whether the "term, **[**17]** as the name for the structure, has a reasonably well understood meaning in the art," keeping in mind that a claim term "need not call to mind a single well-defined structure" to fall within the ambit of *§ 112*, P 6. *Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1583, 39 USPQ2d 1783, 1786 (Fed. Cir. 1996)* (holding that "detent mechanism" limitation was not a means-plus-function limitation). "The fact that a particular [claim term] is defined in functional terms is not sufficient to convert a claim [limitation] into a 'means for performing a specified function' within the meaning of *112(6)*." *Id.*

As an initial matter, none of the claim limitations asserted by Raritan to be means-plus-function limitations contains the term "means," which, as noted, is central to the analysis. While the district court correctly

acknowledged this fact and stated that the limitations were presumed not to be means-plus-function limitations, it nevertheless determined that all but two of the limitations were means-plus-function limitations. In doing so, the district court erred as a matter of law. The primary source of this error lies in the district court's reliance [**18] on single words of the limitations, e.g., "circuit," as opposed to the limitations as a whole, e.g., "a first interface circuit for receiving keyboard and cursor control device signals from the workstation." See *United States v. Telectronics, Inc., 857 F.2d 778, 781, 8 USPQ2d 1217, 1220 (Fed. Cir. 1988)* (holding that district [*1373] court's interpretation of the term "avoid" based on the dictionary definition without regard to the rest of the limitation was error).

a. "circuit" limitations

The "circuit" limitations are contained in the asserted claims of the '096 and '264 patents as identified in section I, *supra*. Initially, all the claim limitations at issue lack the term "means," accordingly, we presume that *§ 112* P 6 does not apply. *CCS Fitness, 288 F.3d at 1369, 62 USPQ2d at 1664*. We next must determine whether Raritan has shown that the limitation, as understood by one of ordinary skill in the art, demonstrates that the claim term fails to recite sufficiently definite structure or else recites a function without reciting sufficient structure for performing that function. *Id.* In the absence of sufficient evidence, the presumption [**19] stands. Raritan failed to meet this evidentiary burden.

The threshold issue for all the limitations involving the term "circuit" is whether the term itself connotes sufficient structure to one of ordinary skill in the art to perform the functions identified by each limitation. The district court determined this term, by itself, did not connote sufficient structure and prematurely ended its analysis at this threshold issue. While we do not find it necessary to hold that the term "circuit" by itself always connotes sufficient structure, the term "circuit" with an appropriate identifier such as "interface," "programming" and "logic," certainly identifies some structural meaning to one of ordinary skill in the art.

The term "circuit" is defined as "the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function." Dictionary of Computing, 75 (4th ed. 1996).n1

n1 Several courts have determined that the term "circuit" connotes sufficiently definite structure to those skilled in the art. See *Nilssen v. Magnetek, Inc., 1999 U.S. Dist. LEXIS 16718, 1999 WL 982966,* * 9 (N.D. Ill. 1999) (considering term "circuit means"); *CellNet Data Sys., Inc. v. Itron, Inc., 17 F. Supp. 2d 1100, 1109 (N.D. Cal. 1998)* (same); *Database Excelleration Sys. Inc. v. Imperial Technology Inc., 1998 U.S. Dist. LEXIS 19038, 48 USPQ2d 1533, 1537 (N.D. Cal. 1998)* (considering term "control circuit"); but see *Nilssen v. Motorola, Inc., 80 F. Supp. 2d 921 (N.D. Ill. 2000)* (holding that the term "circuit" is so generic that by itself it conveys no structure at all).

[**20]

In light of this definition, it is clear that the term "circuit," by itself connotes some structure. In the absence of any more compelling evidence of the understanding of one of ordinary skill in the art, the presumption that *§ 112*, P 6 does not apply is determinative. Raritan's evidence consisted of district court decisions addressing the meaning of the term "circuit means" and Apex's description of the preferred embodiments in the specification. We find that this evidence is not sufficient to rebut the *§ 112*, P 6 presumption. This evidence fails to show by a preponderance of the evidence that one of ordinary skill in the art believes the term does not recite sufficiently definite structure.

Moreover, claims are interpreted in light of the specification and with the knowledge of one of ordinary skill in the art. *Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576-77 (Fed. Cir. 1996)*. The written description discloses only the preferred embodiments of the various circuit limitations and does not use these terms "in a manner clearly inconsistent with the ordinary meaning" as understood by one of ordinary skill in the art. *Tex. Digital, 308 F.3d at 1204, 64 USPQ2d at 1819* [**21] (stating if the specification uses the words in a manner clearly inconsistent with the ordinary meaning of a dictionary definition, the inconsistent [*1374] dictionary definition must be rejected).

The prosecution history also does not suggest that the ordinary meaning of the term "circuit" does not apply. Lastly, the expert testimony submitted by Raritan, including the testimony of Drs. Hoff and Liaw shows only that the term "circuit" is understood by one of ordinary skill in the art as a very broad term and that one of the accused products included several of the circuit elements.

Moreover, every use of the term in the asserted claims includes additional adjectival qualifications further identifying sufficient structure to perform the claimed functions to one of ordinary skill in the art. See *Personalized Media, 161 F.3d at 705, 48 USPQ2d at 1888* ("An adjectival qualification ('digital') placed on an otherwise sufficiently definite structure ('detector') does not make the sufficiency of that structure any less sufficient for purposes of *§ 112*, P 6. Instead, it further narrows the scope of those structures covered by the claim and makes the term more definite."). The **[**22]** district court therefore erred in its interpretation of all the limitations as means-plus-function limitations by failing to consider the limitations as a whole.

While this court is plainly aware that claim construction is a question of law, we decline to construe every claim limitation because the record has not been sufficiently developed. As is the case with other aspects of patent law, e.g. obviousness, a proper determination of whether the claim limitations should be construed as means-plus-function limitations requires an understanding of one of ordinary skill in the art. In this situation, it is appropriate to look to extrinsic evidence, including but not limited to dictionaries and expert testimony to assist the trier of fact in understanding the evidence. *Greenberg, 91 F.3d at 1583, 39 USPQ at 1786*. In particular, the record should reflect the ordinary meaning of the claim limitations, as a whole, and whether these limitations suggest sufficiently definite structure to one of ordinary skill in the art. Despite this need for further development, the record does contain sufficient evidence to address the "first interface circuit" and "second interface circuit" **[**23]** limitations.

The relevant definition of the term "interface" is: "the signal connection and associated control circuits that are used to connect devices." Dictionary of Computing, 250 (4th ed. 1996). Moreover, an "interface circuit" is defined as "a circuit that links one type of logic family with another or with analog circuitry." Rudolf F. Graf, Modern Dictionary of Electronics, 385 (7th ed. 1999). This dictionary definition specifically provides several examples of an interface circuit, including a line driver and analog to digital converters. Thus, the ordinary meaning of this term connotes specific structures to one of ordinary skill in the art. The written description and prosecution history provide no evidence that the inventors intended the term "interface circuit" to have a meaning contrary to this ordinary meaning. Raritan relies solely on its arguments that the term "interface circuit" is a generic term and that the written description, by only showing one embodiment, clearly sets forth a limited definition of "interface circuit." We reject Raritan's classic attempt to limit the scope of a claim limitation to the preferred embodiment. See *Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 48 U.S.P.Q.2D (BNA) 1001 (Fed. Cir. 1998)*. **[**24]**

Because Raritan has failed to rebut the presumption that *§ 112*, P 6 does not apply, we hold that the terms "first interface circuit" and "second interface circuit" are not means-plus-function limitations. The term "interface circuit" means any circuit **[*1375]** that links one type of logic system with another.

