IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AVOCENT REDMOND CORP.<br>Plaintiff,<br>v.<br>THE UNITED STATES<br>Defendant,<br>and<br>ROSE ELECTRONICS,<br>Proposed Defendant-Intervenor. | No. 08-69C<br>Judge Lawrence S. Margolis |

**REPLY DECLARATION OF THOMAS L. CASAGRANDE**

I, THOMAS L. CASAGRANDE, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am over 18 years old and believe in the obligations of an oath. I make this declaration based on my own personal knowledge.

2. I am one of the lawyers representing putative intervenor/defendant Rose Electronics in this case.

3. In the Seattle case between Avocent and Rose, *Avocent Redmond Corp. v. Rose Electronics, et al.*, No. 06-1711-MJP (W.D. Wash.), Avocent recently requested that the Court modify the Protective Order in that case to allow Avocent to submit sales data that Rose designated highly confidential under the protective order in that case to the United States Patent and Trademark Office to help Avocent try to uphold its patents that are being reexamined in light of substantial new questions as to their patentability. A true and correct copy of Avocent's proposed order concerning this request is attached hereto as exhibit 1.

4. The Seattle case between Avocent and Rose, *Avocent Redmond Corp. v. Rose Electronics, et al.*, No. 06-1711-MJP, has not been dismissed. It is pending but stayed pending re-examination of Avocent's three asserted patents. The October 31, 2007 Minute Order staying that case is the last order of the court setting forth the status of the case, and a true and correct copy thereof is attached hereto as exhibit 2.

5. In the Seattle case, Avocent Redmond produced thousands of pages of schematics of its own products, and stamped these highly confidential and for attorney's eyes' only under the protective order in that case.

6. Attached hereto as exhibit 3 is a true and correct copy of the following article: Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L. Rev. 63, 76 (2004).

7. Attached hereto as exhibit 4 is a true and correct copy of the article: Comment, *The Controversy Surrounding Continuing Applications and Requests for Continued Examination*, 7 J. Marshall Rev. Intell. Prop. L. 545, 561-62 (2008).

*I hereby declare under penalty of perjury that the foregoing is true and correct.*

Dated: July 14, 2008

Thomas L. Casagrande
Houston, TX

# EXHIBIT 1

The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AVOCENT REDMOND CORP., a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>ROSE ELECTRONICS, a Texas general partnership; PETER MACOUREK, an individual; DARIOUSH "DAVID" RAHVAR, an individual; ATEN TECHNOLOGY INC., a California corporation; ATEN INTERNATIONAL CO., LTD., a Taiwanese Company; BELKIN INTERNATIONAL, INC., a Delaware corporation, and BELKIN, INC., a Delaware corporation,<br><br>Defendants. | NO. C06-1711 MJP<br><br>[PROPOSED] ORDER GRANTING AVOCENT'S MOTION TO LIFT THE STAY AND TO MODIFY THE PROTECTIVE ORDER |

THIS MATTER having come before the Court on Plaintiff Avocent Redmond Corp.'s Motion to Lift the Stay and Modify the Protective Order, and the Court having reviewed the materials submitted in support of and in opposition to the motion, now, therefore, it is hereby

ORDERED that: (1) Avocent's motion to lift the stay is GRANTED, and (2) the Protective Order (Dkt. No. 116) is modified to allow Avocent to submit evidence of commercial success due to the allegedly infringing sales made by the defendants to the U.S. Patent and Trademark Office.

The Clerk of the Court is directed to serve copies of the Order on counsel of record.



Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

DATED this _______ day of July, 2008.

______________________________
Marsha J. Pechman
UNITED STATES DISTRICT JUDGE

PRESENTED BY:

s/John A. Knox, WSBA #12707

John A. Knox
WILLIAMS, KASTNER & GIBBS PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
Telephone: (206) 628-6600
Fax: (206) 628-6611
Email: jknox@williamskastner.com

James D. Berquist
J. Scott Davidson
Donald L. Jackson
DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
4300 Wilson Blvd., Suite 700
Arlington, Virginia 22203

Attorneys for Plaintiff Avocent Redmond Corp.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AVOCENT REDMOND CORP., Plaintiffs, v. ROSE ELECTRONICS, INC., et al., Defendants. | No. C06-1711MJP<br>MINUTE ORDER |

The following Minute Order is made by direction of the Court, the Honorable Marsha J. Pechman, United States District Judge:

A telephone conference was held in the above-entitled matter, on October 30, 2007, at 4:00 p.m. Counsel for all parties participated in the call. The conference specifically addressed two pending motions — Defendants' motion for relief from certain deadlines (Dkt. No. 158) and Defendants' motion to stay the proceedings pending the U.S. Patent and Trademark Office's reexamination of all the patents-in-suit. After hearing arguments from both sides, the Court ordered as follows:

(1) This matter is STAYED pending resolution of Defendants' request to the USPTO that it reexamine Avocent's patents.

(2) The parties are to update the Court regularly on the progress of the reexamination process. Specifically, the parties must inform the Court:

(a) if the USPTO denies the reexamination request, within one week of the denial;

(b) when all required materials are filed with the USPTO;

(c) annually on the progress of the reexamination process; and

(d) when the USPTO issues a decision on the reexamination application.

Dated this 30th day of October, 2007.

BRUCE RIFKIN, Clerk
By /s/ Mary Duett
Deputy Clerk

# EXHIBIT 3

# ENDING ABUSE OF PATENT CONTINUATIONS

MARK A. LEMLEY*
KIMBERLY A. MOORE**

INTRODUCTION ..... 64
I. THE CURIOUS PRACTICE OF CONTINUING PATENT APPLICATIONS ..... 66
A. *How the System Works* ..... 66
B. *The Use of Continuation Practice* ..... 69
II. THE PROBLEMS WITH CONTINUATION APPLICATIONS ..... 71
A. *Problems Created By Continuations* ..... 71
1. Delay and Uncertainty ..... 71
2. Wearing Down the Examiner ..... 74
3. Changing Claims ..... 76
4. Submarine Patents ..... 79
5. Evergreening ..... 81
B. *Attempts to Combat the Problems Created By Continuations* ..... 83
1. Changing the Patent Term ..... 84
2. Publishing Patent Applications ..... 88
3. Increased Use of the Written Description Requirement ..... 90
4. New Prosecution Laches Defense ..... 92
III. ELIMINATING CONTINUATION APPLICATIONS ..... 93
A. *Justifications for Continuation Applications* ..... 94
B. *Scope of the Abolition* ..... 101
C. *Alternatives to Abolition* ..... 105
1. Limiting the Number of Continuations ..... 106
2. Preventing Broadening of Claims During Continuation Applications ..... 107
3. Publishing Applications ..... 108
4. Creating Intervening Rights ..... 109

* Elizabeth Josslyn Boalt Professor of Law, University of California at Berkeley (Boalt Hall); of counsel, Keker & Van Nest LLP.

** Associate Professor of Law, George Mason University School of Law. I am grateful to the George Mason University Law and Economics Center for its continued support.

We are indebted to the following firms who generously sponsored this research: Banner & Witcoff, Howrey Simon Arnold & White, Kenyon & Kenyon, and Morgan, Lewis & Bockius. Thanks are also due to John Allison, Bob Barr, Becky Eisenberg, Stuart Graham, Rose Hagan, Scott Kieff, Matthew J. Moore, Craig Nard, David O'Brien, Jay Thomas, Hans Troesch, Shashank Upadhye, Harold Wegner, John Whealan, John Witherspoon and participants at a conference at Harvard Law School and a workshop at Stanford Law School for helpful discussions of topics treated in this paper, Jim Hirabayashi at the PTO for assistance in compiling the data, and R. Derek Trunkey for statistical assistance.

5. Limiting the Time an Application Can Spend in Prosecution ........................................ 111
CONCLUSION ........................................ 118
APPENDIX A – Table 1: Issued Patents from 1976-2000: Total Prosecution Time ........................................ 119

## INTRODUCTION

One of the oddest things about the United States patent system is that it is impossible for the U.S. Patent and Trademark Office ("PTO") to ever finally reject a patent application. While patent examiners can refuse to allow an applicant's claims[1] to ownership of a particular invention, and can even issue what are misleadingly called "Final Rejections," the patent applicant always gets another chance to persuade the patent examiner to change her mind. Even stranger, perhaps, is that the PTO doesn't even possess the power to finally *grant* a patent. Even when the examiner concludes that an invention is patentable and issues a "notice of allowance," the patent applicant always retains the right to abandon the application that was deemed patentable and start the process over again. Alternatively, an applicant can take the patent awarded by the PTO and, at the same time, seek additional or broader claims arising out of the same patent application. In all three cases, the culprit lies in what is known as the "continuation" application.[2]

Applicants dissatisfied with the course of patent prosecution can abandon an application and file a continuation. Alternatively, a patentee can prosecute one or more patents to issue and also keep a continuation application on file, hoping to win a better patent from the PTO in the future. We describe this rather remarkable practice in Part I. We also report the results of our comprehensive empirical study of continuation applications, which demonstrates the frequency with which this process is used and abused. In an effort to study the pervasiveness of this practice, we compiled an original dataset comprising 2,224,379 patents, every patent issued from 1976 through 2000.[3] We collected the data on the patent filing dates, issuance dates, whether the

[1] The legal scope of an invention is defined by the "claims" of a patent, which set the boundaries of the rights granted. *See* Markman v. Westview Instruments, Inc., 517 U.S. 370, 373 (1996) (discussing patent claims).

[2] Traditional continuation applications are governed by 35 U.S.C. § 120 (2000). Statutory changes at the end of the last century created an alternative, the "Continuing Prosecution Application" ("CPA"), which permits the prosecution of a continuation without the filing of a new application, but does not otherwise affect the substantive rules governing continuation applications. *See* Request for Continued Examination Practice and Changes to Provisional Application Practice, 65 Fed. Reg. 50092, 50093 (Aug. 16, 2000) (to be codified at 37 C.F.R. pt. 1). In this article, we will treat section 120 continuations and CPA/RCE continuations interchangeably because their policy effects are indistinguishable.

[3] Professor Moore has presented this empirical study in several recent federal district court litigations in order to provide the court with a context to assess the reasonableness of prosecution delays. *See* Table 1, *infra* Appendix A.

patent claimed priority to an earlier filed application, the date of the earliest claim to priority, and whether any other patent in the priority chain was issued and when.

Continuation practice has a number of pernicious consequences, which we detail in Part II. First, at a minimum, continuation practice introduces substantial delay[4] and uncertainty into the lives of a patentee's competitors, who cannot know whether a patent application is pending in most circumstances. Second, the structure of the PTO suggests that continuations may well succeed in "wearing down" the examiner, so that the applicant obtains a broad patent not because he deserves one, but because the examiner has neither incentive nor will to hold out any longer. Third, continuation practice can be—and has been—used strategically to gain advantages over competitors by waiting to see what product the competitor will make, and then drafting patent claims specifically designed to cover that product. Finally, some patentees have used continuation practice to delay the issuance of their patent precisely in order to surprise a mature industry, a process known as "submarine patenting."

Congress and the courts have created a number of patent doctrines designed to combat the misuse of continuation applications. In the last ten years, they have changed the term of patents, ended the secrecy of most patent applications, revived the controversial doctrine of written description, and created an entirely new defense of prosecution laches. While these changes have indeed mitigated some of the worst abuses of the continuation process, our data demonstrate that they are not likely to be effective in tackling the core of the problem.

One simple solution to the problems that beset continuations would be to abolish the practice. Part III explores this alternative. In it, we consider the various justifications that have been offered for continuation practice and find many of them wanting. We also consider various complicating factors and potential downsides to abolishing continuations. We conclude from our empirical research that, while there are very real abuses of the system attributable to continuation practice, they may not be so widespread as to justify eliminating continuation practice entirely. Whether continuations should be abolished entirely depends on a judgment concerning the benefit continuations provide to applicants who are legitimately trying to draft effective patent claims.

As alternatives to this drastic remedy, we offer a number of other steps that Congress and the courts could take to restrict abuse of continuations. These steps include requiring publication of all applications, placing a time limit on the addition of new claims that broaden the scope of the patent, and creating a defense for infringers who independently developed the patented invention

---

[4] Original applications take on average 1.96 years from their filing to issuance. Continuations, in contrast, take on average 4.16 years. *See infra* notes 27-30 and accompanying text (reciting statistics concerning the average length of the patenting process).

before it was added to the patent claims. At a bare minimum, our data should enable the courts to add some rigor to the new doctrine of prosecution laches by providing a baseline against which to judge the reasonableness of any particular patentee's delay.

## I. THE CURIOUS PRACTICE OF CONTINUING PATENT APPLICATIONS

### A. *How the System Works*

In order to obtain a patent, an inventor must persuade the PTO that her invention meets the requirements of the patent statute. The inventor files an application, which is examined by the PTO in a process called "patent prosecution." The application contains a written description of the invention and concludes with a number of "claims" that define the scope of the invention.[5] The inventor must also disclose any "prior art"—other patents or publications that might render the invention unpatentable—of which she is aware, although she has no duty to search for prior art.[6] The prosecution process is ex parte; only the inventor and the patent examiner participate in the decision whether to issue a patent.

The actual process of prosecution is a back-and-forth affair between the applicant and the examiner. Once the inventor files her application, the examiner reviews the application for compliance with the statute and conducts a brief search for prior art.[7] Based on this analysis, the examiner may decide to

---

[5] 35 U.S.C. § 112 (2000). Claims define the scope of the invention, just as a real property deed defines the "metes and bounds" of a real property right. *See, e.g.*, Regents of Univ. of N.M. v. Knight, 321 F.3d 1111, 1122 (Fed. Cir. 2003). Unlike land, however, inventions are difficult and perhaps even impossible to define clearly in words. *See* Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 731 (2002) ("[T]he nature of language makes it impossible to capture the essence of a thing in a patent application."). *See generally* Craig Allen Nard, *A Theory of Claim Interpretation*, 14 HARV. J.L. & TECH. 1 (2000) (discussing attempts by courts to deal with the inherent imprecision of claim drafting). The imprecision of words is further substantiated by the high rate of reversals of claim construction determinations. *See, e.g.*, Christian A. Chu, *Empirical Analysis of the Federal Circuit's Claim Construction Trends*, 16 BERKELEY TECH. L.J. 1075, 1090 (2001) (finding that the Federal Circuit overturned district court claim constructions in between 30% and 39% of the cases); Kimberly A. Moore, *Are District Court Judges Equipped to Resolve Patent Cases?*, 15 HARV. J.L. & TECH. 1 (2001) (demonstrating that the Federal Circuit overturned district court claim constructions in 33% of the cases). The difference between the Moore and Chu statistic on claim construction reversal is due to the fact that Moore classed all Rule 36 summary affirmances as rulings on claim construction, while Chu considered only a certain percentage of Rule 36 affirmances to be related to claim construction.

[6] 37 C.F.R. § 1.56 (2003) (establishing a duty to disclose information material to patentability).

[7] Because of the substantial backlog of cases at the PTO, it often takes a year or more after the application is filed before it is first examined. *See* U.S. PATENT & TRADEMARK

allow the claims of the patent as filed.[8] More likely, however, the examiner will issue a rejection of one or more claims in the application, often based on similarity to the prior art or failure to describe the invention in sufficient detail. The applicant will respond to this rejection and try to persuade the examiner that he is wrong by disclosing information or a declaration showing that the invention is patentable, or by amending the claims of the patent to narrow them and avoid the prior art. The examiner then reviews this response and may either allow the patent claim or issue what is called a "Final Rejection" of the application.

The term "Final Rejection" is a classic legal misnomer.[9] An applicant faced with a final rejection has several options. First, she can request a face-to-face or telephonic interview with the examiner.[10] Unlike the rest of the prosecution history, which involves written correspondence and is therefore carefully documented, the interview is not transcribed and the interview summary that is

---

OFFICE, PERFORMANCE AND ACCOUNTABILITY REPORT FOR FISCAL YEAR 2002, at 21, *available at* http://www.uspto.gov/web/offices/com/annual/2002/1-58.pdf (last accessed Jan. 13, 2004) (reporting that, in 2002, the mean time from when the patent application was filed to when the examiner issued her first office action on the application was 16.7 months).

The PTO does not always have access to prior art and examiners have very little time to search for and analyze the prior art. As a result, the examination is far from perfect. *See* Mark A. Lemley, *Rational Ignorance at the Patent Office*, 95 NW. U. L. REV. 1495, 1497 (2001) ("[T]he PTO doesn't do a very detailed job of examining patents."). One empirical study found that the PTO failed to discover a significant percentage of cases in which two or more inventors applied for a patent on an identical invention, the sort of prior art they should be particularly likely to discover. Mark A. Lemley & Colleen V. Chien, *Are the U.S. Patent Priority Rules Really Necessary?*, 54 HASTINGS L.J. 1299, 1331 (2003). For anecdotal discussion of the failure of the PTO to find relevant prior art, see Jay Kesan & Marc Banik, *Patents as Incomplete Contracts: Aligning Incentives for R&D Investment with Incentives to Disclose Prior Art*, 2 WASH. U. J.L. & POL'Y 23 (2000); Robert P. Merges, *As Many As Six Impossible Patents Before Breakfast: Property Rights for Business Concepts and Patent System Reform*, 14 BERKELEY TECH. L.J. 577, 589 (1999) (noting that generally less than five pieces of prior art are initially cited in a business methods patent).

[8] First-action allowances are sufficiently rare that patent attorneys generally feel that if they get one, it means they have not asked for broad enough claims. *See* KINNEY & LANGE, P.A., INTELLECTUAL PROPERTY LAW FOR BUSINESS LAWYERS § 3.4.3 (2003). The Kinney & Lange text states:

> Patent attorneys generally do not like to have applications allowed when they are first submitted. Such first-action allowances often indicate that the attorney drafted the claims too narrowly and that they could have received more protection for the invention. In fact, some attorneys will try for broader protection for the invention by filing continuation applications if they receive a first-action allowance.

*Id.*

[9] *See* ROBERT P. MERGES ET AL., INTELLECTUAL PROPERTY IN THE NEW TECHNOLOGICAL AGE 116 (3d ed. 2003) ("The label 'final rejection' is a misnomer if ever there was one.").

[10] Regarding this procedure, see 37 C.F.R. § 1.133(b) (2002) (setting forth the requisites for an interview with a patent examiner).

completed by the examiner is often cryptic and uninformative.[11] It is quite common for an examiner to withdraw a final rejection and allow the claims after such an interview. Second, the applicant may choose to appeal the rejection to the Board of Patent Appeals and Interferences ("the Board") and, if she loses there, to the U.S. District Court for the District of Columbia or to the U.S. Court of Appeals for the Federal Circuit.[12]

Alternatively, the applicant may choose to start the prosecution process over by filing a continuation application. Under § 120,[13] an applicant can file such a continuation application at any time before the PTO actually issues the patent or before the applicant abandons the application. Although continu-ations are commonly filed after a final rejection, they are sometimes filed after allowance as well. This happens either because the applicant wants the allowed claims to issue but also wants to argue for broader claims to be included in later patents, or because the applicant decides instead to abandon the allowed claims and try for broader claims. When a continuation application is filed, the prosecution process we have just described starts over. The continuation application is treated just like a new application,[14] giving the applicant another set of chances to persuade the examiner to allow the claims, to further amend the claims, or even to hope to get a different examiner.[15] If none of this works, the applicant can file yet another continuation application, and so on ad infinitum. There is no way an examiner can ever cause a determined applicant to go away, although allowing the applicant's patent claims increases the chance that the case will finally be disposed of.

[11] In the *Manual of Patent Examining Procedure*, section 713.04 explains that examiners must fill out interview summaries to be included in the prosecution history if they meet with the applicant. MANUAL OF PATENT EXAMINING PROCEDURE § 713.04 (2001) [hereinafter MANUAL]. In our experience reviewing prosecution histories, however, this "interview summary" is rarely more than a sentence and often says nothing more than "Claims 1-11 are in condition for allowance."

[12] *See* 35 U.S.C. § 134 (2000) (outlining when a party may seek a Board appeal); 35 U.S.C. § 141 (2000) (permitting appeals of Board decisions to the Federal Circuit); 35 U.S.C. § 145 (2000) (permitting appeals of Board decisions to the U.S. District Court for the District of Columbia).

[13] 35 U.S.C. § 120 (2000) (allowing continuations to use the filing date of the original patent application).

[14] A new procedure, the Request for Continued Examination ("RCE"), works in the same way as the § 120 continuation application except that the applicant does not have to file an entirely new application, but can instead request continued prosecution of the existing application upon the payment of a fee. Because the RCE process is relatively new, none of the cases in our study result from RCEs rather than § 120 continuations. Nonetheless, for purposes of our discussion in this article, the two can be treated interchangeably.

[15] Examiner turnover is notoriously high because of the low salaries and high workloads at the PTO. *See* MERGES ET AL., *supra* note 9, at 606-07 (discussing the high turnover at the PTO).

B. *The Use of Continuation Practice*

Continuations are widely used in today's patent system.[16] The results of our comprehensive study of patent continuations shows that 23% of all patents granted from 1976 through 2000 claim priority to one or more previously filed applications.[17] Although there has been some fluctuation over the years in the number of continuation patents filed, the trend has been a steady increase. In the mid-1970s, about one-fifth of all issued patents were based on continuations.[18] By the mid-1990s the number of patents issued based on continuation applications climbed to 31%. That number has declined somewhat in the last several years, in part because of changes in the way patent term is calculated,[19] but continuation patents still constitute about one-quarter of all issued patents. Continuations are a major part of patent practice. They are especially important in certain industries, particularly pharmaceuticals and biotechnology.[20] In those industries, most patent lawyers with an important application try to keep at least one continuation application pending in the PTO well after a patent issues so that they can track changes in the marketplace.[21]

The effect of these continuations is substantial. Recent work by Cecil Quillen and others shows that when continuations are taken into account, the PTO issues patents on over 85% of the application chains that are filed.[22]

---

[16] *See* Symbol Techs., Inc. v. Lemelson Med. Ed. & Res. Found., 277 F.3d 1361, 1369 (Fed. Cir. 2002) (Newman, J., dissenting) (calling continuation practice "ubiquitous").

[17] Because our data set ends in 2000, all of the patents we study here rely on § 120 continuations, as opposed to CPA or RCE continuations.

[18] In 1976, 1977, 1978, and 1979, the percentage of issued patents that were continuations was 23%, 22%, 21%, and 21%, respectively.

[19] *See infra* notes 82-83 and accompanying text (discussing the change in the calculation of a patent term to a system of counting twenty years forward from the date of initial filing).

[20] *See* John R. Allison & Mark A. Lemley, *Who's Patenting What? An Empirical Exploration of Patent Prosecution*, 53 VAND. L. REV. 2099, 2125, 2154 tbl.9 (2000) (finding that while the average patent in 1996-1998 issued from 1.50 applications, the average pharmaceutical patent issued from 2.27 applications and the average biotechnology patent from 2.38 applications).

[21] *See* Harold Wegner, *The End of Equivalents? Examining the Fallout from* Festo, 13 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 727, 742 (2003). Wegner explains:

> [Y]ou take whatever claims you can, you file a continuation with a disclaimer, and then you keep that new case pending forever and ever and ever, and then you add claims when you need them. Now, that is not a very good public policy. But, it is something that is an effective way to deal with the problem. We do it all the time.

*Id.*

[22] Cecil D. Quillen, Jr. et al., *Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office—Extended*, 12 FED. CIR. B.J. 35, 38 (2002). Quillen and Webster had originally estimated in earlier work that the grant rate was 95%. Cecil D. Quillen, Jr. & Ogden H. Webster, *Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office*, 11 FED. CIR. B.J. 1 (2001). This earlier work was properly criticized for failing to take account of cases in which multiple patents issue from a

Patents that issue from continuation applications, or from families in which continuations are filed, are also substantially more likely to be litigated than patents that issue directly from original applications.[23] While continuations are filed in 23% of all patent applications, patents based on continuation applications represent 52% of all litigated patents. Although continuations are used in a minority of all patents, it is the most important minority because it is the minority most likely to end up in litigation.[24] Figure 1 shows the time spent in prosecution (from earliest priority date to issuance) for issued and

*Fig. 1: Prosecution Times*




family of continuation applications. On the other hand, some of the critics made equally unrealistic assumptions—for example, that every continuation filed results in a separate patent. *See* Robert A. Clarke, *U.S. Continuity Law and Its Impact on the Comparative Patenting Rates of the U.S., Japan and the European Patent Office*, 85 J. PAT. & TRADEMARK OFF. SOC'Y 335, 338 (2003) (erroneously assuming that every continuation resulted in a patent and concluding that the grant rate was 75%). The 85% number provided in the revised Quillen et al. study is based on actual data about the applications that issue based on continuations, and reflects the best estimate we have of how often applications mature into patents.

[23] *See* John R. Allison et al., *Valuable Patents*, 92 GEO. L.J. (forthcoming 2004) (finding that litigated patents filed more than three times as many continuation applications as non-litigated patents, and also came from substantially larger families of patents).

[24] *See id.* (explaining that litigated patents are a subset of all valuable patents).

litigated patents.[25]

## II. THE PROBLEMS WITH CONTINUATION APPLICATIONS

While it is certainly odd to an outsider that the PTO has no power to ever terminate a patent prosecution, the fact that a rule looks odd is not necessarily a reason to do away with it. This is particularly true in patent law, which has no shortage of odd rules.[26] Continuation practice, however, has a number of pernicious consequences for the patent system. Those harmful consequences fall into five categories.

### A. *Problems Created By Continuations*

#### 1. Delay and Uncertainty

Continuations take time. Even if the patentee does not intend to delay the issuance of a patent,[27] starting the prosecution process over naturally adds significantly to the time a patent application spends in prosecution. During the period of our study, prosecution took an average of 2.47 years from the earliest claimed filing date to issuance date. Figure 2 below plots the time applications spent at the PTO by year in terms of their application time (time from filing date to issuance) and their prosecution time (time from earliest claim of priority to issuance). As Figure 2 indicates, the mean time patent applications spend at the PTO has been on the rise in recent years. In fact, the application time reached the highest point of the twenty-five-year study during 2000. The prosecution time (time from earliest claim of priority) has risen even more dramatically in recent years due to the increase in the number of continuation patents.[28] Original patent applications that issue take an average of 1.96 years to issue, while patents with at least one continuation take an average of 4.16 years to issue. Indeed, some patent prosecutions with multiple continuations

[25] The timeline of Figure 1 has been abbreviated so that the difference between litigated and issued patents can be observed. In actuality, the timeline continues to sixty-eight years—the longest prosecution time for any of the issued patents.

[26] To take just one example, the U.S. Supreme Court has held that a single individual wearing underwear (beneath her clothing) is engaged in "public use" of that underwear barring a patent, but that a road in central Boston traversed by people for six years was not in public use. *Compare* Egbert v. Lippmann, 104 U.S. 333, 338 (1881) (holding that more than two years of wearing a corset constituted public use), *with* City of Elizabeth v. Nicolson Pavement Co., 97 U.S. 126, 134-35 (1877) (holding that allowing the public to use an experimental road surface for six years was not a public use).

[27] On intentional delay, see *infra* notes 60-66 and accompanying text (discussing "submarining" as a tactic involving intentional delays on patenting).

[28] Figure 1 shows the increase in mean years spent in prosecution. This increase is attributable to increased use of continuation practice. *See supra* notes 22-25 and accompanying text (attributing part of the increase in years spent in prosecution to continuation practice).

take decades to issue.[29] For example, U.S. Patent No. 5,966,457 claimed priority to 21 different applications and its total prosecution spanned more than forty-four years. Table 1 shows the distribution of patents as measured by the length of their prosecution from their earliest claims of priority to their issuance.[30]

Moreover, continuation applications themselves do not take significantly less time to prosecute than original applications. Intuitively, one might think that the examination time ought to decrease with each continuation since the examiner is, in theory, already familiar with the application, the prior art, and the applicant's claims. This intuition is not accurate. Patents based on one or more continuations take on average 1.86 years from the filing date of the continuation to the grant date. Patents with no earlier claims to priority (original applications) take on average 1.96 years from filing date to grant date—just thirty-six days longer. The fact that there is negligible efficiency associated with continuation examination—that prosecution takes no less time the second time around—could be due to examiner turn-over, heavy examiner caseloads,[31] or the small number of hours that examiners spend on each application over the course of several years.[32]

[29] Of course, there are a few original patent applications that take decades to issue as well, but this is due to secrecy restrictions, interferences, or Board, district court, or Federal Circuit appeals. *See, e.g.*, U.S. Patent No. 5,132,080 (an original application was filed November 28, 1944 and the patent was not permitted to issue until July 21, 1992 due to secrecy restrictions); U.S. Patent No. 6,097,812 (filed July 25, 1933 and delayed due to secrecy until August 1, 2000); U.S. Patent No. 6,130,946 (filed October 23, 1936 and delayed due to secrecy until October 10, 2000). Pursuant to 35 U.S.C. § 181, the Commissioner of the PTO must withhold the granting of any patent "[w]henever publication or disclosure . . . by the grant of a patent on an invention in which the Government has a property interest might, in the opinion of the head of the interested Government agency, be detrimental to the national security." 35 U.S.C. § 181 (2000). Although § 181 only permits the Commissioner to delay patent issuance for up to one year, the secrecy can be renewed for an unlimited number of one-year periods if it is in the interest of national security. *Id.*

[30] *See* Table 1, *infra* Appendix A. The earliest claim to priority is measured as the earliest claim to a related application on the front face of the patent. This would include continuations, *see* 35 U.S.C. § 120 (2000), continuations-in-part, *see id.*, and divisionals, *see* 35 U.S.C. § 121 (2000). It does not include foreign claims to priority under 35 U.S.C. § 119 or PCT claims (priority claims based upon the Patent Cooperation Treaty). Foreign priority claims under § 119 could delay prosecution up to one additional year and PCT claims could delay prosecution another thirty months.

[31] *See, e.g.*, Eugene R. Quinn, Jr., *The Proliferation of Electronic Commerce Patents: Don't Blame the PTO*, 28 RUTGERS COMPUTER & TECH. L.J. 121, 123 (2002) ("[P]atent examiners are simply too overworked . . . ."); John R. Thomas, *The Question Concerning Patent Law and Pioneer Inventions*, 10 HIGH TECH. L.J. 35, 100 (1995) (referring to examiners as "notoriously overworked"); Simson Garfinkel, *Patently Absurd*, WIRED, July 1994, at 104; Flavio Rose, *Patent Truths*, L.A. LAW., Oct. 2001, at 40.