The district court should conduct a similar analysis with respect to the remaining "circuit," "interface," and "unit" limitations. Upon remand, the district court must determine the ordinary meaning of these limitations and whether this ordinary meaning defines sufficiently definite structure. Raritan has the burden of going forward with evidence to prove that *§ 112*, P 6 applies. Raritan must prove by a preponderance of the evidence that the limitations, as a whole, do not connote sufficiently definite structure to one of ordinary skill in the art. We decline to conduct this analysis for the district court because the record is underdeveloped as to the ordinary meaning of these limitations as a whole and construing the claims based on this limited record could be prejudicial to the parties.

2. "Serial data packet"

The district court interpreted the term "serial data packet" **[**25]** in the claims of the '176 patent as "one that can, but need not, include both keyboard and mouse signals." The district court determined that the specification and Examiner's Reasons for Allowance of the '176 patent "required" the serial data packet to be capable of including both keyboard and mouse signals. The Examiner's Reasons for Allowance stated:

> The prior art of record does not teach nor fair [sic] suggest the system arrangement as claimed with circuitry for creating serial data packet from keyboard and mouse electronic signals, and crosspoint switch for connecting keyboard/mouse/video monitor from a number of workstations to plurality of remote computer systems.

This standard reason for allowance, however, states only that the prior art does not teach or suggest the claimed system arrangement. This reason for allowance merely summarizes the claimed invention and fails to

specifically state that patentability is based on the serial data packet including both keyboard and mouse signals.

According to claim 1, a serial data packet "includes the electronic signals." The electronic signals are produced by the keyboard and mouse. A "data packet" is defined as "a [**26] unit of information transmitted as a whole from one device to another on a network." Microsoft Computer Dictionary, (4th ed. 1999). This definition suggests that a data packet, contrary to the district court's decision, need not be capable of including both keyboard and mouse signals.

Moreover, claims are interpreted in light of the written description and with the knowledge and understanding of those of ordinary skill in the art. *Vitronics, 90 F.3d at 1582, 39 USPQ2d at 1576-77.* Nothing in the written description suggests that a keyboard signal must accompany a mouse signal. In fact, while the district court interpreted "serial data packet" to require the capability of including both keyboard and mouse signals, it recognized that the packet could include only mouse or only keyboard signals. In other words, the district court recognized that one of ordinary skill in the art would understand that a signal data packet includes a mouse signal, a keyboard signal, or both. The prosecution history does not evidence a need to depart from the ordinary meaning supported by the written description. Accordingly, the term should be given its ordinary meaning. *Inverness Med. Switz. Gmbh v. Princeton Biomeditech Corp., 309 F.3d 1365, 64 USPQ2d 1926 (Fed. Cir. 2002).* [**27] The ordinary meaning of serial data packet is a unit of information transmitted as a whole from one device to another on a network that includes a keyboard [*1376] signal, a mouse signal, or both. Therefore, we reverse the district court's claim construction of the term "serial data packet."

3. Overlay/overlaid

The district court interpreted the terms "overlay" and "overlaid video signals" to "require the ability to place two separate images (or video signals) on top of one another such that they would both be at the same spot on the screen at the same time." (emphasis added). As support for this interpretation, the district court relied on the prosecution history of the '842 patent, the parent of the first patent in the priority chain of the patents. Specifically, the district court relied upon the preamble of a claim in the Second Preliminary Amendment in the '193 application on January 14, 1997, which recited a "circuit for producing video signals over video signals that are produced by a remote computer." The district court held "without question, this indicates that Plaintiff understood that 'overlay' means having the ability to physically place one signal over another. [**28] "

Turning first to the claim language, the plain language of the limitations do not require display of two separate images at the same time. Instead, the language requires circuitry for producing "overlay" or "overlaid" signals. Again, claims are to be interpreted in light of the written description and with the knowledge and understanding of those of ordinary skill in the art. *Vitronics, 90 F.3d at 1582, 39 USPQ2d at 1576-77.* The Microsoft Computer [*1377] Dictionary cites the definition of the term "overlay" as:

> 1. In computer graphics, to superimpose one graphic image over another. 2. In video, to superimpose a graphic image generated on a computer over video signals, either live or recorded.

This definition does not require simultaneous display of two separate video images, as the district court required.

The written description supports the ordinary meaning by providing numerous methods for displaying "overlaid" images in accordance with the present invention. '176 patent, col. 12, l. 39 - col. 13, l. 12. The prosecution history, contrary to the district court's decision, does not limit the ordinary meaning of the terms "overlay" and "overlaid. [**29] " The district court looked to the prosecution history and determined that language in the preamble of a preliminary amendment of a grandparent application required a narrowed construction of the terms "overlay" and "overlaid." This single instance of "evidence" does not overcome the presumption that claim language takes on its ordinary meaning.

In short, nothing appears within the written description or the prosecution history that limits the ordinary meaning of the terms "overlay" or "overlaid" as the district court held. The terms "overlay" and "overlaid" have their ordinary meanings, to superimpose one graphic image over another. They do not require the two images to be present on the same spot on the monitor at the same time. Therefore, we reverse the district court's claim construction of the term "serial data packet."

4. "Switch"

The district court interpreted the term "switch" in as a device that opens or closes a circuit to form a direct path between inputs and outputs. The district court

adopted this narrow interpretation at the behest of Raritan, without explanation. In the art of networking, the ordinary meaning of the term "switch" is "a device capable of forwarding **[**30]** packets directly to the ports associated with particular network addresses." Microsoft Computer Dictionary, (4th ed. 1999). According to the written description of the patents in suit, a signal conditioning unit receives mouse and keyboard signals from a workstation. The signal conditioning unit generates a serial data packet and sends the mouse/keyboard packet to a central crosspoint switch. The central crosspoint switch routes the data packet to another signal conditioning unit coupled to the remote server that decodes the mouse/keyboard packet. '176 patent, col 1, ll. 54-64. The written description discloses one embodiment of this "crosspoint switch" or "programmable switch." Id. at col. 6, ll. 15-61. This switch includes a master CPU and a number of input and output cards for transmitting and receiving signals. The written description does not limit the term switch to a device that opens or closes a circuit to form a direct path. Nothing was identified in the prosecution history to suggest this direct path. Thus, properly construed, a "programmable switch" or "crosspoint switch" is a programmable device capable of forwarding packets from one computer/workstation/server **[**31]** to another. Therefore, we reverse the district court's claim construction of the term "switch."

Lastly, Raritan argues that even if the claim limitations are not found to be means-plus-function limitations, the limitations are still limited to the only embodiment disclosed in the written description. We disagree. As support for its argument, Raritan states that "Apex has admitted that the preferred embodiment of its patents is nothing more than the invention itself." The record clearly shows that Apex made no such "admission." The evidence Raritan cites to, the trial testimony of one of the inventors of the patents, Danny Lynn Beasley, instead suggests that the overall concept of using an on-screen display in conjunction with KVM switches to facilitate management of various servers or workstations from various computers was believed to be novel. The testimony in no way suggests that the particular embodiment described in the patents is the entire invention.