[32] Although it varies by technology, examiners spend on average eighteen hours on each patent application from start to finish. Lemley, *supra* note 7, at 1496 n.3. During those

*Fig. 2: Time at PTO for Issued Patents*




The delays caused by continuation practice create significant uncertainty among competitors. Patent applications filed before 2000 were kept secret unless and until they issued as patents. As a result, competitors could not know whether patent applications were pending that might cover their products. The passage of time might reduce the risk that a patent would be issued covering a particular technology, but it could never eliminate that risk. Indeed, Stuart Graham has theorized that the use of continuations may be valuable to patentees precisely because it permits them to maintain secrecy while simultaneously benefiting from patent protection.[33] Further, if we accept the repeated statements of courts and commentators that disclosure is a central function of the patent system,[34] the delay in that disclosure is itself problematic

eighteen hours, the examiner must review the patent application, conduct a search of the prior art, compare the prior art to the claims sought, and issue at least one (and usually more) office actions either allowing or rejecting the claims. When examiners only spend eighteen hours on applications and those eighteen hours are spread over nearly two years, it is not surprising that a continuation takes almost as much time as the original application.

[33] Stuart J.H. Graham, *Hiding in the Patent's Shadow: Firms' Use of Secrecy to Capture Value from New Discoveries*, *in* CONTINUATION, COMPLEMENTARITY, AND CAPTURING VALUE: THREE STUDIES EXPLORING FIRMS' COMPLEMENTARY USES OF APPROPRIABILITY MECHANISMS IN TECHNOLOGICAL INNOVATION (forthcoming 2004) (discussing the strategic uses of continuations, one of which is to maintain secrecy).

[34] *See, e.g.*, Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 736 (2002) (mentioning that "patent rights are given in exchange for disclosing the invention to the public"); *see also* J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124,

for society.

2. Wearing Down the Examiner

Prosecutions involving one or more continuations are more complex than other sorts of prosecutions.[35] The applicant spends more time before the PTO and the examiner has more chances to evaluate the application and the prior art. This might be a good thing; if the examiner has more time to spend with an application, we might expect him to do a better job in deciding whether to issue it as a patent.[36] The key question is whether a more extensive patent prosecution translates into a more rigorous evaluation of the application by the PTO. There are reasons to be skeptical. Patent examiners have notoriously heavy caseloads,[37] and they are rewarded only for an initial response to a patent application and for finally disposing of an application.[38] As a result, an examiner has no incentive to spend more time on harder cases. Quite the contrary.[39] There is reason to worry, therefore, that when reviewing patents

142 (2001) ("The disclosure required by the Patent Act is the *quid pro quo* of the right to exclude."); Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 150-51 (1989); Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 481 (1974); W.L. Gore & Assoc. v. Garlock, Inc., 721 F.2d 1540, 1550 (Fed. Cir. 1983) ("Early public disclosure is a linchpin of the patent system."). Economists and legal scholars have also argued that disclosure is a key function of the patent system. *See, e.g.*, Donald S. Chisum, *Anticipation, Enablement, Obviousness: An Eternal Golden Braid*, 15 AIPLA Q.J. 57 (1987) (stating that disclosure is "a primary purpose" of the enablement requirement); Suzanne Scotchmer & Jerry Green, *Novelty and Disclosure in Patent Law*, 21 RAND J. ECON. 131 (1990) (assessing the costs and benefits of the patent system by relying on the value of disclosure).

[35] *See* John R. Allison & Mark A. Lemley, *The Growing Complexity of the U.S. Patent System*, 82 B.U. L. REV. 77, 80-81 (2002) (finding that patents that issue from continuation applications also tend to include more claims, cite more prior art, spend more time in the PTO, and have more inventors than patents that issue from the initial application).

[36] Allison & Lemley call this the "patent value" theory—important patents are worth a more rigorous examination. *Id.* at 139-41. By contrast, it does not make sense to subject all applications to a rigorous examination. Lemley, *supra* note 7, at 1495, 1497 (arguing that the PTO should not subject all applications to the same level of rigorous examination).

[37] *See, e.g.*, sources cited *supra* note 31 (discussing the heavy work-load on patent examiners).

[38] For a full discussion of the difficulties with the examiner incentive system, see MERGES ET AL., *supra* note 9, at 600-03 (discussing the PTO's examination budget); Arti K. Rai, *Addressing the Patent Gold Rush: The Role of Deference to PTO Patent Denials*, 2 WASH. U. J.L. & POL'Y 199, 218 (2000) (arguing for a change in the current patent examiners' incentive system to encourage them to grant patents); John R. Thomas, *Collusion and Collective Action in the Patent System: A Proposal for Patent Bounties*, 2001 U. ILL. L. REV. 305, 324 (discussing the lack of trained patent examiners in high-tech fields).

[39] Data do suggest that the PTO takes longer to issue more complex applications. A simple OLS regression showed that the number of claims and prior art references cited significantly impacted the time it took to prosecute applications. However, in each case, the impact was slight (each additional claim beyond the mean of 12.47 increases prosecution

with multiple claims and a lot of prior art, the PTO will pay less (not more) attention to each claim or piece of prior art. An applicant's ability to file continuation applications and draw the process out further exacerbates the problem. Since an examiner can only finally dispose of an application by allowing it, an examiner faced with a determined applicant has every incentive to give in and allow the patent.[40] This is especially likely since the patents that involve the most continuation applications tend to be those with more claims and more prior art than average[41]—that is, the very patents the examiner least wants to see again. Alternatively, if an applicant is faced with a determined examiner, continuation practice may allow the applicant to "wait out" the examiner and hope that the new application will be assigned to a different examiner, perhaps because the original one has quit. "Examiner-shopping" is a common practice, but the Federal Circuit has recently taken some steps to limit its abuse.[42]

If continuation applications permit the applicant to wear down the examiner—obtaining a patent that the PTO would otherwise refuse to grant—they give applicants with dubious claims to ownership intellectual property rights that they can enforce against the world. It is inevitable that the PTO will make mistakes.[43] But continuation applications may be more likely than average to result in bad patents. This is particularly troublesome for society because our empirical evidence suggests that patents based on continuation

time by 1.66 days and each additional U.S. patent prior art reference cited above the mean of 7.83 increases prosecution 2.08 days). It does not follow, however, that examiners spend more time reviewing those applications. They may simply put off the hardest tasks, concentrating first on applications that are easier to dispose of. *Cf.* DAVID POPP ET AL., TIME IN PURGATORY: DETERMINANTS OF THE GRANT LAG FOR U.S. PATENT APPLICATIONS (Nat'l Bureau of Econ. Research, Working Paper No. 9518, 2003), *available at* http://www.nber.org/papers/w9518 (last accessed Jan. 13, 2004) (examining the patent characteristics that impact grant lag).

[40] *See* Allison et al., *supra* note 23. Allison and others suggest that the PTO should change its internal processes to enable examiners to spend more time on complex applications. *Id.*

Some commentators have suggested to us that examiners might actually prefer continuation applications, since they have already learned the technology and can get disposal credits without having to do as much work. The long delay associated with continuation applications belies that claim; it scarcely seems credible that an examiner will remember enough about a case nearly two years after she last dealt with it to result in a significant time savings.

[41] *Id.*

[42] *See* Dayco Prods. v. Total Containment, 329 F.3d 1358, 1368 (Fed. Cir. 2003) (holding that taking an application to a new examiner without disclosing that a different examiner had already rejected the claims was inequitable conduct).

[43] *See* Lemley, *supra* note 7, at 1495 (describing the costs of trying to weed out all bad patents).

applications are far more likely to be litigated than other sorts of patents.[44] As a result, mistakes in issuing continuation patents are much more likely to impose social costs than mistakes with other sorts of patents.

3. Changing Claims

While some applicants file continuation applications in order to have a further opportunity to persuade the PTO to issue the claims they originally sought, others file continuation applications in order to have an opportunity to modify their claims. Applicants might want to modify their claims after filing for a variety of reasons. Some are innocuous—the applicant may simply have drafted the claims poorly in the first instance and want a second chance at drafting claims of appropriate scope. Other explanations, however, are more problematic. Inventors can keep an application pending in the PTO for years, all the while monitoring developments in the marketplace. They can then draft claims that will cover those developments.[45] In the most extreme cases, patent applicants add claims during the continuation process to cover ideas they never thought of themselves but instead learned from a competitor.[46] The most egregious and notorious example of submarine patenting is Jerome Lemelson.[47] Lemelson filed eight of the ten continuation patents with the longest delays in prosecution in our study. Those Lemelson patents spent

---

[44] Although 23% of all issued patents are based on continuations, 52% of all litigated patents are based on continuations.

[45] *See, e.g.*, MERGES ET AL., *supra* note 9, at 116. Merges et al. explain:

> [P]atent lawyers often file a continuation application just prior to the issuance of a patent, so that prosecution based on the original disclosure may continue. This is valuable where a competitor may attempt to design around a patent by adopting minor variants. In that event, it may be possible to revise the continuation application claims to cover the competitor's new variant, considerably enhancing the effective scope of the patent.

*Id.*

[46] For example, in *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1148 (E.D. Cal. 2002), the plaintiff filed a patent application covering monoclonal antibodies in 1984, a time when the technology was in its infancy. It kept various applications pending in the PTO until 1999, when it drafted new claims designed to cover not just monoclonal antibodies as they were understood in 1984, but new types of antibodies developed in the intervening 15 years, including those invented by the defendant. *Id.* at 1151-52. Another example is *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998). The patentee there amended his claims to a reclining chair to claim placing the controls for that chair in a position he never thought of, but saw for the first time on his competitor's product. *Id.* at 1479 ("Sproule admitted at trial that he did not consider placing the controls outside the console until he became aware that some of Gentry's competitors were so locating the recliner controls.").

[47] For discussion of Lemelson's patent tactics, see James W. Morando & Christian H. Nadan, *Silent Enemies*, RECORDER, May 4, 1994, at 10 (discussing submarining tactics in software patenting).

anywhere from thirty-eight to more than forty-four years in the PTO.[48]

The Federal Circuit has made it clear that the law permits the drafting of claims written during prosecution specifically in order to cover a competitor's products. In *Kingsdown Medical Consultants v. Hollister*,[49] the court explained:

> It should be made clear at the outset of the present discussion that there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application. Any such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in the marketplace is simply irrelevant and cannot of itself evidence deceitful intent.[50]

To be sure, applicants do not simply have carte blanche to rewrite their claims. The new claims must find adequate support in the original application. If not, the patent will be invalid for lack of enablement or written description,[51] or alternatively, the new claims will be considered "new matter" invented only as of the date the claims were added.[52] If the patentee can find some support in the original patent application for the current claims, however, she can obtain legal rights over ideas that (at least in that form) never occurred to her until she saw what others were already doing.

It makes some sense for the law to permit correction of claim drafting errors. Words are notoriously imperfect at defining inventions.[53] But we do not need

[48] Some of Lemelson's patents and their delays are as follows: U.S. Patent No. 5,966,457 (21 related applications, 44.33 years in prosecution); U.S. Patent No. 5,570,992 (30 related applications, 42.28 years in prosecution); U.S. Patent No. 5,491,591 (8 related applications, 40.67 years in prosecution); U.S. Patent No. 5,351,078 (12 related applications, 39.76 years in prosecution); U.S. Patent No. 5,283,641 (11 related applications, 39.11 years in prosecution); U.S. Patent No. 5,281,079 (29 related applications, 39.50 years in prosecution); and U.S. Patent No. 5,249,045 (10 related applications, 38.76 years in prosecution).

[49] 863 F.2d 867 (Fed. Cir. 1988).

[50] *Id.* at 874; *accord* State Indus., Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1235 (Fed. Cir. 1985) (finding it proper to keep track of one's competitor's products and modify one's patent claim in light of those products).

[51] This was the fate of the claim changes in *Gentry Gallery, Inc.*, 134 F.3d at 1479 (holding claim invalid for lack of written description), and *Chiron Corp.*, 268 F. Supp. 2d at 1166 (denying Chiron's motion for judgment as a matter of law because the "parent applications fail[ed] to meet the written description requirement").

[52] 35 U.S.C. § 132(a) (2000) ("No amendment shall introduce new matter into the disclosure of the invention.").

[53] *See* Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 731 (2002) ("[T]he nature of language makes it impossible to capture the essence of a thing in a patent application."). *See generally* Nard, *supra* note 5 (discussing the different theories of claim

continuation practice in order to achieve this goal. Instead, a patentee dissatisfied with her claims can rewrite those claims in a reissue proceeding.[54] A patentee may seek a reissue at any time to narrow her claims, or within two years of the original issue date if she wishes to broaden them.[55] In addition, the doctrine of equivalents exists to prevent a patent owner from losing effective protection because she did not draft claims that effectively cover what she invented.[56] That doctrine permits a patentee to argue that an accused infringer's device should be adjudged infringing, even though it does not literally fit within the language of the claims, because the differences between the claims and the accused device are "insubstantial."[57] Together, these doctrines are sufficient to solve any legitimate problems with poorly drafted claims.

Permitting patentees to change claims to track competitor's products invites abuse of the system.[58] This practice seems fundamentally unfair, since a competitor who was legitimately the first to invent a particular device or process may be held to have infringed on a patent claim written after (and indeed because of) that invention. It also seems inconsistent with the fundamental economic justification for the patent system, which is to encourage new inventions. As commentators have noted, the patent system must balance encouraging pioneering inventions and encouraging improvements.[59] Strategic claim changes may hold-up legitimate improvers or

---

interpretation that the Federal Circuit has adopted to deal with the inherent ambiguity of language).

[54] 35 U.S.C. § 251 (2000) (providing a patentee the right to have her patent reissued so long as she does not seek to broaden her claims after more than two years).

[55] *Id.*

[56] *See* Graver Tank & Mfg. Co. v. Linde Air Prods., 339 U.S. 605, 608-09 (1950) (holding that the doctrine of equivalents prevents alleged infringers from achieving the benefit of inventions by obtaining the same result using a device that performs substantially the same function in substantially the same way).

[57] *See* Hilton Davis Chem. Co. v. Warner Jenkinson Co., 62 F.3d 1512, 1518 (Fed. Cir. 1995) (en banc) (holding that the application of the doctrine of equivalents depends on the substantiality of the differences between claimed and accused products), *rev'd on other grounds*, 520 U.S. 17 (1997).

[58] Regarding the general problem of abusive intellectual property litigation entered into in order to hold-up competitors, see Michael J. Meurer, *Controlling Opportunistic and Anticompetitive Intellectual Property Litigation*, 44 B.C. L. REV. 509 (2003) (analyzing two methods of controlling rent-seeking costs associated with opportunistic and anticompetitive intellectual property lawsuits).

[59] *See, e.g.*, Mark A. Lemley, *The Economics of Improvement in Intellectual Property Law*, 75 TEX. L. REV. 989 (1997) (describing the difficult distinction between improvers and imitators); Robert P. Merges & Richard R. Nelson, *On the Complex Economics of Patent Scope*, 90 COLUM. L. REV. 839, 843 (1990) ("[O]ur approach . . . is a broadening of what counts as an incentive to invent or as a social cost of issuing patents."); Suzanne Scotchmer, *Standing on the Shoulders of Giants: Cumulative Research and the Patent Law*, 5 J. ECON. PERSP. 29, 30 (1991) (highlighting difficulties in the optimal allocation of rights between

independent inventors, reducing their ability and incentive to innovate.

4. Submarine Patents

A related problem to changing claims is intentional delay in the issuance of patents designed to take a mature industry by surprise. A number of patentees have used the continuation process to delay the issuance of their patents indefinitely. By doing so, they obtain a patent that may be more valuable than one that issued in the early stages of a new industry. This value may come from the growth of the market over time: the broad patents the Wright brothers obtained on aircraft would presumably bring in more revenue if in force today than they did one-hundred years ago.[60] Alternatively, the value may come from the ability to capture specific investments made by competitors who assumed with the passage of time that a technology was in the public domain. Once a semiconductor company has invested two- to four-billion dollars in a new fab,[61] it will be willing to pay more for the right to use that fab than if approached for a license ex ante.[62] Intentional delay to increase the value of the resulting patent is referred to as "submarine patenting" because the patents surface unexpectedly and take competitors by surprise.

Submarine patenting depends heavily on continuation practice. Without the ability to abandon and refile applications an unlimited number of times, even in the face of a decision by the PTO to allow the patent, submarine patentees

pioneers and improvers).

[60] On the Wright brothers' patents and their litigation, see Richard P. Hallion, *The Wright Brothers: How They Flew*, 19 AM. HERITAGE INVENTION & TECH., *available at* http://www.inventionandtechnology.com/2003/02/wright.shtml (last accessed Jan. 13, 2004) (tracing the Wright brothers' technological achievements during the development of their plane).

[61] *See* Steve Lohr, *World-Class Chip, but a Fragile Business*, N.Y. TIMES, Aug. 4, 2003, at C1 (stating that fabs cost two- to three-billion dollars each); Mark LaPedus, *Leading-edge Fab Costs Soar to $4 Billion*, *at* http://www.siliconstrategies.com/story/OEG20030310S0067 (last accessed Nov. 3, 2003) (estimating cost of a next-generation semiconductor fab at four-billion dollars).

[62] This is not simply because the semiconductor company fails to understand the economic concept of sunk costs, though surprisingly few people do. Before investment, the semiconductor company likely faces a choice of alternative technologies, and the value of a patent on one of those alternatives is constrained by the ability to choose the other. By contrast, once a large investment has been made in using the patented technology, it will often become uneconomical to switch to the other technology. As a result, the patentee will have substantial bargaining power if the patent is not disclosed until after the investment has been made. An analogous problem arises where patent owners withhold information from standard-setting organizations in an effort to encourage that investment. *See generally* Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 CALIF. L. REV. 1889 (2002) (examining the effect of standard-setting organizations on intellectual property rights); Mark R. Patterson, *Inventions, Industry Standards, and Intellectual Property*, 17 BERKELEY TECH. L.J. 1043 (2002) (exploring options for changing the existing law to avoid this problem).

like Jerome Lemelson would not be able to delay the issuance of their patents. Submarine patenting also depended significantly on two other long-standing rules in U.S. patent law that have now been modified: the fact that a patent, once issued, lasted for seventeen years from the date of issue regardless of when it was filed, and the fact that applications were kept secret until they issued as patents. Secrecy permitted submarine patents to surprise the industry, and the invariability of the patent term meant that the patentee did not give up any protection by delaying issuance of the patent. Both rules were changed in the 1990s. Congress changed the patent term in 1995 from seventeen years from issue to twenty years from the filing of the first application.[63] As a result, every year a patentee delays prosecution of its application is a year of protection lost. In 1999, Congress required publication of many (though not all) patent applications eighteen months after the application is filed.[64] This makes secrecy of submarine patents difficult to maintain. While these legislative changes have significantly ameliorated the problem of submarine patents for applications filed after 1995, they have not eliminated the problem entirely, as we discuss below.

There is no social benefit whatsoever to submarine patents. They extend the effective life of patents, permit patentees to hold-up competitors who have made investments in plant capacity, and upset the settled expectations of manufacturers in a variety of industries. They do nothing to encourage innovation and indeed, on balance, they probably discourage it.[65] Abolishing continuations would make it far more difficult to engage in submarine patenting.[66]

---

[63] 35 U.S.C. § 154(a)(2) (2000). The statute states:

> [A] grant shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed . . . or, if the application contains a specific reference to an earlier filed application or applications . . . from the date on which the earliest such application was filed.

*Id.*

[64] 35 U.S.C. § 122(b)(1)(A) (2000) ("[E]ach application for a patent shall be published . . . promptly after the expiration of a period of 18 months from the earliest filing date for which a benefit is sought under this title.")

[65] Transferring revenues to a patentee will increase the reward to patenting, but it will not necessarily support innovation. It may instead support the activities of "inventors" like Jerome Lemelson, whose primary focus was in drafting patents rather than promoting the progress of the useful arts.

[66] Submarine patentees might also delay issuance of patents by provoking interferences (administrative trials between two or more applicants who claim to have invented the same thing) or by using the internal PTO appeals process rather than continuations to challenge rejections. Both approaches are risky, though, because they may result in a loss of all patent rights and because, at least in the Federal Circuit, the patentee will have an adversary arguing against patentability. Before the Board, by contrast, the examiner is entitled to write a brief defending her decision, but often fails to do so and in any event does not argue the case to the Board. Unlike someone using continuations, the loser in an appeal or interference cannot simply refile and try again.

5. Evergreening

A final problem with continuation applications is that they can result in multiple patents covering the same invention. Patentees regularly use continuation applications not just to fight repeatedly for the issuance of a single patent, but also to obtain a narrow patent relatively quickly while continuing to argue for a broader one.[67] Of the more than two-million patents in our dataset, 23.3% claim priority to one or more earlier filed applications and 42.3% of these patents with earlier claims of priority had at least one other patent in the chain issue.[68] Continuation applications are an important part of this practice because they permit a patentee to claim the same priority date for both patents, thus avoiding having one patent serve as prior art invalidating the other.[69] This practice is known as "double patenting," and the law has evolved a complex set of rules to deal with it. Stripped to its essence, the rule is that a patentee cannot obtain two or more patents that cover precisely the same thing.[70] A second patent that covers precisely the scope of the first is invalid for double patenting, even if they stem from the same application. By contrast, if the second patent is not precisely the same as the first, but covers an invention that would be obvious (and therefore unpatentable) in view of the first, the rule is different. The doctrine of "obviousness-type double patenting" permits the grant of two or more patents to the same inventor,[71] but requires that the patents expire on the same day in order to prevent the extension of

[67] *See* MERGES ET AL., *supra* note 9, at 116 ("Typical prosecution strategy is to take the bird in the hand and fight over the contested claims separately."); Wegner, *supra* note 21, at 742 (suggesting that patentees do this "all the time").

[68] The Quillen et al. study found that 31% of the patents that issued based on a continuation application also had a patent issue from the parent application. Quillen et al., *supra* note 22, at 38 (discussing this finding). The study was based on a sample of only 1000 patents, while the data presented in this study has been compiled from all 2,224,379 issued patents from 1976-2000. *Cf.* Allison et al., *supra* note 23 (observing that, while non-litigated patents each had on average only 0.22 "relatives" (other patents issued from applications in the same family chain), litigated patents each had 0.85 relatives on average).

[69] An issued patent can invalidate a subsequently filed application if it issues more than a year before the new application is filed. *See* 35 U.S.C. § 102(b) (2000) (stating that a patent can be denied if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent").

[70] *See infra* note 92 (discussing the rules of double patenting).

[71] If inventorship is not the same but overlapping, two different patents are generally treated as unrelated. An important exception is 35 U.S.C. § 103(c) ("Subject matter developed by another person . . . shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person"), which was amended in 1984 to provide that if different inventors work for the same company, their unpublished inventions will not be prior art against each other for purposes of finding the later invention obvious. *Id.*

patent rights beyond the lawful term of the first patent.[72] The law has traditionally accomplished this by having the patentee disclaim part of the term of the second patent,[73] but with the shift to a patent term measured from the first filing date, the problem will generally take care of itself.

While the doctrine of obviousness-type double patenting solves the worst problem with obtaining multiple patents, double patenting has still had harmful consequences in the pharmaceutical industry. Under the Hatch-Waxman Act, a pharmaceutical patent owner is entitled to list its patents with the FDA in the "Orange Book."[74] A generic company that wants permission from the FDA to make a drug covered by a patent in the Orange Book must certify that the patent is invalid or that the drug will not infringe the patent.[75] Once the generic makes such a certification, the patent owner can sue the generic for infringement and obtain an automatic thirty-month stay preventing the generic from entering the market.[76] Pharmaceutical patent owners have used the continuation process to obtain multiple patents covering obvious variants of the same drug, and have listed each of those patents in the Orange Book at different times.[77] The result has been that the pharmaceutical company could obtain not one, but many sequential thirty-month stays. This practice is known as "evergreening."[78] It serves no useful social purpose and reflects a rather

---

[72] *In re* Goodman, 11 F.3d 1046, 1052 (Fed. Cir. 1993) ("To prevent extension of the patent right beyond statutory limits, the doctrine of obviousness-type double patenting rejects application claims to subject matter different but not patentably distinct from the subject matter claimed in a prior patent.").

[73] Ortho Pharm. Corp. v. Smith, 959 F.2d 936, 940 (Fed. Cir. 1992) ("Unlike 'same-invention' double patenting, obviousness-type double patenting can be overcome by filing a terminal disclaimer.").

[74] 21 U.S.C. § 355(j)(7)(A)(iii) (2000) (permitting patent information "respecting a drug included on the list" to be published). For a good overview of the provisions of the Hatch-Waxman Act, see generally Thomas F. Cotter, *Refining the "Presumptive Illegality" Approach to Settlements of Patent Disputes Involving Reverse Payments*, 87 MINN. L. REV. 1789 (2003).

[75] 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (mandating that an application for a new drug based on an already approved but patented drug contain a certification "that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted").

[76] 21 U.S.C. § 355(j)(5)(B)(iii) (stating that if a patent owner brings an action for infringement against a new drug manufacturer, approval of the new drug will be effective only after the expiration of a mandatory thirty-month period).

[77] *See, e.g.*, *In re* Biovail Corp., No. 011 0094, 2002 WL 727033 (F.T.C. April 23, 2002) (consent decree settling antitrust charges related to sequential listing of patents covering Tiazac in the Orange Book); 2 HERBERT HOVENKAMP ET AL., IP AND ANTITRUST § 33.9 (2003) (discussing cases involving this practice).

[78] *See, e.g.*, Lara J. Glasgow, *Stretching the Limits of Intellectual Property Rights: Has the Pharmaceutical Industry Gone Too Far?*, 41 IDEA 227, 233-35 (2001) (pointing out the loopholes in the Hatch-Waxman Act that pharmaceutical companies exploit to extend the life of their patents); Christine S. Paine, *Brand-Name Drug Manufacturers Risk Antitrust*

blatant gaming of the Hatch-Waxman rules for pharmaceutical patents.

The existence of continuation applications facilitates evergreening. Evergreening without using continuations is possible, but it would be much more difficult, since the patentee would have to file multiple applications on the same day but manage to draw one prosecution out much longer than another without using continuations. Abolishing continuations would help end the practice. There may be other ways to solve the problem, however. Evergreening has been challenged as an antitrust violation, though courts generally have not been receptive to these claims.[79] Legislation enacted by Congress at the end of 2003 closed the Hatch-Waxman loophole by requiring that patentees obtain no more than one thirty-month stay per product, no matter how many patents they list in the Orange Book.[80] Such statutory or antitrust solutions would be largely unnecessary, however, if continuations were abolished.

B. *Attempts to Combat the Problems Created By Continuations*

The abuse of continuation practice has led to a number of legislative and judicial efforts to solve the problems by indirect means. Congress has changed the patent term, required that patent applications be published before they issue, and is considering changing the Hatch-Waxman rules for pharmaceutical patent litigation. The Federal Circuit has created an entirely new doctrine (prosecution history laches) and revived another (the written description doctrine). The PTO is considering a proposal to change the way it charges fees in order to discourage the filing of multiple continuation applications. All this was done in order to combat some of the evils of continuation applications. This section briefly reviews those legal changes. We note that they have not been completely effective in preventing abuse of continuation practice, and that the new doctrines in turn create problems of their own. It is also important to note that approximately 1.3 million issued patents in the dataset were filed before the term change and could still be in force today with a term of seventeen years from issuance.[81] Suffice it to say that despite the legal

*Violations By Slowing Generic Production Through Patent Layering*, 33 SETON HALL L. REV. 479, 497 (2002) (defining the tactic of evergreening as a strategy to extend monopoly); Frederick Tong, *Widening the Bottleneck of Pharmaceutical Patent Exclusivity*, 24 WHITTIER L. REV. 775, 787-88 (2003) (discussing the legitimate and problematic purposes of evergreening).

[79] *See* Paine, *supra* note 78, at 507 (arguing that evergreening involves petitioning the government for patent rights, and so is likely to be protected from antitrust scrutiny by *Noerr-Pennington* immunity).

[80] Greater Access to Affordable Pharmaceuticals Act of 2001, S. 812, 107th Cong. (2002) (proposing to amend the Food, Drug, and Cosmetic Act to provide better access to generic drugs). The bill was signed into law as part of the Medicare bill on December 8, 2003. *See* The Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173 (to be codified as amended in scattered sections of 42 U.S.C.).

[81] Since patents may expire because their owners fail to pay their maintenance fees, and

changes we describe here, there remains both a large pool of potential submarine patents still in force and a continued potential for abuse of the continuation process in new applications.

1. Changing the Patent Term

The adoption of the twenty-year patent term for applications filed beginning in 1995[82] reduces the incentives to extend prosecution through continuation practice. Under pre-1995 law, a patent was given seventeen years of protection regardless of how long it took to obtain. Because the new patent term is measured twenty years from the date the first application is filed, applicants who spend significant time in prosecution lose an equivalent amount of time from the patent term.[83] This reduces the incentive to engage in long-duration continuation practice, and eliminates entirely the incentive to continue an application for more than twenty years.

While the patent term change undoubtedly reduces the incentive to submarine patent, continuation practice has continued to be problematic. A recent study by Graham and Mowery finds that the use of continuations rose from approximately 12% of all applications in the late 1980s to 30% of all applications by the mid-1990s. By the late 1990s, after the patent term changed, the number of continuations had fallen somewhat to 20%, but was still well above its historic levels.[84] Some of the problems that remain are

indeed approximately two-thirds of all patents eventually do so, *see* Lemley, *supra* note 7, at 1503 (finding that "nearly two-thirds of all issued patents lapse for failure to pay maintenance fees before the end of their term: nearly half of all patents are abandoned in this way before their term is half over"), there are no accurate calculations presently available for the number of enforceable patents at any given time. While we can calculate the number of patents filed before June 8, 1995 which have yet to expire due to term end, and can therefore get an idea of the maximum number of potentially enforceable patents (1,300,000), we cannot calculate the exact number that are still enforceable or the number of potential submarine patents in that group. One of the authors, however, is currently studying patents that expire due to failure to pay maintenance fees and what can be learned from them. Kimberly A. Moore, *Worthless Patents* (on file with author).

[82] 35 U.S.C. § 154(a)(2) (2000) ("[A] grant shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed . . . or, if the application contains a specific reference to an earlier filed application or applications . . . from the date on which the earliest such application was filed.").