Raritan further attempts to limit the claims to the preferred embodiment by stating that "since, the Apex patents do not teach any alternatives, the patent-in-suit [sic] must therefore be limited to this one embodiment." This **[**32]** is not the law. While it is true that a court may limit the meaning of a claim term if the patentee clearly set forth a definition of the claim term in the written description, see e.g., *Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990, 50 U.S.P.Q.2D (BNA) 1607, 1068-69 (Fed. Cir. 1998)*, such is clearly not the case here. The description of the preferred embodiment is one particular example of the claimed invention that is consistent with the ordinary meaning of the claim terms as we currently understand them.

> Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic evidence using words or expressions of manifest exclusion or restriction, representing clear disavowal of claim scope.

*Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1327, 63 USPQ2d 1374, 1382 (Fed. Cir. 2002)* (emphasis added). The written description contains no "words or expressions of manifest exclusion or restriction, representing clear disavowal **[**33]** of claim scope."

C. Infringement

The second step of the infringement analysis is comparing the properly construed claims with the allegedly infringing devices. *Cybor, 138 F.3d at 1467, 46 USPQ2d at 1184*. This comparison is a question of fact, id., that we review for **[*1378]** clear error. *Ultra-Tex Surfaces, 204 F.3d at 1360, 53 USPQ2d at 1895*.

In light of its claim construction, the district court found that none of the accused products infringe any of the asserted claims in the patents literally or under the doctrine of equivalents. The district court simply stated that there is no infringement of the patents because "the accused devices do not, but must, embody every element of any of the claims as properly interpreted." Based on the errors in claim interpretation as discussed, and the further development of the evidence to determine the ordinary meaning of a number of the disputed claim limitations, we vacate the district court's infringement determination. Upon remand, the district court should conduct an infringement analysis consistent with the precedents of this court. In particular, the district court should provide an analysis under **[**34]** both literal infringement and infringement under the doctrine of

equivalents. See *Lear Siegler, Inc. v. Sealy Mattress Co., 873 F.2d 1422, 1425, 10 USPQ2d 1767, 1770 (Fed. Cir. 1989)* (holding that infringement analysis under the doctrine of equivalents requires a separate analysis from literal infringement - "the evidence and argument concerning the doctrine [of equivalents] cannot merely be subsumed in plaintiff's case of literal infringement.").

III. CONCLUSION

Accordingly, we vacate the district court's grant of summary judgment of non-infringement and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED

IV. COSTS

Costs to appellant.

# Exhibit 2

LEXSEE 2005 USDISTLEXIS 4017

Analysis
As of: Jul 12, 2007

**AVOCENT REDMOND CORP. (formerly known as APEX INC.), a Washington corporation, Plaintiff, -against- RARITAN COMPUTER, INC., a New Jersey corporation, Defendant.**

**01 Civ. 4435 (PKC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***2005 U.S. Dist. LEXIS 4017***

**March 11, 2005, Decided**
**March 11, 2005, Filed**

**PRIOR HISTORY:** *Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 2003 U.S. App. LEXIS 6321 (Fed. Cir., 2003)*

**DISPOSITION:** On remand, patents interpreted.

**COUNSEL:** [*1] For Avocent Redmond Corp, a Washington corporation, Plaintiff: Donald L. Jackson, James D. Berquist, Scott J. Davidson, Davidson, Berquist, Klima & Jackson, L.L.P., Arlington, VA; Stuart I. Friedman, Friedman, Wittenstein & Hochman, New York, NY.

For Raritan Computer, Inc., A New Jersey corporation, Defendant: David M. Hill, John W. Olivo, Jr., John F. Ward, Ward & Olivo, New York, NY; Vincent E. McGeary, Gibbons, Del Deo, Dolan, Griffinger and Vecchione P.C., Newark, NJ.

For Avocent Redmond Corp, Counter Defendant: Donald L. Jackson, James D. Berquist, Scott J. Davidson, Davidson, Berquist, Klima & Jackson, L.L.P., Arlington, VA; Stuart I. Friedman, Friedman, Wittenstein & Hochman, New York, NY.

For Raritan Computer, Inc., Counter Claimant: David M. Hill, John W. Olivo, Jr., John F. Ward, Ward & Olivo, New York, NY; Vincent E. McGeary, Gibbons, Del Deo, Dolan, Griffinger and Vecchione P.C., Newark, NJ.

For Raritan Computer, Inc., ThirdParty Plaintiff: David M. Hill, John W. Olivo, Jr., John F. Ward, Ward & Olivo, New York, NY; Vincent E. McGeary, Gibbons, Del Deo, Dolan, Griffinger and Vecchione P.C., Newark, NJ.

**JUDGES:** P. Kevin Castel, United States District Judge. **[*2]**

**OPINION BY:** P. Kevin Castel

**OPINION**

MEMORANDUM AND ORDER ON MARKMAN ISSUES

P. KEVIN CASTEL, District Judge:

This is a patent infringement suit brought by plaintiff Avocent Redmond Corp. against Raritan Computer Inc. ("Raritan") alleging infringement of certain patents related to computer switching systems for connecting computer workstations to remote computers. Because Avocent Redmond Corp. was formerly known as Apex Inc., the name utilized in prior proceedings, I will refer to it throughout as "Apex." The patents at

issue, Patents Nos. 5,884,096 (the "'096 patent"), 5,937,176 (the "'176 patent") and 6,112,264 (the "'264 patent"), disclose and claim computerized switching systems, known in the art as keyboard, video, mouse ("KVM") switches that allow centrally located network administrators to operate multiple server computers without requiring a complicated wiring scheme. Defendant Raritan markets and sells computer switching systems, and Apex contends that certain of Raritan's computer switching products infringe the patents at issue. The parties dispute a number of limitations within various claims of the patents. From January 14-23, 2002, the Honorable Milton Pollack conducted **[*3]** a trial in this matter. Following trial, Judge Pollack observed that the infringement questions rested in large measure on claim construction, and ordered the parties to submit post-trial claim construction briefs on the disputed claim terms. In its submissions, defendant Raritan argued, in relevant part, that the disputed claims should be construed as "means-plus-function" claim elements under *35 U.S.C. § 112*, P6, which would limit the scope of such claims to the "structure, material, or acts described in the specification and equivalents thereof." Plaintiff Apex argued that the disputed terms should be construed as having their common and ordinary meaning.

On February 25, 2002, Judge Pollack adopted claim constructions for 14 of the disputed terms. He also found that none of Raritan's products infringed Apex's patents. An appeal was taken by Apex to the Court of Appeals for the Federal Circuit.