[83] This statement is no longer entirely accurate. Congress changed the law in 1999 to give back some patent term where the PTO was responsible at least in part for the time spent in prosecution. 35 U.S.C. § 154(b) (describing situations and providing procedures for the adjustment of patent terms). Nonetheless, applicants get less protection the more time they spend in prosecution.

[84] Stuart J.H. Graham & David C. Mowery, *Submarines in Software? Continuations in U.S. Software Patenting in the 1980s and 1990s*, ECON. INNOVATION & NEW TECHS. (forthcoming 2004), *available at* http://faculty.haas.berkeley.edu/graham/jobmarket/graham_moweryEINT.pdf (last accessed Jan. 13, 2004) (providing a graph charting

transition issues. The twenty-year patent term applies only to applications filed after June 7, 1995,[85] and indeed there was a rush to file applications before that deadline.[86] As discussed earlier, there could be as many as 1.3 million issued, enforceable patents that exist under the old patent term.[87] Those patents will slowly dwindle over time.

Even beyond the transition period, submarine patenting can be expected to continue. While an applicant faced with the twenty-year term would not have any incentive to delay her prosecution twenty years or more, since she would lose the entire period of exclusivity, a patentee may well have an incentive to sacrifice, say, ten years of patent term in order to capture an industry by surprise. This is particularly true in industries such as pharmaceuticals or biotechnology, where the main economic value of a patent comes late in the patent, after FDA approval.[88] The PTO has several means of categorizing an invention according to its technological field. Broadly, all inventions are classified into "technology centers" (of which there are 7); more narrowly, inventions are classified into a "technology class" (of which there are 464). Within technology classes there are further levels of subclassification.[89] Table 2 demonstrates that the frequency of continuation practice varies by technology center, with the highest percentage of continuations filed in the Biotechnology and Chemical areas. Table 2 also shows the corresponding delay in prosecution caused by these continuations.[90]

---

continuation patents as a share of issued patents from 1987 through 1999).

[85] Uruguay Round Agreements Act, Pub. L. No. 103-465, § 532, 108 Stat. 4809, 4984 (1994) (amending 35 U.S.C. § 154 to provide a patent term of twenty years). Applications filed or patents in force before June 7, 1995 are entitled to the longer of the two term options. Any continuations or divisionals filed after June 7, 1995 have the term twenty years from earliest claimed filing date. *See* MANUAL, *supra* note 11, § 2701 (explaining the application of the amended patent term).

[86] *See* Allison & Lemley, *supra* note 20, at 2119 & n.66 (documenting this effect); Quillen et al., *supra* note 22, at 39-42 figs.1-4 (documenting the spike in filings in 1995).

[87] *See supra* note 81 (estimating that there are 1.3 million patents in force that were filed before June 8, 1995).

[88] *See, e.g.*, Allison et al., *supra* note 23. As a result, it is not surprising that patentees in those industries are particularly likely to use continuation applications.

[89] We recognize that the PTO's classification system for delineating inventions by technology is far from perfect. For example, there is no single technology class or center that contains all software; rather, software inventions may be found in many different classes. For criticisms of the PTO's technology classifications system, see Allison et al., *supra* note 23 (explaining that the PTO classification system was "never intended to provide conceptual delineations of technology areas, but instead identify inventions by function at very low levels of abstraction in order to serve as aids to prior art searching"). In an ideal world, we would classify each patent by hand into the proper area of technology. With a database of over two-million patents that is, of course, unrealistic. The reader should be aware that the broad technology classes we discuss here do not map perfectly the actual industry boundaries.

[90] While length of prosecution is affected by continuation practice, factors such as

*Table 2: Continuation Filing By Technology Center*

| Tech Center # | Tech Center | % of Applications that are Continuations | Length of Prosecution (Yrs) |
|---|---|---|---|
| 1600 | Biotechnology and Organic Chemistry | 43% | 3.34 |
| 1700 | Chemical and Materials Engineering | 30% | 2.54 |
| 2100 | Computer Architecture, Software, and Information Security | 25% | 3.17 |
| 2600 | Communications | 21% | 2.75 |
| 2800 | Semiconductors, Electrical and Optical Systems and Components | 18% | 2.28 |
| 3600 | Transportation, Construction, Electronic Commerce, Agriculture, National Security | 15% | 2.20 |
| 3700/2900 | Mechanical Engineering, Manufacturing, and Products and Designs | 20% | 2.21 |

Another reason why the twenty-year term will not eliminate abuse of continuations is that a patent applicant who obtains a patent in order to hold-up a mature industry may not be as concerned about the length of the exclusion right as they are about taking the industry by surprise. For such a patentee, it may be worth foregoing some years of royalties if they can coerce licensing payments from companies who have already made asset-specific investments in the technology that is ultimately patented.[91] In addition, the ability of a

technology class, number of claims, and the number of prior art references also affect it. *See infra* notes 210-212 and accompanying text (discussing the factors that impact length of prosecution).

[91] For a discussion of co-specific assets that correlate with inventions and that companies can appropriate, see David J. Teece, *Profiting from Technological Innovation: Implications for Integration, Collaboration, Licensing and Public Policy*, 15 RES. POL'Y 285, 288-90 (1986) (explaining that the owners of complementary assets, rather than owners of intellectual property, often receive the profits of innovation). For a more specific example of how such asset-specific investments can facilitate hold-up by patent lawyers, see Patterson, *supra* note 62 (noting that patent owners can demand a higher royalty rate once their inventions have been incorporated in industry standards).

patentee to obtain an early patent in a quick prosecution and also to keep a continuation application pending means that the patentee need not forego all protection while the continuation application is pending, but could enforce the narrow patent while waiting to issue a broad one.[92]

While the twenty-year term measured from filing date does help minimize submarine patenting or at least limits the amount of time these patents can stay under, it does not eliminate the harmful impact of the surprise on the maturing industry of an intentionally delayed patent. Moreover, if the twenty-year term were absolute, it would disadvantage some innocent applicants whose prosecutions are delayed for legitimate grounds or through no fault of their own. Responding to this concern, Congress created exceptions to the twenty-year term that permit patent term choice,[93] restorations of lost term,[94] adjustments in the calculation of patent term,[95] and extensions of patent term.[96]

---

[92] Patent law does forbid so called double-patenting, at least where the two patents claim the identical invention. Gen. Foods Corp. v. Studiengesellschaft Kohle mbH, 972 F.2d 1272, 1280-81 (Fed. Cir. 1992) ("[T]he same invention cannot be patented more than once;" otherwise "a second patent . . . would expire some time after the original patent and extend the protection time-wise.").

Patent law also restricts the patenting of obvious variants on an existing invention under the judicially created doctrine of "obviousness-type double patenting." *In re* Goodman, 11 F.3d 1046, 1052-53 (Fed. Cir. 1993) (discussing the doctrine of obviousness-type double patenting). Interestingly, the obviousness-type double patenting rules developed in ways that punished applicants who intentionally delayed prosecution, but not those whose prosecution was delayed because of PTO mistakes. *Compare In re* Emert, 124 F.3d 1458, 1461-62 (Fed. Cir. 1997) (holding that, where the defendant "orchestrated the rate of prosecution for the two applications," the claims of his second patent were unpatentable under the obviousness-type double patenting doctrine), *with In re* Braat, 937 F.2d 589, 594 (Fed. Cir. 1991) (stating that the court must apply a different standard where it was not the defendant's fault that one patent issued before the other). Because obviousness-type double patenting can be cured by disclaiming the period of protection after the expiration of the first patent, *see* Ortho Pharm. Corp. v. Smith, 959 F.2d 936, 940 (Fed. Cir. 1992) ("Unlike 'same-invention' double patenting, obviousness-type double patenting can be overcome by filing a terminal disclaimer."), it no longer has much relevance since the patent term was changed to run twenty years from the filing of the first application.

[93] Any patent filed before June 7, 1995 and still pending gets the longer of the two patent terms. *See supra* note 82-87 and accompanying text (discussing the effect of statutory changes to the patent term).

[94] 35 U.S.C. § 155A (2000) (providing for patent term restoration where the FDA stayed approval of the patented product inhibiting the patentee's utilization of their exclusive patent term).

[95] 35 U.S.C. § 154(b) (2000) (providing for adjustment in patent term where delays are attributable to the PTO). There are even appeal procedures for disputes regarding the appropriate amount of patent term adjustment. *Id.* § 154(b)(4) (providing that an applicant dissatisfied with a term adjustment made under the statute can file a civil action in the U.S. District Court for the District of Columbia).

[96] 35 U.S.C. § 155 (providing for patent term extensions where the FDA stayed approval

As a result, one cannot tell when a patent expires without complicated patent term calculation and resort to the patent's prosecution history. These deviations from the twenty-year term may further reduce its effectiveness in dealing with abuse of the continuation process.

2. Publishing Patent Applications

A second legislative attempt to control submarine patenting is the new requirement that patent applications be published eighteen months after they are filed.[97] Publishing pending applications in theory reduces uncertainty, since it gives competitors an opportunity to find out who has pending patent applications. In practice, however, the anemic publication rules in U.S. patent law are unlikely to have much effect. Congress significantly weakened the eighteen-month publication rule before passing it in 1999. The statute requires publication only of those applications that will also be filed abroad.[98] Because the rest of the world already required publication eighteen months after filing,[99] the U.S. publication requirement will result in little or no increase in the information that is published. Applications that were already published abroad will now be published in the United States as well, but applications that were not filed or published abroad need not be published in the United States either.[100] Because many submarine patentees are individuals who do not file

of the patented product inhibiting the patentee's utilization of their exclusive patent term); 35 U.S.C. § 156 (2000) (providing for patent term extensions when a product covered by the patent claims has been subject to regulatory review).

[97] 35 U.S.C. § 122(b) (2000) (mandating that patent applications be published unless one of the stated exceptions apply).

[98] 35 U.S.C. § 122(b)(2)(B)(i) ("If an applicant makes a request upon filing, certifying that the invention disclosed in the application has not and will not be the subject of an application filed in another country . . . the application shall not be published."). Indeed, the statute provides that a patentee does not have to publish any material that she is not already obligated to publish abroad. *Id.* § 122(b)(2)(B)(v) (providing that, if a foreign filed application "is less extensive than the application or description of the invention in the application filed in the Patent and Trademark Office," the applicant can submit a redacted application, and the PTO may only publish that copy). Thus, it essentially adds nothing to what was already being published outside the United States. Moreover, design patents, provisional applications, and applications no longer pending (abandoned or not issued) are not published. *Id.* § 122(b)(2)(A)(i)-(iv) (listing exceptions to the publication rule).

[99] *See, e.g.*, Charles R. McManis, *Intellectual Property, Genetic Resources and Traditional Knowledge Protection: Thinking Globally, Acting Locally*, 11 CARDOZO J. INT'L & COMP. L. 547, 565 n.85 (2003) (discussing "the requirement in most national patent systems that patent applications be published eighteen months after they have been filed").

[100] Early evidence from the PTO suggests that most applications are being published, presumably including some that are not also filed abroad. But the abusers of continuation practice—those who engage in submarining or changing claims—will have an incentive to avoid publication.

abroad,[101] they will not be deterred by the eighteen-month publication rule. Further, our data show that individual domestic inventors, who are least likely to patent abroad, are the most common users of the continuation system. There are 854 patents that took twenty years or longer in prosecution,[102] and 26% of these patents issued to U.S. individuals.[103]

Even for those applications that are published, the fact that the patent has not issued means that competitors still face significant uncertainty. A competitor can find out that an application is pending, but cannot know for sure whether a patent will issue[104] and, until the patent issues, what the scope of its claims might be.[105] Moreover, even if publication of the original application occurs, it currently requires significant effort to get access to the ongoing prosecution record.[106] Hence, publication will not solve the problem of changing claims to track competitors. If the patentee changes claims over time, those changes may take the market by surprise even if competitors read the published applications.[107] Publication is also limited in scope: there is no publication of

---

[101] For example, none of the fifty patents with the longest delays claim priority to any foreign filings. Foreign filings may have been made after the U.S. patent filing, however, a possibility that our dataset does not allow us to determine.

[102] *See* Table 1, *infra* Appendix A.

[103] By contrast, U.S. individuals obtain only 18% of all issued patents.

[104] To be sure, it is a pretty good bet that the patent will ultimately issue. Quillen et al. demonstrate that the PTO issues patents on about 85% of the application chains it receives, far more than the European or Japanese patent offices. Quillen et al., *supra* note 22, at 38 (determining that the PTO issues patents on over 85% of application chains filed when continuations are taken into account).

[105] Patent claims are often amended during prosecution, *see* ROBERT P. MERGES, PATENT LAW AND POLICY 51 (3d ed. 2002) (noting that applicants often amend specifications and claims during patent prosecution), and one of the reasons to file a continuation application is to get a chance to argue for claims different from those in the original application. *See supra* notes 45-59 and accompanying text (discussing the use of continuation applications to allow for opportunities to amend claims).

[106] The PTO has "laid open" the patent prosecution at its offices in Virginia, but does not publish the prosecution history of pending applications or make the information available electronically. The only way to obtain such information is to show up at the PTO and request it. Beginning in 2004, however, the PTO's "PAIR" system promises to make electronic file wrappers for published applications open to the public. This system, when implemented, will be a significant advance in accessibility of patent applications.

[107] Many of the patents with the longest delays did have a relative in the chain of priority issue at some point during prosecution. While this would give the public access to the specification of the patent that issued including the written description and the claims, the public has no way of knowing that the applicant would later seek broader claims. The issuance of a patent in the chain with narrow claims, like the publication of an application with narrow claims, can actually mislead the public. Accordingly, we believe that intervening rights ought to arise in these circumstances. *See infra* notes 191-201 and accompanying text (proposing that intervening rights be used when a competitor adopts her technology prior to the issuance of the continuation patent).

provisional applications,[108] design patents,[109] applications subject to secrecy, or applications that are no longer pending.[110]

Further, while publication provides competitors with an opportunity to see what applications are pending, it does not necessarily follow that competitors will take advantage of that opportunity. There are strong incentives for competitors *not* to read patents or published patent applications. Reading a patent puts a company on notice of possible infringement, triggering an obligation to pay for an expensive written opinion of counsel or risk treble damage liability and attorneys' fees as a willful infringer.[111] Companies often advise their employees not to read patents;[112] even if this is good advice, it plays into the hands of submarine patentees.

3. Increased Use of the Written Description Requirement

In recent years, the Federal Circuit has attempted to curtail abusive continuation practice by strengthening the written description requirement.[113] Section 112 requires that a patent contain a written description of the invention the applicant seeks to claim.[114] For continuation applications, the originally

---

[108] *See* 35 U.S.C. § 111(b) (2000) (defining provisional applications).

[109] *See* 35 U.S.C. § 171 (defining design patents).

[110] 35 U.S.C. § 122(b)(2)(A) (listing the exceptions to the publication rule).

[111] For more on this remarkable doctrine, see Mark A. Lemley & Ragesh K. Tangri, *Ending Patent Law's Willfulness Game*, 18 BERKELEY TECH. L.J. (forthcoming Fall 2003); Matthew D. Powers & Steven C. Carlson, *The Evolution and Impact of the Doctrine of Willful Patent Infringement*, 51 SYRACUSE L. REV. 53, 71 (2001) (tracing the emergence of an affirmative duty rule in patent infringement). The Federal Circuit recently granted en banc review to consider the willfulness doctrine. *See* Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 344 F.3d 1336 (Fed. Cir. 2003).

[112] Companies often advise their scientists not to read patents at all for fear of being determined to be willful infringers. *See, e.g.*, Lemley & Tangri, *supra* note 111. Applicants may have an incentive to put competitors on notice of published patent applications as soon as possible to take advantage of a right to collect pre-issuance royalties from those who copied the published applications. *See* 35 U.S.C. § 154(d)(1) (including in a patent the right to collect a reasonable royalty from anyone who makes or sells the invention in the published patent).

[113] *See, e.g.*, Brian Wm. Higgins, Note, Reiffin *and the New Economy: Rethinking the Use of the Written Description Requirement to Curb Submarine Patent Tactics*, 11 FED. CIR. B.J. 23, 24-25 (2001-2002) (arguing that, although the written description requirement has become "the latest weapon against these so-called submarine patent tactics," "the test is fraught with imperfection, and adds confusion rather than clarity to the submarine patent problem").

[114] 35 U.S.C. § 112. Section 112 states:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

*Id.*

filed specification must meet the § 112 written description requirement for the newly filed claims. The purpose of this requirement is to ensure that the applicant claiming priority to an earlier-filed application possessed the invention and made this possession clear in her original specification. In circumstances where the original application does not disclose the invention sought to be claimed in the continuation application, those continuation claims are invalid for failing to satisfy the written description requirement.[115]

In the main, the written description requirement exists to combat continuation abuse. The focus of the doctrine on claims changed during prosecution is consistent with a desire to eliminate one of the core harms of continuation practice, the drafting of new claims designed to capture inventions first made by competitors. The Federal Circuit has also expanded the written description requirement beyond continuation cases by holding that even originally filed claims can fail the written description requirement, at least in the biotechnology field.[116] The strengthening and evolution of the

[115] *See, e.g.*, Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330-31 (Fed. Cir. 2003) (summarizing the written description requirement with respect to future claims); Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc., 291 F.3d 1317, 1322 (Fed. Cir. 2002) (finding that the written description requirement was satisfied where the original application included a drawing of the invention claimed); Hyatt v. Boone, 146 F.3d 1348, 1352 (Fed. Cir. 1998) (explaining that, when seeking to rely on an earlier filing date, the earlier application must satisfy the written description requirement); Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1479-80 (Fed. Cir. 1998) (holding that the claims added during prosecution to read on competitor's device were invalid for failing to satisfy the written description requirement).

[116] *See, e.g.*, Enzo Biochem, Inc. v. Gen-Probe, Inc., 323 F.3d 956, 968 (Fed. Cir. 2002) (holding that the written description requirement can even invalidate originally filed biotechnology claims); Regents of the Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1568 (Fed. Cir. 1997) (holding that originally filed biotechnology claims were invalid for failing to satisfy the written description requirement); Janice M. Mueller, *The Evolving Application of the Written Description Requirement to Biotechnological Inventions*, 13 BERKELEY TECH. L.J. 615, 652 (1998) (commenting that "the *Lilly* decision . . . reflect[s] an increasingly-widening gulf between the norms of the business and scientific community and those of the United States patent system"); Harold C. Wegner, *When a Written Description is Not a "Written Description": When* Enzo *Says It's Not*, 12 FED. CIR. B.J. 271, 273-74 (2002) (highlighting the Federal Circuit's rejection of the argument that original claims meet the written description requirement). For criticism of the court's extension of written description to DNA cases, see Dan L. Burk & Mark A. Lemley, *Is Patent Law Technology-Specific?*, 17 BERKELEY TECH. L.J. 1155, 1173-85 (2002) (describing and critiquing the application of the rules of patent law to biotechnology patent cases); Arti K. Rai, *Intellectual Property Rights in Biotechnology: Addressing New Technology*, 34 WAKE FOREST L. REV. 827, 834-35 (1999) (claiming that the court's use of the written description requirement "raises the patentability bar," and arguing that the court's characterization of DNA-based technology is "fundamentally misconceived"); Margaret Sampson, *The Evolution of the Enablement and Written Description Requirements Under 35 U.S.C. § 112 in the Area of Biotechnology*, 15 BERKELEY TECH. L.J. 1233, 1258-62 (2000) (highlighting several

written description requirement has been criticized as incoherent.[117] It seems to narrow the scope of patent claims and provides a powerful new weapon to those seeking to invalidate patents, particularly patents issued before the mid-1990s, when the doctrine was rejuvenated. At the same time, the court has cut back on the broad reading of the written description requirement as applied to claim changes, the very area in which the doctrine is most useful.[118]

Even if the written description requirement were a predictable and coherent doctrine, it would do nothing to solve several of the continuation-based abuses such as wearing down the examiner, surprising the industry, or extending one's monopoly. The only continuation-based abuse that could be addressed by a strong written description requirement is the filing of broader claims in a continuation to read on a competitor's device that the earlier specification did not clearly disclose. Written description is therefore, at best, only a partial solution to the problem of continuation abuse.

4. New Prosecution Laches Defense

The Federal Circuit created a new defense to patent infringement (or more precisely revived a dormant one)[119] in 2002. Called "prosecution laches," the

---

arguments against the Federal Circuit's extension of the written description requirement). For an argument that this expansion of the written description requirement is limited to biotechnology cases, see Dan L. Burk & Mark A. Lemley, *Policy Levers in Patent Law*, 89 VA. L. REV. 1575, 1653-54 (2003) ("The Federal Circuit has applied the doctrine to biotechnology cases in a way that would be inconceivable in other industries . . . .").

[117] For criticism of the written description doctrine as applied to changed claims, see Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1327-28 (Fed. Cir. 2003) (Bryson, J., concurring) (suggesting that written description is unnecessary as a way of dealing with claim changes); Jeffie A. Kopczynski, *A New Era for § 112? Exploring Recent Developments in the Written Description Requirement as Applied to Biotechnology Inventions*, 16 HARV. J.L. & TECH. 229, 230 (2002) (asserting that the new written description requirement is "unduly rigid"); Harris A. Pitlick, *The Mutation on the Description Requirement Gene*, 80 J. PAT. & TRADEMARK OFF. SOC'Y 209, 222 (1998) (calling the doctrine "an unmitigated disaster"); Laurence H. Pretty, *The Recline and Fall of Mechanical Genus Claim Scope Under "Written Description" in the Sofa Case*, 80 J. PAT. & TRADEMARK OFF. SOC'Y 469, 479 (1998) (addressing the use of an originally filed claim as a written description that limits later claims). The written description requirement might still play a role in cases in which, without filing a continuation, a patentee changed her claims to cover a competitor's technology during the initial prosecution period. Because the time elapsed is shorter, however, that is less likely to happen than claim changes that occur during prosecution of a continuation application.

[118] *See, e.g.*, Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985 (Fed. Cir. 1999).

[119] The Federal Circuit only recently endorsed the defense as a valid ground for challenging the enforceability of a patent. We call it a revived defense, however, because the Federal Circuit held that prosecution laches is a viable defense based on Supreme Court precedent nearly eighty years in age. Symbol Techs., Inc. v. Lemelson Med. Ed. & Res. Found., 277 F.3d 1361, 1364-65 (Fed. Cir. 2002) (validating the defense). Of course, the

defense renders unenforceable patents that spent an unreasonable amount of time in prosecution without sufficient explanation,[120] and permits the PTO to reject applications that have been unreasonably delayed by the applicant.[121] The new prosecution laches defense may help function as a catchall to ultimately render unenforceable those submarine patents that either were not eliminated through other reform efforts or were filed before the reforms went into effect. Prosecution laches is hardly an optimal solution, however. Litigation is expensive, time consuming, and uncertain.[122] At present, only one district court has held that the prosecution laches defense ought to apply, and in that case, the delays in prosecution were as long as thirty-nine years.[123] The hesitancy of the district courts to utilize this defense may be attributable to the difficulty in assessing the reasonableness of the delay, a problem that our empirical study can help eliminate. We discuss our data on the reasonableness of continuation delays in the next Part.

## III. ELIMINATING CONTINUATION APPLICATIONS

The doctrines we described in the last Part are helpful in combating some of the worst abuses. They do not, however, solve the problem of continuation abuse altogether, and they come with their own costs. Moreover, they are efforts to address the problem indirectly. Instead, we consider solving the

Federal Circuit had itself indicated that there was no such defense in several non-precedential decisions. *See* Ricoh Co. v. Nashua Corp., No. 97-1344, 1999 WL 88969, at *3 (Fed. Cir. Feb. 18, 1999) (rejecting suggestion that continuation applications are subject to any judicially-imposed time restrictions); Ford Motor Co. v. Lemelson, No. MISC. 516, 1997 WL 547905, at *1 (Fed. Cir. Aug. 20, 1997) (refusing to grant Ford permission to appeal the district court's denial of summary judgment, which was based on the laches defense); Bott v. Four Star Corp., No. 88-1117, 1988 WL 54107, at *1 (Fed. Cir. May, 26 1988) (refusing to recognize the defense). Unpublished, non-precendential decisions of the court are not binding authority on the Federal Circuit and, in fact, are not even to be cited to the court in briefs or during oral arguments. *See* FED. CIR. R. 47.6(b).

[120] *Symbol Techs., Inc.*, 277 F.3d at 1361 (discussing the effect of the prosecution laches defense).

[121] *In re* Bogese, 303 F.3d 1362, 1367 (Fed. Cir. 2002) (granting the PTO the authority to reject patent applications under its holding in *Symbol Technologies*).

[122] *See* AM. INTELL. PROP. LAW ASS'N, REPORT OF THE ECONOMIC SURVEY 2003, at 21-22 (2003) (demonstrating that the median litigation expenses for a patent infringement case are two-million dollars per side).

[123] Symbol Techs. Inc. v. Lemelson Med. Ed. & Research Found., No. CV-S-01-703-PMP(RJJ), 2004 WL 161331 (D. Nev. Jan. 23, 2004) (holding Lemelson's patents unenforceable for prosecution laches on the basis of delay from eighteen to thirty-nine years). All of the other district courts that have ruled on the issue have found no laches because the time involved was not unreasonable. *See infra* note 204 (listing these district court opinions). *Cf.* Digital Control, Inc. v. McLaughlin Mfg. Co., 225 F. Supp. 2d 1224, 1242 (W.D. Wash. 2002) (holding that factual issues precluded resolution of prosecution laches on summary judgment).

problem directly by eliminating continuation applications altogether.

Eliminating continuation applications is the obvious solution to the manifold abuses of the system. But is it the right solution? In this Part, we consider the likely effects of abolition. We begin by examining the justifications that have been offered by patentees and scholars in support of continuation applications, and find those arguments generally wanting. While there is some risk that abolishing continuation applications will weaken the value of patents, the weakening that is most likely to occur is in the anticompetitive "hold-up" value of a small subset of patents. Weakening the power of patentees to hold-up true innovators is a feature of abolition, not a bug. Next, we consider some complications that arise from the various forms of continuation practice. Any proposal to eliminate continuations and continuation-in-part applications should not extend to divisional applications. Eliminating continuations altogether would not eliminate all abuses of the patent prosecution system, but it would certainly restrict those abuses and eliminate the worst elements.

While abolishing continuation practice would address many of our concerns about abuse of the patent system, our empirical research convinces us that such a solution may be overkill. There are only a few inventors who are severely abusing continuation practice. Those abuses are spotlighted because the inventors who abuse the system are more likely to litigate their patents. The abuse, while severe, is narrow in scope. As Table 1 demonstrates, only a few patents issued with particularly lengthy prosecutions based upon numerous continuations. Moreover, we recognize the political realities that would likely prevent Congress from abolishing continuation practice. Accordingly, since continuations will likely remain a part of the patent landscape, we propose several interim measures that can be employed to help solve the problems they present.

### A. *Justifications for Continuation Applications*

Why do patentees file continuation applications? By and large, the benefits to patent applicants of filing continuations track the social harms discussed in the last section. Three such justifications can be disposed of easily. Patent applicants have historically used continuations to extend the effective life of their patents, to avoid having to disclose their technology too early, and to change claims in order to cover their competitors' products.[124] It is easy to see why patentees would want to do these things; they are likely to enhance the value of the patent. They are also all things that society has a strong interest in preventing, however. Patent law reflects a series of bargains and compromises between the patentee, subsequent inventors, and the public. Patents must disclose the claimed invention in sufficient detail that others can make and use it; patents that do not provide such disclosure are invalid.[125] The disclosure

[124] *See supra* notes 45-80 and accompanying text (discussing these uses in detail).

[125] 35 U.S.C. § 112 (2000) (requiring that the "specification shall contain a written description of the invention, and of the manner and process of making and using it").

requirement is imposed in order to give the public the ability to make and use the invention once the patent expires, and to design around the patent while in force.[126] Similarly, the patent term is limited so that the public may make use of the invention after a certain time without paying a royalty;[127] efforts to

[126] On the value of disclosure to the public as part of the patent bargain, see R. Polk Wagner, *Information Wants to be Free: Intellectual Property and the Mythologies of Control*, 103 COLUM. L. REV. 995, 1007 n.46 (2003) (arguing that inventions or works of expression can stimulate discussion, thus conveying an additional benefit); *see also* David J. Teece & Edward F. Sherry, *Standards Setting and Antitrust*, 87 MINN. L. REV. 1913, 1964 (2003) (discussing arguments for and against public disclosure of patent applications). The classical explanation is that disclosure of an invention permits the public to use it once the patent expires. *See, e.g.*, Eldred v. Ashcroft, 123 S. Ct. 769, 791 (2003) (Stevens, J., dissenting) ("Complete disclosure as a precondition to the issuance of a patent is part of the *quid pro quo* that justifies the limited monopoly for the inventor as consideration for full and immediate access by the public when the limited time expires.").

Disclosure serves another purpose as well—it permits competitors to design around the invention, creating a non-infringing product even while the patent is in force. On the social value of design-arounds, see Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 36 (1997) (contrasting "the intentional copyist making minor changes to lower the risk of legal action" with "the incremental innovator designing around the claims, yet seeking to capture as much as is permissible of the patented advance"); *see also* Slimfold Mfg. Co. v. Kinkead Indus., Inc., 932 F.2d 1453, 1457 (Fed. Cir. 1991) (Rich, J.) ("Designing around patents is, in fact, one of the ways in which the patent system works to the advantage of the public in promoting progress in the useful arts, its constitutional purpose."); State Indus., Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("One of the benefits of a patent system is its so-called 'negative incentive' to 'design around' a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace."); Matthew J. Conigliaro et al., *Foreseeability in Patent Law*, 16 BERKELEY TECH. L.J. 1045, 1050 (2001) ("Unlike copyists, who merely mimic a device and add nothing to the public body of knowledge, those who invent new devices by intentionally designing around a patent nonetheless advance the public welfare and fulfill the purpose of the Patent Clause."); Nard, *supra* note 5, at 40-41 ("The practice of designing-around extant patents creates viable substitutes and advances, resulting in competition among patented technologies. The public clearly benefits from such activity.").