On April 2, 2003, the Federal Circuit vacated all 14 claim constructions, observing that none of the claims limitations asserted by Raritan to be means-plus-function limitations contained the term "means," thereby triggering a presumption that the claims were not such **[*4]** limitations. The Court went on to construe the terms "programmable switch," "crosspoint switch," "overlay/overlaid," and "serial data packet" as not means-plus-function as a matter of law. *Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1374-76 (Fed. Cir. 2003).*

With respect to the remaining claims containing "circuit" limitations, the Court found that while the term "circuit" standing alone may not always connote sufficient structure, "the term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art." *Apex, 325 F.3d at 1373.* The Court noted that the term "circuit" has been defined as "the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function." Id. (citing Dictionary of Computing, 75 (4th ed. 1996)). Accordingly, the Court found that "it is clear that the term 'circuit,' by itself, connotes some structure. In the absence of any more compelling evidence of the understanding of one of ordinary skill in the art, the presumption that *§ 112*, **[*5]** P6 does not apply is determinative," and Raritan's evidence in support of its proposed construction therefore failed to meet its burden "to show by a preponderance of the evidence that one of ordinary skill in the art believes the term does not recite sufficiently definite structure." *325 F.3d at 1373.*

The Court then noted that every use of the term "circuit" in the asserted claims "includes additional adjectival qualifications further identifying sufficient structure to perform the claimed functions to one of ordinary skill in the art," and found it "appropriate to look to extrinsic evidence, including but not limited to dictionaries and expert testimony to assist the trier of fact in understanding the evidence." *Id. at 1374.* Although the Court found that the record contained sufficient evidence to construe certain of the "circuit" limitations, and thereby went on to construe "first interface circuit" and "second interface circuit," the Court found the record less developed as to the other "circuit," "interface," and "unit" limitations, and directed that "upon remand, the district court must determine the ordinary meaning of these limitations and whether **[*6]** this ordinary meaning defines sufficiently definite structure . . . Raritan must prove by a preponderance of the evidence that the limitations, as a whole, do not connote sufficiently definite structure to one of ordinary skill in the art." *325 F.3d at 1375.* In doing so, the district court was instructed to develop the record "as to the ordinary meaning of these limitations as a whole." Id.

In an infringement action, the court first must determine the scope and meaning of the patent claims asserted. Then, the properly construed claims are compared to the allegedly infringing devices. *Apex, 325 F.3d at 1370* (citing *Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998)).* The first step, claim construction, is a question of law to be decided by the Court. *Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)*, aff'd, *517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996).*

After remand (and following the death of Judge Pollack), this case was reassigned to me, and I ordered that a claim construction hearing be held on February 3, 2005. In advance of the hearing, the parties each submitted briefs **[*7]** setting forth their proposed claim

constructions and the legal and factual support therefore, along with expert declarations and other supporting materials.

On February 3, 2005, I conducted a hearing as to the proper construction of the claims remaining to be construed. At the February 3 hearing, I heard opening and closing argument from counsel for the parties, and, pursuant to the agreement of the parties, testimony from one technical witness in support of each side's position. Joseph C. McAlexander III, testified on behalf of Apex. He has been in the semiconductor and electronics industry since 1972 and has been engaged in chip design at the circuit level and also systems design. He holds several patents in the relevant field of art. Sharad Malik, Ph.D., a tenured professor in the department of electrical engineering at Princeton University, testified for Raritan. He holds a bachelor of technology degree from the Indian Institute of Technology and masters and doctoral degrees from the University of California at Berkeley. He, too, holds patents in the field of computer engineering.

The Federal Circuit has directed that when construing claims, the Court should "begin with an examination **[*8]** of the intrinsic evidence, i.e., the claims, the other portions of the written description, and the prosecution history (if any, and if in evidence)." *Apex, 325 F.3d at 1371* (citations omitted). "In analyzing the intrinsic evidence, we start with the language of the claims and engage in a 'strong presumption' that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art." Id. Dictionary definitions may be consulted in establishing a claim term's ordinary meaning. Id. The Court may also look to extrinsic evidence, including expert testimony, "to assist [it] in comprehending the technology in accordance with the understanding of skilled artisans and as necessary for actual claim construction, . . . [but such evidence] may not be relied upon . . . to vary or contradict the clear meaning of terms in the claims." Id.; see also *Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358-59 (Fed. Cir. 2004)* (noting that expert testimony may be relevant to the question of whether a limitation should be regarded as means-plus-function).

It is well-established that where a claim term does not use the word **[*9]** "means," a rebuttable presumption is triggered that *§ 112*, P6 does not apply. See, e.g., *Lighting World, 382 F.3d at 1358*. In order to overcome the presumption in this case, Raritan must demonstrate, "by a preponderance of the evidence that the limitations, as a whole, do not connote sufficiently definite structure to one of ordinary skill in the art." *Apex, 325 F.3d at 1375*. The law is clear, however, "that the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." *Lighting World, 382 F.3d at 1358* (citations omitted). Indeed, the Federal Circuit has observed that "we have seldom held that a limitation not using the term 'means' must be considered to be in means-plus-function form." *Id. at 1362* (noting that the Court could identify only one published opinion since its Greenberg decision doing so). In order to determine if there is sufficient structure to avoid a means-plus-function limitation, it is enough if the claim term "is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures **[*10]** and even if the term identifies the structures by their function." *Lighting World, 382 F.3d at 1359-60* (citations omitted).

After considering the parties' submissions, along with their argument and the testimony of the witnesses at the February 3 hearing, as well as the guidance provided in this matter by the Federal Circuit, I have construed the claims and, where asserted by Raritan, determined whether a means-plus-function limitation is appropriate. My rulings are as follows.

A. *a programmable switch* for routing keyboard and cursor control signals from the workstation to a selected computer and for routing video signals from the selected computer to the video monitor of the workstation.

Raritan acknowledges that the term "a programmable switch" connotes structure. The term is to be construed according to its ordinary meeting to one skilled in the art. A "programmable switch" is a device capable of forwarding packets from one computer/workstation/server to another that permits the user to control the switch.

B. *an on-screen programming circuit* that produces video signals for display on the video monitor.

Raritan argues that the phrase "on screen **[*11]** programming circuit" does not connote structure but rather describes a function. Because the term is not expressed in "means plus function" language, there is a rebuttable presumption that *§ 112*, P6 does not apply. Raritan has not overcome the presumption. The term "circuit" is defined as the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function. It connotes some structure. The adjectival phrase "on-screen programming" gives the structure greater definition. To a person of ordinary skilled in the art, it means a circuit that produces a

display on a monitor that allows a user to control a switch.

C. a plurality of *first signal conditioning units* coupled to the workstations for receiving electronic signals produced by the keyboard and mouse and for creating a serial data packet that includes the electronic signals. a plurality of *second signal conditioning units* coupled to the remote computer systems, for receiving the serial data packets transmitted on one of the plurality of second communication links switch and for supplying the data packets to a keyboard and mouse input of the remote **[*12]** computer, the plurality of *second signal conditioning units* receiving video signals produced by the remote computer systems and transmitting the video signals to the central switch on one of the plurality of second communication links.

Raritan asserts that the term "signal conditioning units" does not connote structure. Raritan asserts that it has overcome the presumption against the application of *§ 112*, P6 that arises from the absence of "means plus function language." The term "units" in the phrase "signal conditioning units" is used with the parenthetical term "pod" thereby giving it further definition as structure. ('076 Patent at Column 2, line 20.) Counsel for Raritan acknowledges that it is appropriate to consider the term "pod" in deciding whether the word "units" connotes structure. (Tr. 164.) The adjectival phrase "signal conditioning" also gives it further definition. I conclude that there is sufficient structure so as to avoid the application of *§ 112*, P6. To a person of ordinary skill in the art it means a stand-alone entity or box that receives a signal input and translates (i.e. conditions) the signal into an output in a different format.

D. a *central* **[*13]** *crosspoint switch* including a number of bidirectional inputs and outputs, said central crosspoint switch receiving the serial data packets from an input and routing the serial data packet to one or more of said outputs.