[127] A number of economists have attempted to derive the optimal patent term by balancing the incentives created by patent protection against the social value of permitting the public to practice the invention after expiration. *See, e.g.*, WILLIAM D. NORDHAUS, INVENTION, GROWTH, AND WELFARE 76-86 (1969) (attempting to determine the optimal life of a patent); Louis Kaplow, *The Patent-Antitrust Intersection: A Reappraisal*, 97 HARV. L. REV. 1813, 1817 (1984) (attempting to derive an optimal patent term requires balancing the interests served by patent law and antitrust law); F.M. Scherer, *Nordhaus' Theory of Optimal Patent Life: A Geometric Reinterpretation*, 62 AM. ECON. REV. 422, 424 (1972) (discussing the method for finding the socially optimal patent life); John F. Duffy, *A Minimum Optimal Patent Term* (working paper 2003), *available at* http://ssrn.com/abstract=354282 (last accessed Jan. 31, 2004) (discussing the effect of changing Nordhaus's assumption of a static model to that of a dynamic model). *Cf.* Ian Ayres & Paul Klemperer, *Limiting Patentees' Market Power Without Reducing Innovation Incentives: The Perverse*

extend that time are illegal per se.[128] In addition, patent law divides entitlements between initial inventors and subsequent improvers, permitting the initial inventor to capture the value of an improver's technology only in limited circumstances.[129] These compromises are an integral part of the balance that patent law strikes between encouraging innovation and promoting the use and dissemination of new technology.[130] Continuation practice permits patentees to undo this balance, benefiting them privately but hurting society as a whole.

The patent statute strikes a balance between changing claims and stopping hold-ups through reissue practice, which permits patentees to broaden their claims within two years after the patent issues.[131] Reissue practice already leaves competitors with a zone of uncertainty, but at least with reissue, the zone has a definitive end—two years from issuance, a competitor can be certain the claims' scope will not be expanded. Continuation practice makes this zone of uncertainty boundless.

A fourth reason patentees use continuation practice is more ambiguous in effect. Patentees often file continuations not to try to game the system, but in order to continue fighting for claims they believe they are entitled to but which examiners refuse to grant. These patentees are trying in good faith to obtain coverage they believe they are entitled to under the patent system. Continuation practice gives them multiple opportunities to persuade the PTO to grant their claims and the ability to refine their claims to make sure they are effective. But it is not clear that granting unlimited opportunities is good for society as a whole. Patent examiners have strong incentives to allow contested

---

*Benefits of Uncertainty and Non-Injunctive Remedies*, 97 MICH. L. REV. 985, 986-87 (1999) (suggesting that society would benefit from longer patent terms coupled with limited amounts of infringement); Richard Gilbert & Carl Shapiro, *Optimal Patent Length and Breadth*, 21 RAND J. ECON. 106, 111 (1990) (suggesting that optimal patents might be extremely long but quite narrow).

[128] Brulotte v. Thys, 379 U.S. 29, 32 (1964) (concluding that a "patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*"). *See generally* HOVENKAMP ET AL., *supra* note 77, §§ 3.3(b)(3), 23.2.

[129] For a discussion of the division of profit between initial inventors and subsequent improvers, see Jerry R. Green & Suzanne Scotchmer, *On the Division of Profit in Sequential Innovation*, 26 RAND J. ECON. 20, 21 (1995) (suggesting that profit should be weighted toward initial inventors); Lemley, *supra* note 59, at 993-1000 (suggesting the importance of balance between initial inventors and improvers); Merges & Nelson, *supra* note 59, at 70-78 (suggesting the importance of limiting the scope of warrants so as not to stifle further invention); Scotchmer, *supra* note 59 (discussing tradeoff).

[130] *See* MERGES ET AL., *supra* note 9, at 15 ("[T]he economic incentive benefits of intellectual property rights must be balanced against the costs of limiting diffusion of knowledge.").

[131] 35 U.S.C. § 251 (2000) (prescribing that applicants must apply for reissue within two years of the grant of the original patent).

patent claims rather than continuing to fight.[132] Permitting a patent applicant to file an unlimited number of continuations has the effect of "wearing down" the examiner, inducing the PTO to issue patents because they are sick of fighting rather than because the application deserves a patent.[133] The risk of issuing bad patents is a reason not to permit patentees to argue indefinitely for broad claims.[134] And it is worth noting that even abolishing continuations would not leave these patentees without recourse. The patent application process includes a provision for appeal to the Board,[135] and from there to the U.S. Court of Appeals for the Federal Circuit[136] or the U.S. District Court for the District of Columbia.[137] This appeal process, not continuation practice, is the way the patent system was intended to handle fights over patentability.[138]

Despite the existence of an appeal process, there is some risk that, without continuation practice, patent applicants will not obtain claims of sufficiently broad scope to effectively protect their invention. That, in turn, could reduce incentives to innovate.[139] But we think that this risk is balanced by several

---

[132] *See supra* notes 38-39 and accompanying text (discussing these incentives).

[133] For a discussion of the problem of "wearing down" examiners, see Allison et al., *supra* note 23 (discussing the tactic of wearing down patent examiners).

[134] Mark Lemley has argued elsewhere that we need not be too concerned about bad patents issuing, since most such patents will never be litigated. Lemley, *supra* note 7, at 1497 (arguing that it would not be cost efficient for the PTO to thoroughly examine all patent applications since few are actually litigated and more thorough procedures would cost too much). But our data has shown that patents based on continuation applications are more likely than other sorts of patents to be litigated, meaning that the costs of permitting bad patents to issue based on continuation applications are significantly higher than average.

[135] 35 U.S.C § 134 (2000) (providing for appeal to the Board).

[136] 35 U.S.C. § 141 (providing for appeal of the Board's decision to the U.S. Court of Appeals for the Federal Circuit, provided that patentee has not exercised appeal to the U.S. District Court for the District of Columbia).

[137] 35 U.S.C. § 145 (providing for appeal of the Board's decision to the U.S. District Court for the District of Columbia, provided that patentee has not exercised appeal to the U.S. Court of Appeals for the Federal Circuit).

[138] The appeal process is slow, however, particularly at the Board, and if the patent system is to rely more heavily on appeals, it would be a good idea to devote resources to expediting them.

[139] This is a problem only if patent protection is not too strong already. If patents are too strong now, weakening some of them might be good for society on balance. We express no opinion on this general question.

It is worth noting that the most valuable patents are more likely than average to use continuation applications. Continuations represent 23% of all issued patents and 52% of all litigated patents. To conclude from this that continuations make patents valuable, however, is probably to confuse cause and effect. Allison et al. find that patent applicants know in advance which patents are valuable and use tools like the continuation application to maximize the scope of those valuable patents. Allison et al., *supra* note 23 (suggesting that patent applicants know which patents are valuable, inducing them to justify the cost of additional prosecution). The technologies that underlie those patents would still be valuable

countervailing factors. First, the effective scope of patents has been limited in the last seven years by the rebirth of the written description requirement.[140] With the exception of biotechnology, all the written description cases have involved changes made to patent claims during prosecution, and indeed one judge has argued that that is the only proper role for the doctrine.[141] Abolishing continuation applications would all but eliminate the need for this much-criticized doctrine.

Second, the doctrine of prosecution history estoppel significantly limits the scope of patents under the doctrine of equivalents. Prosecution history estoppel arises when a patentee amends its claims during prosecution to narrow them for a reason related to patentability.[142] When this happens, with two narrow exceptions, the patentee gives up any argument under the doctrine of equivalents with respect to the amended claim element.[143] The courts have applied the doctrine of prosecution history estoppel broadly, finding virtually any limiting amendment to be made for a reason related to patentability[144] and

---

if the continuation right ceased to exist.

[140] *See, e.g.*, Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330-34 (Fed. Cir. 2003) (holding that the district court was not clearly erroneous in determining that Amgen satisfied the written description requirement); Cooper Cameron Corp. v. Kvaerner Oilfield Prods., 291 F.3d 1317, 1322-23 (Fed. Cir. 2002) (holding that the district court erred in granting summary judgment of invalidity on the basis of written description); Hyatt v. Boone, 146 F.3d 1348, 1355 (Fed. Cir. 1998) (holding that the Board did not clearly err in finding that appellant failed to satisfy the written description requirement); Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1479 (Fed. Cir. 1998) (discussing the written description requirement and stating that a narrow disclosure limits the scope of the right to exclude).

[141] *See* Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1324-25 (Fed. Cir. 2003) (Rader, J., concurring) (arguing for a return to the original understanding of the description requirement as involving only changes in patent claims).

[142] Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 33 (1997) (imposing upon the patent applicant the burden of establishing that the reason for amending her claim is not related to patentability, where the record reveals no reason for the amendment).

[143] Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 740 (2002) (holding that the patentee has the burden of showing that an amendment does not surrender a particular equivalent). The two exceptions are where the effect of a claim change would not be foreseeable to a reasonable patent drafter, and where the intent of the claim change was tangential to the purpose for which it is now being asserted. The Court also suggested that an exception is possible where "there is some other reason the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id.* at 740-41.

[144] *Warner-Jenkinson Co.* created a presumption that any claim amendment that was not explained was necessary in order to issue the patent and therefore would create an estoppel. *Warner-Jenkinson Co.*, 520 U.S. at 33-34. *Festo Corp.* made clear that estoppel applies not just to amendments made to avoid the prior art, but also to amendments made for any reason at all related to the patentability of the invention. *Festo Corp.*, 535 U.S. at 736 ("Estoppel arises when an amendment is made to secure the patent and the amendment narrows the

refusing to accept post hoc arguments or boilerplate trying to explain away an amendment.[145] The more likely a patent claim is to be amended during prosecution, therefore, the less likely it is to be entitled to protection under the doctrine of equivalents. And the more times an applicant goes back and forth with an examiner, the more likely they are to amend their claims.[146] As a recent study by Doug Lichtman shows, there is good reason to believe that some examiners require claim amendments not because of any particular defect in the application at hand, but simply as a matter of course.[147] Abolishing continuations may therefore have the surprising effect of strengthening, not weakening, the scope of many patents by preserving the patentees' ability to argue for infringement under the doctrine of equivalents.

If continuations were abolished, the most serious problem patent prosecutors would face comes from the Federal Circuit's 2002 en banc decision in *Johnson & Johnston Associates, Inc. v. R.E. Service Co.*[148] In that case, the Federal Circuit held that a patentee who disclosed an embodiment in the patent but failed to claim that embodiment could not obtain protection for it under the doctrine of equivalents.[149] The court reasoned that the patentee was clearly aware of the invention, having described it in the patent specification, and should be required to claim the invention if she wanted it included within the

---

patent's scope.").

[145] *See, e.g.*, Pioneer Magnetics, Inc. v. Micro Linear Corp., 330 F.3d 1352, 1357 (Fed. Cir. 2003) (holding that a patentee cannot escape the presumption by relying on arguments or testimony made after the fact); Bai v. L&L Wings, Inc., 160 F.3d 1350, 1355 (Fed. Cir. 1998) (holding that a patentee cannot escape the presumption by including boilerplate language in the amendment stating that it was not made for a reason related to patentability).

[146] Amendments or arguments made during the prosecution of related applications bind all subsequent applications in the chain. *See* Mycogen Plant Sci., Inc. v. Monsanto Co., 252 F.3d 1306, 1311 (Fed. Cir. 2001) (holding that statements made in a parent application must be construed the same way as statements made in continuations).

[147] Douglas G. Lichtman, *Rethinking Prosecution History Estoppel*, 71 U. CHI. L. REV. (forthcoming 2004), *available at* http://www.law.uchicago.edu/Lawecon/index.html (last accessed Jan. 14, 2004) (finding that some examiners routinely require language alterations and others do not); *see also* Iain Cockburn et al., *Are All Patent Examiners Equal? Examiners, Patent Characteristics, and Litigation Outcomes*, *in* PATENTS IN THE KNOWLEDGE-BASED ECONOMY 17, 19-20 (Wesley M. Cohen & Stephen A. Merrill eds., 2003) (finding significant variation in the quality and behavior of patent examiners).

[148] 285 F.3d 1046 (Fed. Cir. 2002) (en banc).

[149] *Id.* at 1054-55 ("[W]hen a patent drafter discloses but declines to claim subject matter . . . this action dedicates that unclaimed subject matter to the public." Therefore, "[h]aving disclosed without claiming the steel substrates, . . . [patentee] cannot now invoke the doctrine of equivalents to extend its aluminum limitation to encompass steel."). This doctrine has been expanded even further in the recent case *PSC Computer Prods. v. Foxcomm Int'l, Inc.*, No. 03-1089, 2004 WL 78009 (Fed. Cir. Jan. 20, 2004) (barring equivalents where the accused infringing equivalent is part of unclaimed but only generally disclosed matter in the patent).

scope of the patent.[150] The court did, however, permit patentees to recapture such disclosed inventions by filing a reissue patent or a continuation application.[151] Abolishing continuation applications would increase the importance of the patent drafter getting it right the first time (prior to issuance) or the second time (during the two year reissue period).[152] Doing away with continuation practice would eliminate a mechanism that currently provides third (and fourth and fifth . . .) chances. Requiring patent applicants to claim what they disclose doesn't seem an unreasonable burden to impose. And it is certainly consistent with giving adequate notice to competitors about what is and is not covered by a patent, a policy goal the court has repeatedly emphasized.[153] It does, however, put a premium on getting claims drafting just right, and abolishing continuations means that patent prosecutors would have to get it right at the outset.[154]

In short, there are not many good reasons for society to allow continuation applications. The most that can be said in their defense is that patent prosecutors will have a somewhat more difficult job if continuations are abolished. But that job will be far from impossible, and patent owners may even benefit from abolition in the long run, since the claims they obtain will be more likely to be held valid and they will have a greater chance to employ the

[150] *Johnson & Johnston Assoc., Inc.*, 285 F.3d at 1055.

[151] *Id.* (citing 35 U.S.C. §§ 120, 251 (2000)). This is consistent with the suggestions of some commentators that a reissue proceeding, rather than broad application of the doctrine of equivalents, is the way to correct drafting errors in patent claims. *See, e.g.*, Martin J. Adelman & Gary L. Francione, *The Doctrine of Equivalents in Patent Law: Questions that Pennwalt Did Not Answer*, 137 U. PA. L. REV. 673, 716 (1989).

[152] The patent law permits an applicant who failed to claim part of her invention to seek a broader patent within two years by filing a reissue application. 35 U.S.C. § 251 (2000) (permitting reissued patents to enlarge the scope of the claims of the original patent within two years of grant of original patent). In addition, patentees can seek to *narrow* their claims through the reissue process at any time. *Id.*

[153] On the importance of notice to the public, see Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 33 (1997) (discussing the importance of public notice as a justification for establishing the prosecution history estoppel presumption where no reason for a claim amendment is explained in the prosecution history); *Johnson & Johnston Assoc., Inc.*, 285 F.3d at 1052 (stating that a function of the claim requirement is notice to the public); Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1425, 1430 (Fed. Cir. 1997) (stating that the costs of foreclosed business activity are a more onerous burden on society than the costs of careful patent prosecution on patentees, and that the public-notice function of the claiming requirement should not be obviated by permitting a patentee to argue the doctrine of equivalents against a device lacking a functionality recited in a prior patent claim); Conigliaro et al., *supra* note 126, at 1056-57 (discussing the importance of the notice function).

[154] *See also* Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 344 F.3d 1359, 1375 (Fed. Cir. 2003) (en banc) (Rader, J., concurring) (discussing the need for applicants to use continuation applications in response to the strict requirements of prosecution history estoppel).

doctrine of equivalents.

B. *Scope of the Abolition*

Continuation applications are not a unitary phenomenon. We have focused our attention so far on what were traditionally called "continuation applications," which have been divided more recently into § 120 continuations, CPAs, and finally RCEs.[155] Two other types of continuation applications are also common in patent prosecution. First, an applicant can file a "continuation-in-part" ("CIP") application if she wishes to add new information to an existing application.[156] CIP applications are entitled to claim priority back to the original application, but only for patent claims that arise out of the existing material, not claims based on the material added in the CIP.[157] Second, the PTO will sometimes impose what is called a "restriction" requirement on an applicant who has identified two or more distinct inventions in a single application. Applicants can file a "divisional" application in response to a restriction requirement, separating their original application into two or more applications, each with claims directed to a different invention.[158]

If we abolish continuations, what should happen to CIPs and divisionals? Our answer is different for each. CIPs suffer from the same problems as continuations. They are under the control of the applicant, who can file an unlimited number. They are subject to abuse by applicants who seek to delay issuance or publication of a patent, to obtain multiple patents, or to change claims during prosecution. Indeed, the potential for abuse of a CIP is even greater than with ordinary continuations because CIPs allow the applicant to add new material to the application during the prosecution process while retaining an argument that any particular claim can be traced to the original material and therefore ought to be entitled to the original filing date. Applicants who wish to extend the duration of their patent can add "new matter"[159] to their application, taking a chance that the new material has not been disclosed elsewhere. If the material is in fact new, or if the PTO decides

[155] The PTO created the term "CPA" in 1997. Changes to Patent Practice and Procedure, 62 Fed. Reg. 53132 (Oct. 10, 1997) (to be codified at 37 C.F.R. pt. 1) (providing for continued prosecution applications). It abolished the term "CPA" in favor of "RCE" in 2003. *See* 37 C.F.R. § 1.53(d) (2003); *see also* Elimination of Continued Prosecution Application Practice as to Utility and Plant Patent Applications, 66 Fed. Reg. 35763 (July 9, 2001) (to be codified at 37 C.F.R. pt. 1) (giving notice of proposed rulemaking whereby the PTO proposed to eliminate CPA practice as to utility and plant applications).

[156] 37 C.F.R. § 1.153(b) (2003).

[157] MERGES ET AL., *supra* note 9, at 116.

[158] 35 U.S.C. § 121 (2000) (providing for the separation of applications where two or more independent and distinct inventions are claimed in the same application).

[159] 35 U.S.C. § 132(a) (declaring that "[n]o amendment shall introduce new matter into the disclosure of the invention"). This section prevents the addition of new matter during prosecution of an existing application; thus, it must be added in a CIP. *Id.*

the new matter is necessary to provide adequate disclosure for the claims, the applicant can decide to relinquish priority to the original application and start their twenty-year clock running from the date of the CIP. If, however, the new matter has in fact been disclosed in a prior art reference, they can argue that the original application adequately disclosed the invention, and then claim priority under that application.[160]

Further, it is not clear that today's patent applicants have much legitimate need for CIPs. If the new matter disclosed in the CIP is patentably distinct from that in the original application, the applicant doesn't need to file a CIP at all: she can simply file a new patent application. If the "new" matter is in fact the same invention as disclosed in the original application, the CIP effectively acts as a regular continuation application of the type we have already discussed. The traditional justification for the CIP has come in the middle cases, where the original disclosure was not strong enough to justify the current claims, but close enough that it would invalidate those claims if considered as prior art. This most commonly occurs when the applicant claims an invention that was not disclosed in the original application, but would be obvious in view of that application. Congress changed the law in 1984 to permit most such applications to be patentable if filed separately, without the need for a CIP.[161] After this statutory change, there is little reason why an applicant should need to file a CIP.

Divisional applications, by contrast, serve a useful purpose. They prevent

---

[160] While the shift to a twenty-year patent term foreclosed most opportunities for patentees to extend the length of their protection, CIP practice is a loophole. The *Manual of Patent Examining Procedure* does not require CIP applicants to decide immediately whether to claim priority to an original application. Rather, they can wait and see if they need priority, permitting them to engage in the game-playing described in text. MANUAL, *supra* note 11, § 201.08. Moreover, neither the application nor the issued patent ever specify which claims are entitled to which filing date, leaving competitors with no guidance as to the filing date or the corresponding expiration date of the patent claims.

[161] The only reason the applicant could not file such a claim separately is if the original application constituted prior art to the new application. If the same inventor filed both applications, it would not constitute prior art except under 35 U.S.C. § 102(b), and then only if the original application was patented or published more than a year before the new application was even filed. This is both unlikely and avoidable.

If the new matter was filed by a slightly different group of inventors (say, Alice, Beth, and Carol as opposed to just Alice and Beth on the original application), patent law used to bar such applications under § 102(e). But 35 U.S.C. §103(c) provides that as long as the group of inventors are the same or the assignee is the same (same employer), a prior application by one subset will not constitute prior art barring a later patent by a different subset. *See* 35 U.S.C. § 103(c) (2000) ("Subject matter developed by another person . . . shall not preclude patentability . . . where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person."). Thus, § 103(c) eliminates the use of § 102(e), (f), or (g) prior art for obviousness determinations when there is common inventorship or assignment. This statute closed the loophole that justified filing CIPs.

an applicant from filing an omnibus application that overwhelms the patent office, either by including too many different claims and separate inventions to examine thoroughly[162] or by including inventions in disparate areas of technology that would ordinarily go to different examiners with appropriate specializations.[163] Divisionals are also less likely to be abused than are continuations and CIPs. Divisionals are a response to a restriction requirement imposed by an examiner, so the PTO and not the applicant determines when they can be used.[164] They tend only to be used once in any given prosecution—typically near the outset—meaning that, while a divisional may delay issuance somewhat, it cannot delay prosecution indefinitely. The requirement of consonance, which the Federal Circuit has recently interpreted strictly, can be used to prevent abuse of divisional practice by applicants who attempt to engage in sub rosa double patenting in response to a restriction requirement.[165] Nor can divisionals be used to obtain multiple patents on the same invention, since claims written for each divisional application must stay on the proper side of the line drawn by the PTO.[166] Finally, the Paris Convention expressly provides for divisionals but not for other kinds of continuation applications, and their abolition might therefore contravene U.S. treaty obligations.[167]

---

[162] For a proposal to introduce complexity weighing at the PTO so that more complex applications get more attention, see Allison et al., *supra* note 23 (advocating a complexity-based weighting system).

[163] They also permit the PTO to collect more fees, perhaps one reason why anecdotal evidence suggests that the PTO has been issuing more restriction requirements.

[164] There is some evidence suggesting that sophisticated applicants, particularly in the biotechnology field, may be intentionally filing multiple inventions in a single application in order to provoke a restriction requirement and therefore delay the prosecution of their claim. *See* Graham & Mowery, *supra* note 84 (observing that both the most valuable and the least valuable patents file divisional applications, suggesting that divisionals are sometimes used as a strategic tool and are sometimes a result of the applicant's ignorance of the rules). Even if this is happening, divisional applications are much less useful as a tool for delay and other forms of abuse than are continuations and CIPs.

[165] *See, e.g.*, Geneva Pharms., Inc. v. GlaxoSmithKline PLC, 349 F.3d 1373 (Fed. Cir. 2003) (invalidating a patent for obviousness-type double patenting where the PTO had not clearly required separation, and where the patentee appeared to have used the divisional application in an effort to extend the term of its rights).

[166] 35 U.S.C. § 121 (2000). Section 121 provides that, if the PTO requires an applicant to divide an application, it cannot cite one application against the other as prior art. *See id.*; Applied Materials, Inc. v. Advanced Semiconductor Materials Am., 98 F.3d 1563 (Fed. Cir. 1996) (holding that the benefits of § 121 are retained when PTO requires a divisional application). The courts have limited this rule with the principle of "consonance." However, a patentee who crosses the line by claiming the same invention in two different divisional applications may have those applications cited against each other as prior art. Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n, 988 F.2d 1165, 1179 (Fed. Cir. 1993) (discussing the principle of consonance).

[167] Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, art. 4(G),

The abolition of continuations and CIPs would not end all abuse of the prosecution process. Some patent applicants may craft their applications in a way that provokes a restriction requirement, permitting them to divide their application after the first office action and add perhaps fourteen months to total prosecution times.[168] Other applicants might seek to provoke interferences with other pending applications in the hope of delaying prosecution.[169] Still other applicants will choose to appeal if they can no longer file continuation applications. Appeals and interferences take a long time[170] and may therefore be an attractive way to delay patent prosecution. This is particularly true since the patent statute extends the patent term to compensate for delays caused by appeals and interference proceedings.[171] But using appeals and interferences as delay tactics comes at a substantial cost. Appeals and interferences are both at least quasi-adversarial proceedings; someone argues the other side. Unlike continuation practice, where the applicant gets an unlimited number of bites at the apple, if the applicant loses in the appeal or interference process, they get nothing.[172] And even if they ultimately prevail, neither appeals nor interferences permit applicants to obtain multiple patents or to obtain a narrow patent while awaiting resolution of an argument for a broader one.

---

13 U.S.T. 2, 828 U.N.T.S. 107, as last revised at the Stockholm Revision Conference, July 14, 1967, 21 U.S.T. 1538, 828 U.N.T.S. 303, *reprinted in* G.H.C. BODENHAUSEN, GUIDE TO THE APPLICATION OF THE PARIS CONVENTION FOR THE PROTECTION OF INDUSTRIAL PROPERTY 223, 223-52 (1968). Article 4(G)(1) provides that the patent offices may require divisionals. *Id.* art. 4(G)(1). Article 4(G)(2) provides for "voluntary divisionals" by the applicant, but only under such circumstances as each country chooses to permit. *Id.* art. 4(G)(2). While it is possible to read this to require continuation applications not based on multiple inventions, in which case abolishing continuations and CIPs might also conflict with the Convention, most countries outside the United States have not done so, and the text of the Convention gives nations broad discretion to decide when a voluntary divisional is permissible.

[168] Graham and Mowery offer anecdotal evidence that this does occur, particularly in the pharmaceutical and biotechnology industries. *See* Graham & Mowery, *supra* note 84.

[169] 35 U.S.C. § 135 provides for administrative trials when more than one party claims the same invention. An applicant can "provoke" an interference by copying the claims from a pending or issued patent into her own application. For a discussion of interference litigation, see generally Lemley & Chien, *supra* note 7 (discussing empirical results of interference litigation study).

[170] Interferences spend an average of 30.5 months before the PTO, and certain infamous interferences have continued for decades. *See* AM. INTELL. PROP. LAW ASS'N, COMMITTEE REPORT: PATENT—RELATIONS WITH THE U.S. PTO, *at* http://www.aipla.org (last accessed Nov 3, 2003) (data reported by PTO Board of Patent Appeals and Interferences Chief Judge Stoner).

[171] 35 U.S.C. § 154(b)(1)(C) (2000).

[172] Applicants can appeal an adverse decision by the Board to the Federal Circuit, *see* 35 U.S.C. § 141, or in the case of interferences, to a district court and then to the Federal Circuit. *See* 35 U.S.C. § 146. But, the PTO Solicitor's office will actively defend the Board's decision on appeal, and in the case of an interference, another interested party will also oppose the applicant's claim.

C. *Alternatives to Abolition*

Abolishing patent continuations would require legislative action.[173] Recent experience with patent system reform suggests that this legislative change might prove controversial.[174] Individual inventors, who have proven surprisingly powerful in influencing Congress,[175] are more likely than other

[173] Continuation applications are provided for in 35 U.S.C. § 120 and CIPs in 35 U.S.C. § 132(b).

[174] Even modest efforts to reform the patent system in the late 1990s to harmonize it with the rest of the world proved politically divisive. Independent inventors and conservative politicians opposed harmonization. *See* 140 CONG. REC. 29602-03, 29609 (1994) (statements of Representatives Bentley and Rohrabacher opposing harmonization because they claimed it permitted big Japanese and multinational corporations to steal American inventors' patent rights); James J. Barta, Jr., *Death of a Superior Intellectual Property Law System*, 17 ST. L. U. PUB. L. REV. 383, 387-88, 401 (1998) (concluding that harmonization benefits Japan but hurts the United States); Dana Rohrabacher & Paul Crilly, *The Case for a Strong Patent System*, 8 HARV. J.L. & TECH. 263, 263-67, 272-73 (1995) (criticizing proposed reform for hurting American inventors and benefiting only multinational corporations). For a discussion of the political debate, see John F. Duffy et al., *Early Patent Publication: A Boon or Bane? A Discussion on the Legal and Economic Effects of Publishing Patent Applications After Eighteen Months of Filing*, 16 CARDOZO ARTS & ENT. L.J. 601, 604 (1998) (identifying a political division between large corporations and small inventors); Stephanie Gore, *"Eureka! But I Filed Too Late . . .": The Harm/Benefit Dichotomy of a First-to-File Patent System*, 1993 U. CHI. L. SCH. ROUNDTABLE 293, 307-09 (1993) (analyzing harmonization from a theoretical perspective); Mark A. Lemley, *An Empirical Study of the Twenty-Year Patent Term*, 22 AIPLA Q.J. 369, 376-82 (1994) (highlighting submarine patents as a primary focus of political controversy). On the power of the small inventor as an icon, see Mark D. Janis, *Patent Abolitionism*, 17 BERKELEY TECH. L.J. 899, 910-22 (2002) (observing that the "heroic inventor motif" prevails in literature, debate, and judicial opinions).

This political firestorm delayed patent reform for several years, and when reform did come, it was so watered down as to be completely ineffective. For example, the U.S. patent law now includes eighteen-month publication, a twenty-year term, a limited prior user right, and an inter partes opposition procedure. 35 U.S.C. §§ 154(a)(2), 122(b), 271, 311–318 (2000). In each case, however, Congress so watered down the new provisions that they bear little resemblance to their foreign counterparts. Thus, the twenty-year term is riddled with extensions, *see* 35 U.S.C. § 154(b); eighteen-month publication is required only for inventors who also file abroad, *see* 35 U.S.C. § 122(b)(1)(B); the prior user right applies only to business method patents, and even then only in extreme cases, *see* 35 U.S.C. § 273(b)(3); and the opposition procedure is so anemic and the estoppel consequences so severe that virtually no one seems willing to use it. *See* 35 U.S.C. §§ 311–318; U.S. PATENT & TRADEMARK OFFICE, INTER PARTES REEXAMINATION FILING DATA (Dec. 31, 2002) (stating that only seven inter partes reexamination requests were filed between 1999 and 2002, compared with 6501 normal reexamination requests). For a description of those shortcomings, see Mark D. Janis, *Inter Partes Patent Reexamination*, 10 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 481, 483-85 (2000) (criticizing reexamination reforms as being ineffective and frustrating to use).

[175] *See* Janis, *supra* note 174, at 918-19 (observing that changes in the AIPA "bear the

inventors to abuse the continuation process,[176] and they may object to outright abolition. Further, the patent bar organizations are predominantly composed of patent prosecutors, who stand to lose some of their business if patent prosecution becomes less protracted. As a result, they would likely object to such a proposal as well. The primary beneficiaries of abolition—companies who make products that might be the subject of patent hold-up and the customers who pay a lower price for those products—have a diffuse interest and might not organize around a reform measure.