Raritan does not assert that *§ 112*, P6 applies to the term "crosspoint switch." Guided by the opinion of the Federal Circuit,*325 F.3d at 1376-77*, as well as the evidence presented at the hearing, I conclude that a person of ordinary skill in the art would define a central crosspoint switch as a programmable device that is capable of forwarding packets from a computer/workstation to a server or another computer/workstation and from a server or computer/workstation to another computer/workstation.

E. an *analog video overlay image generating circuit*, disposed between the computer-side interface and the user-side interface, for producing an analog overlay video signals internal to the switching system.

Raritan argues that the phrase "analog video overlay image generating circuit" connotes functionality and that *§ 112*, P6 applies to the term. Here, the term "circuit," which itself connotes some structure, is modified by the adjectival phrase **[*14]** "analog video overlay image generating." The phrase "image generating circuit" connotes structure to one of ordinary skill in the art. It means a structure (i.e. a circuit) that produces the signals (e.g. red, blue, green) that form an image. "Overlay" further qualifies the term and means the two-dimensional visual representation that has the appearance of being overlaid on top of another image. "Analog" means that which is not digital; it means a continuously varying signal as distinguished from a binary one. An "analog overlay image generating circuit" is a circuit that generates an analog video overlaid image.

F. an *analog video overlay circuit*, disposed between the computer-side interface and the user-side interface, for combining (1) a portion of the analog video signals received by the analog video receiving circuit and (2) the analog overlay video signals generated internally to the switching system to form a combined analog signal that is output to the first monitor via the user-side interface.

Again, Raritan argues that the term "analog video overlay circuit" describes a function, not a structure, and that *§ 112*, P6 applies. As in the case of "analog video **[*15]** overlay image generating circuit," the term "circuit" connotes some structure and the additional identifiers provide further definition. To one of ordinary skill in the art, a "video overlay circuit" is the structure (i.e. circuit) that combines two images--the overlaid image and the underlying image--on a video screen. "Analog" has the same meaning as in Section E above. An "analog video overlay circuit" is a circuit that combines an overlaid image and an underlying image for display on a video screen.

G. an *analog video receiving circuit*, connected to the computer-side interface for receiving analog video signals from one of the plural computers through the computer-side interface.

In the trial before Judge Pollack, Raritan argued that the phrase "analog receiving circuit" described a function and not a structure. Judge Pollack did not reach the issue and it was not addressed on appeal to the Federal Circuit. Apex argues that it has not been preserved. I consider it appropriate to address the issue and conclude that *§ 112*, P6 does not apply. The term circuit, together with the identifiers "analog video receiving" connotes structure.

To a person of ordinary skill in **[*16]** the art, it is a structure (i.e. a circuit) that is adapted to receive video signals of the analog type. "Analog" has the same meaning as in Section E above.

The final pretrial conference of May 9, 2005 at 9:45 a.m. and trial date of May 16 at 10 a.m. remain as scheduled.

SO ORDERED.

P. Kevin Castel

United States District Judge

Dated: New York, New York

March 11, 2005

# Exhibit 3

**Exemplary and Preliminary Claim Charts**

| '096 Patent, Claim 1 | QuadraVista |
|---|---|
| 1. A system for connecting a workstation of the type that includes a keyboard, a cursor control device and a video monitor to a number of computers, comprising: | The QuadraVista is a system for connecting a workstation of the type that includes a keyboard, a cursor control device (such as a mouse) and a video monitor to a number of computers. (QuadraVista User Guide) |
| a programmable switch for routing keyboard and cursor control signals from the workstation to a selected computer and for routing video signals from the selected computer to the video monitor of the workstation; | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches; AD9887A Dual Interface Video (4); IP00C716 Image Scaler |
| a first interface circuit for receiving keyboard and cursor control device signals from the workstation; | TUSB2046B 4-port Hub KVM interface, input circuits |
| an on-screen programming circuit that produces video signals for display on the video monitor; | Myson MTV130 |
| a programmed logic circuit coupled to the first interface that transmits the keyboard and cursor control device signals to the programmable switch and controls the on-screen programming circuit to produce the video signals upon the detection of a predefined input from a user of the workstation, the programmed logic circuit further operating to detect keyboard or cursor control device signals received while the on-screen programming circuit is producing video signals on the video monitor and to control the programmable switch in response to the keyboard or cursor control device signals detected; and | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry |
| a second interface circuit disposed between the programmable switch and the selected computer for supplying the keyboard and cursor control device signals routed through the programmable switch to the selected | Atmel ATMega64 microcontroller, port drivers; USB N9604-28M node controller, input/output drivers |

| '096 Patent, Claim 1 | QuadraVista |
|---|---|
| computer. | |

| '096 Patent, Claim 6 | QuadraVista |
|---|---|
| 6. In a system including a workstation of the type that includes a keyboard, cursor control device and a video monitor and a plurality of individual computers, a method of transmitting keyboard, cursor control device signals and video signals between the workstation and a selected computer of the plurality of individual computers through a programmable switch, comprising: | The QuadraVista is used in a system including a workstation of the type that includes a keyboard, cursor control device and a video monitor and a plurality of individual computers for transmitting keyboard, cursor control device signals and video signals between the workstation and a selected computer of the plurality of individual computers through a programmable switch. (QuadraVista User Guide) |
| a) receiving keyboard and cursor control device signals from the workstation; | TUSB2046B 4-port Hub KVM interface, input circuit (QuadraVista User Guide) |
| b) transmitting the keyboard and cursor control device signals from the workstation to the selected computer through the programmable switch; | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches (QuadraVista User Guide) |
| c) receiving keyboard, cursor control device and video signals from the selected computer; | Atmel ATMega64 microcontroller, port drivers; USB N9604-28M node controller, input/output drivers; AD9887A Dual Interface Video (4), line receivers (QuadraVista User Guide) |
| d) transmitting the keyboard, cursor control device and video signals from the selected computer to the workstation through the programmable switch; | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches; AD9887A Dual Interface Video (4); IP00C716 Image Scaler (QuadraVista User Guide) |
| e) producing overlaid video signals for display on the video monitor of the workstation; | Myson MTV130 (QuadraVista User Guide) |
| f) receiving keyboard or cursor control device signals entered at the workstation in response to the overlaid video signals on the video monitor, and programming the switch to route the keyboard and cursor control device | TUSB2046B 4-port Hub KVM interface, input circuits; Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, |

| '096 Patent, Claim 6 | QuadraVista |
|---|---|
| signals to another of the plurality of individual computers; | core including ALU and associated circuitry (QuadraVista User Guide) |
| g) repeating steps (e) and (f) whenever it is again desired to change the computer between which the keyboard and cursor control device signals from the workstation are transmitted. | Steps (e) and (f) are repeated whenever it is again desired to change the computer between which the keyboard and cursor control device signals from the workstation are transmitted. (QuadraVista User Guide) |

| '096 Patent, Claim 7 | QuadraVista |
|---|---|
| 7. The method of claim 6, wherein the step of producing overlaid video signals further includes the step of: | See claim 6. |
| analyzing the keyboard and cursor control device signals received from the workstation, wherein the overlaid video signals are produced upon receipt of a predefined keyboard or cursor control device signal. | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry (QuadraVista User Guide) |