In addition to the fact that legislative reform may be difficult to achieve, abolition may be an overly broad remedy. The number of patentees who abuse continuation practice seems to be small[177] and may not justify such a sweeping change to long-standing patent practice. Thus, in this section, we propose a number of partial steps Congress or the courts might take to address the abusers. We address five possible ways to restrict the abuse of continuation practice in a world in which the continuation application remains a reality.

1. Limiting the Number of Continuations

Even if policymakers conclude there are good reasons to permit patentees to file continuation applications in an effort to argue for the claims they want, those reasons don't justify an unlimited number of continuation applications. A compromise proposal might, therefore, limit each applicant to no more than one continuation application or CIP. In each application, the inventor has at least two, and generally more, attempts to persuade the examiner that the applicant's position is correct.[178] Allowing even one continuation application

unmistakable influence of lobbying on behalf of independent inventors").

[176] Individuals obtained 26% of the continuation patents with delays of twenty years or more. Although individuals are actually less likely to file continuations generally (individuals obtain 18% of all issued patents and 15% of all continuation patents), a few highly visible individual inventors are more likely to abuse the practice by filing multiple continuations stretching prosecution out many years. *Cf.* Allison & Lemley, *supra* note 20, at 2140 (finding "no [statistically] significant relationship between entity size and the number of continuation applications filed").

[177] *See* Table 1, *infra* Appendix A (showing that less than 1% of all patents take more than nine years to issue).

[178] An applicant presents an initial set of claims, faces an initial rejection, gets at least one chance to amend the claims or argue for the original claims before facing a final rejection, and then usually gets an opportunity for an off-the-record personal or telephonic interview with the examiner. For a discussion of this process, see John R. Thomas, *On Preparatory Texts and Proprietary Technologies*, 47 UCLA L. REV. 183, 188-89 (1999) (describing the series of steps an applicant must take before obtaining a patent). A striking number of claims that are "finally rejected" before the interview end up being allowed with little or no explanation after the interview. *See* MERGES ET AL., *supra* note 9, at 116-17 (demonstrating the various ways a "final rejection" is not really final); *see also supra* note 11 and accompanying text (discussing the lack of information in an "interview summary").

will give the applicant five or six bites at the apple. Surely that is enough.[179]

Eliminating multiple continuation applications would also deal with the worst abusers of the system. In the past, a small number of applicants have filed a large number of continuation applications. For example, of the thirty-three patents with the longest prosecution delays (thirty-two to nearly fifty-four years), twenty-three of them belong to Jerome Lemelson and five belong to George Sawyer. Of the remaining five, two took so long because of secrecy orders restricting their issuance.

Multiple continuations can be harmful in another way: they confuse the public. One U.S. patent claims priority to ninety-eight different related applications.[180] This patent claims to be a continuation-in-part of seventeen different applications, each with their own priority chains. For these types of patents, there is no way the public can have any idea which claims are entitled to which priority date or when the various claims will expire. Although it is unusual to have this many priority claims—the mean for all issued patents is a claim of priority to 0.36 applications—the example demonstrates the confusion that continuation practice can cause.

Limiting the number of continuations that can be filed may require an act of Congress. In *In re Henriksen*,[181] the PTO sought to preclude applicants from filing more than three continuation applications in any one prosecution. The Court of Customs and Patent Appeals, the Federal Circuit's predecessor court, struck down the PTO regulation, concluding that § 120 by its terms did not impose any limit on the number of continuations and that whether there should be such limits "is for Congress to decide."[182]

2. Preventing Broadening of Claims During Continuation Applications

One of the most egregious abuses of continuation applications described above is the use of the process to change patent claims to track inventions first made by one of the applicant's competitors.[183] Central to this abuse is the applicant's ability not only to change claims during prosecution, but also to broaden those claims to cover inventions that may or may not be supported in the initial disclosure but are not within the scope of the claims as initially filed. Permitting applicants to broaden claims allows them to correct errors, and it may be important to do so if failing to claim the full range of an invention

[179] Of course, the patentee could still use the reissue process within two years of the patent issuance to argue once again for broader claims, in effect giving the applicant yet another chance. 35 U.S.C. § 251 (2000).

[180] U.S. Patent No. 5,714,566 (issued Feb. 3, 1998). Similarly, U.S. Patent 5,640,805 claims priority to eighty-two different applications through ten different application chains. *See* U.S. Patent No. 5,640,805 (issued June 24, 1997).

[181] 399 F.2d 253 (C.C.P.A. 1968).

[182] *Id.* at 262.

[183] *See supra* Part II.A (describing this abuse).

would also disable an applicant from relying on the doctrine of equivalents.[184] But it also invites abuse of the system.

One partial solution to this problem is to permit applicants to file continuation applications but refuse to allow them to broaden the scope of their claims during the prosecution of those applications.[185] Patentees would have to correct any unintended narrowness in their claims during the prosecution of the initial application or, alternatively, in a reissue proceeding within two years after the patent issued.[186] They could file continuation applications to persuade the PTO that they were entitled to broad claims that they originally filed, or to narrow their claims sufficiently to make them patentable. But they could not capture new ground with claims offered for the first time in a continuation application. This approach would address one specific abuse associated with continuation applications. It would also impose many of the same burdens on patent prosecutors as abolishing continuations, however, and would do nothing about delay, secrecy, or multiple patenting.[187]

3. Publishing Applications

Another alternative would be to institute more meaningful publication requirements. A first step, since the exceptions at present threaten to swallow the rule, is to eliminate the "optional" nature of publication. Publishing all applications regardless of whether the applicant intends to file abroad would minimize the surprise associated with submarine patents. Moreover, the creation of provisional damages for those who infringe published applications that ultimately issue[188] mitigates the threat to inventors of having their published technology usurped during the pendency of the patent prosecution.[189] Provisional rights give patentees a reasonable royalty for

---

[184] Johnson & Johnston Assoc., Inc. v. R.E. Serv. Co., 285 F.3d 1046, 1055 (Fed. Cir. 2002) (en banc) (holding that a patentee cannot claim doctrine of equivalents protection for disclosed but unclaimed items). *See supra* notes 148-151 and accompanying text (discussing this rule).

[185] If abuse of the appeal and interference processes were determined to be a significant problem, this proposal could also be applied to prosecution after a successful appeal or interference proceeding.

[186] Broadening reissues, unlike continuation applications, give "intervening rights" to companies who started using an invention covered by the newly broadened claims before those claims were issued. 35 U.S.C. § 252 (2000) (allowing courts to convey such intervening rights as equity requires). The reissue process therefore protects against unscrupulous applicants who change their claims to track their competitors' new inventions.

[187] Limiting continuations may also encourage patent attorneys to game the system by initially filing overly broad claims and then systematically narrowing; this would preserve the right to file broader claims in a continuation. But doing so would create problems of prosecution history estoppel for patentees, and so it is unlikely to be a major concern.

[188] 35 U.S.C. § 154(d) (2000) (creating a provisional right against patent infringements involving published applications).

[189] The fact that a patent, when it issues, will be enforced by injunctive relief, *see* 35

infringement that occurs after publication but before patent issuance, provided that the infringer has actual notice of the published application and that the infringer would have infringed under both the published version of the claims and the issued version of the claims.[190] Requiring infringement to occur under both versions of claims is beneficial because it creates an incentive to have the broadest claims included in the application from the beginning. If broader claims are added after publication, and the infringer would not have infringed the published claims, the patentee has no cause of action for the infringement until after the patent issues. Closing loopholes in the publication requirement would help minimize the uncertainty associated with submarine patents, but it would do nothing about delay, multiple patenting, or filing subsequent claims to cover a competitor's technology.

4. Creating Intervening Rights

Another alternative that would eliminate many of the perils of submarine patents would be the creation of intervening rights for competitors who began making, using, or selling the patented invention prior to the broadening continuation.[191] The Federal Trade Commission recently called for the creation of such intervening rights in its comprehensive report proposing reforms to the patent system.[192] Intervening rights already protect competitors from situations where the patentee broadens issued patent claims to cover their products through a reissue patent.[193] Intervening rights for broadening continuations could work the same way.[194] Continuation-based intervening

---

U.S.C. § 283 (2000), also makes such use of inventions disclosed in pending applications unlikely. A company that produces infringing products based on a published patent application knows that it will soon have to shut down production once the patent issues. Further, anyone who learns of a technology from a published patent application will likely be a willful infringer subject to treble damages.

[190] 35 U.S.C. § 154(d).

[191] The Federal Trade Commission recently proposed the creation of intervening rights in continuation practice in its comprehensive proposals for reform of the patent system. *See* FED. TRADE COMM'N, TO PROMOTE INNOVATION: THE PROPER BALANCE OF COMPETITION AND PATENT LAW AND POLICY 16 (Oct. 2003), *available at* http://www.ftc.gov/os/2003/10/innovationrpt.pdf (last accessed Jan. 14, 2004) (recommending that Congress enact legislation creating intervening and prior user rights in continuation practice).

[192] *Id.*

[193] For a discussion of equitable and absolute intervening rights in the context of broadening reissue, see Timothy R. Holbrook, *Liability for the "Threat of a Sale"*, 43 SANTA CLARA L. REV. 751, 769-70 (2003) (explaining that absolute rights guarantee competitors relief in cases of broadening reissue, and equitable rights allow competitors to continue infringing activities); *see also* J. Christopher Carraway, *The Uncertain Future of Enforcing Patents that Have Been Broadened Through Reissue*, 8 FED. CIR. B.J. 63, 66-70 (1998) (describing the requirements for obtaining equitable and absolute intervening rights).

[194] The Federal Circuit declined to create such a doctrine judicially in *Ricoh Co. v. Nashua Corp.* 185 F.3d 884, 1999 WL 88969, *3 (Fed. Cir. Feb. 18, 1999) (unpublished

rights could limit liability to those circumstances when the infringer would have infringed both the claims in the original application and the ultimately issued continuation patent claims. Although claim construction and infringement determinations for a single claim are hard enough, and this test would double the court's workload by requiring it to determine infringement of both claims, there is an established body of law on both whether a reissue is broadening[195] and the scope of intervening rights.[196] The "substantial identity" test used for both reissue-based intervening rights and the new provisional rights accorded to published applications could be applied to continuation-based broadening of claims as well.[197]

Another model for reform besides intervening rights in reissues and provisional rights for published applications is the prior user right. Many European countries grant a limited right to independent developers to continue using technology they developed before the patent issued.[198] In the United

decision) (holding that intervening rights are reserved for broadening reissue patent and not available for broadening continuations). *Ricoh* is an unpublished decision of the Federal Circuit and therefore is not binding precedent. In any event, there is nothing that would prevent Congress from creating such a right expressly.

[195] *See, e.g.*, Hockerson-Halberstadt, Inc. v. Converse, Inc., 183 F.3d 1369, 1374 (Fed. Cir. 1999) (stating that an amended claim is impermissibly broadened if it includes material that would not have been infringing under original claim); Vectra Fitness, Inc., v. TNWK Corp., 162 F.3d 1379, 1384 (Fed. Cir. 1998) (holding that original patent does not bind reissue claims that are part of a disclaimer); Mentor Corp. v. Coloplast, Inc., 998 F.2d 992, 994 (Fed. Cir. 1993) (finding reissue claims invalid because not based on "error" but deliberately changed to avoid prior art).

[196] *See, e.g.*, Shockley v. Arcan, Inc., 248 F.3d 1349, 1360-61 (Fed. Cir. 2001) (limiting absolute intervening rights to articles manufactured before patent reissuance and equitable intervening rights to non-willful infringement); BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214 (Fed. Cir. 1993) (allowing general intervening rights defense when infringed claims were not in original patent and absolute intervening rights for articles manufactured before reissuance).

[197] *See* Philippe Signore, *The New Provisional Rights Provision*, 82 J. PAT. & TRADEMARK OFF. SOC'Y 742, 752-54 (2000) (analogizing the "substantial identity" test for provisional rights to the test for reissue-based rights).

[198] Robert Merges has called for a system of prior user rights on the European model, and a number of commentators have suggested the creation of a limited defense of some sort for independent inventors. *See, e.g.*, Stephen M. Maurer & Suzanne Scotchmer, *The Independent Invention Defense in Intellectual Property*, 69 ECONOMICA 535, 536 (2002) (presenting the economic benefits of an independent inventor defense, including lower market price and reduction of duplicate research and development); Michelle Armond, Comment, *Introducing the Defense of Independent Invention to Motions for Preliminary Injunctions in Patent Infringement Lawsuits*, 91 CAL. L. REV. 117, 139-47 (2003) (proposing an independent invention affirmative defense to preliminary injunctions); John S. Liebovitz, Note, *Inventing a Nonexclusive Patent System*, 111 YALE L.J. 2251, 2273-74 (2002) (considering an independent invention defense as a logical yet controversial step toward nonexclusive patent reform).

States, recent legislation established a prior user right defense to patent infringement for business method patents.[199] Under that provision, prior user rights exist as a defense to infringement if the prior user reduced the invention to practice more than one year before the patent claims were filed and commercially used the invention before the claims were filed.[200]

While intervening rights would minimize the use of continuations to obtain claims to read on a competitor's product where the patentee had not contemplated the embodiment prior to seeing the competitor's device[201]—a particularly offensive practice—it would not solve other continuation-based problems. For example, intervening rights would not eliminate attempts to wear down the examiner by fighting over-and-over again for broad claims.

5. Limiting the Time an Application Can Spend in Prosecution

An alternative to abolishing or restricting the use of continuation applications is to permit the use of those applications, but to set an independent limit on the amount of time an application can spend in prosecution. Unlike our other proposals, this one can be implemented retroactively and without legislative reform. Indeed, the Federal Circuit has done something very similar in the last two years by creating a new equitable defense of continuing prosecution laches.[202] If continuation applications persist, this new doctrine serves an important function in preventing abuses of the system, though as we noted above, the fact that it is applied after the fact makes it far from a perfect solution. The major problems with the laches doctrine are: (1) the parameters

---

[199] 35 U.S.C. § 273(b) (2000) (allowing the defense to infringement for business method patents only).

[200] *Id.*

[201] We say minimize rather than eliminate because we can envision circumstances where applicants could game the system to avoid intervening rights. For example, imagine a situation where the applicant filed a few extremely broad claims initially, even though she knew these claims would be rejected, then prosecuted more narrow claims, and then later filed a continuation with claims to read on a competitor's device that were broader than those obtained, but narrower then those originally applied for. In this circumstance, the originally filed claims would likely have been broad enough to cover the competitor and therefore, no intervening rights would likely arise.

[202] *See, e.g.*, *In re* Bogese, 303 F.3d 1362, 1369 (Fed. Cir. 2002) (affirming PTO's finding of prosecution history laches because applicant's prosecution delay was unreasonably long); Symbol Techs., Inc. v. Lemelson Med. Ed. & Res. Found., 277 F.3d 1361, 1363 (Fed. Cir. 2002) (creating a prosecution history laches defense for unreasonable and unexplained delay even if applicant complied with statutes). A district court opinion has confirmed that the doctrine of prosecution laches applies even to applications subject to the twenty-year term, *see* Digital Control, Inc. v. McLaughlin Mfg. Co., 225 F. Supp. 2d 1224, 1227 (W.D. Wash. 2002) (refusing to limit the defense to applications filed before the GATT extension), though the court refused to find prosecution laches in the case before it, at least on summary judgment. *Id.* at 1242.

of the doctrine and its application are not, at present, well defined;[203] and (2) courts lack clear standards and hard evidence upon which to base a decision on reasonableness. In order for it to be effective, the doctrine needs some certainty. Both applicants and competitors should have a decent idea about when the doctrine will apply. While the first problem will likely correct itself in time, the second may not. The defense will become better defined as the Federal Circuit has an opportunity to evaluate laches cases and precedent on the issue evolves. One of the major contributions of our empirical research is to help facilitate the laches analysis by providing evidence on the distribution of prosecution delays. This evidence will provide courts with a baseline for their reasonableness analysis. Our research will offer some guidance on the applicability of the defense as well.

To date, only one district court has actually applied prosecution laches to any of the patents in which the defense was raised.[204] The Federal Circuit held

[203] Reiffin v. Microsoft Corp., 270 F. Supp. 2d 1132, 1149 (N.D. Cal. 2003) (stating "the *Symbol* court did little to clarify the elements of the defense, its scope or the burden of proof required to demonstrate it"); *see also* Michael T. Hawkins, *Prosecution Laches in the Wake of* Symbol Technologies*: What is "Unreasonable and Unexplained" Delay?*, 87 MINN. L. REV. 1621, 1648 (2003) ("Although the ultimate conclusion of the *Symbol Technologies* court was well reasoned, the court provided little guidance on how to apply the doctrine."); Jennifer C. Kuhn, Symbol Technologies*: The (Re)Birth of Prosecution Laches*, 12 FED. CIR. B.J. 611, 611-612 (2003) (criticizing the revived laches defense for its uncertainty and lack of guidance).

[204] Symbol Techs., Inc. v. Lemelson Med. Ed. & Research Found., No. CV-S-01-703-PMP(RJJ), 2004 WL 161331 (D. Nev. Jan. 23, 2004) (holding Lemelson's patents in issue unenforceable for prosecution laches on the basis of several decades of delay). Other courts have not found prosecution laches to apply despite some pretty lengthy prosecutions. *See, e.g.*, *Reiffin*, 270 F. Supp. 2d at 1156-59 (denying summary judgment of laches for delays in prosecution of eleven years from the claimed priority date to when the claims at issue were added during prosecution); Cummins-Allison Corp. v. Glory Ltd., No. 02 C 7008, 2003 WL 355470, at *2, *25 (N.D. Ill. Feb. 12, 2003) (denying preliminary injunction because defendant did not prove a likelihood of success of prosecution laches where delay was more than ten years from the earliest claim of priority to the filing of the claims at issue); Stambler v. RSA Sec., Inc., 243 F. Supp. 2d 74, 74-75 (D. Del. 2003) (finding no unreasonable delay as a matter of law where the delay between the original claim to priority and the issuance of the final patent was approximately seven years); Intuitive Surgical, Inc. v. Computer Motion, Inc., No. 01-203-SLR, 2002 WL 31833867, at **4-6 (D. Del. Dec. 10, 2002) (finding no laches where delay from earliest claim of priority to issuance was nearly nine years); *Digital Control, Inc.*, 225 F. Supp. 2d at 1228 (granting patentee summary judgment of no laches even where delay from earliest priority to issue was 10 years, 2.5 months); *cf.* John Mezzalingua Assocs. v. Corning Gilbert, Inc., No. 03-C-354-S (W.D. Wis. Nov. 20, 2003) (refusing to find prosecution laches where the prosecution took less than six years). *But cf.* Chiron Corp. v. Genentech, Inc., 268 F. Supp. 2d 1139, 1143-44, 1148 (E.D. Cal. 2002) (denying summary judgment to patentee on laches issue because delay of more than fifteen years from earliest filing date to issuance was unexplained). The only case in which prosecution laches was found, *In re Bogese II*, the PTO held claims unenforceable where the applicant filed twelve continuations, each on nearly the last possible day, each

that laches ought to apply to bar the enforceability of a patent when there was "an unreasonable and unexplained delay" in prosecution.[205] What the laches cases decided thus far have lacked was evidence regarding normal, median, mean, or "reasonable" prosecution times. If the judges do not have a baseline for assessing how long is too long, then they will have difficultly finding a particular delay unreasonable, especially where both sides present patent experts with opposing opinions on the issue.[206] The empirical results presented in this article provide a baseline for assessing the reasonableness of prosecution length.

As Figure 3 shows, the median amount of time patents spend in prosecution from their earliest filing date to issuance is 2.04 years; the mean is 2.47 years. Figure 3 plots the distribution of patents by the amount of time spent in prosecution. Figure 4 is an inverse cumulative plot of patent prosecution time. At any given year on the X axis, it plots the percentage of patents still in prosecution. For example, eight years after a filing date, only 1.38% of all patent applications are still pending.

We suggest that any patent pending eight years or longer ought to automatically be subject to scrutiny for laches[207]—a presumption of laches.[208]

after a final rejection, and each with no claim changes or amendments. 303 F.3d at 1363-66, 1369 (holding applicant forfeited patent rights through unreasonable delay). This delay in prosecution spanned nearly eight years, from April 6, 1987 to January 23, 1995. *Id.* at 1364-65 (detailing the extensive case history). Prior to these delays, Bogese had actually appealed rejections to the Board and then to the Federal Circuit, but the court did not consider this to be part of the unreasonable delay. *Id. Bogese* is a textbook case of trying to wear down the examiner.

[205] *Symbol Techs., Inc.*, 277 F.3d at 1363.

[206] It also encourages litigants to take unreasonable positions. In *John Mezzalingua Assocs.*, No. 03-C-354-S (W.D. Wis. Nov. 20, 2003), for example, the defendant argued that a prosecution that lasted two years was presumptively unreasonable. Given that the average prosecution lasts 2.77 years, *see* Allison & Lemley, *supra* note 20, at 2199, the court was clearly correct to reject this claim on summary judgment.

[207] While 1.38% does not sound like a lot, in raw numbers it can actually be quite intimidating. As Table 1 indicates, 30,649 patents took eight years or longer from earliest filing date to issuance. *See* Table 1, Appendix A. Many of these patents, however, have already expired since they issued more than seventeen years ago, leaving 23,789 patents still potentially enforceable. Undoubtedly some of these patents would have expired due to failure to pay maintenance fees making the raw number even smaller. While an eight year presumption would potentially call into question 23,789 issued patents, it is important to keep in mind that while approximately 150,000 patents issue each year, only about 3000 end up being litigated and 75% of the litigated cases settle. In short, the raw number of patents encompassed by the eight-year rule is not likely to be unreasonably large.

[208] This is not to say that patents that take less time to prosecute could not be guilty of laches. We have just selected eight years as a benchmark period that ought to always trigger a laches inquiry. The Federal Circuit created a similar presumption for litigation laches, which was triggered at the six-year point, in *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (creating presumption of

*Fig. 4: Patents Still Pending By Year*




Eight years is more than three standard deviations from the mean of 2.47 years.[209] Although the mean amount of time an application spends in prosecution varies somewhat by technology, that variation is not so great that an eight-year presumption would be unreasonable. For example, measuring the time from the most recent filing date to issuance date of the patents issued in each technological class,[210] the technology class with the shortest mean

laches six years after patentee knew or should have known about infringement).

[209] The mean time in prosecution of all patents granted from 1976 to 2000 is 2.4690 years. The standard deviation is 1.6295. Hence, three standard deviations away from the mean is 7.3575. An eight-year presumption is thus more than three standard deviations away from the mean prosecution time.

[210] If we measured time from earliest claim of priority to issuance the difference is more substantial. The class with the shortest mean was class 38 (Textiles: Ironing or Smoothing) with a mean prosecution time of 1.68 years. The class with the longest prosecution time of 4.08 years was class 530 (Chemistry: Natural Resins or Derivatives; Peptides or Proteins; Lignins or Reactions Products Thereof). This variation is almost entirely attributed to the likelihood that members of each class filed continuations and multiple continuations. In class 38, only 7% of all applications claim priority to earlier filed applications (small number of continuations). In class 530, 50% of all patents were continuations. The

(1.53 years) was class 150 (Purses, Wallets, and Protective Covers) and the technology class with the longest application time (3.18 years) was class 380 (Cryptography). The difference in prosecution time may be somewhat related to the complexity of the technology, but in the case of cryptography, many of the patents that issued in this class were delayed because of secrecy orders related to national security issues. Having reviewed the data on each technology class, we conclude that while there is variation by class, the eight-year presumption is fair to all classes and, absent other factors,[211] differences in technology do not justify different presumptive laches periods. Moreover, the PTO examiners are technically trained in the relevant field.[212] While Cryptography would certainly be more complex than wallets to a lay observer, examiners are not laymen.

The eight-year presumption of prosecution laches would be measured from the earliest continuation filing date to which the patentee claims priority to the issuance date.[213] While eight years ought to trigger the presumption, it still

complexity of the technology may of course have some impact as well. In class 38, time from filing to issuance was 1.58 and in class 530 it was 2.52 years. Examiners, however, are educated in the technical field in which they review applications, which ought to diminish the impact of technical complexity on prosecution time.

[211] Since the number of claims and prior art references cited did significantly affect prosecution, we believe that a court in determining whether the delay is unreasonable could consider these factors. A large number of claims and prior art references may cause the examiner to spend more time on the application or may cause the examiner to put off examination due to the complexity. In either event, lengthy prosecution in this case would be due to PTO delay, not applicant delay. Of course, to be a reason for the delay, the large number of claims and prior art would have to be present in each of the applications in the chain. If an applicant files 10 claims initially with several continuations and finally files a continuation with 100 claims ten years after the initial filing, the number of claims cannot be said to have caused the ten-year delay.

[212] In addition to their technical degrees in the relevant field (for example, in biotechnology the PTO almost never hires examiners without a Ph.D. in biology), the examiners also become acquainted with the technology by repeatedly examining applications in the same field.

[213] We recognize that there could be many ways to measure the relevant time period for laches inquiries. We propose the simplest—measure from earliest claim of priority to issuance. Of course we could alternatively measure from the filing date of the patent to which priority is claimed to the filing date of the claims being asserted in the issued patent. This would measure how long the patentee delayed in filing the relevant claims. Such a measure would entirely forgive patentees who file the same claims over and over to wear down the examiner, which we think should not be encouraged. A measure from filing date to filing date would encourage patentees to file exceptionally broad claims initially then prosecute the narrower ones iteratively. That way they could have lengthy delays, but claim to be immune from laches because they had filed the broad claims initially. Measuring from filing date to filing date would also open the door to disputes regarding the scope of the original claims. Patentees would undoubtedly argue that their original (rejected) claims did in fact cover the embodiments claimed in continuations. This would cause district courts to

may be possible for laches to apply for shorter periods of delay, if such delay was unreasonable. A laches presumption is logical as it also mirrors the litigation laches presumption. If a patentee delays filing suit longer than six years from when she knew or should have known of a potential infringer, a presumption of laches arises.[214] Of course, like litigation laches, the prosecution laches presumption ought to be rebuttable. If the patentee can demonstrate that the delay was not unreasonable, but instead there was a legitimate reason why prosecution took so long, then she ought to be able to overcome the presumption. We can think of several reasons that ought to rebut the presumption: (1) delay caused by an appeal to the Board, the district court, or the Federal Circuit, (2) delay caused by an interference, (3) delay caused by PTO error, or (4) delay caused by a secrecy order that prohibited the patent from issuing.

Patentees should not be able to defend against the presumption merely on the grounds that they did not break any laws by filing multiple continuations. That argument, if accepted, would defeat the doctrine of prosecution laches entirely. Prosecution laches is an equitable defense and therefore ought to apply even where a patentee did not violate the letter of the law, but where equity would dictate that the unreasonable delay renders the patent unenforceable. Moreover, arguments that an applicant decided to prosecute her applications in series rather than in parallel,[215] or filed a terminal disclaimer,[216] should not be sufficient to overcome the presumption. The harms from laches are twofold: (1) "unreasonably delaying the issuance of a patent and attendant publication of an invention for the purpose of maximizing its commercial value" and (2) unduly postponing the time when the public can have free use of the invention (extending the monopoly period).[217] Filing a terminal disclaimer may obviate the second harm caused by unreasonable delay—the monopoly is not extended—but it does not address the first harm, and is therefore not an explanation sufficient to overcome laches.

Finally, unlike litigation laches, prosecution laches ought to be a one-part

---

suffer through construction of not only the claims at issue, but also rejected claims from earlier applications.

[214] *See A.C. Aukerman Co.*, 960 F.2d at 1028 (creating a six-year litigation laches presumption).

[215] Serial prosecution means that the applicant decided to prosecute the applications one at a time. Hence she would turn to the new application only after the old one was finished. In general, we have no problem with this approach to prosecution, but we think that the applicant ought not be entitled to the earlier filing date of the continuation application unless she is actually continuing the patent prosecution. A decision to prosecute in series is not meaningfully advancing prosecution on each application.

[216] Patentees may argue that the filing of a terminal disclaimer eliminates the extension of the monopoly that may result from the delay. This generally matters only for applications filed before the change to the twenty-year patent term.

[217] Reiffin v. Microsoft Corp., 270 F. Supp. 2d 1132, 1154 (N.D. Cal. 2003) (citing Woodbridge v. United States, 263 U.S. 50, 58, 60 (1923)).

test: whether the patentee delayed prosecution for an unreasonable length of time.[218] While litigation laches also requires proof that the delay operated to the prejudice or injury of the defendant,[219] prosecution laches ought not have such a requirement.[220] Unlike litigation laches, which is designed to preserve the validity of a patent while preventing injustice to a particular defendant who relied on the patentee's acquiescence, prosecution laches is intended to render the patent unenforceable as a whole. Litigation laches is a personal defense whereas prosecution laches, like validity, is a public defense. Even if the Federal Circuit should subsequently find that proof of both unreasonable delay and material prejudice are required, when our presumption applies (the patent was prosecuted eight years or longer), a prima facie case of laches is made, and both unreasonable delay and material prejudice ought to be inferred.[221]

[218] As an equitable doctrine, prosecution laches is for the court—not the jury—to decide, and it seems as though it would most always be resolvable on summary judgment. Moreover prosecution laches, if it applies, ought to render the entire patent unenforceable, just as such other equitable defenses as equitable estoppel and inequitable conduct.

[219] *See A.C. Aukerman Co.*, 960 F.2d at 1032 (explaining the two-part test for litigation laches).

[220] Indeed, it is hard to see how a particular competitor could specifically rely on the absence of a patent. *See Reiffin*, 270 F. Supp. 2d at 1154 (asserting that proof of unreasonable delay should be the only factor in the prosecution laches inquiry). "Prosecution laches is not a doctrine, like traditional laches, aimed to protect specific competitors. It rather serves the broader public interests in the timely issuance of patents." *Id. But see In re* Certain Data Storage Sys. & Components Thereof, Order No. 47 (Int'l Trade Comm'n Jan. 24, 2003) (rejecting claim of prosecution laches because Hitachi could not show that it had suffered "material prejudice" from a seven-year prosecution delay).