| '096 Patent, Claim 10 | QuadraVista |
|---|---|
| 10. In a system including a workstation of the type that includes a keyboard, cursor control device and video monitor and a plurality of remotely located computers, a method of selectively connecting the workstation to the computers for the transmission between them of keyboard and cursor control device signals, comprising: | The QuadraVista is for use in a system including a workstation of the type that includes a keyboard, cursor control device and video monitor and a plurality of remotely located computers for selectively connecting the workstation to the computers for the transmission between them of keyboard and cursor control device signals. (QuadraVista User Guide) |
| a) producing overlaid video signals for display on the video monitor of the workstation; | Myson MTV130 (QuadraVista User Guide) |
| b) generating a control signal in response to the video signals on the video monitor to route the keyboard and cursor control device signals from the workstation to a first computer of the plurality of remotely located computers and keyboard, cursor control and video signals from the first computer to the workstation; | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry (QuadraVista User Guide) |

| '096 Patent, Claim 10 | QuadraVista |
|---|---|
| | |
| c) transmitting keyboard and cursor control device signals from the workstation to the first computer, and keyboard and cursor control device and video signals from the first computer to the workstation; | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches; AD9887A Dual Interface Video (4); IP00C716 Image Scaler (QuadraVista User Guide) |
| d) generating a control signal in response to the overlaid video signals on the video monitor of the workstation to route the keyboard and cursor control device signals from the workstation to a second computer of the plurality of remotely located computers, and keyboard, cursor control device and video signals from the second computer to the workstation. | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry (QuadraVista User Guide) |

| '096 Patent, Claim 11 | QuadraVista |
|---|---|
| 11. A system for connecting a workstation of the type that includes a keyboard, a cursor control device and a video monitor to a number of computers, comprising: | The QuadraVista is a system for connecting a workstation of the type that includes a keyboard, a cursor control device (such as a mouse) and a video monitor to a number of computers. (QuadraVista User Guide) |
| a programmable switch for routing keyboard and cursor control device signals from the workstation to a selected computer and for routing video signals from the selected computer to the video monitor of the workstation; | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches; AD9887A Dual Interface Video (4); IP00C716 Image Scaler |
| a first interface circuit for receiving keyboard and cursor control device signals from the workstation; | TUSB2046B 4-port Hub KVM interface, input circuits |
| an on-screen programming circuit that produces video signals for display on the video monitor; | Myson MTV130 |
| a programmed microprocessor coupled to the first interface circuit that transmits the keyboard and cursor control device signals to the programmable switch, the microprocessor being further programmed to detect keyboard | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry. In addition, the two |

| '096 Patent, Claim 11 | QuadraVista |
|---|---|
| or cursor control device signals received while the on-screen programming circuit is producing video signals on the video monitor and to control the programmable switch in response to the keyboard or cursor control device signals detected; and | microcontroller cores and the PLD share responsibilities and thus operate in a manner insubstantially different from a single core handling the same responsibilities. |
| a second interface circuit coupled to the programmable switch for supplying the keyboard and cursor control device signals routed through the programmable switch to the selected computer. | Atmel ATMega64 microcontroller, port drivers; USB N9604-28M node controller, input/output drivers |

| '096 Patent, Claim 20 | QuadraVista |
|---|---|
| 20. A system for connecting a workstation of the type that includes a keyboard, a cursor control device and a video monitor to a number of computers, comprising: | The QuadraVista is a system for connecting a workstation of the type that includes a keyboard, a cursor control device and a video monitor to a number of computers. (QuadraVista User Guide) |
| a programmable switch for routing keyboard and cursor control signals from the workstation to a selected computer and for routing video signals from the selected computer to the video monitor of the workstation; | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches; AD9887A Dual Interface Video (4); IP00C716 Image Scaler |
| a first interface circuit for receiving keyboard and cursor control device signals from the workstation; | TUSB2046B 4-port Hub KVM interface, input circuits |
| an on-screen programming circuit that produces video signals for display on the video monitor; | Myson MTV130 |
| a programmed microprocessor coupled to the first interface circuit that transmits the keyboard and cursor control device signals to the programmable switch and controls the on-screen programming circuit to produce the video signals upon the detection of a predefined input from a user of the workstation, the programmed microprocessor further operating to detect keyboard or cursor | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry. In addition, the two microcontroller cores and the PLD share responsibilities and thus operate in a manner insubstantially different from a single core handling the same responsibilities. |

| '096 Patent, Claim 20 | QuadraVista |
|---|---|
| control device signals received while the on-screen programming circuit is producing video signals on the video monitor and to control the programmable switch in response to the keyboard or cursor control device signals detected; and | |
| a second interface circuit disposed between the programmable switch and the selected computer for supplying the keyboard and cursor control device signals routed through the programmable switch to the selected computer. | Atmel ATMega64 microcontroller, port drivers; USB N9604-28M node controller, input/output drivers |

| '096 Patent, Claim 26 | QuadraVista |
|---|---|
| 26. A system for connecting a workstation of the type that includes a keyboard, a cursor control device and a video monitor to a number of computers, comprising: | The QuadraVista is a system for connecting a workstation of the type that includes a keyboard, a cursor control device and a video monitor to a number of computers. (QuadraVista User Guide) |
| a programmable switch for routing keyboard and cursor control signals from the workstation to a selected computer and for routing video signals from the selected computer to the video monitor of the workstation; | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches; AD9887A Dual Interface Video (4); IP00C716 Image Scaler |
| a first interface circuit for receiving keyboard and cursor control device signals from the workstation; | TUSB2046B 4-port Hub KVM interface, input circuits |
| an on-screen programming circuit that produces video signals for display on the video monitor; | Myson MTV130 |
| a processor coupled to the first interface circuit that transmits the keyboard and cursor control device signals to the programmable switch and controls the on-screen programming circuit to produce the video signals upon the detection of a predefined input from a user of the workstation, the processor further operating to detect keyboard | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry. In addition, the two microcontroller cores and the PLD share responsibilities and thus operate in a manner insubstantially different from a single core |

| '096 Patent, Claim 26 | QuadraVista |
|---|---|
| or cursor control device signals received while the on-screen programming circuit is producing video signals on the video monitor and to control the programmable switch in response to the keyboard or cursor control device signals detected; and | handling the same responsibilities. |
| a second interface circuit disposed between the programmable switch and the selected computer for supplying the keyboard and cursor control device signals routed through the programmable switch to the selected computer. | Atmel ATMega64 microcontroller, port drivers; USB N9604-28M node controller, input/output drivers |

| '096 Patent, Claim 32 | QuadraVista |
|---|---|
| 32. In a system including a workstation of the type that includes a keyboard, cursor control device and video monitor and a plurality of computers, a method of selectively connecting the workstation to the computers, comprising: | The QuadraVista is for use in a system including a workstation of the type that includes a keyboard, cursor control device and video monitor and a plurality of computers for selectively connecting the workstation to the computers. (QuadraVista User Guide) |
| a) producing overlaid video signals for display on the video monitor of the workstation in response to defined keyboard or cursor control device signals received from the workstation; | Myson MTV130 (QuadraVista User Guide) |
| b) detecting keyboard and cursor control device signals entered in response to the overlaid video signals and setting an internal condition of a switch of the type that routes keyboard and cursor control device signals between the workstation and a computer in order to select which of the plurality of computers will receive the keyboard and cursor control device signals; | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry (QuadraVista User Guide) |
| c) transmitting keyboard and cursor control device signals from the workstation to the selected computer, and transmitting keyboard, cursor control device and video signals from the selected computer to the workstation. | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches; AD9887A Dual Interface Video (4); IP00C716 Image Scaler (QuadraVista User Guide) |