In *Symbol Technologies, Inc.*, the Federal Circuit sought to reconcile the early Supreme Court cases on prosecution laches by concluding that laches applied only where someone—even if not the defendant in suit—had independently developed the product during the years of prosecution delay. Symbol Techs., Inc. v. Lemelson Med. Ed. & Res. Found., 277 F.3d 1361, 1364-65 (Fed. Cir. 2002). This might be viewed as a sort of reliance interest: a requirement that someone be disadvantaged by a material change in position that arguably would not have occurred but for the delay in prosecution. To date, the Federal Circuit has not decided whether such a delay is an element of a prosecution laches defense. For the reasons stated in text, we think it should not be an element.

[221] If the Federal Circuit concludes that proof of material prejudice is required, then adoption of one's technology and use in commerce prior to the filing by the patentee of the broader claims ought to suffice to establish such prejudice. It seems that prejudice would be even clearer if the patentee obtained a related patent with narrower claims (such as a parent or grandparent), the infringer adopted and used technology it believed designs around the claims, and the patentee then filed broader claims to read on the infringer's device. Such facts ought to amount to material prejudice and give rise to intervening rights or render the patent unenforceable at least against that competitor. The problem with rendering the patent unenforceable against everyone in this circumstance is that the prejudice against a single competitor may not exist for the industry at large.

## CONCLUSION

Continuation applications have led to abuse of the patent prosecution process. They serve very little useful purpose, and what benefits they confer may be outweighed by their potential for mischief. The world would probably be a better place if continuation applications were abolished. Recognizing, however, that the abuse of continuation practice is not as pervasive as some might think, we propose a number of means by which Congress and the courts could strengthen existing rules designed to limit their abuse while preserving the practice.

# EXHIBIT 4

John Marshall Review of Intellectual Property Law
Spring, 2008
**Comment**

***545** THE CONTROVERSY SURROUNDING CONTINUING APPLICATIONS AND REQUESTS FOR CONTINUED EXAMINATION

Scott D. Barnett [FNa1]

Copyright © 2008 The John Marshall Law School, Scott D. Barnett

## INTRODUCTION

"Although continuations have a legitimate role in the **patent** prosecution practice, increasingly they are the subject of debate because of their growing volume, their effect on pendency, and the opportunistic use of them." [FN1] On August 21, 2007, the United States **Patent** and Trademark Office ("USPTO") published new regulations placing a limit on the number of continuing applications and requests for continued examination ("RCE") that a **patent** applicant could file without a petition and showing. [FN2] These new regulations sharply contrasted the longstanding system that permitted an applicant to file an unlimited number of continuing applications and RCEs without a petition and showing. [FN3]

***546** The rules ("Final Rules") were set to go into effect on November 1, 2007. [FN4] However, prior to their implementation, the Final Rules were challenged in court in the case of Tafas v. Dudas. [FN5] In Tafas, the United States District Court for the Eastern District of Virginia voided the Final Rules, concluding that they were substantive in nature, and thus "otherwise not in accordance with law" and "in excess of statutory jurisdiction [and] authority." [FN6] Accordingly, the court granted the plaintiffs' motion for summary judgment. [FN7]

Despite the ruling in Tafas, many believe that the USPTO will continue to fight for the implementation of new rules governing continuing applications and requests for continued examination. [FN8] The Final Rules were not unanimously opposed. Although the Final Rules were generally opposed by **patent** agents and attorneys, [FN9] manufacturing companies, [FN10] biotechnology companies, [FN11] and independent inventors, [FN12] ***547** they were generally favored by software companies, [FN13] electronics companies, [FN14] and U.S. government agencies. [FN15] Because some form of the new rules may still come into effect, it is important to analyze the impact that such rule changes would have on parties concerned with **patent** rights. [FN16] This comment examines the sufficiency of the new rules in promoting the USPTO's goals [FN17] and addresses the new rules' potential impact on interested parties and the **patent** prosecution process.

***548** Part I of this comment defines continuing applications and requests for continued examination. Part I then surveys the historical development of these rights. Finally, Part I traces the process leading up to the issuance of the Final Rules. Part II examines the case of Tafas v. Dudas and offers arguments for keeping the Rules void. Part III analyzes the factors that prompted the issuance of the Final Rules and examines the potential effects the Rules will have on different sectors. Finally, Part IV considers the USPTO's options post Tafas and proposes alternative, less intrusive, means of achieving the USPTO's goals.

## I. BACKGROUND: DEFINITIONS, HISTORY, AND THE EVENTS LEADING UP TO THE RULE'S ISSUANCE

The background section of this comment defines the continuing application and request for continued examination in light of the historical development of these rights. Section A examines the different types of continu-

ing applications and discusses the right to file a request for continued examination. Section B describes the historical development of an applicant's right to file continuing applications and requests for continued examination. Finally, Section C provides an overview of the process leading up to the issuance of the new rules.

A. Defining Continuing Applications and Requests for Continued Examination

A continuing application is one filed during the pendency of another application that contains at least part of the disclosure of the other application and names at least one inventor in common with that application. [FN18] There are three main types of continuing applications that one may file at the USPTO. [FN19] An applicant may file a continuation, a divisional, or a continuation-in-part ("CIP") application of a prior application, all of which the USPTO characterizes as "continuing" applications. [FN20] The expressions "continuation," "divisional," and "continuation-in-part" are merely terms used for administrative convenience. [FN21] The fundamental characteristic shared by all types of continuing applications is that they are entitled to the benefit of the filing date of an earlier application as to common subject matter. [FN22]

***549** Industry terms have evolved to describe the often confusing relationships between the initial application and the derivative continuing applications. [FN23] A "parent" application is the immediately preceding application upon which a continuing application claims priority. [FN24] An "original" application refers to the first application in a chain of continuing applications upon which subsequent applications claim priority. [FN25]

A "continuation" is a second application for the same invention claimed in a prior nonprovisional (parent) application and filed before the original prior application becomes abandoned or patented. [FN26] A "divisional" is a second application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application. [FN27] A divisional application is often filed to obtain **patent** protection on subject matter that is withdrawn from examination during the prosecution of the parent application because of a restriction requirement. [FN28] A CIP application is a continuing application containing a portion or all of the disclosure of an earlier application along with added matter not present in that earlier application. [FN29]

Filing a request for continued examination ("RCE") allows applicants to continue to have their application examined after prosecution has closed. [FN30] Both a RCE and a ***550** continuing application retain the priority date of the parent application. [FN31] The main difference between a RCE and a continuing application is that a RCE retains the filing date of the parent application, whereas a continuing application is provided a new filing date. [FN32] Consequently, a RCE enters the examination queue in the place where the parent application sat prior to the final Office action, but a continuing application, having a new file date, goes to the back of the examination queue. [FN33] Thus, an applicant will receive an office action on the merits sooner by filing a RCE than by filing a continuing application. [FN34] In sum, requests for continued examination provide an alternate avenue for obtaining continued examination of an application, without having to file a continuing application. [FN35]

B. Historical Development of the Continuing Application and Request for Continued Examination

An applicant's right to file a continuing application and a request for continued examination is rooted in both common law and legislation. [FN36] This section begins by examining the common law development of the right to file continuing applications followed by a discussion on the statutory embodiment of the continuing application and request for continued examination rules.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1. Common Law Development of Continuing Applications

The Supreme Court first recognized the concept of the continuing application in 1864 in Godfrey v. Eames. [FN37] In Godfrey, an applicant withdrew his application after being notified by the Commissioner of **Patents** that it was refused. [FN38] On the same day that he was notified of the refusal, the applicant filed a new and altered application for the invention that subsequently issued as a **patent**. [FN39] The Court held ***551** that the issued **patent** was entitled to the filing date of the first application because the second application was so analogous to a permissible amendment [FN40] that the two applications should be construed as one continuous application within the meaning of the law. [FN41] However, in order for such continuity to exist, it was necessary that the two applications were for the same invention such that they exhibited "substantial identity." [FN42]

In 1877, the Court in Smith v. Goodyear Dental Vulcanite [FN43] reaffirmed Godfrey and expanded the doctrine of continuing applications. [FN44] In Smith, an applicant allowed his application to remain dormant for eight years following a third rejection and then refiled with a new application. [FN45] During the prosecution of the new application, the USPTO recognized that earlier rejections were erroneous and allowed the claims as originally filed in the first application. [FN46] Recognizing that the delay in filing was due to poverty and illness rather than neglect or indifference, [FN47] the Court held that the applicant had not abandoned his application and was entitled to the original filing date. [FN48]

In General Talking Pictures Corp. v. Western Electric Co., [FN49] the Court reaffirmed the validity of continuing applications. [FN50] The Court concluded that a continuing application is entitled to the filing date of the original application where the subject matter sought to be patented in the continuing application is the same subject matter described in the original application. [FN51]

***552** 2. Statutory Embodiment of the Continuing Application and Request for Continued Examination

The **Patent** Act of 1952 [FN52] codified the continuing application doctrine of Godfrey, but also added that the continuing application must specifically mention the first application. [FN53] 35 U.S.C. § 120 contains four main requirements for continuing applications: [FN54] (1) continuity of disclosure between the applications; [FN55] (2) codependency between the applications; [FN56] (3) the continuation application must specifically reference to the earlier filed application; [FN57] and (4) the continuation and prior applications must be filed by the same inventor. [FN58]

The doctrine permitting an applicant to file a request for continued examination was codified in a 1999 amendment to 35 U.S.C. § 132(b). [FN59] Section 132(b) allows an applicant to pay a fee and continue prosecution of an application following a final rejection. [FN60] In 2000, the USPTO enacted 37 C.F.R. § 114 ("Rule 114"), which permits ***553** an applicant to file a request for continued examination ("RCE") of an application where prosecution was closed, either by final rejection or notice of allowance. [FN61]

Prior to the 1999 amendment, applicants could continue prosecution on a **patent** applicant by filing a continued prosecution application ("CPA") or a file wrapper continuation ("FWC"). [FN62] CPAs and FWCs essentially served the same function as a RCE; however, such applications were typically assigned a new serial number. [FN63] FWCs are now obsolete [FN64] and current CPAs may only be filed on design **patent** applications. [FN65]

C. Process Leading up to the Issuance of the New Rules

Following the adoption of the rules permitting continuing applications and requests for continued examina-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion, it became evident that in some instances, the rules were being used to broaden the scope of an applicant's original claims or wear down an examiner until the application was allowed. [FN66] Furthermore, the right to file continuing applications and requests for continued examination has increased the backlog at the USPTO. [FN67] With these issues in mind, on January 3, 2006, the USPTO ***554** proposed rule changes affecting an applicant's right to file continuing applications and requests for continued examination. [FN68] This proposal would have given applicants the right to file only one continuation absent a petition and showing, regardless of what form the continuation took. [FN69]

Following the proposed rule changes, interested parties were asked to submit their comments on the proposed rules. [FN70] After careful analysis of the comments, the USPTO revised the rules and issued the Final Rules on August 21, 2007. [FN71]

The Final Rules limited the number of continuing applications and RCEs that an applicant could file absent a petition and showing. [FN72] Under the Final Rules, an applicant could only file two continuing applications or one RCE without providing a petition and showing. [FN73] Then, "[t]he third or subsequent continuing application or request for continued examination must be filed with a petition showing why the amendment, argument, or evidence sought to be entered could not have been previously submitted." [FN74]

Had the rules gone into effect, the petition and showing requirement for a third or subsequent continuing application would be provided in § 1.78(d)(1)(vi) as: "A petition must be filed in such nonprovisional application that is accompanied by the fee set forth in § 1.17(f) and a showing that the amendment, argument, or evidence sought to be entered could not have been submitted during the prosecution of the prior-filed application." [FN75] Likewise, had the rules gone into effect, section 1.114(a) would instruct the applicant:

> If prosecution in an application is closed, an applicant may, subject to the conditions of this section, file a request for continued examination of the application accompanied by a submission, the fee set forth in § 1.17(e), and if required, a petition under paragraph (g) of this section accompanied by the fee set forth in § 1.17(f). [FN76]

***555** Although the Final Rules were intended to alleviate many of the USPTO's concerns regarding continuing applications and RCEs, they represent a drastic departure from historical practice and should be viewed with great scrutiny.

## II. KEEP THEM VOID: WHAT THE FEDERAL CIRCUIT SHOULD DO IF IT GETS THE CHANCE

Legal precedent establishes that "[c]ourts must be cautious before adopting changes that disrupt the settled expectations of the inventing community." [FN77] This is because "[f]undamental alterations in [**patent**] rules risk destroying the legitimate expectations of inventors in their property." [FN78] If given the opportunity, the Federal Circuit should uphold the Eastern District of Virginia's decision to permanently enjoin enforcement of the Final Rules. The Court should enjoin the Rules because: (1) the Final Rules are substantive in nature and therefore outside the scope of the USPTO's rulemaking authority and (2) the Final Rules would disrupt the expectations of the inventing community because of their retroactive effect.

### A. Tafas v. Dudas

On August 22, 2007, one day after the new rules were issued, independent inventor Triantafyllos Tafas filed a complaint in the United States District Court for the Eastern District of Virginia seeking to have the rules declared null, void and without legal effect as being beyond the rulemaking power of the USPTO. [FN79] On October 9, 2007, pharmaceutical giant GlaxoSmithKline ("GSK") filed a similar complaint. [FN80] The actions

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

were consolidated and on October 15, 2007, GSK moved for a temporary restraining order and preliminary injunction enjoining the implementation of the Final Rules, which the court granted on October 31, 2007. [FN81] GSK, Tafas, and the USPTO then filed their respective motions for summary judgment on December 20, 2007. [FN82]

***556** On April 1, 2008, the district court ruled that the Final Rules were substantive in nature and exceeded the scope of the USPTO's rulemaking authority under the **Patent** Laws. [FN83] Consequently, the court granted summary judgment to GSK and Tafas, and voided the Final Rules as "otherwise not in accordance with law" and "in excess of statutory jurisdiction [and] authority." [FN84] While Tafas and GSK had pleaded other issues for judicial review, the court opted to decide the case solely on the question of whether the Final Rules fell within the scope of the USPTO's rule-making powers. [FN85]

Regarding the new rules governing continuing applications, the court noted that prior case law held that "there is no statutory basis for fixing an arbitrary limit to the number of [continuing] applications that may be filed and retain the benefit of the priority date." [FN86] After acknowledging that the new rules "do[] not completely prohibit applicants from filing more than two continuation or continuation-in-part applications," the court stated that the new rules "effectively impose[] a hard limit on additional applications." [FN87] The court found that there was effectively a hard limit on additional applications because the "could not have been submitted" standard of the petition and showing requirement would be nearly impossible to satisfy. [FN88] Because the new rules changed existing law, the court found them to be "substantive" in nature and thus, outside of the scope of the USPTO's rule-making authority. [FN89]

As to the new rules imposition of a limit on the filing of RCEs, the court found that the limitation of one RCE per **patent** application family was "a clear departure from the plain language of" 35 U.S.C. § 132. [FN90]

B. The USPTO Lacks Substantive Rulemaking Authority

Congress has granted the USPTO limited rulemaking authority. [FN91] For instance, the USPTO is authorized to "establish regulations, not inconsistent with law" to "govern the conduct of proceedings in the Office." [FN92] The USPTO may also promulgate ***557** regulations that "facilitate and expedite the processing of **patent** applications" [FN93] and "govern the ... conduct of agents, attorneys, or other persons representing applicants or other parties before the Office." [FN94] However, Federal Circuit legal precedent establishes that the USPTO lacks any substantive rulemaking power. [FN95]

A rule is said to be substantive if it causes a change in existing law or policy which affects individual rights and obligations. [FN96] It is important to distinguish purely substantive rules from procedural rules having "collateral substantive consequences." [FN97] The Federal Circuit has established that 35 U.S.C. § 2(b)(2) does not grant the USPTO the ability to promulgate purely substantive rules. [FN98] The Court preceding the Federal Circuit, however, granted the USPTO the ability to promulgate procedural rules that have "collateral substantive consequences." [FN99]

In the case In re Van Ornum, [FN100] the U.S. Court of Customs and **Patent** Appeals ("CCPA") upheld a USPTO rule requiring an applicant to file a disclaimer if he or she sought more than one **patent** on an invention. [FN101] The CCPA found that the rule was procedural in that it "clearly relate[ed] to application processing within the PTO," but that it had a "collateral substantive consequence" because "it relate[d] to a condition under which a **patent** w[ould] be granted which otherwise would have to be denied for double patenting." [FN102] In deciding whether to uphold the rule, the CCPA held that the USPTO had the authority to implement procedural

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

rules regardless of their collateral substantive consequences. [FN103]

The Final Rules are distinguishable from the rules at issue in In re Van Ornum. If the USPTO appeals the decision, the Federal Circuit should affirm the lower court's decision and view the Final Rules as purely substantive rules, rather than ***558** merely procedural rules having substantive consequences, because the Final Rules change existing law and affect applicants' rights and obligations. [FN104] The Final Rules change existing law because they effectively deprive applicants of the ability to file an unlimited number of continuing applications and requests for continued examination. [FN105]

35 U.S.C. § 120 provides that continuation and CIP applications "shall" have the benefit of the priority date of the initial application. [FN106] The CCPA has interpreted section 120 to mean that "there is no statutory basis for fixing an arbitrary limit to the number of [continuing] applications that may be filed." [FN107] Although the Final Rules do not technically prohibit an applicant from filing more than two continuations or CIPs (applicants may file a third continuation or CIP if they satisfy the petition and showing requirement), it is generally understood that the petition and showing requirement will be nearly impossible to satisfy. [FN108] Thus, the Final Rules' effectively place a hard limit on the number of continuations and CIPs that can be filed, thereby changing existing law and depriving applicants of their rights under section 120. [FN109]

An analysis of the Final Rules regarding RCEs results in the same conclusion. 35 U.S.C. § 132 provides that "[t]he Director shall prescribe regulations to provide for the continued examination of applications for **patent** at the request of the applicant." [FN110] The use of the words "shall" and "at the request of the applicant" demonstrates Congress's intention to provide for RCEs at the discretion of the ***559** applicant, not the USPTO. [FN111] Because the Final Rules' petition and showing requirement effectively places a hard limit on the number of RCEs that an applicant can file, the Final Rules significantly change existing law and alter applicants' rights under 35 U.S.C. § 132 to file an unlimited number of RCEs per application at their discretion. [FN112] In sum, the Tafas court was correct in finding the Final Rules substantive and outside of the USPTO's rulemaking authority because they change existing law that affects individual rights and obligations.

### C. The USPTO Lacks the Power to Promulgate the New Rules Because of Their Retroactive Effect

Another reason that the Final Rules should be void, which was not considered by the court in Tafas, is that the Final Rules, if implemented, would have a retroactive effect, and the USPTO lacks the authority to promulgate rules that have such an effect. [FN113] The Supreme Court has stated, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." [FN114] In the instant case, Congress did not expressly grant the USPTO any retroactive rulemaking power under 35 U.S.C. § 2(b)(2). [FN115]

A regulation is said to have a retroactive effect when "the new provision attaches new legal consequences to events completed before its enactment." [FN116] The new rules governing continuing applications and RCEs have a retroactive effect because they will apply to applications pending on November 1, 2007 (the date the rules were supposed to go in to effect). [FN117] By applying the new rules to applications that were pending before enactment of the rules, the USPTO would be substantially altering the bargain that many applicants relied on at the time they filed. [FN118] For example, by filing for a **patent** application, an inventor effectively loses the opportunity to protect that invention as a trade secret. [FN119] Because of the new rules limitations on ***560** continuing applications and RCEs, many inventors might have preferred to seek adequate protection for their invention through trade secrecy. [FN120] They were given no such choice, and as such, their property rights were

impermissibly altered. [FN121]

III. THE FINAL RULES IGNORE FUNDAMENTAL DIFFERENCES ACROSS TECHNICAL FIELDS AND WOULD INCREASE THE BURDEN ON **PATENT** PRACTITIONERS

Although the Final Rules were intended to apply equally to **patents** as a class, they would have affected various technological sectors differently. [FN122] Opposing viewpoints from the different sectors evidence the likely disparate effects. For instance, biotechnological, chemical, and pharmaceutical industries generally opposed the Final Rules. [FN123] Conversely, electronics and software industries generally supported the Final Rules. [FN124] In addition, the Rules would have affected parties who perform **patent** prosecution differently. [FN125] The Rules were obviously supported by the USPTO, [FN126] but were harshly criticized by many **patent** practitioners. [FN127]

The following section addresses the reasons why certain industries opposed the new rules while other industries favored them. This section begins by addressing the USPTO's concerns regarding the prior use of continuing applications that prompted the issuance of the Final Rules. Then, it examines the effect that the Final Rules would have on different technological fields. Finally, this section addresses the effect that the Final Rules would have on **patent** practitioners.

***561** A. The Improper Use of Continuing Applications and RCEs Prompted the Final Rules

Despite much of the negative publicity surrounding the Final Rules, it seems evident that the USPTO had several reasons to introduce **patent** reform. [FN128] Rather than merely addressing the USPTO's goals of promoting efficiency and reducing backlog, the Final Rules likely would have obviated many of the longstanding abuses that arose from the excessive filing of continuing applications and RCEs. [FN129]

For instance, the right to file an unlimited number of continuing applications and RCEs has led to the practice of "submarine patenting." [FN130] Submarine patenting takes place when an applicant intentionally delays the issuance of his or her **patent** through continuing applications or RCEs. [FN131] The applicant would then seek to get his or her **patent** issued at a time when competitors would not be expecting it, so as to take those competitors by surprise. [FN132] By introducing a submarine **patent** when a market is mature, the patentee can obtain a more valuable **patent** than the one which would have issued without the use of continuing applications or RCEs. [FN133] Competitors then waste their resources because they could not possibly know that the submarine **patent** might anticipate one of their products. [FN134]

The problem of submarine **patents** has largely been addressed by modifications to the **patent** laws. [FN135] In 1995, Congress changed the **patent** term from seventeen years from issue to twenty years from the filing of the first application. [FN136] Thus, "every year a patentee delays prosecution of its application is a year of protection ***562** lost." [FN137] In 1999, Congress implemented the requirement that many **patent** applications be published eighteen months after being filed. [FN138] This makes it difficult to maintain the secrecy of a submarine **patent**. [FN139]

Continuing applications and RCEs may also be employed to "wear down" examiners at the USPTO until they grant an allowance. [FN140] Because an applicant is permitted to file an unlimited number of continuing applications and RCEs, an examiner is forced to issue the application as a **patent** in order to dispose of the case. [FN141] Issuing **patents** for the sake of convenience rather than merit leads to bad **patents**. [FN142]

Finally, permitting applicants to file an unlimited number of **continuing applications** and RCEs poses detri-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

mental effects to an applicant's **competitors**. [FN143] For example, an applicant could keep an application pending in the PTO for years while monitoring developments in the marketplace. [FN144] The applicant could then modify claims to cover competitors' products, or more severely, add claims that they never thought of themselves, but rather garnered from the commercial market. [FN145] While this practice may seem unjust, the Federal Circuit has established that it is permissible. [FN146]

B. The Final Rules Would Have a Disparate Negative Impact on the Unpredictable Arts

In the biotechnology, chemical, and pharmaceutical fields, one skilled in the art often cannot predict all of the properties of the claimed subject matter at the time the application is filed. [FN147] These technical areas are commonly referred to as the "unpredictable arts," and the USPTO and federal courts have imposed a heightened ***563** standard for the enablement requirement [FN148] and written description requirement [FN149] of claims directed to compositions in these areas. [FN150] Inventors in these technical areas overwhelmingly use continuing applications and RCEs as a means of adequately protecting their **patent** rights as they continue to understand the scope of their invention. [FN151] For example, as experimentation reveals new information about a composition, researchers often seek to extend **patent** coverage from a small number of molecules to an entire class of compounds. [FN152] Inventors working in the unpredictable arts would typically file multiple continuations and RCEs, without justification, to obtain adequate coverage on their product as experimentation revealed new utility. [FN153]

There is a great deal of speculation that the Final Rules would have increased the cost and time necessary to secure **patent** rights in discoveries made in the unpredictable arts because of the petition and showing requirement. [FN154] The perceived difficulty in satisfying the petition and showing requirement would likely cause applicants to file costly appeals to the Board of **Patent** Appeals and Interferences ("BPAI") if their claims were rejected. [FN155] Applicants who have to appeal their rejections to the BPAI would incur a greater expense than they would have had ***564** they been able to merely file one or more continuing applications or RCEs to get their claims allowed. [FN156]

There has been a sizeable amount of criticism from parties working in the unpredictable arts concerning the Final Rules' requirement that a petition and showing would be necessary to obtain additional continuing applications and RCEs. [FN157] This is a very reasonable concern considering one study concluded that from 1995 through 1999, continuing applications accounted for seventy to eighty percent of **patents** in the top biotech firms, i.e., Amgen, Chion, Genentech, and Immunex. [FN158] Continuing applications also comprise a significantly greater proportion of the **patents** issued in the fields of organic chemistry and chemical engineering than **patents** issued to electronics or software companies. [FN159] The Final Rules would have had the effect of forcing parties in the unpredictable arts to make a difficult decision: Should they only use their two "free" continuing applications and one "free" RCE in the prosecution of a **patent** and risk losing adequate coverage on the discovery, [FN160] or should they file an appeal to the BPAI during the prosecution of their application which can be costly and time consuming? [FN161]

***565** C. The Final Rules Would Not Significantly Burden the Predictable Arts

The use of continuing applications is not nearly as prevalent in the "predictable arts," which comprise the mechanical, electronics, and software fields. [FN162] Inventors in these areas typically have a greater understanding of the scope of their inventions at the time they file for a **patent**, compared to their counterparts in the unpredictable arts. [FN163] Further, inventions in the predictable arts often lose their commercial viability relatively quickly as they are displaced by next generation technology. [FN164] Accordingly, the Final Rules would

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

have had a relatively unsubstantial effect on parties in the predictable arts. [FN165]

Some parties in the predictable arts strongly favored the Final Rules. [FN166] These parties felt that the Final Rules would have produced several beneficial effects. [FN167] First, proponents of the Rules believed that placing a limit on the ability to file continuing applications and RCEs would help curtail a **patent** holder's ability to monitor developments in the market and subsequently modify their claims to cover other companies' products. [FN168] Second, proponents of the Final Rules believed that they would have helped reduce the potential for future litigation and the associated costs. [FN169] This is because evidence demonstrates that **patents** based on continuing applications are far more likely to be litigated than other sorts of **patents**. [FN170]

***566** D. The Final Rules Would Introduce Added Work and Uncertainty for **Patent** Practitioners

**Patent** practitioners generally were quite opposed to the Final Rules. [FN171] Practitioners labeled the Rules as "arbitrary rule changes that will have crazy, unintended consequences," [FN172] and stated that "this is going to be one of the most complex changes to deal with ... in a long while." [FN173] One reason is that the Final Rules would have created a substantial amount of added work for many **patent** attorneys and **patent** agents. [FN174] This is largely because of the Final Rules' petition and showing requirement for filing continuing applications or RCEs. [FN175] In addressing the disclosure documents that an applicant would have to produce to satisfy the petition and showing requirement, one **patent** attorney stated: "Nobody in their right mind would file those." [FN176]

Many practitioners believed that the uncertainty surrounding what would constitute a sufficient "showing" would further exacerbate the problem. [FN177] While the USPTO had not developed a uniform standard to apply in determining what would constitute a sufficient showing, it did provide some direction to applicants. [FN178] When considering the merits of a petition, the USPTO stated that it would examine the prosecution record of the **patent** family to determine the "earnestness of the applicant's efforts to overcome outstanding rejections," [FN179] and whether amendments, arguments or evidence in the petition are being submitted with reasonable diligence. [FN180]

***567** Many practitioners also questioned the adequacy of the Final Rules in promoting the USPTO's goals of increasing efficiency and reducing the backlog. [FN181] In addressing efficiency, one attorney noted: "I don't think this will speed up the process. With all of the appeals and backlog in biotech, I just can't fathom that it will speed it up." [FN182]

Other practitioners believe that the ability to file unlimited continuing applications and RCEs is not the main factor contributing to backlog. [FN183] Rather, many believe that a shortage of examiners at the USPTO is the main reason for the backlog. [FN184]

IV. Achieving the USPTO's Goals Post Tafas

The Eastern District of Virginia's decision in Tafas makes the future of the Final Rules uncertain. [FN185] For instance, the USPTO could appeal the decision to the Court of Appeals for the Federal Circuit. [FN186] Alternatively, the USPTO could attempt to implement the Final Rules by lobbying Congress to incorporate a provision into the **Patent** Reform Act granting them substantive rulemaking authority. [FN187] While recognizing that the Final Rules are not yet "dead," this proposal concludes that limiting the number of continuing applications and RCEs which an applicant is permitted to file is not the best course of action for achieving the USPTO's goals. It is suggested that the USPTO pursue alternate means of achieving its goals by (1) ***568** modifying the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Final Rules to eliminate the disparate impact on different technical fields, (2) hiring more examiners and increasing the investment in the training of new and existing examiners, or (3) charging higher filing fees for continuing applications and RCEs.

A. USPTO Should Go Through Congress, Not Appeal

It is highly unlikely that the USPTO will stop fighting for the implementation of the Final Rules following the Eastern District of Virginia's ruling in Tafas. [FN188] Thus, the question becomes: what forum should the USPTO select to try and have the Rules implemented? [FN189] This proposal suggests that the USPTO should seek to have the Final Rules implemented pursuant to Congressional authority via the **Patent** Reform Act, rather than appealing the decision in Tafas to the Federal Circuit.

The Tafas court issued a permanent injunction, voiding the Final Rules, on April 1, 2008, and the USPTO now has sixty days to file a notice of appeal in the Federal Circuit. [FN190] However, appealing the decision to the Federal Circuit would not be the timeliest means of having the Final Rules implemented. [FN191] A normal appeal to the Federal Circuit takes at least one year. [FN192] Further, if the USPTO appeals, it will likely undergo an administration change during the appellate process, and some speculate that the new administration would withdraw the appeal before the Federal Circuit renders a decision. [FN193]

As an alternative to filing an appeal, the USPTO could attempt to implement the Final Rules by lobbying Congress to grant it substantive rulemaking authority through the **Patent** Reform Act. [FN194] If the **Patent** Reform Act were to be enacted in ***569** this manner, it would legislatively overrule Tafas v. Dudas. [FN195] Moreover, a Congressional grant of substantive rulemaking authority would likely quash any future challenges concerning the USPTO's ability to promulgate rules that are similar in scope to the Final Rules. [FN196]

B. The Final Rules Should be Modified to Eliminate the Disparate Impact on Different Technical Fields

When it comes to rules placing a limit on the number of continuing application and RCEs that may be filed off an application, one size does not fit all. [FN197] **Patent** applicants in the unpredictable arts need to file continuing applications and RCEs to obtain adequate coverage on the subject matter of their applications. [FN198] Conversely, **patent** applicants in the predictable arts do not regularly need to file continuing applications and RCEs to obtain adequate coverage. [FN199] Should the USPTO seek to implement a revised version of the Final Rules, it is suggested that the revised rules provide more "free" (not requiring a petition and showing) continuing applications and RCEs for applications directed to technology in the unpredictable arts, than for applications directed to the predictable arts.