# Exhibit 4

## Exemplary and Preliminary Claim Charts

| '264 Patent, Claim 1 | QuadraVista |
|---|---|
| 1. A switching system comprising: | The QuadraVista is a switching system. (QuadraVista User Guide) |
| a computer-side interface for simultaneously physically connecting to independent, dedicated cables of respective keyboard and analog video outputs of plural computers; | PS2, USB, and DVI connectors for connection to computers |
| a user-side interface for physically connecting to a first set of independent, dedicated cables of a first keyboard and an analog video input of a first monitor; | USB and DVI connectors for connection to workstation |
| an analog video receiving circuit, connected to the computer-side interface, for receiving analog video signals from one of the plural computers through the computer-side interface; | AD9887A Dual Interface Video (4), input circuits |
| an analog video overlay image generating circuit, disposed between the computer-side interface and the user-side interface, for producing an analog overlay video signals internal to the switching system; and | Myson MTV130 |
| an analog video overlay circuit, disposed between the computer-side interface and the user-side interface, for combining (1) a portion of the analog video signals received by the analog video receiving circuit and (2) the analog overlay video signals generated internally to the switching system to form a combined analog signal that is output to the first monitor via the user-side interface. | Xilinx XC95144XL PLD |

| '264 Patent, Claim 2 | QuadraVista |
|---|---|
| 2. The system as claimed in claim 1, | See claim 1. |
| wherein the analog video receiving circuit further comprises a synchronization signal detecting circuit for detecting one of a horizontal- and a vertical-synchronization | AD9887A Dual Interface Video (4) |

| '264 Patent, Claim 2 | QuadraVista |
|---|---|
| signal corresponding to the analog video signals from the one of the plural computers. | |

| '264 Patent, Claim 3 | QuadraVista |
|---|---|
| 3. The system as claimed in claim 1, | See claim 1. |
| wherein the computer-side interface further comprises a computer-side mouse interface for transceiving signals to and from mouse ports of the plural computers, and | PS2 and/or USB connectors |
| wherein the user-side interface further comprises a user-side mouse interface for transceiving signals to and from a first computer mouse. | USB connectors |

| '264 Patent, Claim 4 | QuadraVista |
|---|---|
| 4. The system as claimed in claim 1, | See claim 1. |
| wherein the analog video overlay circuit comprises a multiplexer for multiplexing (1) the portion of the analog video signals received by the analog video receiving circuit and (2) the analog overlay video signals generated internally to the switching system without requiring a frame buffer. | Xilinx XC95144XL PLD |

| '264 Patent, Claim 5 | QuadraVista |
|---|---|
| 5. The system as claimed in claim 1, | See claim 1. |
| further comprising a keyboard translator disposed between the computer-side and the user-side interfaces for translating a keyboard code from a first format used on the user-side to a second format used on the computer-side. | Atmel ATMega64 microcontroller, core including ALU and associated circuitry |

| '264 Patent, Claim 6 | QuadraVista |
|---|---|
| 6. The system as claimed in claim 1, | See claim 1. |
| wherein the analog video receiving circuit receives separate analog red, green and blue | AD9887A Dual Interface Video (4), input circuits |

| '264 Patent, Claim 6 | QuadraVista |
|---|---|
| signals. | |

| '264 Patent, Claim 7 | QuadraVista |
|---|---|
| 7. The system as claimed in claim 2, | See claim 2. |
| wherein the analog video receiving circuit comprises a receiving circuit for receiving real-time, analog video signals. | AD9887A Dual Interface Video (4), input circuits |

| '264 Patent, Claim 8 | QuadraVista |
|---|---|
| 8. The system as claimed in claim 2, | See claim 2. |
| wherein the analog video receiving circuit comprises a receiving circuit for receiving real-time, analog video signals including the at least one of the horizontal- and a vertical-synchronization signal superimposed on the real-time, analog video signals. | AD9887A Dual Interface Video (4), input circuits |

| '264 Patent, Claim 9 | QuadraVista |
|---|---|
| 9. The system as claimed in claim 7, | See claim 7. |
| wherein the analog video receiving circuit receives separate analog red, green and blue signals. | AD9887A Dual Interface Video (4), input circuits |

| '264 Patent, Claim 10 | QuadraVista |
|---|---|
| 10. The system as claimed in claim 8, | See claim 8. |
| wherein the analog video receiving circuit receives separate analog red, green and blue signals. | AD9887A Dual Interface Video (4), input circuits |

| '264 Patent, Claim 14 | QuadraVista |
|---|---|
| 14. The system as claimed in claim 1, | See claim 1. |
| further comprising a keyboard command detector, disposed between the computer-side interface and the user-side interface, for detecting when the first keyboard requests | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and |

| '264 Patent, Claim 14 | QuadraVista |
| --- | --- |
| that the analog video signals of the one of the plural computers be replaced by analog video signals of another of the plural computers. | associated circuitry |

| '264 Patent, Claim 16 | QuadraVista |
| --- | --- |
| 16. The system as claimed in claim 1, | See claim 1. |
| further comprising a keyboard command detector, disposed between the computer-side interface and the user-side interface, for detecting when the first keyboard requests that the analog video signals of the one of the plural computers be replaced by analog video signals of another of the plural computers in response to the combined analog signal that is output to the first monitor via the user-side interface. | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry |

# Exhibit 5

**Exemplary and Preliminary Claim Charts**

| '978 Patent, Claim 1 | QuadraVista |
|---|---|
| 1. A switching system comprising: | The QuadraVista is a switching system. (QuadraVista User Guide) |
| computer-side connectors including plural computer-side user input device connectors and plural computer-side video connectors for simultaneously physically connecting to independent, dedicated cables of respective user-input device inputs and analog video outputs of plural computers; | Signal pin connectors that directly connect to the computers' user-input device connectors and video connectors, and that convey the keyboard, mouse and video signals. |
| a first set of user-side connectors including a first user-side user-input device connector and a first user-side video connector for physically connecting to independent, dedicated cables of a first user-input device and an analog video input of a first monitor; | Signal pin connectors that directly connect to the workstation's user-input device connectors and video monitor, and that convey the keyboard, mouse and video signals. |
| a first analog video receiving circuit interposed between the computer-side connectors and the first set of user-side connectors for receiving analog video signals from one of the plural computers through at least one of the computer-side connectors, and | AD9887A Dual Interface Video (1), input circuits |
| a first analog video processing circuit, interposed between the computer-side connectors and the first set of user-side connectors, for selecting, for at least one sub-region of an image to be displayed on the first monitor, at least one of (1) a portion of the analog video signals received by the first analog video receiving circuit and (2) internally generated analog video signals, to form an output analog video signal that is output to the first monitor via the first user-side video connector. | Xilinx XC95144XL PLD |

| '978 Patent, Claim 2 | QuadraVista |
|---|---|
| 2. The switching system as claimed in claim 1, | See claim 1. |

| '978 Patent, Claim 2 | QuadraVista |
|---|---|
| | |
| wherein the first analog video receiving circuit further comprises a synchronization signal detecting circuit for detecting one of a horizontal-and a vertical-synchronization signal corresponding to the analog video signals from the at least one of the plural computers through the at least one of the computer-side connectors. | AD9887A Dual Interface Video (1) |
| | |