When an applicant files for a **patent** at the USPTO, the application is classified based on its subject matter. [FN200] The USPTO itself has recognized a distinction between subject matter that is directed to the unpredictable arts and subject matter that is directed to the predictable arts. [FN201] This proposal suggests that the USPTO should initially classify all incoming **patent** applications as either being directed to the unpredictable arts or the predictable arts. The applications could then be further ***570** classified based on their specific subject matter in accordance with current practice. [FN202]

The revised rules should then allocate a different number of "free" continuing applications and RCEs that may be filed off that application, based on whether the application is directed to an unpredictable art or a predictable art. For instance, applicants having a **patent** application directed to an unpredictable art should be able to file three continuing applications and two RCEs based on the initial application, without the need to provide a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

petition and showing. [FN203] However, applicants having a **patent** application directed to a predictable art should be limited to two "free" continuing applications and one RCE before they would be required to provide a petition and showing.

The suggestion to provide applications directed to the unpredictable arts with one additional continuing application and one additional RCE (relative to applications directed to the predictable arts) is supported by a study concluding that the average unpredictable arts **patent** issued from roughly one more application than the average **patent** generally. [FN204] By revising the Final Rules in this manner, the USPTO could reduce the disparate negative impact that the current version of the Final Rules places on applications directed to the unpredictable arts.

C. Hire More Examiners and Increase the Continuing Application/RCE Fees

This proposal concludes that the USPTO does not have to promulgate the Final Rules governing continuing applications and RCEs to achieve its goals. [FN205] Firstly, the USPTO could hire more examiners and increase its investment in the training of new and existing examiners. [FN206] Secondly, the USPTO could charge higher fees for multiple continuing applications and RCEs. [FN207]

***571** Increasing the number of examiners at the USPTO would obviously increase prosecution efficiency and reduce the backlog because more examiners equates to fewer applications in examiners' queues and more applications examined simultaneously. [FN208] Also, increasing the USPTO's investment in examiner training would have the effect of improving the quality of **patents** that issue. Naturally, a well-trained examiner will be better able to evaluate **patent** validity and reduce the number of "bad **patents**" that issue. [FN209] Further, the USPTO could attract more, and potentially better qualified, examiners by opening satellite offices. [FN210] By opening offices in the Midwest and on the West Coast, for instance, the USPTO could attract candidates who might otherwise not apply because they do not want to move to the Washington, D.C. area. [FN211]

Charging higher fees for filing multiple continuing applications and RCEs would also be an effective means of curtailing abuses in the continuation process. [FN212] This approach would make applications designed purely for delay more difficult to justify. [FN213] More importantly, such an approach would enable applicants who believe their inventions have economic values that are worth the increased fees to use continuing applications and RCEs as means of obtaining adequate **patent** coverage. [FN214]

CONCLUSION

It is evident that there is a real need to increase **patent** prosecution efficiency, improve the quality of **patents** that issue, and decrease the current backlog. [FN215] Further, permitting applicants to file an unlimited number of continuing applications and RCEs has led to occasional abuses of the **patent** system. [FN216] While these considerations are certainly legitimate, the Final Rules are overly broad in their ***572** scope and impose unnecessarily harsh restrictions on applicants who file continuing applications and RCEs in good faith. [FN217]

Two main reasons exist why the Final Rules should not have gone into effect. Firstly, the USPTO does not have the authority to promulgate the Final Rules because of their substantive nature [FN218] and retroactive effect. [FN219] Secondly, the Final Rules have a disparate effect on different technology sectors. [FN220] Specifically, the Final Rules would limit the ability of inventors in the unpredictable arts to obtain **patent** coverage on the full scope of their inventions. [FN221]

This proposal suggests that the Federal Circuit, if it gets the opportunity, should affirm the district court's decision to void the Final Rules. In doing so, the Court would protect a process that serves as a vital means of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

obtaining adequate **patent** protection and compel the USPTO to seek less intrusive means of achieving its goals. Such more narrowly tailored means of achieving the USPTO's goals include: (1) modifying the Final Rules to enable applicants to file more continuing applications or RCEs without a petition and showing for **patent** applications directed to the unpredictable arts, [FN222] (2) increasing the hiring and training of examiners, [FN223] and (3) charging higher fees for filing multiple continuing applications or RCEs to deter abuse. [FN224]

[FNa1]. J.D. Candidate, May 2009, The John Marshall Law School. B.S. Electrical Engineering, Northwestern University, Evanston, IL, June 2005. Thank you to my editor, Brad Nykiel and the staff of the THE JOHN MARSHALL REVIEW OF INTELLECTUAL PROPERTY LAW.

Note aa1. Available at www.jmripl.com.

[FN1]. NAT'L ACAD. OF PUB. ADMIN., U.S. **PATENT** AND TRADEMARK OFFICE: TRANSFORMING TO MEET THE CHALLENGES OF THE 21ST CENTURY 50 (2005) [hereinafter TRANSFORMING]. This report reflects the views of panel members Thomas H. Stanton, Marilu Goodyear, Bernard Ross, Daniel L. Skoler, and Charles Van Horn. Id. at i. The House Appropriations Subcommittee on Science, State, Commerce, and Justice asked the Academy to review the USPTO's structure and business process and to provide insights on whether and how agency efforts have helped to increase **patent** quality and decrease **patent** pendency. Id. at iii.

[FN2]. See Changes To Practice for Continued Examination Filings, **Patent** Applications Containing Patentably Indistinct Claims, and Examination of Claims in **Patent** Applications, 72 Fed. Reg. 161, 46,716 (Dep't of Commerce Aug. 21, 2007) [hereinafter Changes] ("The third or subsequent continuing application or request for continued examination must be filed with a petition showing why the amendment, argument, or evidence sought to be entered could not have been previously submitted."), voided by Tafas v. Dudas, Nos. 1:07cv846 (JCC), 1:07cv1008 (JCC), 2008 WL 859467 (E.D. Va. Apr. 1, 2008). Under the current rules, an applicant may file an unlimited amount of continuing applications or requests for continued examination without a filing a petition and showing. See 37 C.F.R. §§ 1.78, 1.114 (2007). Had the rules gone into effect, the petition and showing requirement for a third or subsequent continuing application would be provided in § 1.78(d)(1)(vi) as: "A petition must be filed in such nonprovisional application that is accompanied by the fee set forth in § 1.17(f) and a showing that the amendment, argument, or evidence sought to be entered could not have been submitted during the prosecution of the prior-filed application." Changes, supra note 2, at 46,733-34. Likewise, had the rules gone into effect, section 1.114(a) would instruct the applicant:

> If prosecution in an application is closed, an applicant may, subject to the conditions of this section, file a request for continued examination of the application accompanied by a submission, the fee set forth in § 1.17(e), and if required, a petition under paragraph (g) of this section accompanied by the fee set forth in § 1.17(f).

Id. at 46,841.

[FN3]. See, e.g., In re Henriksen, 399 F.2d 253, 261 (C.C.P.A. 1968) (relying on the pre-1952 **Patent** Act practice, the court held that 35 U.S.C. § 120 "provides no limit to the number of applications that may be copending"); In re Hogan, 559 F.2d 595, 604 n.13 (C.C.P.A. 1977) (placing "a limit upon continuing applications is a matter of policy for the Congress, not for us"); Bott v. Four Star Corp. 848 F.2d 1245, 1245 (Fed. Cir. 1988) (unpublished table decision) (stating that the Court would not "adopt equitable safeguards to limit continuation applications when the Congress gave no indication that it intended to so do"). But cf. Mark A. Lemley & Kimberly A. Moore, Ending Abuse of **Patent** Continuations, 84 B.U. L. Rev. 63, 64 (2004). This article suggests that an applicant's right to file an unlimited number of continuing applications is "[o]ne of the oddest things

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

about the United States **patent** system." Id. The right to file an unlimited number of **continuing applications** is criticized because it "introduces substantial delay and uncertainty into the lives of a patentee's **competitors**," wears down examiners, may be used to broaden a patentee's claims through hindsight, and allows for "submarine patenting." Id. at 65.

[FN4]. Changes, supra note 2, at 46,716.

[FN5]. 2008 WL 859467, at *1. Plaintiffs claimed that the proposed rules were an unlawful agency action under section 706(2) of the Administrative Procedure Act ("APA") and should be declared null and void. Id.; see 5 U.S.C. § 706(2)(2). Section 706(2)(c) of the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

Id.

[FN6]. Tafas, 2008 WL 859467, at *10 (quoting 5 U.S.C. § 706(2)(c)).

[FN7]. Id.

[FN8]. See Sandra Thompson, Vaccinate Your **Patent** Portfolio: How to Protect Your Intellectual Property Rights During the Sweeping Changes at the USPTO, Mar. 18, 2007, MONDAQ BUS. BRIEFING, available at http:// www.mondaq.com/article.asp?articleid=58238 (stating that "it is likely that these new rules will be repackaged at some point in 2008-09."); Kevin Tampone, Possible New IP Rules Could Have Major Effect for Firms, CENT. N.Y. BUS. J., Dec. 21, 2007, at 13, available at http://www.cnybusinessjournal.com/ (stating that the new rules "are still likely to come through in some form, local intellectual-property law attorneys say").

[FN9]. See Letter from Michael K. Kirk, Executive Director, AIPLA, to John W. Dudas, Under Secretary of Commerce for Intellectual Property and Director of the U.S. **Patent** and Trademark Office (Apr. 24, 2006), available at http:// www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/aipla.pdf [hereinafter Kirk Letter] (noting that the proposed changes to the continuation process "would disadvantage applicants by prematurely truncating prosecution of their applications").

[FN10]. See Letter from Honda R&D Americas, Inc. to John W. Dudas, Under Secretary of Commerce for Intellectual Property and Director of the U.S. **Patent** and Trademark Office (May 3, 2006), available at http:// www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/honda.pdf [hereinafter Honda Letter] (commenting that Honda does not believe the proposed changes to the continuation rules "will adequately protect applicants while achieving the USPTO's goal of the reducing the pendency backlog").

[FN11]. See Letter from A. Scott Whitaker, Chief Operating Officer, Biotechnology Industry Organization, to Robert W. Bahr, Commissioner for **Patents** (May 2, 2006), available at http:// www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/bio.pdf (commenting that the "PTO's proposed rule changes will adversely impact innovation, especially in the biotechnology sector, by inhibiting the ability of innovators to obtain adequate coverage on their inventions and to attract financing for products that often take a relatively long time to reach the marketplace").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN12]. See Letter from Byron L. Hale, Chief Technology Officer, Effective Information, LLC to Commissioner for **Patents** (May 3, 2006), available at http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/ia_ con.pdf. Hale, an independent inventor, believed that "the proposed rule changes on continuations would drastically increase my costs for obtaining a **patent**, while at the same time restricting the protection I pay for." Id.

[FN13]. See Letter from Robert W. Holleyman, II, President and C.E.O, the Business Software Alliance, to John W. Dudas, Under Secretary of Commerce for Intellectual Property and Director of the U.S. **Patent** and Trademark Office (May 3, 2006), available at http:// www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/bsa.pdf [hereinafter Holleyman Letter]. In comments directed to the USPTO, the Business Software Alliance noted that they "support[] the changes aimed at ending the abuses of continuation practices whether by rule changing or through legislation." Id. at 1.

[FN14]. See Letter from David Simon, Chief **Patent** Counsel, Intel Corp., to Commissioner for **Patents**, U.S. **Patent** and Trademark Office (May 3, 2006), available at http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_ continuation/intel.pdf. In comments directed to the USPTO, Intel noted that they "commend[] the [**Patent**] Office's efforts to curtail abuses by those outliers who unnecessarily delay prosecution of their applications with multiple continuation filings." Id.

[FN15]. See Letter from the Antitrust Division of the U.S. Dep't of Justice to the U.S. **Patent** and Trademark Office (May 3, 2006), available at http:// www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/usdoj_ad.pdf (noting that the proposed changes to the continuation rules will likely "improve the efficiency of the **patent** examination process and should discourage potential abuses of that process").

[FN16]. See Tampone, supra note 8 (noting that the new rules governing continuing applications and RCE's "could have a major effect on how companies and attorneys protect intellectual property"); see also Stewart Weinberg, U.S. **Patent** Office to Unveil New Continuation Rules Monday, DOW JONES NEWSWIRES, Aug. 20, 2007, http://www.patentlyo.com/**patent**/2007/08/continuation-ru.html (stating that the original proposal to limit continuations "generated strong reaction, both positive and negative, from various industries that rely on the **patent** system"). But see Posting of Simon J. Elliott & Courtenay C. Brinckerhoff to **Patent** Docs: Biotech & Pharma **Patent** Law & News Blog, New Continuation Rules: Unfair to Biotech?, http://www.patentdocs.us/**patent**_ docs/2007/08/new-pto-continu.html (Aug. 29, 2007, 22:52) ("[T]he PTO asserts that the new rules will affect less than three percent of **patent** applications.").

[FN17]. See Changes, supra note 2, at 46,717. The USPTO stated that there is a "need for a better focused and effective examination process to reduce the large and growing backlog of unexamined applications while maintaining or improving the quality of issued **patents**." Id.; see also Press Release, U.S. **Patent** and Trademark Office, USPTO to Publish Measures to Improve **Patent** Quality: Claims and Continuations Rules Will Improve Effectiveness and Efficiency of **Patent** Examination (Aug. 20, 2007), available at http:// www.uspto.gov/web/offices/com/speeches/07-33.htm. John Dudas, Under Secretary of Commerce for Intellectual Property, addressed the proposed changes stating: "These rules better focus examination and will bring closure to the examination process more quickly, while ensuring quality and maintaining the right balance between flexibility for applicants and the rights of the public." Id.

[FN18]. See 35 U.S.C. §§ 120, 121 (2006); 37 C.F.R. § 1.78 (2007); Transco Prod. Inc. v. Performance Con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tracting Inc., 38 F.3d 551, 555 (Fed. Cir. 1994); 4A DONALD S. CHISUM, CHISUM ON **PATENTS** § 13.01 (2006) ("A person who has filed one application for a **patent** in the **Patent** and Trademark Office may file a subsequent or continuation application.").

[FN19]. U.S. PAT. & TRADEMARK OFFICE, U.S. DEP'T OF COMMERCE, MANUAL OF **PATENT** EXAMINING PROCEDURE § 201.11 (8th ed., 5th rev. 2006) [hereinafter MPEP]. See also Transco, 38 F.3d at 555 (recognizing that "there are various types of 'continuing' applications that one may file at the PTO").

[FN20]. MPEP, supra note 19, § 201.11. The application types are exclusive. Id. For example, an application cannot be both a continuation and divisional application. Id.

[FN21]. Transco, 38 F.3d at 556.

[FN22]. MPEP, supra note 19, § 201.11.

[FN23]. See Transco, 38 F.3d at 555.

[FN24]. MPEP, supra note 19, § 201.04. Section 201.04 states:

> The term "parent" is applied to an earlier application of an inventor disclosing a given invention. Such invention may or may not be claimed in the first application. Benefit of the filing date of copending parent application may be claimed under 35 U.S.C. 120. The term parent will not be used to describe a provisional application.

Id.; see also 4A CHISUM, supra note 18, § 13.03[1] (stating that, in the case of a chain of three applications, the original may be called the "grandparent" and the subsequent applications may then be called a "child" or "grandchild" accordingly).

[FN25]. See Transco, 38 F.3d at 556; Cecil D. Quillen, Jr. & Ogden H. Webster, Continuing **Patent** Applications and Performance of the U.S. **Patent** and Trademark Office, 11 FED. CIR. B.J. 1, 4 n.14 (2002) (noting that, when discussing continuing applications and RCEs, the term original "means a U.S. **patent** application that does not claim the filing date of an earlier filed nonprovisional U.S. application."). However, the MPEP provides a broader definition of original applications, stating that an original may be a continuing application. MPEP, supra note 19, § 201.04(a).

[FN26]. MPEP, supra note 19, § 201.07.

[FN27]. Id. § 201.06.

[FN28]. Id.; 35 U.S.C. § 121 (2006). Section 121 states:

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 of this title it shall be entitled to the benefit of the filing date of the original application.

Id.; see also U.S. PAT. & TRADEMARK OFFICE, QUESTIONS AND ANSWERS CLAIMS AND CONTINUATIONS FINAL RULE 2 (2007), available at http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/ccfrfaq.pdf [hereinafter QUESTIONS] ("The divisional application must contain only claims directed to an invention or inventions that were identified in the restriction requirement but were not elected for examination and were not examined in any other nonprovisional applica-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion.").

[FN29]. MPEP, supra note 19, § 201.08.

[FN30]. See 35 U.S.C. § 132(b) (2006); 37 C.F.R. § 1.114(a) (2007). Prosecution in an application is closed when "the application is under appeal, or that the last Office action is a final action (§ 1.113), a notice of allowance (§ 1.311), or an action that otherwise closes prosecution in the application." Id. § 1.114(b).

[FN31]. 35 U.S.C. § 120, 37 C.F.R. §§ 1.78, 1.114.

[FN32]. 37 C.F.R. §§ 1.53(b), 1.114; MPEP, supra note 19, § 706.07(h) ("An RCE is not the filing of a new application. Thus, the Office will not convert an RCE to a new application such as an application filed under 37 C.F.R. [§] 1.53(b) ...."); see also Stephen T. Schreiner & Patrick A. Doody, **Patent** Contaminations: How Proposed Rule Changes Will Undermine Our System and Create New Problems, 24 INTELL. PROP. L. NEWSL. 38, 42 (2006) (noting that a RCE is not a new or separate application while a continuation application is a new and separate application).

[FN33]. See MPEP, supra note 19, § 708; see also Posting of James D. Ivey to Intellectual Property Law Server, Re: Difference Between Continuation, CIP, RCE and Div, http://www.intelproplaw.com/Forum/Forum.cgi?board=**patent**_filing; action=display;num=1138202897 (Jan. 25, 2006, 11:08) [hereinafter Ivey].

[FN34]. See Ivey, supra note 33.

[FN35]. MPEP, supra note 19, § 706.07(h).

[FN36]. See generally 4A CHISUM, supra note 18, § 13.02 (noting that an inventor's right to rely on the filing date of a prior copending application in a subsequent application developed through court decisions and gained statutory embodiment in 1952 with the enactment of 35 U.S.C. § 120).

[FN37]. 68 U.S. 317 (1864).

[FN38]. Id. at 318. Godfrey filed an application for boot-trees. Id. The application was rejected for want of novelty. Id. Godfrey then withdrew the rejected application and filed a new application on the same invention simultaneously. Id.

[FN39]. Id. at 319.

[FN40]. See **Patent** Act of 1836, ch. 357, § 7, 5 Stat. 117 (1836). The **Patent** Act of 1836 expressly authorized applicants to alter their applications following a rejection and have the amended application reexamined.

[FN41]. Godfrey, 68 U.S. at 325-26. If a party withdraws his application for a **patent**, "intending at the time of such withdrawal to file a new petition, and he accordingly do[es] so, the two petitions are to be considered as parts of the same transaction." Id. The court held that both petitions are to be viewed as "constituting one continuous application, within the meaning of the law." Id.

[FN42]. Id. The Supreme Court held that continuity between applications was proper only where the two applications were for the same invention. Id. In finding that the applications were sufficiently similar to warrant con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tinuity, the Court stated: "We are satisfied that there was here such substantial identity in the two specifications as brings the case within the rule thus laid down." Id. at 325.

[FN43]. 93 U.S. 486 (1877).

[FN44]. Id. at 500-01.

[FN45]. Id.

[FN46]. Id. at 492.

[FN47]. Id. at 491. The Court noted that the applicant's poverty made him "utterly unable to bear the necessary expenses of prosecuting his case further," but he did not withdraw his application, did not ask for a return of part of the fee he had paid, "nor by any act of his did he indicate acquiescence in the unfavorable action of the **Patent** Office." Id.

[FN48]. Id. at 500-01. The Court held that filing a second petition for a **patent**, after the first has been rejected, does not sever the second application from the first and deprive the applicant of "any advantage he would have enjoyed had the **patent** been granted without a renewal of the application." Id. But cf. **Patent** Act of 1870, ch. 230, § 32 (1870). In 1870 Congress placed an express limit on the time for responding to an action on an application by the USPTO wherein if no timely response is made, the application is regarded as abandoned. **Patent** Act of 1870 § 32.

[FN49]. 304 U.S. 175 (1938).

[FN50]. Id. at 183.

[FN51]. Id.

[FN52]. **Patent** Act of 1952, ch. 950, § 1, 66 Stat. 792 (1952) (codified as amended in 35 U.S.C.).

[FN53]. See 35 U.S.C. § 120 (2006). Section 120 states:

> An application for **patent** for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

Id.

[FN54]. Id.; see 4A CHISUM, supra note 18, § 13.02[4].

[FN55]. 35 U.S.C. § 120; 4A CHISUM, supra note 18, § 13.02[4] (noting that the prior application must meet the enablement, best mode, and description requirements as to the invention claimed in the later continuation application).

[FN56]. 35 U.S.C. § 120; 4A CHISUM, supra note 18, § 13.02[4] (noting that the second application must be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

filed prior to the patenting or abandonment or termination of proceedings on the first application).

[FN57]. 35 U.S.C. § 120.

[FN58]. Id.; 4A CHISUM, supra note 18, § 13.02[4]. The **Patent** Law Amendments Act of 1984 replaced the "same inventor" requirement of section 120 with the phrase "which is filed by an inventor or inventors named in the previously filed application." **Patent** Law Amendments Act of 1984 § 105(b), Pub. L. No. 98-622, 98 Stat. 3385 (codified as amended 35 U.S.C. § 120). The change was made to provide an application with the benefit of the filing date of an earlier application when all of the inventors named in the later application were not named in the earlier application. Section-by-Section Analysis: **Patent** Law Amendments Act of 1984, 98th Cong., 130 Cong. Rec. H10, 526 (Oct. 1, 1984), as reprinted in 1984 U.S.C.C.A.N. 5827.

[FN59]. Act. of Nov. 29, 1999, P.L 106-113, § 1000(a), 113 Stat. 1501A-560, 582 (1999) (enacting S. 1948 §§ 4403, 4732(a)(10)(A), codified in 35 U.S.C. § 132(b)). After the amendment, section 132(b) states:

> The Director shall prescribe regulations to provide for the continued examination of applications for **patent** at the request of the applicant. The Director may establish appropriate fees for such continued examination and shall provide a 50 percent reduction in such fees for small entities that qualify for reduced fees under section 41(h)(1) of this title.

Id.

[FN60]. Id.

[FN61]. 37 C.F.R. § 1.114(a) (2007). Section 1.114(a) states: "If prosecution in an application is closed, an applicant may request continued examination of the application by filing a submission and the fee set forth in § 1.17(e)."

[FN62]. See Rajiv P. Patel, An Introduction to U.S. **Patent** Prosecution, in FUNDAMENTALS OF **PATENT** PROSECUTION 2007: A BOOT CAMP FOR CLAIM DRAFTING & AMENDMENT WRITING, at 161, 178 (PLI Pats., Copyrights, Trademarks, & Literary Prop. Course, Handbook Ser. No. 906, 2007), available at WL, 906 PLI/Pat 161 (stating that "[o]lder **patents** may note applications referred to as file wrapper continuations (FWCs) or continued prosecution applications (CPAs), which essentially served the same function as an RCE"); see also In re Bogese, 303 F.3d 1362, 1364 n.3 (Fed. Cir. 2002) (stating that "a 'file wrapper continuation' application ... had the effect of abandoning the pending application and physically transferring the file history of the abandoned application into a new application for further prosecution.").

[FN63]. Patel, supra note 62, at 178.

[FN64]. Changes to **Patent** Practice and Procedure, 62 Fed. Reg. 53,132, 53,142 (Dep't of Commerce Oct. 10, 1997). In 1997, the provision authorizing the filing of a FWC was deleted. Id. Applicants were advised that applications purporting to be FWCs would be treated as CPAs. Id. at 53,147.

[FN65]. Elimination of Continued Prosecution Application Practice as to Utility and Plant **Patent** Applications, 68 Fed. Reg. 32,376, 32,376 (Dep't of Commerce May 30, 2003) ("Since continued prosecution application (CPA) practice is largely redundant in view of RCE practice, the Office is eliminating CPA practice as to utility and plant applications."); 37 C.F.R. § 1.53(d).

[FN66]. See TRANSFORMING, supra note 1, at 51 (noting that "[a]cademic papers and congressional testi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

mony maintain that continuations are used to 'wear down' examiners until the applicant obtains a **patent**, or so that the applicant can include claims in the new application that cover a **competitor's** product that has come on the market since the original application was filed"); accord Paul Festa, Bar Code **Patents** Thrown Out, CNET NEWS.COM, Jan. 27, 2004, http://www.news.com/2100-1025_3-5148584.html; see also In re Bogese, 303 F.3d 1362, 1369 (Fed. Cir. 2002) (holding that the PTO did not err in rejecting applicant's claims due to unreasonable delay where the applicant filed twelve **continuation applications** over an eight-year period and did not substantively advance the prosecution of his application when required and given opportunity to do so by the PTO); Lemley & Moore, supra note 3, at 74-75 (noting that the only way an examiner can dispose of an application is by allowing it and therefore, when faced with a determined applicant, the examiner has an incentive to allow the application).

[FN67]. See TRANSFORMING, supra note 1, at 51 ("[O]ne study reported that it took USPTO an average of 4.16 years to issue a **patent** for applications with at least one continuation compared to an average of 1.96 years for applications without continuations."); accord Lemley & Moore, supra note 3, at 64; see also Weinberg, supra note 16 (noting that the number of continuation requests has been rising in recent years).

[FN68]. See Changes To Practice for Continued Examination Filings, **Patent** Applications Containing Patentably Indistinct Claims, and Examination of Claims in **Patent** Applications, 71 Fed. Reg. 48 (Dep't of Commerce Jan. 3, 2006).

[FN69]. Id. at 48 ("The revised rules would require that second or subsequent continued examination filings, whether a continuation application, a continuation-in-part application, or a request for continued examination, be supported by a showing as to why the amendment, argument, or evidence presented could not have been previously submitted.").

[FN70]. See Changes, supra note 2, at 46,717 ("Both the Continuing Applications Proposed Rule and the Claims Proposed Rule requested public comments and provided a comment period of four months to give the public an opportunity to submit written comments.").

[FN71]. Id.

[FN72]. Id.

[FN73]. Id. at 46,716; QUESTIONS, supra note 28, at 2 ("An applicant may file two continuation or CIP applications claiming the benefit of an initial application, plus an RCE in the application family, without any justification.").

[FN74]. Changes, supra note 2, at 46,716.

[FN75]. Id. at 46,733-34.

[FN76]. Id. at 46,841.

[FN77]. Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 739 (2002) (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co. 520 U.S. 17, 28 (1997)).

[FN78]. Id.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN79]. Complaint at 2, Triantafyllos Tafas v. John Dudas and The United States **Patent** and Trademark Office, No. 1:07cv846 (E.D. Va. Aug. 22, 2007).

[FN80]. Complaint at 1, Smithkline Beecham Corp. v. Dudas, No. 1:07 cv1008 (E.D. Va. Oct. 9, 2007).

[FN81]. Tafas v. Dudas, 511 F. Supp. 2d 652, 663 (E.D. Va. 2007) ("In carefully weighing the factors of the Federal Circuit's balancing test ... the Court will grant GSK's Motion for a Preliminary Injunction.").

[FN82]. Tafas v. Dudas, Nos. 1:07cv846 (JCC), 1:07cv1008 (JCC), 2008 WL 859467, at *3 (E.D. Va. Apr. 1, 2008); see also Defendants' Reply Memorandum in Support of Their Motions for Summary Judgment 2-26, Tafas v. Dudas, Nos. 1:07cv846(L) (JCC/TRJ), 1:07cv1008 (JCC/TRJ) (E.D. Va. Feb. 1. 2008). The USPTO provided several counter arguments to the plaintiffs' claims. Id. For instance, the USPTO argued that: (1) "The Final Rules Were Promulgated Pursuant to Expressly Delegated Rulemaking Authority"; (2) "Final Rule 78 Places Reasonable Conditions on the Filing of Continuing Applications, Consistent with Section 120 of the **Patent** Act"; (3) "Final Rule 114 Comports With Section 132"; and (4) The "Final Rules are not Retroactive in Their Current Application." Id.; John E. Schneider & Mark T. Garrett, Tafas v. Dudas: The PTO Rules Limiting Continuations and Claims Are Null and Void 1 (2008), http:// www.fulbright.com/images/publications/BRIEFPTORulesNullandVoid.pdf ("Dudas and the USPTO countered on several grounds as well, including that the final rules were procedural because they did not affect any core patentability requirements, that they were necessary in view of the crippling backlog of applications, and that no[]property rights were taken because none vested until a **patent** actually issued.").

[FN83]. Tafas, 2008 WL 859467, at *4; see also 35 U.S.C. § 2(b)(2) (2006) (granting the USPTO the authority to "establish regulations, not inconsistent with law ....").

[FN84]. Tafas, 2008 WL 859467, at *4; see also 5 U.S.C. § 706(2).

[FN85]. Tafas, 2008 WL 859467, at *4 (noting "because the Court believes that one who judges least judges best, it will not reach the other issues raised by the parties, resting instead on the determination of a single dispositive issue").

[FN86]. Id. at *7 (quoting In re Henriksen, 399 F.2d 253, 254 (C.C.P.A. 1968)); see also In re Hogan, 559 F.2d 595, 604 n.13 (C.C.P.A. 1977).

[FN87]. Tafas, 2008 WL 859467, at *7.

[FN88]. Id.; see also Christopher A. Brown, Survey of Developments in Intellectual Property Law, 40 IND. L. REV. 987, 988 (2007) (stating: "[n]ot only is a burden created on the applicant that has never before existed, but the 'could not have been presented' burden appears to be quite high").