| '978 Patent, Claim 3 | QuadraVista |
|---|---|
| 3. The switching system as claimed in claim 1, | See claim 1. |
| wherein the first user-input device comprises a computer mouse. | The user-side USB connector pins connect to a computer mouse. (QuadraVista User Guide) |

| '978 Patent, Claim 4 | QuadraVista |
|---|---|
| 4. The switching system as claimed in claim 1, | See claim 1. |
| wherein the first user-input device comprises a keyboard. | The user-input device comprises a keyboard. (QuadraVista User Guide) |

| '978 Patent, Claim 5 | QuadraVista |
|---|---|
| 5. The switching system as claimed in claim 1, | See claim 1. |
| wherein the first analog video processing circuit comprises a multiplexer for multiplexing (1) the portion of the analog video signals received by the first analog video receiving circuit and (2) internally generated analog video signals without requiring a frame buffer. | Xilinx XC95144XL PLD |

| '978 Patent, Claim 6 | QuadraVista |
|---|---|
| 6. The switching system as claimed in claim | See claim 1. |

| '978 Patent, Claim 6 | QuadraVista |
|---|---|
| 1, | |
| further comprising a user-input device translator, disposed between at least one of the plural computer-side user-input device connectors and the first user-side user-input device connector, for translating information from the first user-input device in a first format to a second format used by at least one of the plural computers. | Atmel ATMega64 microcontroller, core including ALU and associated circuitry (QuadraVista User Guide) |

| '978 Patent, Claim 7 | QuadraVista |
|---|---|
| 7. The switching system as claimed in claim 1, | See claim 1. |
| wherein the first analog video receiving circuit receives separate analog red, green and blue signals. | AD9887A Dual Interface Video (1), input circuits |

| '978 Patent, Claim 8 | QuadraVista |
|---|---|
| 8. The switching system as claimed in claim 2, | See claim 2. |
| wherein the first analog video receiving circuit comprises a receiving circuit for receiving real-time, analog video signals. | AD9887A Dual Interface Video (1), input circuits |

| '978 Patent, Claim 9 | QuadraVista |
|---|---|
| 9. The switching system as claimed in claim 2, | See claim 2. |
| wherein the first analog video receiving circuit comprises a receiving circuit for receiving real-time, analog video signals including the at least one of the horizontal- and a vertical-synchronization signal superimposed on the real-time, analog video signals. | AD9887A Dual Interface Video (1) |

| '978 Patent, Claim 10 | QuadraVista |
|---|---|
| 10. The switching system as claimed in claim | See claim 8. |

| '978 Patent, Claim 10 | QuadraVista |
|---|---|
| 8, | |
| wherein the first analog video receiving circuit receives separate analog red, green and blue signals. | AD9887A Dual Interface Video (1), input circuits |

| '978 Patent, Claim 11 | QuadraVista |
|---|---|
| 11. The switching system as claimed in claim 9, | See claim 9. |
| wherein the first analog video receiving circuit receives separate analog red, green and blue signals. | AD9887A Dual Interface Video (1), input circuits |

| '978 Patent, Claim 12 | QuadraVista |
|---|---|
| 12. The switching system as claimed in claim 1, further comprising: | See claim 1. |
| digital switching circuits; and | 74HC138 3:8 decoders (4); USB N9604-28M Node controllers (4); Atmel ATMEGA64 microcontroller, port latches |
| analog switching circuits, wherein user-input device information is routed from at least one of the plural computer-side user-input device connectors to the first user-side user-input device connector on the digital switching circuits independent of the analog video signals that are routed from at least one of the computer-side video connectors to the first user-side video connector on the analog switching circuits. | AD9887A Dual Interface Video (4); IP00C716 Image Scaler. User-input device information is routed from at least one of the plural computer-side user-input device signal pin connectors to the first user-side user-input device connector on the digital switching circuits independent of the analog video signals that are routed from at least one of the computer-side video signal pin connectors to the first user-side video connector on the analog switching circuits. |

| '978 Patent, Claim 15 | QuadraVista |
|---|---|
| 15. The switching system as claimed in claim 1, | See claim 1. |
| further comprising a user-input device command detector, connected to the first user-side user-input device connector, for | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 |

| '978 Patent, Claim 15 | QuadraVista |
|---|---|
| detecting when configured to detect a first command by which the first user-input device requests that the analog video signals of one of the plural computers be replaced by analog video signals of another of the plural computers and configured to send commands other than the first command from the first user-input device to one of the plural computers. | microcontroller, core including ALU and associated circuitry |

| '978 Patent, Claim 16 | QuadraVista |
|---|---|
| 16. The switching system as claimed in claim 1, | See claim 1. |
| further comprising a user-input device command detector, connected to the first user-side user-input device connector, for detecting when configured to detect a first command by which the first user-input device requests that the analog video signals of one of the plural computers be replaced by analog video signals of another of the plural computers in response to the internally generated video signal that is output to the first monitor via the first user-side video connector, and | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry |
| said user-input device command detector configured to send commands other than the first command from the first user-input device to one of the plural computers. | Atmel ATMega64 microcontroller, core including ALU and associated circuitry; Xilinx XC95144XL PLD; Atmel ATMega128 microcontroller, core including ALU and associated circuitry |

| '978 Patent, Claim 19 | QuadraVista |
|---|---|
| 19. The switching system as claimed in claim 1, | See claim 1. |
| wherein the first analog video receiving circuit comprises analog video receiving means for receiving analog video signals from one of the plural computers through the computer-side connectors. | AD9887A Dual Interface Video (4), input circuits |

| '978 Patent, Claim 21 | QuadraVista |
|---|---|
| 21. The switching system as claimed in claim 1, | See claim 1. |
| wherein said at least one of (1) the portion of the analog video signals received by the first analog video receiving circuit and (2) the internally generated analog video signals comprises only (1) the portion of the analog video signals received by the first analog video receiving circuit in a first mode of operation. | Xilinx XC95144XL PLD (QuadraVista User Guide) |

| '978 Patent, Claim 22 | QuadraVista |
|---|---|
| 22. The switching system as claimed in claim 1, | See claim 1. |
| wherein said at least one of (1) a portion of the analog video signals received by the first analog video receiving circuit and (2) internally generated analog video signals comprises only (2) the internally generated analog video signals in a second mode of operation. | Xilinx XC95144XL PLD (QuadraVista User Guide) |

| '978 Patent, Claim 23 | QuadraVista |
|---|---|
| 23. The switching system as claimed in claim 1, | See claim 1. |
| wherein said at least one of (1) the portion of the analog video signals received by the first analog video receiving circuit and (2) the internally generated analog video signals comprises both (1) the portion of the analog video signals received by the first analog video receiving circuit and (2) the internally generated analog video signals in a third mode of operation. | Xilinx XC95144XL PLD (QuadraVista User Guide) |

| '978 Patent, Claim 25 | QuadraVista |
|---|---|
| 25. The switching system as claimed in claim 1, | See claim 1. |

| '978 Patent, Claim 25 | QuadraVista |
|---|---|
| | |
| wherein the internally generated analog video signals further comprise at least one of an internally generated horizontal synchronization signal and an internally generated vertical synchronization signal. | Xilinx XC95144XL PLD |

| '978 Patent, Claim 26 | QuadraVista |
|---|---|
| 26. The switching system as claimed in claim 1, | See claim 1. |
| wherein the internally generated analog video signals comprise a menu. | Myson MTV130 (QuadraVista User Guide) |