[FN89]. Tafas, 2008 WL 859467, at *7.

[FN90]. Id. at *8; see also 35 U.S.C. § 132 (2006).

[FN91]. 35 U.S.C. § 2(b)(2).

[FN92]. Id. § 2(b)(2)(A).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN93]. Id. § 2(b)(2)(C); see also Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction at 15, Smithkline Beecham Corp. v. Dudas, No. 1:07cv1008 (E.D. Va. Oct. 15, 2007) [hereinafter Plaintiff's Memorandum] (noting that the current USPTO apparently interpreted its power to implement the new rules under 35 U.S.C. § 2(b)(2)(C), which grants the USPTO the power to facilitate and expedite the processing of **patent** applications).

[FN94]. 35 U.S.C. § 2(b)(2)(D).

[FN95]. Merck & Co. v. Kessler, 80 F.3d 1543, 1549-50 (Fed. Cir. 1996) (recognizing that the Commissioner of the USPTO does not have the authority to issue substantive rules); accord Eli Lilly & Co. v. Bd. of Regents of Univ. of Wash., 334 F.3d 1264, 1269 n.1 (Fed. Cir. 2003).

[FN96]. Animal Legal Def. Fund v. Quigg, 932 F.2d 920, 927 (Fed. Cir. 1991); see also Chrysler Corp. v. Brown, 441 U.S. 281, 282 (1979) (noting that substantive rules "must be the product of a congressional grant of legislative authority, promulgated in conformity with any procedural requirements imposed by Congress"); Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (defining substantive rules as those that "grant rights, impose obligations, or produce other significant effects on private interests" or that "effect a change in existing law or policy").

[FN97]. Tafas v. Dudas, Nos. 1:07cv846 (JCC), 1:07cv1008 (JCC), 2008 WL 859467, at *7 (E.D. Va. Apr. 1, 2008) ("Despite this attempt to abolish the substantive-procedural distinction, however, the balance of the case law in the Federal Circuit and the Supreme Court indicates that the distinction exists, and that it is pertinent to this dispute."); see In re Van Ornum, 686 F.2d 937 (C.C.P.A. 1982).

[FN98]. Merck, 80 F.3d 1543, 1549-50.

[FN99]. See In re Van Ornum, 686 F.2d at 937.

[FN100]. Id.

[FN101]. Id. at 945.

[FN102]. Id.

[FN103]. Id. at 946 (holding the regulation to be valid); see also Tafas v. Dudas, Nos. 1:07cv846 (JCC), 1:07cv1008 (JCC), 2008 WL 859467, at * 7 (E.D. Va. Apr. 1, 2008) ("In re Van Ornum stands for the proposition that procedural rules with collateral substantive consequences are permissible under Section 2(b)(2).").

[FN104]. Tafas, 2008 WL 859467, at *7 (finding that "the Final Rules are neither procedural rules nor rules relating to application processing that have substantive collateral consequences, but substantive rules that change existing law and alter the rights of applicants"); see also Posting of Peter Zura to Peter Zura's 271 **Patent** Blog, Tafas v. Dudas: Continuation Rules Oral Argument Recap, http;//271patent.blogspot.com/2008/02/tafas-v-dudas-continuation-rules-oral.html (Feb. 10, 2008) [hereinafter Zura]. The plaintiffs argued that USPTO inherently lacked the authority to implement the Final Rules because the rules were substantive in nature. Id. The USPTO countered that the rules were "'procedural' restrictions that would aid the [US]PTO in curbing the avalanche of [continuation] applications at the PTO." Id.; Andrew Noyes, Amid **Patent** Legislation Debate, Court Hears Rules Challenge, CONGRESS DAILY, Feb. 6, 2008, available at 2008 WLNR 2202256 (noting that Attorney Mark Fox Evens, who represents clients contesting the rule

changes, believes that the USPTO has exceeded its authority by issuing rules which "have to be viewed as substantive").

[FN105]. Tafas, 2008 WL 859467, at *7 (finding that the Final Rules "constitute a drastic departure from the terms of the **Patent** Act as they are presently understood ... [and] [b]y so departing, the Final Rules effect changes in GSK's and Tafas's existing rights and obligations"); see also 35 U.S.C. §§ 120, 132 (2006); Ex parte Hull, 191 U.S.P.Q. 157, 159 (Bd. Pat. App. & Int. 1975) ("[T]he Office cannot deny an applicant the benefit of the filing date of his earliest filed case no matter how many intervening continuing applications when no other pertinent facts are involved.").

[FN106]. 35 U.S.C. § 120; see also Plaintiff's Memorandum, supra note 93, at 7.

[FN107]. Tafas, 2008 WL 859467, at *7 (quoting In re Henriksen, 399 F.2d 253, 254 (C.C.P.A. 1968)).

[FN108]. Id. at *7 ("[B]ecause the USPTO intends to deny additional applications in almost all circumstances, the 'could not have been submitted' standard of the petition and showing requirement effectively imposes a hard limit on additional applications."); see also supra text accompanying note 88.

[FN109]. Tafas, 2008 WL 859467, at *7 ("Final Rule 78 and the hard limit it imposes changes existing law and deprives applicants of their valuable rights under 35 U.S.C. § 120 to an unlimited number of continuation and continuation-in-part applications as a matter of right."); see also Plaintiff's Memorandum, supra note 93, at 17-20.

[FN110]. 35 U.S.C. § 132.

[FN111]. Tafas, 2008 WL 859467, at *8; see also Plaintiff's Memorandum, supra note 93, at 8.

[FN112]. Tafas, 2008 WL 859467, at *8.

[FN113]. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988); Brimstone R.R. & Canal Co. v. United States, 276 U.S. 104, 122 (1928) ("The power to require readjustments for the past is drastic ... [and] ought not be extended so as to permit unreasonably harsh action without very plain words.").

[FN114]. Bowen, 488 U.S. at 208; see also Landgraf v. USI Film Prods., 511 U.S. 244, 272-73 (1994).

[FN115]. See 35 U.S.C. § 2(b)(2).

[FN116]. Landgraf, 511 U.S. at 270.

[FN117]. Changes, supra note 2, at 46,716; see also Zura, supra note 104 (stating that, in Tafas, "the PTO appeared to concede that substantive rules could not be applied retroactively, adding that changes to the FRCP have been routinely applied to pending litigation without any trouble").

[FN118]. See Plaintiff's Memorandum, supra note 93, at 25 (noting that changes to the **patent** rules, while applications are pending, are inherently retroactive).

[FN119]. See Brief for Amicus Curiae American Intellectual Property Law Ass'n in Support of the "GSK" Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction at 3-4, Tafas v. Dudas, No. 1:07cv846, 2008 WL 859467 (E.D. Va. Oct. 25, 2007) [hereinafter AIPLA Brief] (noting that the new rules "re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

strict the ability of **patent** application owners to file continuation applications to seek adequate protection for the inventions they elected to protect through the **patent** system, rather than relying on trade secrecy"); see also SCHNEIDER & GARRETT, supra note 82, at 1 (noting that one argument the Plaintiff's in Tafas relied on is that the Final Rules "retroactively extinguished applicants' trade secrets rights").

[FN120]. AIPLA Brief, supra note 119, at 3-4.

[FN121]. See Plaintiff's Memorandum, supra note 93, at 25 (noting that **patent** applications are property).

[FN122]. See Elliott & Brinckerhoff, supra note 16 (stating that "the PTO speaks of **patents** as a class, ignoring fundamental differences across technical fields").

[FN123]. See id. (noting that the use of continuations, including CIP and RCEs, have been more popular in biotech, pharmaceutical, and chemical fields than in other technologies); Lemley & Moore, supra note 3, at 69 (noting that the use of multiple continuations is especially important in the pharmaceutical and biotechnology areas).

[FN124]. See Elliott & Brinckerhoff, supra note 16. The use of multiple continuations is less important in electronics and software industries because patented technologies in those fields are generally commercially viable at the beginning of a **patent** term. Id. In contrast, life-science technologies often do not become commercially viable until later in their **patent** terms. Id.

[FN125]. See Charles Emerick, **Patent** Attorneys in U.S. Decry Changes to the Rules, KC DAILY REC., Oct. 17, 2007, available at 2007 WLNR 20543507. The USPTO supported the rule changes because they believed the changes would have increased **patent** prosecution efficiency while decreasing the backlog. Id. **Patent** attorneys criticized the rules, alleging that they would have eroded the rights of **patent** holders while not significantly decreasing the backlog. Id.

[FN126]. See Changes, supra note 2, at 46,717 (noting that there is a "need for a better focused and effective examination process to reduce the large and growing backlog of unexamined applications while maintaining or improving the quality of issued **patents**").

[FN127]. See Kirk Letter, supra note 9.

[FN128]. See generally Lemley & Moore, supra note 3, at 65. The "[c]ontinuation practice has a number of pernicious consequences ...." Id. This article treats the filing of RCEs as a form of "continuation practice." Id. at 68 n.14.

[FN129]. Id. Abuses of the continuation practice have created a number of problems. Id. **Continuing applications** can introduce substantial delay and uncertainty into the lives of a patentee's **competitors**. Id. They may be used to wear down examiners. Id. They can be used to gain a competitive advantage over competitors by waiting to see what product the competitor will make, and then modifying **patent** claims to cover that product. Id. Some patentees have also used continuing applications to delay the issuance of their **patent** in an effort to surprise a mature industry, known as "submarine patenting." Id.

[FN130]. Id. at 79.

[FN131]. Id.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN132]. Id.

[FN133]. Id.; see also Patricia Montalvo, Comment, How Will the New Twenty-Year **Patent** Term Affect You? A Look at the TRIPS Agreement and the Adoption of a Twenty-Year **Patent** Term, 12 SANTA CLARA COMPUTER & HIGH TECH. L.J. 139, 157 (1996). One of the most frequently cited examples of submarine patenting concerns the inventor Jerome H. Lemelson. Id. Lemelson would file very broad **patent** applications and then use delay mechanisms to keep those applications pending until industry develops the idea. Id. Lemelson would then modify the application to cover products relating to the technology disclosed in his initial **patent** application. Id. When the industry relating to the subject matter disclosed in Lemelson's applications was mature, Lemelson would let the **patent** issue and force companies using the patented technology to pay him royalties. Id.

[FN134]. Lemley & Moore, supra note 3, at 79.

[FN135]. See Montalvo, supra note 133, at 157 (noting "[t]he first advantage to a twenty-year term is to prevent the emergence of submarine **patents**").

[FN136]. 35 U.S.C. § 154(a)(2)-(3) (2006) (establishing the basic term for **patents** issuing on applications, including continuing applications, filed after June 7, 1995, as "beginning on the date on which the **patent** issues and ending 20 years from the date on which the application for the **patent** was filed in the United States").

[FN137]. Lemley & Moore, supra note 3, at 80.

[FN138]. 35 U.S.C. § 122(b)(1)(A) (requiring that "each application for a **patent** shall be published, in accordance with procedures determined by the Director, promptly after the expiration of a period of 18 months from the earliest filing date for which a benefit is sought under this title").

[FN139]. Lemley & Moore, supra note 3, at 80.

[FN140]. Id. at 75.

[FN141]. Id.

[FN142]. Id.

[FN143]. Id. at 76.

[FN144]. Id.

[FN145]. Id.

[FN146]. See Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 874 (Fed. Cir. 1988). There is nothing improper about amending or inserting claims into a pending application to cover a competitor's product which the applicant's attorney learned of during prosecution of the **patent** application. Id.

[FN147]. See Ted Agres, New **Patent** Rules Hurt Biotech?, Aug. 21, 2007, SCIENTIST, available at http://www.the-scientist.com/news/home/53497/. The strategy of filing multiple continuations is frequently employed by companies in the life sciences field because "the full scope of their discoveries cannot be established" at the time when a **patent** is filed. Id.; see also Regents of Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1568 (Fed. Cir. 1997) (discussing that in the unpredictable arts, "[o]ne skilled in the art ... cannot ... visualize or re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cognize the identity of the members of the genus").

[FN148]. See 35 U.S.C. § 112 (2006). The enablement requirement found in the first paragraph of section 112 requires that the **patent** specification describes how to make and use the invention. Id. See also MPEP, supra note 19, § 2164 ("The purpose of the requirement that the specification describe the invention in such terms that one skilled in the art can make and use the claimed invention is to ensure that the invention is communicated to the interested public in a meaningful way.").

[FN149]. See 35 U.S.C. § 112. Section 112 also requires that a **patent** includes a written description of the invention that adequately describes the invention. Id.

[FN150]. See TINA QUINTON, BIOTECH **PATENT** PROSECUTION UNDER THE NEW CONTINUATION RULES 2 (2007), http:// www.cojk.com/pdf/articles/BioTechNewRules.pdf. The heightened enablement and written description standards often lead to numerous rejections for biotech companies. Id. As experimentation uncovers new ways to make, use, or describe the invention, continuations and RCEs are often filed to obtain a **patent** directed to the full scope of the invention. Id.

[FN151]. See Elliott & Brinckerhoff, supra note 16 (stating that continuing applications and RCEs have been more popular in biotech, pharmaceutical, and chemical fields than in other technologies; see also Changes, supra note 2, at 46,775 ("The Office recognizes that, in certain unpredictable arts (including, for example, biotechnology and certain pharmaceuticals), there may be a need for research or testing to obtain additional evidence or data to obviate a rejection for lack of utility under 35 U.S.C. [§] 101 (and consequently for lack of enablement under 35 U.S.C. [§] 112, ¶ 1).").

[FN152]. See Agres, supra note 147.

[FN153]. See QUINTON, supra note 150 (stating that biotechnology companies rely on filing multiple continuations because of "the complex nature of the subject matter, the time and expense required to carry out experimental testing, and the length of the time period for product development ....").

[FN154]. See Agres, supra note 147 (stating that the change will make it more costly and time consuming to secure rights in life science discoveries); accord Heather Chambers, Biotech Firms Wary of Changes to **Patent** Application Regulations, SAN DIEGO BUS. J., Sept. 3, 2007, available at http:// www.sdbj.com/ ("New rules effective Nov. 1 will make it costlier and more time consuming for biotechnology companies to comply with **patent** application requirements ....").

[FN155]. See Agres, supra note 147 (quoting Ronald Eisenstein, a partner in the biotech and intellectual property group at the law firm Nixon Peabody in Boston, as saying: "If all that the **patent** examiner has to say is no, it's going to get much harder to negotiate, and will lead to applicants having to file costly appeals"); QUINTON, supra note 150 (recognizing that under the Final Rules, prosecution time for an application would likely increase because applicants would be induced into "filing an appeal to the BPAI for all issues involving the merits of an Examiner's rejection").

[FN156]. See MICHAEL LASKY, CHARLES L. WARNER, THOMAS H. JACKSON, & JASON A. BERNSTEIN, NEW US **PATENT** OFFICE RULES SUBSTANTIALLY INCREASE BURDENS AND RISKS TO **PATENT** APPLICANTS 2, Sept. 6, 2007, http:// www.pogolaw.com/attachments/850.pdf (noting that because of the difficulty in satisfying the petition and showing requirement, applicants might be inclined to "incur[] the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

greater expense of filing an appeal for rejected claims early on instead of the less expensive former route of simply filing one or more continuation applications and/or RCEs"); see also Robert D. Gunderman & John M. Hammond, How the U.S. **Patent** Office's New **Patent** Rules Affect You, IEEE SPECTRUM ONLINE, Oct. 2007, http://www.spectrum.ieee.org/oct07/5664 ("The new rule adds complexity and cost to the prosecution of a **patent** application.").

[FN157]. See Elliott & Brinckerhoff, supra note 16 (stating that industries involved in the unpredictable arts are "justifiably concerned about the impact the new rules will have on the ability to obtain **patents** that cover all aspects of an invention ...."); see also supra text accompanying note 11 (expressing the Biotechnology Industry Organization's opposition to the rule changes).

[FN158]. See Elliott & Brinckerhoff, supra note 16 (citing Stuart J. H. Graham & David C. Mowrey, Submarines in Software? Continuations in U.S. Software Patenting in the 1980s and 1990s, 13 ECON. INNOVATION & NEW TECH. 443 (2004)).

[FN159]. See Lemley & Moore, supra note 3, at 86-87. Table two in their article notes the percentage of applications that were continuing applications for various technical fields. Id. Forty-three percent of biotechnology and organic chemistry applications were continuing applications. Id. Thirty percent of chemical and materials engineering applications were continuing applications. Id. Only eighteen percent of semiconductor, electrical, and optical components applications were continuing applications. Id. Twenty-five percent of computer architecture, software and information security applications were continuing applications. Id.

[FN160]. See Avital Louria Hahn, Innovators' Dilemma, CFO MAG., Nov. 1, 2007, available at http://www.cfo.com/article.cfm/10023790/c_10051145? f=magazine_alsoinside (quoting Howard Brick, Chief Operating Officer, Panel Intelligence, as stating: "Do they file early and risk being limited in how fully they can flesh out their applications, or file later and risk no longer having a unique invention?"); see also Agres, supra note 147 (noting that continuations are used to extend **patent** coverage as the scope of the discovery becomes apparent).

[FN161]. See supra text accompanying note 155.

[FN162]. See Elliott & Brinckerhoff, supra note 16. The predictable arts generally comprise rapidly moving technology which is unimpeded by regulatory barriers, e.g., the FDA (compared to the unpredictable arts). Id. As such, inventions in these areas may be rapidly commercialized. Id. Consequently, **patents** in the predictable arts are more valuable at the beginning of their **patent** terms because they are likely to be replaced by next-generation technology rather quickly. Id.

[FN163]. Id.

[FN164]. Id.

[FN165]. Id.

[FN166]. See supra text accompanying notes 13-14 (stating that the Business Software Alliance and Intel Corp. support the new rules). But see Honda Letter, supra note 10, at 1 (stating that "it is essential that we be able to achieve the appropriate amount of **patent** coverage to which we are entitled ... even if additional prosecution is required," through the use of continuing applications and RCEs).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN167]. See supra text accompanying notes 13-14.

[FN168]. See Holleyman Letter, supra note 13. Some companies use continuing applications and RCEs to keep their applications pending for a considerable amount of time while they monitor developments in the market. Id. at 2. These companies may then modify their claims to cover other companies' products, often after those companies invest significant funds developing their products. Id.

[FN169]. See Business Software Alliance, Public Policy on **Patents,** http://www.bsa.org/country/Public%20Policy/Patents.aspx (last visited May 20, 2008). **Patent** reform is necessary because the potential exposure arising from an assertion of even a single **patent** in complex software or computer systems puts technology company innovators in a difficult position. Id. They can either "bet the company" on the case or settle to avoid possible ruinous damages. Id.

[FN170]. See Lemley & Moore, supra note 3, at 75-76.

[FN171]. See Donald Zuhn, NAPP Opposes New Continuation and Claims Rules, Sept. 7, 2007, available at http://www.patentdocs.net/**patent**_docs/2007/09/napp-opposes-ne.html (stating that the Directors and Officers of the National Association of **Patent** Practitioners (NAPP) "unanimously agreed that implementation of the new rules will be detrimental to all of our practices ....").

[FN172]. See Emerick, supra note 125.

[FN173]. Id.

[FN174]. Id. ("**Patent** attorneys say they are already finding themselves with extra work as a result."); see also Allen E. Hoover, Let's Run the PTO as a Business, 14 INTELL. PROP. TODAY 12, 27 (Dec. 2007).

[FN175]. Changes, supra note 2, at 46,716.

[FN176]. See Emerick, supra note 125 (quoting Jill Singer, of counsel attorney at Hovey Williams LLP).

[FN177]. See QUESTIONS, supra note 28, at 20-21. The Office will determine on a case-by-case basis whether the showing was sufficient. Id. at 20. The Office will also consider whether the data submitted with the petition to meet the showing was presented in a reasonably diligent manner. Id. at 21; see also Posting of Kevin E. Noonan to **Patent** Docs: Biotech & Pharma **Patent** Law & News Blog, The "Word" on the New Continuation Rules (from the USPTO Webcast)-- Part I, http://www.patentdocs.us/**patent**_docs/2007/08/the-word-on-the.html (Aug. 23, 2007, 15:04). In describing what would constitute a sufficient showing under the new rules, the USPTO has merely stated that "reasonable diligence" is required; however, they have failed to explain in detail what that might be. Id. The USPTO has created further uncertainty by stating that each petition and showing will be decided on a "case-by-case" basis, suggesting that the decisions will be subjective and will not lead to the development of a uniform standard. Id.

[FN178]. See QUINTON, supra note 150, at 3.

[FN179]. See QUESTIONS, supra note 28, at 20-21.

[FN180]. Id.; see also QUINTON, supra note 150, at 3.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN181]. See Emerick, supra note 125; see also Letter from Lawrence Ebert, to the U.S. Pat. & Trademark Office 2 (Apr. 30, 2006), available at http:// www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/ebert2.pdf [hereinafter Ebert Letter] (quoting the just-n-examiner blog, http://just-n-examiner.livejournal.com/9399.html, as saying: "I would think limiting continuations would hurt examiner productivity, as applicants will be unlikely to ever cancel claims to expedite issuance, thereby further increasing the number of appeals").

[FN182]. Emerick, supra note 125 (quoting Kevin Buckley, founder of the Biotactica law firm in St. Louis).

[FN183]. See Hoover, supra note 174, at 27 (noting that the backlog problem should be addressed by hiring more examiners, not by implementing rules which deter applicants from filing for **patents**).

[FN184]. Id. (stating that there are an "insufficient number of PTO examiners to handle the PTO's caseload" and that a long term solution for reducing the backlog would be to simply hire more examiners).

[FN185]. See Andrew Noyes, Court Puts Brakes On PTO Rules; Might Affect **Patent** Debate, CONGRESS DAILY, Apr. 2, 2008 (quoting Harold Wegner, an intellectual property attorney at Foley & Lardner, as saying the new rules "are 'now finally dead' unless language to codify the changes is added to a pending Senate measure that would overhaul the U.S. **patent** system."); see also Posting of Stephen Albainy-Jenei to **Patent** Baristas **Patent** Blog, No Joke, Court Smacks Down New **Patent** Rules, http:// www.patentbaristas.com/archives/2008/04/01/no-joke-court-smacks-down-new-**patent**-rules/ (Apr. 1, 2008) (stating that "[l]ike the villain in a bad, B-movie horror flick, the **Patent** Office will keep coming back with more proposed rules to reduce their workload").

[FN186]. 28 U.S.C. § 1295(a) (2006); see Amy Coombs, **Patent** Office May Appeal Ruling that Favors Biotechs, SAN FRANCISCO BUS. TIMES, Apr. 10, 2008, available at http:// sanfrancisco.bizjournals.com/sanfrancisco/stories/2008/04/07/daily31.html ("The federal office that regulates **patents** is considering whether to appeal a court decision earlier this month that threw out proposed rules that would limit how many times companies can resubmit **patent** applications.").

[FN187]. See Harold Wegner, Death to the Continuation Rules, IPFRONTLINE.COM, Apr. 2, 2008, http://www.ipfrontline.com/depts/article.asp? id=18286&deptid=7#; see also The **Patent** Reform Act of 2007, S. 1145, 110th Cong. (2007).

[FN188]. See supra text accompanying note 185; see also Coombs, supra note 186 (quoting the USPTO as saying: "[We] believe that these rules are consistent with existing statutes and will strengthen the U.S. **patent** system for all stakeholders"); Tafas v. Dudas: Appeal and Legislation, Patently-O **Patent** Law Blog, Apr. 2, 2008, [hereinafter Appeal and Legislation] http:// www.patentlyo.com/**patent**/2008/04/tafas-v-dudas-a.html ("PTO General Counsel James Toupin has reportedly indicated that the PTO will appeal the ruling to the Court of Appeals for the Federal Circuit.").

[FN189]. See SCHNEIDER & GARRETT, supra note 82 (stating that the USPTO has 60 days to file a Notice of Appeal to the Federal Circuit from April 1, 2007, and that "the [current] Senate version of the **Patent** Reform Bill does not include a provision granting the USPTO substantive rulemaking-authority").

[FN190]. Fed R. App. P. 4(a)(1)(B) ("When the United States or its officer or agency is a party, the notice of appeal may be filed by any party within 60 days after the judgment or order appealed from is entered.").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN191]. See Coombs, supra note 186 (quoting Shantanu Basu, a **patent** attorney at the San Francisco-based law firm Morrison & Foerster, as saying the appeals process would be "lengthy").

[FN192]. See Wegner, supra note 187; see also Appeal and Legislation, supra note 188.

[FN193]. Wegner, supra note 187 (noting that the USPTO would likely undergo an administration change while the case was in the process of being decided and that the "new administration ... might conceivably withdraw [the] appeal before a decision."); Coombs, supra note 186 (noting that the USPTO might be deterred from starting the costly and time consuming appeals process because "when the new administration takes office in 2009 it's possible it will have an entirely different agenda.").

[FN194]. See Wegner, supra note 187 ("The PTO is expected to make a final push for inclusion of substantive rulemaking authority as part of the Leahy **patent** reform bill."); see generally The **Patent** Reform Act of 2007, S. 1145, 110th Cong. (2007).

[FN195]. Wegner, supra note 187.

[FN196]. See Dugie Standeford, US Election, **Patent** Reform Could Decide Fate of Voided USPTO Rules, INTELL. PROP. WATCH, Apr. 3, 2008, http://www.ip-watch.org/weblog/index.php?p=992&print=1 (quoting Tafas' attorney, William Golden, as saying: "The solution to the USPTO's problems properly lies with Congress, not the courts").

[FN197]. See John R. Allison & Mark A. Lemley, Who's Patenting What? An Empirical Exploration of **Patent** Prosecution, 53 VAND. L. REV. 2099, 2125 (2000). "There is a strong relationship between area of technology and the total number of applications filed before a **patent** issued." Id. For the years 1996-1998, the mean number of applications filed across all areas of technology was 1.50 per **patent** issued. Id. "**Patents** in the chemistry, pharmaceutical, and biotechnology fields were based on many more filings than were the norm." Id. "Indeed, pharmaceutical and biotechnology **patents** had on average well over two applications, that is, at least one refiling, before issuance." Id. "By contrast, **patents** in the electronics, mechanics, acoustics, automotive, and communications industries were significantly less likely than average to engage in refilings." Id.

[FN198]. See discussion supra Part III.B.

[FN199]. See discussion supra Part III.C.

[FN200]. See U.S. PAT. & TRADEMARK OFFICE, OVERVIEW OF THE U.S. **PATENT** CLASSIFICATION SYSTEM (USPC) I-3, Dec. 2007, available at http:// www.uspto.gov/web/offices/opc/documents/overview.pdf [hereinafter USPC] ("U.S. **patents** receive a mandatory classification for all claimed disclosure.").

[FN201]. See MPEP, supra note 19, at § 2163 ("[F]or inventions in emerging and unpredictable technologies, or for inventions characterized by factors not reasonably predictable which are known to one of ordinary skill in the art, more evidence is required to show possession.").

[FN202]. See USPC, supra note 200, at I-3. "A USPC classification uniquely identifies one of the more than 150,000 subclasses in the USPC." Id. "Because subclass identifiers may be repeated among the more than 450 classes, a USPC classification must include both a class and a subclass." Id. "Every U.S. **patent** document has at least one mandatory classification, and may optionally include one or more discretionary classifications." Id.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN203]. See Allison & Lemley, supra note 197, at 2154 tbl.9. While the average **patent** in 1996-1998 issued from 1.50 applications, the average pharmaceutical **patent** issued from 2.27 applications and the average biotechnology **patent** from 2.38 applications. Id.

[FN204]. Id.

[FN205]. See supra text accompanying note 17.

[FN206]. See Brief of Amici Curiae in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction at 3 n.1, Tafas v. Dudas, No. 1:07cv846, 2008 WL 859467 (E.D. Va. Oct. 26, 2007) [hereinafter Brief Supporting Plaintiff] (suggesting that the backlog problem could be more effectively addressed by "hiring more examiners and/or increas[ing the] investment in training and retention of new and existing examiners"); Letter from Derek Minihane, on behalf of the Innovation Alliance, to Susan E. Dudley, Administrator, Office of Information and Regulatory Affairs, Office of Management and Budget 9 (June 14, 2007), available at http:// www.patentlyo.com/**patent**/InnovationAllianceMemo.pdf. [hereinafter Minihane] (stating that most **patent** practitioners believe that hiring more examiners should be a central part of addressing the backlog problem).

[FN207]. See Minihane, supra note 206, at 9 (noting that the USPTO should confer with Congress and consider charging higher fees for multiple continuations in order to address potential abuses of the continuation rules).

[FN208]. See Brief Supporting Plaintiff, supra note 206 at 3 n.1. The USPTO is one of the few government agencies that realizes a profit (based primarily on **patent** application filing fees) and therefore has the financial resources to hire more examiners and/or increase the investment in training and retention of new and existing examiners. Id.

[FN209]. See Charles Emerick, Law Prof Takes Aim at "Silly" **Patents** at University of Missouri-Kansas City School of Law Seminar, Nov. 6, 2007, DOLAN MEDIA NEWSWIRE, available at http://www.dolanmedia.com/view.cfm?recID=285937 (noting that **patents** issued for inventions such as: "using a laser pointer as a way to exercise a cat," a time machine, and a "method of swinging a swing sideways [that] issued to an eight-year old").

[FN210]. See Hoover, supra note 174, at 27.

[FN211]. Id.

[FN212]. See Letter from The National Association of **Patent** Practitioners to the U.S. Pat. & Trademark Office 35 (May 3, 2006), available at http:// www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/napp.pdf ("[A] charge would likely discourage, and reduce the number of, such later continuations. An appropriately set fee would seem to provide as much, or nearly as much, benefit in terms of backlog-reduction as a complete ban, without the difficulties to invention protection.").

[FN213]. See Minihane, supra note 206, at 9.

[FN214]. Id.

[FN215]. See Changes, supra note 2, at 46,716.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN216]. See Lemley & Moore, supra note 3, at 65.

[FN217]. See Elliott & Brinckerhoff, supra note 16.

[FN218]. See Merck & Co. v. Kessler, 80 F.3d 1543, 1549-50 (Fed. Cir. 1996).

[FN219]. See Landgraf v. USI Film Prods., 511 U.S. 244, 272-73 (1994).

[FN220]. See discussion supra Parts III.B-III.C.

[FN221]. Id.

[FN222]. See discussion supra Part IV.B.

[FN223]. See discussion supra Part IV.C.

[FN224]. Id.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.