## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AVOCENT REDMOND CORP.,<br>            Plaintiff,<br><br>    v.<br><br>THE UNITED STATES,<br>            Defendant,<br>and<br>ROSE ELECTRONICS,<br>            Defendant-Intervenor. | No. 08-69C<br><br>Judge Lawrence S. Margolis |

## AVOCENT REDMOND'S OPENING CLAIM CONSTRUCTION BRIEF

James D. Berquist
J. Scott Davidson
Donald L. Jackson
Grace K. Obermann
DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
4300 Wilson Blvd, Suite 700
Arlington, Virginia 22203
Tel. 703-894-6400
Fax. 703-894-6430

*Attorneys for Plaintiff Avocent Redmond Corp.*

## TABLE OF CONTENTS

I.    BACKGROUND ............................................................................................................... 1

   A.  Procedural History and Prior Claim Construction Rulings ............................................. 1

   B.  The Patented Technology ................................................................................................ 2

   C.  The Disputed Claim Terms ............................................................................................. 4

II.   ARGUMENT .................................................................................................................... 5

   A.  The Principles of Claim Construction ............................................................................. 5

       1.  The Claims Define the Invention ............................................................................. 6

       2.  Claim Terms Are Presumed to Carry Their Ordinary Meaning ............................... 7

       3.  The Specification Does Not Limit the Scope of the Claims .................................... 8

   B.  Construction of the Disputed Claim Terms ..................................................................... 8

       1.  "Crosspoint switch" ................................................................................................ 9

       2.  "Signal" ................................................................................................................. 13

       3.  "Route," "Routing," and "Routed" ....................................................................... 16

       4.  "Coupled" .............................................................................................................. 18

       5.  "Transmit" ............................................................................................................. 20

       6.  "Cables" and "Independent Dedicated Cables" .................................................... 22

       7.  "Link" .................................................................................................................... 24

       8.  "Connectors" ......................................................................................................... 26

       9.  "Combining" and "Combined" .............................................................................. 27

       10. "A portion of the analog video signals" ................................................................ 29

       11. "Remote" and "Remotely Located" ....................................................................... 32

       12. "In response to" ..................................................................................................... 34

   C.  Avocent Also Asks the Court to Adopt the Other Claim Constructions
       Rendered by the Federal Circuit and Judge Castel ........................................................ 35

1.    The '096 Patent Claim Constructions .................................................. 36

    i.    "Programmable Switch" ....................................................... 36

    ii.    "Switch" ................................................................................ 37

    iii.    "Interface" ............................................................................ 37

    iv.    "Interface Circuit" .............................................................. 37

    v.    "On-Screen Programming Circuit" .................................... 37

    vi.    "Overlay" and "Overlaid" ................................................... 37

2.    The '264 Patent Claim Constructions .................................................. 38

    i.    "Interface" ............................................................................ 38

    ii.    "Analog" ................................................................................ 38

    iii.    "Image Generating Circuit" ............................................... 38

    iv.    "Overlay" and "Overlaid" ................................................... 38

    v.    "Analog [Video] Overlay Image Generating Circuit" ................ 39

    vi.    "Analog Video Overlay Circuit" ......................................... 39

    vii.    "Analog Video Receiving Circuit" ..................................... 39

3.    The Federal Circuit's and Judge Castel's Constructions for the '176
Patent Apply Equally to the '323 Patent and Should Be Adopted .......................... 39

    i.    "Signal Conditioning Units" ............................................... 40

    ii.    "Data Packet" ....................................................................... 40

    iii.    "Serial Data Packet" ........................................................... 40

III.    CONCLUSION ............................................................................................. 40

## TABLE OF AUTHORITIES

### CASES

*Amgen, Inc. v. Hoffmann-La Roche Ltd.*,
  494 F. Supp. 2d 54 (D. Mass. 2007) ................................................................................36

*Apex Inc. v. Raritan Computer, Inc.*,
  325 F.3d 1364 (Fed. Cir. 2003)................................................................................ *passim*

*Avocent Redmond Corp. v. Raritan Computer, Inc.*,
  2005 U.S. Dist. LEXIS 4017 (S.D. N.Y 2005)........................................................ *passim*

*Bell & Howell Document Mgmt. v. Altek Sys.*,
  132 F.3d 701 (Fed. Cir. 1997)..............................................................................................6

*Cias, Inc. v. Alliance Gaming Corp.*,
  504 F.3d 1356 (Fed. Cir. 2007)..........................................................................................31

*Continental Paper Bag Co. v. Eastern Paper Bag*,
  210 U.S. 405 (1908).............................................................................................................8

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
  868 F.2d 1251 (Fed. Cir. 1989)............................................................................................6

*Cybor Corp. v. Fas Techs., Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) .......................................................................36

*Ferguson Beauregard/Logic Controls v. Mega System, LLC*,
  350 F.3d 1327 (Fed. Cir. 2003)............................................................................................7

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
  370 F.3d 1131 (Fed. Cir. 2004)............................................................................................6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
  381 F.3d 1111 (Fed. Cir. 2004)..........................................................................................36

*Lamps Plus, Inc. v. Dolan*,
  2003 U.S. Dist. LEXIS 25545 (N.D. Tex. 2003)...............................................................36

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996).........................................................................................................5, 6

*Merrill v. Yeomans*,
  94 U.S. 568 (1876).............................................................................................................6

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................6, 7, 8

*Renishaw PLC v. Marposs Societa Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)........................................................................6, 7

*Smith v. Snow*,
    294 U.S. 1 (1935)...............................................................................................8

*SRI Int'l v. Matsushita Elec. Corp. of America*,
    775 F.2d 1107 (Fed. Cir. 1985) (*en banc*) .......................................................8

*Tate Access Floors, Inc. v. Interface Arch. Res., Inc.*,
    279 F.3d 1357 (Fed. Cir. 2002)........................................................................7

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)............................................................... *passim*

*Vivid Techs., Inc. v. American Science & Engr., Inc.*,
    200 F.3d 795 (Fed. Cir. 1999)........................................................................31

*White v. Dunbar*,
    119 U.S. 47 (1886)...........................................................................................8

## STATUTES

28 U.S.C. § 1498.....................................................................................................1

35 U.S.C. § 112..................................................................................................6, 8

As a preliminary matter, Avocent submits that the Court should not entertain any claim construction arguments from Defendants, the United States and Rose Electronics, because they refused to fulfill their discovery obligations by providing the claim construction discovery sought by Avocent's interrogatories.  This issue is the subject of Avocent's motion to compel claim construction contentions.  (Dkt. No. 59).  Even at this late date, neither defendant has yet provided the legal and factual bases for the constructions that they will seek from the Court.

## I.    BACKGROUND

### A.    Procedural History and Prior Claim Construction Rulings

Avocent filed this action on January 31, 2008 against the United States, pursuant to 28 U.S.C. § 1498, for unauthorized use of Avocent's patented inventions.  (Dkt. No. 1).  Avocent seeks to recover damages for the Rose's infringing sales made to the United States.  The four patents-in-suit here are U.S. Patent Nos. 5,884,096 ("the '096 patent"), 6,112,264 ("the '264 patent"), 7,113,978 ("the '978 patent"), and 6,345,323 ("the '323 patent") (collectively "the patents-in-suit").  (*See* Exhibits 1-4).

Avocent's patents have been litigated before.  In 2001, Avocent sued Raritan Computer, Inc. ("Raritan") for infringement of the '096 patent, the '264 patent, and U.S. Patent No. 5937176 ("the '176 patent") in the Southern District of New York ("the Raritan action").[1]  In the Raritan action, Judge Pollack narrowly interpreted fourteen disputed claim terms and entered summary judgment of no infringement based on those constructions.  On April 3, 2003, the Federal Circuit vacated all 14 claim constructions, interpreted six of the disputed claim terms, and remanded the case back to the district court to address the remaining terms.  *See Apex Inc. v.*

---

[1]  The '176 patent is another member of the Beasley patent family that is at issue in this case and in the Seattle action.  Although the '176 patent is not asserted in this case, the claims of the '176 patent are very similar to the claims of the '323 patent.

*Raritan Computer, Inc*., 325 F.3d 1364 (Fed. Cir. 2003), attached as Exhibit 5.  On remand,

Judge Castel construed the remaining disputed claim terms.  *See Avocent Redmond Corp. v.*

*Raritan Computer, Inc*., 2005 U.S. Dist. LEXIS 4017 (S.D. N.Y 2005) (Exhibit 6).

    **B.**    **The Patented Technology**

    The patents-in-suit cover computerized switching systems that connect the keyboard, mouse

and video monitor of one or more workstations to remotely located computers.  (*e.g*., Exh. 1, '096

patent, Abstract).  These switches or switching systems are commonly called "KVM switches"

because they allow the keyboard, video monitor and mouse of a user's workstation to access, and

switch between, computers (sometimes called "servers").  KVM switches are used by network

administrators who require access to many computers from their own workstation.

    KVM switches reduce costs by reducing workstation space and equipment requirements.

Without a KVM switch, a company needs a keyboard, video monitor and mouse (*i.e.,* cursor

control device) for *each of its servers*, which could number in the hundreds.  With a KVM

switch, the company needs only enough keyboards, monitors and mice *to support the users* of

these servers – sometimes as few as one or two network administrators.   KVM switches also

allow network administrators to access and operate multiple servers without leaving their desks.

(Exh. 1, '096 patent, col. 1:49-52).

    Prior to Avocent's inventions, KVM switches, including those offered by Rose, switched

between servers in one of two ways:  (a) a set of pushbuttons on the KVM switchbox itself, or

(b) a "hot key" sequence entered on a keyboard.  Avocent's patented invention fundamentally

changed the KVM switch market by changing *how* switching occurred.

    At the user's request, the switch displayed a menu of available servers (*e.g*., "executive

email server") on the user's video monitor.  The system administrator could then select a

particular server by scrolling through the list using a cursor control device (*e.g*. a "mouse") and

highlighting the server *or* by typing in the identified server's name.  Because the list was visually

displayed on the workstation video monitor over the screen that should otherwise appear, the

menu display was called "on-screen display," or simply "OSD."

The '096, '264 and '978 patent claims are primarily directed to switching systems having

on-screen switch control.  For example, claim 1 of the '096 patent requires "an on-screen

programming circuit that produces video signals for display on the video monitor," *and* "a

programmed logic circuit" that controls both the on-screen programming circuit and the

programmable switch.  The claimed "programmed logic circuit":

> controls the on-screen programming circuit to produce the video signals upon
> detection of a predefined input from a user of the workstation, the programmed logic
> circuit further operating to detect keyboard or cursor control device signals received
> while the on-screen programming circuit is producing video signals on the video
> monitor and to control the programmable switch in response to the keyboard or
> cursor control device signals detected.

(Exh. 1, claim 1).  Before anyone else, Avocent (then Apex) put those on-screen programming

and programmed logic circuits into a KVM switch to provide the user with the ability to

conveniently and reliably switch between connected computers.

In use, the workstation user activates the on-screen switch control by entering a pre-

defined set of keystrokes such as the "printscreen" key.  (Exh. 1, col. 13:14-16).  The

"programmed logic circuit," described in the specification as central processing unit ("CPU") 80,

recognizes these keystrokes and instructs the "on-screen programming circuit 364," described in

Fig. 12A of the specification as a Motorola OSD processor MC141543P, to produce video

signals for display on the workstation monitor.  (Exh. 1, col. 13:15-16).  The user can control the

programmable switch by selecting an item from this on-screen menu, which the specification

refers to as an overlaid menu or window.  The CPU 80 interprets this input as a switch command

and forwards the command to the programmable switch.  (Exh. 1, col. 13:16-20).

In short, the patented inventions revolutionized the way users operate KVM switches by moving the switch commands from the "blind" keyboard and pushbuttons found on early KVM switches to text display *on a user's video monitor*. It is this menu that permits the user to navigate through the system to connect to different computers and to receive feedback that the proper connection has been made. (Exh. 1, col. 13:15-24).

Avocent's inventions also enabled workstations to be removed from the computer servers by hundreds of feet. Avocent accomplished this result by adding a workstation transmit/receive unit (sometimes called a "pod 70" or "first signal conditioning unit") near the workstation, and a computer transmit/receive unit (called "pod 76" or "second signal conditioning unit") near each remote computer. As shown in Figure 1 of the '978 patent, this structure creates what is called a "pod-switch-pod" or "distributed" architecture. That novel architecture is the subject of asserted claims 27 and 42 of the '978 patent, and the claims of the '323 patent.

### C.    The Disputed Claim Terms

Avocent, Rose, and the U.S. have identified the following claim terms for construction by the Court. The meanings of the following terms are submitted for construction by the Court:

1. "Crosspoint switch" as used in claims 1-8 of the '323 patent, and claims 27-42 of the '978 patent;

2. "Signal" as used in claims 1-32 of the '096 patent, claims 1-17 of the '264 patent, claims 1-42 of the '978 patent, and claims 1-8 of the '323 patent;

3. "Route" (and its variants "Routing" and "Routed") as used in claims 1-32 of the '096 patent, claims 11, 13, 15 and 17 of the '264 patent, claim 12 of the '978 patent, and claims 1-8 of the '323 patent;

4. "Coupled" as used in claims 1-5 and 11-31 of the '096 patent, claims 27-42 of the '978 patent, and claims 1-8 of the '323 patent;

5. "Transmits" (and its variants "Transmitted" and "Transmitting") as used in claims 1-32 of the '096 patent, claims 27-41 of the '978 patent, and claims 1-8 of the '323 patent;

6.  "Cable[s]" as used in claims 1-17 of the '264 patent and claims 1-26 of the '978 patent, and the related term "independent dedicated cables" also used in claims 1-17 of the '264 patent, and claims 1-26 of the '978 patent;

7.  "Link" as used in claims 1-8 of the '323 patent, and claims 27-42 of the '978 patent;

8.  "Connectors" as used in claims 1-26 of the '978 patent;

9.  "Combining" (and its variant "combined") as used in claims 1-17 of the '264 patent;

10. "A portion of the analog video signals received by the (. . .) analog video receiving circuit" as used in claims 1-17 of the '264 patent and claims 1-26 of the '978 patent;

11. "Remote" (and its variant "remotely located") as used in claims 27-42 of the '978 patent, claim 10 of the '096 patent, and claims 1-8 of the '323 patent; and

12. "In response to" as used in claims 1-32 of the '096 patent, claims 16-17 of the '264 patent, and claim 16 of the '978 patent.[2]

## II.    ARGUMENT

### A.    The Principles of Claim Construction

"It has long been understood that a patent must describe the exact scope of an invention and its manufacture to secure to the patentee all to which he is entitled, and to apprise the public of what is still open to them." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996).  When a district court is required to interpret the words of a patent, therefore, "intrinsic evidence" of the patent's scope is preferred over "extrinsic evidence."  Intrinsic evidence consists of records available to the public from the PTO – *i.e.,* the patent itself and the prosecution history of the patent before the PTO.  "Extrinsic evidence," on the other hand, consists of all evidence external to the patent and prosecution history, including expert testimony, dictionaries, and learned treatises.  *See e.g. Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).  Intrinsic evidence is assigned the position of first importance because it is included in records obtainable from the PTO, "a record on which the public is

---

[2]  In the Seattle action, Avocent, Rose and the other defendants agreed that the term "switching system" as used in the preamble of claims 1-10 of the '264 patent is "a KVM switch."

entitled to rely" when attempting to ascertain the scope of the patent owner's exclusive rights. *Bell & Howell Document Mgmt. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*).

### 1.    The Claims Define the Invention

The first paragraph of section 112 of the Patent Act requires an inventor to provide a "specification" describing his invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U.S.C. § 112, ¶ 1. The first paragraph of § 112 also provides that the specification "shall set forth the best mode contemplated by the inventor for carrying out the invention." *Id.* The second paragraph of §112 requires that the inventor conclude his specification with one or more "claims" "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Id.* at ¶ 2.*; see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) (describing the claims as "the metes and bounds" of the invention). As the Supreme Court has noted, a claim "defines the scope of a patent grant." *Markman,* 517 U.S. at 373. Each claim of a patent defines a separate invention. *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1148 (Fed. Cir. 2004).

When interpreting the scope of a patent, courts begin with the words of the inventor's claims, because they are of "primary importance" when attempting to determine what has been patented. *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876); *Phillips*, 415 F.3d at 1312 (claims of a patent define the invention to which the patentee is entitled the right to exclude); *Vitronics*, 90 F.3d at 1582 (the words of the claims "define the scope of the patented invention.") The Federal Circuit has sometimes stated that "the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

Many resources can be consulted when attempting to discern the meaning of a word in a patent, including both the "intrinsic" evidence found in the patent specification and the prosecution history, and the "extrinsic" evidence found in dictionaries and treatises and, in some cases, expert testimony. *Phillips*, 415 F.3d at 1318 (dictionaries and expert testimony may be used to inform the court's understanding). Extrinsic evidence, however, "may not be used to vary or contradict the claim language." *Vitronics,* 90 F.3d at 1584. Because technical dictionaries attempt to collect the accepted meanings of terms used in various technological fields, dictionaries can be use to assist the court in determining the meaning of claim terms as understood by those skilled in the relevant technical art. *See Phillips*, 415 F.3d at 1318.

### 2.    Claim Terms Are Presumed to Carry Their Ordinary Meaning

When an inventor acts as his own lexicographer, "the definition selected by the patent applicant controls." *Renishaw,* 158 F.3d at 1249. In the absence of clear evidence that the patent applicant acted as his own lexicographer, each disputed claim term should be given its "ordinary and customary meaning" – that is, the sense in which the word is ordinarily or customarily used by "a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13; *Ferguson Beauregard/Logic Controls v. Mega System, LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003) (claim terms "are examined through the viewing glass of a person skilled in the art."). "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the inventions and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Phillips,* 415 F.3d at 1313. Absent an express intent by the applicant to impart a novel meaning, the presumption that the term carries its ordinary meaning is strong. *Tate Access Floors, Inc. v. Interface Arch. Res., Inc.*, 279 F.3d 1357, 1369 (Fed. Cir. 2002).

### 3.     The Specification Does Not Limit the Scope of the Claims

The "claims must be read in view of the specification, of which they are a part." *Phillips,*

415 F.3d at 1315.  Even so, the Supreme Court has long held the view that a specification cannot

be used to limit the claim.  *White v. Dunbar*, 119 U.S. 47, 51-52 (1886).

Under the Patent Act, the patent specification must describe the best mode of carrying out

the claimed invention with enough specificity to enable one skilled in the art to make use of the

invention. 35 U.S.C. § 112, ¶ 1.  The patent specification, however, need not describe all possible

embodiments of the invention claimed.  *Smith v. Snow*, 294 U.S. 1, 11 (1935).  The content of

the claims themselves is controlled by a different provision of the Patent Act, *see* 35 U.S.C. §

112, ¶ 2, and it is well established that "[t]he claims, not the specification, measure the

invention."  *Continental Paper Bag Co. v. Eastern Paper Bag*, 210 U.S. 405, 419 (1908).

Accordingly, the Federal Circuit has long rejected the efforts of accused infringers to import

limitations from the patent specification into the claims, *SRI Int'l v. Matsushita Elec. Corp. of

America*, 775 F.2d 1107, 1121-22 & n.14 (Fed. Cir. 1985) (*en banc*), and warned district courts

against "confining the claims to [the disclosed] embodiment."  *Phillips*, 415 F.3d at 1323.

However, a construction that excludes the preferred embodiment "is rarely, if ever, correct and

would require highly persuasive evidentiary support."  *Vitronics*, 90 F.3d at 1583.

### B.     Construction of the Disputed Claim Terms

Avocent respectfully requests that the Court accord each of the disputed claims terms the

full breadth of their customary and ordinary meaning.  The inventors and their patent counsel

chose the claim terms that they felt best described what they considered to be their invention.

These words should not lightly be removed from the claims or replaced with other words, even

substitute words that closely resemble the words actually used in the claims.  Avocent's

proposed constructions are also supported by Avocent's technical expert, Mr. McAlexander.

(*See generally* Declaration of Joseph C. McAlexander filed herewith).

The Defendants' constructions are designed to exclude both the preferred embodiment and any commercially-viable KVM switch.  Defendants' approach is not correct.  Indeed, Defendants' attempts to limit the claims reveal what Avocent has known all along – Defendants' non-infringement arguments hinge entirely on improper claim constructions that contradict the Federal Circuit's prior ruling on these patents, and the Federal Circuit's case law.

> **1.**     **"Crosspoint switch"**

> <u>Avocent's Proposed Construction:</u>  "a programmable device capable of forwarding packets from one computer/workstation/server to another."

> <u>Defendants' Proposed Construction:</u>  "a set of vertical and horizontal switches arranged in a matrix, and which serves to connect any vertical point with any horizontal point."[3]

The term "crosspoint switch" is used in claims 1-8 of the '323 patent, and in claims 27-42 of the '978 patent.  Although the '323 patent was not at issue in the Raritan action, the claims of the '323 patent are virtually identical to the claims of the '176 patent that were construed by the Federal Circuit and Judge Castel.  The declaration of Mr. McAlexander submitted herewith includes a table showing that claims 1-3 of the '323 patent are substantively identical to claim 1 of the '176 patent.[4]  (*See* McAlexander Decl., ¶ 139).

In the Raritan action, the Federal Circuit ruled that a "crosspoint switch" is "a programmable device capable of forwarding packets from one computer/workstation/server to another."  *Apex*, 325 F.3d at 1377.  Avocent asks the Court to adopt this same construction in this case.  The specification of the two patents is the same, and the claim elements are identical.  There is no difference between claim 1 of the '176 patent that was construed by the Federal

---

[3]   Defendants' proposed construction comes from Rose's August 6, 2009 letter.

[4]   A copy of the '176 patent is attached hereto as Exhibit 7.

Circuit and claims 1-3 of the '323 patent. Nor does anything in the prosecution history of the '323 patent mandate a different construction.

Indeed, the district court construction that was appealed to the Federal Circuit was an overly narrow construction like that now being advocated by Defendants. In the Raritan action, Judge Pollack construed "crosspoint switch" to mean "a device that opens or closes a circuit to form a direct path between inputs and outputs." *Apex*, 325 F.3d at 1377. Raritan was arguing for a construction that required a direct connection between an input and output of the switch, without any intervening circuitry.

But, as explained by the Federal Circuit, "[i]n the art of networking, the ordinary meaning of the term 'switch' is 'a device capable of forwarding packets directly to the ports associated with particular network addresses.'" *Id.*; *see also* Exh. 8 (Microsoft Computer Dictionary, p. 505 (5th ed. 2002). The Federal Circuit also explained how the specification supported this broader definition of "switch."

> According to the written description of the patents in suit, a signal conditioning unit receives mouse and keyboard signals from a workstation. The signal conditioning unit generates a serial data packet and sends the mouse/keyboard packet to a central crosspoint switch. The central crosspoint switch routes the data packet to another signal conditioning unit coupled to the remote server that decodes the mouse/keyboard packet. '176 patent, col. 1, ll. 54-64. The written description discloses one embodiment of this "crosspoint switch" or "programmable switch." Id. at col. 6, ll. 15-61. This switch includes a master CPU and a number of input and output cards for transmitting and receiving signals.

*Apex*, 325 F.3d at 1377. The Federal Circuit held that there was nothing in the specification or the prosecution history that limited the term "switch" to a "direct path" type of device as advocated by Raritan.

> The written description does not limit the term switch to a device that opens or closes a circuit to form a direct path. Nothing was identified in the prosecution history to suggest this direct path.

*Id*. Based on this, the Federal Circuit concluded that, "properly construed, a 'programmable switch' or 'crosspoint switch' is a programmable device capable of forwarding packets from one computer/workstation/server to another." *Id*. at 1377.

Here, Rose is arguing in favor of a similar, overly narrow construction. Rose argues that "crosspoint switch" means "a set of vertical and horizontal switches arranged in a matrix, and which serves to connect any vertical point with any horizontal point." The problem with Rose's construction is that it is inconsistent with the preferred embodiments disclosed in the specification. (McAlexander Decl., ¶¶ 142). Nowhere is the preferred embodiment of the crosspoint switch depicted or described as a horizontal and vertical matrix of switches. Figures 7-9 of the specification depict different aspects of the crosspoint switch. In each case, the switch cards and switch circuits are shown vertically, with each card or circuit receiving multiple inputs that can be connected to one of several outputs. Figure 7 is shown below.



*Fig. 7.*

A construction that does not cover the preferred embodiment of a patent is rarely the correct construction. *See Vitronics*, 90 F.3d at 1583 (holding that a claim construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary

support.").  In this case, there is nothing that limits the crosspoint switch beyond the construction

adopted by the Federal Circuit.

Certainly, one skilled in the art would recognize that a crosspoint switch could be

constructed using a horizontal and vertical matrix of switches provided that it were a

programmable device capable of forwarding packets, but there is nothing in the specification or

prosecution history if the Beasley patents that limits the construction of "crosspoint switch" to

such an arrangement.  (*See* McAlexander Decl., ¶¶ 143-144).

As shown in the block diagram representation of Figure 1 (shown below), the crosspoint

switch 60 has a number of inputs 72, and a number of outputs 74.  Any one of the inputs can be

operationally connected to any one of the outputs.



*Fig. 1.*

That is one of the fundamental purposes of a crosspoint switch.  The Beasley crosspoint

switch, however, also has to be a programmable device so that the computers can be intelligently

switched from one workstation to another based on a user's input, and the switch has to be able

to forward packets from one workstation to a computer or server, and *vice versa*.  *See Apex*, 325

F.3d at 1377.  The correct construction of "crosspoint switch" is "a programmable device

capable of forwarding packets from one computer/workstation/server to another."  *See id*.

-12-

### 2. "Signal"

*Avocent's Proposed Construction:* "information content."

*Defendants' Proposed Construction:* "any electrical quantity, such as voltage, current, or frequency, that can be used to transmit information."[5]

The term "signal" (or "signals") is used in claims 1-32 of the '096 patent, claims 1-17 of the '264 patent, claims 1-42 of the '978 patent, and claims 1-8 of the '323 patent. The patents use the word "signal" to describe types of data (*e.g.*, "video," "keyboard," and "cursor control device"). "Signal" is not limited to an exact waveform or to a single electrical quantity. (McAlexander Decl., ¶¶ 148-154). Two signals are the same if they have the same information content, even though their electronic waveform may be different. Thus, a signal into a switch is the same signal out of the switch if its information content is the same (such as information identifying that a user stuck a letter "K" on the keyboard) even if the package (*i.e.*, waveform) that carries that signal changes.

The Federal Circuit and Judge Castel have previously equated "signal" with "information content." Judge Pollack construed the term "switch" to mean "a device that opens or closes a circuit to form a <u>direct path</u> between inputs and outputs." *Apex*, 325 F.3d at 1377 (emphasis added). Requiring a "direct path" between inputs and outputs mandates that the input signal be carried on the same waveform from input to output – *i.e.*, the waveform would be *unaltered*.

The Federal Circuit rejected the requirement that the waveforms be unaltered, instead holding that the terms "programmable switch" and "cross-point switch" broadly mean "a programmable device capable of forwarding packets from one computer/workstation/server to another." *Id.* On remand, Judge Castel construed the "switch" terms almost identically, but for

---

[5] Defendants' proposed construction comes from Rose's August 6, 2009 letter, which is the same construction Rose advocated in the Seattle action.

the "programmable switch," he noted that the data "packets" permit user control of the switch. *Avocent*, 2005 U.S. Dist. LEXIS at *10. Those two rulings rejected the idea that waveforms must pass unaltered through the switches. Avocent's proposed construction of "signal" comports with the Federal Circuit's decision: a "signal" is "information content" – not a particular electrical waveform.

Avocent's definition is also consistent with the intrinsic evidence. The claims of the patents support a construction of "signal" that is not limited to an exact waveform. Claim 1 of the '096 patent recites a system including:

> a programmable switch for routing <u>keyboard and cursor control signals</u> from the workstation to a selected computer and for routing <u>video signals</u> from the selected computer to the video monitor of the workstation;
>
> a <u>first interface circuit</u> for receiving keyboard and cursor control device signals from the workstation; . . .
>
> a programmed logic circuit … that transmits the keyboard and cursor control device signals to <u>the programmable switch</u> … ; and
>
> a <u>second interface circuit</u> disposed between the programmable switch and the selected computer for supplying the keyboard and cursor control device signals routed through the programmable switch to the selected computer.

According to this claim, the keyboard and cursor control signals pass through at least the first interface circuit, the programmable switch, and the second interface circuit. Each of these devices can alter the electrical waveform, while at the same time passing the underlying keyboard or mouse information (*i.e.*, signal) through the switch system.

Similarly, in claim 1 of the '323 patent, the "first signal conditioning units" receive "electronic signals" from the keyboard and mouse, and creates a "serial data packet" that "includes the electronic signals." (Exh. 3, col. 13, lines 58-61). The creation of a "serial data packet" that includes the keyboard and mouse signals would not be possible if the construction of "signal" were "any electrical quantity, such as voltage, current, or frequency, that can be used

to transmit information," as argued by Rose.  Defendants' construction requires that the same

"electrical quantity" pass from one end of the KVM switch system to the other.  That requires

that the "electrical quantity" pass <u>unaltered</u> through the system.  But, because the specification

expressly describes the alteration of the "electrical quantities" as they pass through the system,

Defendants' proposed construction is inconsistent with the specification and the claims of the

patents.  (McAlexander Decl., ¶¶ 150-154).

Indeed, if the information (signal) could not be passed from workstation to computer, and

*vice versa*, the KVM switch would not perform one of its fundamental purposes – to make it

appear as if the workstation and computer were directly connected together.  The specification

also teaches that a signal is not a specific waveform or electrical impulse.  In discussing the

operation of the user-side pod 70, the specification explains that:

> As the user moves the mouse or types on the keyboard, the keyboard/mouse
> interface 82 generates an interrupt signal that is fed to the CPU 80. <u>The
> CPU 80 then reads</u> the digitally buffered keyboard and mouse signals from
> the keyboard/mouse interface 82 <u>and converts the signals into a data packet
> that is transmitted to the remote computer</u>.  ('096 patent, col. 3:42-48
> (emphasis added)).

The pod 70 "converts" the signals received from the workstation into a data packet for

transmission to pod 76.  (Exh. 1, col. 3, line 38-col. 4, line 12).  Pod 76 converts the signal from

one waveform to another while retaining the same information content (signal).  (Exh. 1, col. 5,

lines 13-42).  So when the patents describe the transmission of "signals" through the switch

system, they are necessarily equating "signal" with "information content," not the waveform that

carries that content.

Claim 6 of the '978 patent specifically recites a "user-input device translator, disposed

between at least one of the plural computer-side user-input device connectors and the first user-

side user-input device connector, for translating information from the first user-input device in a

first format to a second format used by at least one of the plural computers." (Exh. 4, col. 14, lines 45-51). This claim expressly requires that the format of the keyboard or mouse data be converted into a different format by the translator. This necessarily means that the electrical characteristics of the waveform are altered by the translator.

In a KVM switch, the information transmitted between the workstation to the remote computer must be the same in order for the user of the workstation to be able to communicate with and control the remote computer. Yet, the specification shows the signals passing through multiple devices and signals, each of which can alter the electrical waveform of the signal.

Avocent submits that the term "signal" means "information content."

### 3. "Route," "Routing," and "Routed"

_Avocent's Proposed Construction:_  "moving data or information from one intended point to another point."

_Defendants' Proposed Construction:_  No construction being requested.

Variations of the term "routing" (including "routed," "route," and "routes") are found in claims 1-32 of the '096 patent, claims 11, 13, 15, and 17 of the '264 patent, claim 12 of the '978 patent, and 1-8 of the '323 patent. The specification uses "route" to describe the movement of data or information from one intended point to another. (McAlexander Decl., ¶¶ 157-163). One fundamental purpose of a KVM switch is to allow a user to select one of many computers with which to communicate, while at the same time making it appear as if the user is directly connected to the computer. An underlying focus of a KVM switch is the communication of information between a computer on one side of the switch and a user's workstation on the other side. When routing information, a selection of end points is important – choosing the specific path in advance is not critical.

In almost every instance where "route" or its variations are recited in the claims, that term

is used to describe the movement of data from one point to another without regard for the path in between.  For example, claim 1 of the '096 patent reads, in pertinent part:

> a programmable switch for <u>routing</u> keyboard and cursor control signals <u>from the workstation</u> <u>to a selected computer</u> and for <u>routing</u> video signals <u>from the selected computer</u> <u>to the video monitor</u> of the workstation.

('096 patent, col. 13:57-61 (emphasis added)).  That "routing" is defined simply by the goal of moving information from point A to point B through a switch, which is consistent with the Federal Circuit's and Judge Castel's rulings on the meanings of the terms "switch" and "programmable switch."  The Federal Circuit ruled that the "programmable switch" was "a programmable device capable of forwarding packets from one computer/workstation/server to another."  *Apex*, 325 F.3d at 1377; *see also Avocent*, 2005 U.S. Dist. LEXIS at *10 ("a programmable device capable of forwarding packets from one computer/workstation/server to another that permits the user to control the switch.").  In so ruling, the Federal Circuit rejected the district court's construction that a "programmable switch" was "a device that opens or closes a circuit to form a direct path between inputs and outputs" (like that shown in Figure 1).  *Apex*, 325 F.3d at 1377.  In other words, the Federal Circuit and Judge Castel analyzed the routing of information through the "switch" based on the goal of getting the information from a beginning point (one "computer/workstation/server") to another while rejecting any specific path requirement through the switch (rejecting the "direct path" requirement).

The claims do not require that the specific routing path through the switch be defined, assigned or selected.  The claims merely require that the programmable switch cause the keyboard and mouse signals (*i.e.*, information) to travel from the workstation to the selected computer, and cause the video signals to travel from the selected computer to the video monitor. To the extent a path is required, it is simply "through the switch" without any further specificity. Nothing more is required and nothing more should be read into the claims.

The specification describes "routing" without regard to a specific path through a switch.

> FIG. 4 is a block diagram of a crosspoint switch according to the present invention that routes data between a workstation and a remote server computer;  ('096 patent, col. 2, lines 28-30).

> The crosspoint switch routes the keyboard/mouse packet to another signal conditioning unit that is coupled to the remotely located server computer. ('096 patent, col. 1, lines 57-60).

Thus, "routing" means moving information from one intended point to another through a switch. Neither the claims nor the specification require that the specific path or a unique path through the switch be assigned or selected to route the data from point to point.

Technical dictionaries support Avocent's construction.  The <u>Modern Dictionary of Electronics</u> defines "routing" as "(t)he assignment of the communications path by which information is carried to its destination."  (Exh. 9, p. 876)).  The Seventh Edition of the <u>Modern Dictionary of Electronics</u> also defines "routing" as "(t)he process of selecting the correct circuit path for a message."  (Exh. 10, p. 660)).  The path that is assigned or selected by the claimed "routing" circuit is nothing more than the switch <u>as a whole</u> which gets information from one of its inputs to an output.  This construction is consistent with the Federal Circuit and Judge Castel rulings.  The context of these inventions only requires that the switch path – whatever it may be – be capable of forwarding packets between a workstation and a computer.  Avocent's definition of "route" avoids any improper extension of the meaning of "route" to limit the type of switches covered by the claims.

Avocent requests that the Court construe the term "route," and its variations, to mean "moving data or information from one intended point to another point."

### 4.    "Coupled"

*Avocent's Proposed Construction:*  "communicating information either by direct connection or through intervening elements."

_Defendants' Proposed Construction:_  No construction being requested.

The word "coupled" is used in claims 1-5 and 11-31 of the '096 patent, claims 27-42 of the '978 patent, and 1-8 of the '323 patent.  Claim 1 of the '096 patent recites (emphasis added) "a programmed logic circuit _coupled_ to the first interface . . . ."  Claim 1 of the '798 patent recites "a first signal conditioning device _coupled_ to the workstation user-input device . . . ."

The word "coupled" is used in the patents to describe the situation where two electronic components are directly connected as well as the situation where electronic components are indirectly connected.  (McAlexander Decl., ¶¶ 171-175).  In both cases, the components are electrically "coupled" in that information passes from one to the other as required to operate.  Specifically, in reference to Figure 1, at column 3, lines 1-4 of the '096 patent, the patent notes that (emphasis added):

> . . . the computerized switching system or crosspoint switch according to the present invention allows a number of server computers 52, 54, 56 to be _coupled to_ a number of workstations 62, 64, 66.

In other words, the server computers are coupled to the workstations _through the switch_ – an example of an indirect connection through an intervening element.  Indirect connections are also described as "couplings" at several other parts of the specification.  (_See_ '096 patent, col.12:22-24 (the outputs of the onscreen processor 364 are coupled to the monitor's color inputs indirectly through tristate buffers 368, 370 and 372); '096 patent, col. 1:17-19; col.6:22-27, col. 7:33-57).

The specification establishes that the word "coupled" is also used to indicate direct electrical connection.  For example, at column 3, lines 27-29, the patent explains that "[f]rom a user's perspective, the work station appears as if it is directly coupled to the remote server computer."  At column 5, lines 14-16, the '096 patent describes "a central processing unit (CPU) 120 that is coupled to a keyboard/mouse interface 134."  As shown in Figure 3 of that patent,

CPU 120 and the keyboard/mouse interface are shown as being connected with no intervening electrical element between them. (*See also* '096 patent, col. 2:19-20; col. 3:14-18; col. 3:67 – col. 4:5; col. 8:23-28; and col. 9:22-24 (all describing direct electrical communication between electronic elements as "coupled.")).

"Coupled" should be construed to mean "communicating information either by direct connection or through intervening elements."

### 5. "Transmit"

*Avocent's Proposed Construction:* "to cause information to be transferred or communicated."

*Defendants' Proposed Construction:* No construction being requested.

Variations of the word "transmit" (including "transmits," "transmitting," and "transmitted") are used in claims 1-32 of the '096 patent, claims 27-41 of the '978 patent, and 1-8 of the '323 patent. The "transmit" terms are used in the specification to describe the situation where one device causes information to be transferred from point A to point B, or from device A to device B. (McAlexander Decl., ¶¶ 177-183).

The specification describes the overall transmission from the input of the switching system (at pod 70) all the way to the output of the system (at the remotely-located computer system) as a single transmission of the same keyboard and mouse signals (*i.e.*, information). Figure 1 is a block diagram of a preferred embodiment of the switching system. The specification describes the transmission of the keyboard and mouse data through that system:

> FIG. 2 is a block diagram of a pod 70. As described above, the pod operates to receive the mouse and keyboard signals and to transmit them through the crosspoint switch to a remotely-located server computer system. ('096 patent, col. 3, lines 30-33 (emphasis added)).

But the specification also explains that even within the user-side pod 70, the keyboard and mouse

signals pass through, and thus are altered by, different electronic devices.  Referring to Figure 2,

the specification describes keyboard and mouse data (*i.e.*, information) being intercepted and

retransmitted by the CPU, the quad UART, and the differential line driver/receiver.

> After the CPU 80 has assembled the pod to pod packet, the packet is
> <u>transmitted</u> to a quad UART 84, which <u>transmits</u> and receives serial data on
> four leads 84a-84d. The pod to pod packet is serialized and <u>transmitted</u> on
> the lead 84a to a differential line driver/receiver 88 that <u>transmits</u> and
> receives data on a number of twisted-pair cables 72a-72e, that are coupled
> to the central crosspoint switch 60 (shown in FIG. 1).  ('096 patent, col. 3,
> lines 65-col. 4, line 5)

Thus, the specification describes at least three different devices within the pod 70 that receive

and retransmit the keyboard and mouse signals.  Yet, the reception of the keyboard and mouse

signals at the pod to the ultimate delivery of those signals to the computer is described as a single

transmission of those signals.  ('096 patent, col. 3, lines 30-33).

Thus, the specification uses "transmit" to describe the function of a device that itself

supplies information (*e.g.*, CPU 80), and uses "transmit" to also refer to the situation where one

device (*e.g.*, CPU 80) causes the information to be supplied through other devices (*e.g.*, the quad

UART 84, and the differential line driver/receiver 88) to a destination.  (*See* '096 patent, col. 3,

lines 30-33).  The claim construction should ensure that neither situation is excluded.  The

specification explains that CPU 80 causes the keyboard and mouse information to be transmitted

through the crosspoint switch by sending commands to the crosspoint switch indicating which

remote computer should be communicating with the workstation.  ('096 patent, col. 4, lines 62-

col. 5, line 12).  The CPU 80 establishes the correct communication path through the crosspoint

switch to the correct computer by sending command data to the crosspoint switch.  By doing so,

the CPU 80 causes the keyboard and mouse information to be transferred to the correct remote

computer.  This single "transmission" occurs through the workstation-side pod 70, through the

crosspoint switch, and to the input of the receivers in the computer-side pod 76, even though

there are other devices within the pod 70 and the crosspoint switch that are themselves receiving the keyboard and mouse data and retransmitting that same data.

"Transmit" and its variations mean "to cause information to be transferred or communicated."

### 6.    "Cables" and "Independent Dedicated Cables"

*Avocent's Proposed Construction:*  "cables" means "a dedicated medium for conveying a signal from one location to another, for example a wire."

"independent dedicated cables" means "a cable that is separate from another cable ('independent') and dedicated to carrying one type of signal (for example, keyboard signals, mouse signals, USB device signals, video signals, etc.)."

*Defendants' Proposed Construction:*  No construction being requested.

The term cable (or "cables") is found in claims 1-17 of the '264 patent, and claims 1-26 of the '978 patent.  The specification uses the term "cable" to refer to the wires, either individually or collectively, that carry a signal between two points.  (McAlexander Decl., ¶¶ 185-190).  Figure 1 shows the various cables connecting the system devices as the wires that carry the signals through the switching system.  Figure 2 shows the details of an embodiment of the user-side pod 70.  Again, the cables that carry the signals are represented by the wires and wire paths between devices and circuits.  The same is true for the computer-side pod 76 shown in Figure 3.

In the Seattle case, the defendants attempted to define a "cable" by the outer, plastic sheath that is wrapped around any number of conductors.  A sheath is the plastic wrapping around a conductor or a group of conductors that insulates the conductor from each other and from anything else.  Usually, a wire has a sheath and, typically, groups of wires are wrapped in a second sheath.  But sheaths are never discussed in the specification.

One of the benefits of the invention described in the specification is the ability to reduce the number of cables needed to carry signals in the system of the preferred embodiment.  The

specification explains how combining the horizontal and vertical synchronization signals onto

the red, green or blue signals reduced the number of cables needed to transmit the signals

between the computer and the workstation.

> Horizontal and vertical sync signals are encoded on to the video signals <u>to reduce the number of cables</u> that extend between the workstation and the remote computer.  ('264 patent, abstract)

Figures 10A-10C show the details of reducing the number of cables by reducing the number of

wires needed to handle the video signals.  As used there, the cables and wires are synonymous.

The sync combine circuit 146 (shown in Figure 3) combines the horizontal and vertical sync

signals (which occupy two signal lines) and combines those signals onto the RGB signal lines to

reduce the number of wires needed from 5 to 3.  ('264 patent, col. 5, line 59-col. 6, line 5).

Because the signals are transmitted in a differential format on twisted pairs, the number of wires

is reduced from 10 to 6.  If the term "cable" was defined by the outer, plastic sheath, the

invention would not reduce the number of cables because an outer, plastic sheath can be

arbitrarily wrapped around any number of electrical conductors.  Thus, there would be no

reduction in the number of cables if the cable is defined by the sheath.

 <u>The specification never discusses the sheaths of the cables</u>.  To the extent the cables are

discussed, the focus is on the electrical conductors themselves because that is the medium that

actually carries the signals.  For example, Figures 1-3 show independent connections between

the switch and each of the workstation components (*i.e.*, the video monitor, keyboard, mouse), as

well as independent connections between the switch and the computer ports.  The specification

does not show whether those three independent and dedicated cables are wrapped in three

separate sheaths, a single sheath, or some combination thereof.  Thus, it is improper to define

"cable" by looking to the outer sheath.  Such a definition exalts form over substance.

 The extrinsic evidence supports Avocent's proposed construction.  The <u>Modern</u>

Dictionary of Electronics defines "cable" as "(a)n assembly of one or more conductors, usually within a protective sheath, and so arranged that the conductors can be used separately or in groups." (*See* Exh. 9, p. 127; *see also* Exh. 10, p. 92). Thus, a cable can be one conductor (for example, a copper wire) usually, though not necessarily, in a sheath.

In the Seattle case, the defendants there also argued about the meaning of the phrase "independent dedicated cables." Having studied defendants' position and the arguments of defendants' expert, Dr. Eisenbarth, the real dispute is over the meaning of "cables."

The phrase "independent dedicated cables" is found in claims 1-17 of the '264 patent, and claims 1-26 of the '978 patent. An "independent, dedicated cable" is a cable that is separate from another cable ("independent") and dedicated to carrying one type of signal (*e.g.*, keyboard signals, mouse signals, USB device signals, video signals). (McAlexander Decl., ¶¶ 192-195).

Avocent's interpretation is supported by the claim language. Claim 1 of the '264 patent states in part:

> a computer-side interface for simultaneously <u>physically connecting to independent, dedicated cables</u> of respective keyboard and analog video outputs of plural computers;
>
> a user-side interface for <u>physically connecting to</u> a first set of <u>independent, dedicated cables</u> of a first keyboard and an analog video input of a first monitor;

The keyboard cable is independent of the video cable, and the two cables are dedicated to carrying keyboard and video signals, respectively. (*See also* claim 1 of the '978 patent).

The term "cables" as used by itself and as used in the phrase "independent dedicated cables," means "a dedicated medium for conveying a signal from one location to another, for example a wire."

### 7. "Link"

*Avocent's Proposed Construction:* "a communication channel, path, or circuit."

*Defendants' Proposed Construction:*  "cable."[6]

The term "link" is used in claims 1-8 of the '323 patent, and claims 27-42 of the '978 patent.  The specification uses the term "link" to refer to the data communication path between a transmitter and receiver of information.  In the Background of the Invention section of the specification, the '323 patent describes a typical local computer network in which the computers are coupled "via a communication link" to other network resources, including file servers, print servers, etc.  (Exh. 3, col. 1, lines 16-20).  The specification describes the ability of client computers to use the server computer functions that are provided "through the communication link."  (Exh. 3, col. 1, lines 16-20).  In these passages, the communication link is not described as a "cable," as Rose would construe the term.  (McAlexander Decl., ¶¶ 198-201).

The patents' broad use of the term "link" is also consistent with the ordinary meaning of that term as understood by those skilled in the art.  The relevant definitions in the Modern Dictionary of Electronics define "link" as "[a] transmitter-receiver system connecting two locations," "an interconnection," and "[i]n automatic switching, a path between two units of switching apparatus within a central office."[7]  (Exh. 9, p. 566).  The Modern Dictionary of Electronics also identifies the term "channel" as a synonym for "link."  (*Id.*).

Other technical dictionaries include similar, relevant definitions for "link."  The Seventh Edition of the Modern Dictionary of Electronics includes the same definitions as the Sixth Edition, but adds another helpful definition: "[a] communication channel between two adjacent signaling points that provides a path for messages to travel."  (Exh. 10, p. 429).  The Penguin Dictionary of Electronics defines "link" as "[a] communication channel or circuit that is use to

---

[6]  Defendants' proposed construction comes from Rose's August 6, 2009 letter.

[7]  "Central office" refers to telephone switching equipment.  (McAlexander Decl., ¶ 199, n.11).

connector other channels or circuits," and "[a] path between two switches that form part of a central control system in automatic switching." (Exh. 11, p. 319). Finally, Newton's Telecom Dictionary defines "link" as "[a]nother name for a communications channel or circuit." (Exh. 12, p. 405). Each of these definitions reflects the relevant understanding of the term "link" by those skilled in the electronics art. Moreover, each definition comports with the use of the term "link" in the Beasley patent specification.

Certainly, the specification contemplates that a cable can serve as a link. The specification describes the undesirable nature of having to run dedicated communication links in the form of cables as one way of controlling multiple computers in a network. (Exh. 3, col. 1, lines 40-44). But nowhere does the specification, claims, or prosecution history limit the claimed "link" to a "cable." Rose's proposed construction of "link" is overly narrow, and not consistent with the broader meaning of that term as it is used in the patents.

8.    **"Connectors"**

*Avocent's Proposed Construction:*  "a coupling device which provides an electrical and/or mechanical junction between two cables, or between a cable and a chassis or enclosure."

*Defendants' Proposed Construction:*  No construction being requested.

The term "connectors" is found in claims 1-26 of the '978 patent. The definition of "connector" naturally follows from the definition of "cable." Once it is understood that the term "cable" as used in the patents means the dedicated medium that carries signals, the connector is "a coupling device that provides an electrical and/or mechanical junction between two cables, or between a cable and a chassis or enclosure." (McAlexander Decl., ¶¶ 203-206).

Throughout the specification, a connector is described as the point where electrical signals pass from a cable to a device, or *vice versa.*

> The signal conditioning unit coupled to the server computer decodes the keyboard/mouse packet and <u>applies the signals to a keyboard and mouse connector</u> on the remote computer in the same manner as if the mouse and keyboard were directly coupled to the remote computer.  ('978 patent, col. 1, line 66-col. 2, line 4 (emphasis added)).

> The CPU reads the packet and then transmits the received keyboard and mouse signals to the keyboard and mouse interface 134 <u>where the signals are supplied to the remote computer's keyboard and mouse connectors</u> in the same manner as if the keyboard and mouse were directly connected to the remote server computer.  ('978 patent, col. 5, lines 39-46 (emphasis added)).

Thus, the signals pass through the "connectors" and those connectors are located at the junction between two cables or between a cable and a device.

Claim 1 of the '978 patent also describes the "connectors" in terms of the signals that pass through those connectors.

> the first set of user-side connectors for receiving analog video <u>signals</u> from one of the plural computers <u>through</u> at least one of <u>the computer-side connectors</u>, …  ('978 patent, col. 14, lines 14-17).

Again, the focus is on the electrical signal path, not the outer plastic piece or housing.

Avocent's construction of "connector" is also consistent with the <u>Modern Dictionary of Electronics</u> which defines "connector" as "(a) coupling device which provides an electrical and/or mechanical junction between two cables, or between a cable and a chassis or enclosure." (Exh. 9, p. 195; *see also* Exh. 10, pp. 146-47).  Because a cable is a single wire (or other transmission medium), a connector is the physical coupling or junction between the wire and another wire/cable or a device.

"Connector" should be construed as "a coupling device which provides an electrical and/or mechanical junction between two cables, or between a cable and a chassis or enclosure."

### 9.    "Combining" and "Combined"

<u>*Avocent's Proposed Construction:*</u>  "to take at least portions of two things and put them together, to merge them, or to unite them."

_Defendants' Proposed Construction:_  No construction being requested.

The terms "combining" and "combined" are found in claims 1-17 of the '264 patent. Avocent respectfully submits that the term "combining" is not ambiguous, and thus, does not need to be construed.  _See Vitronics_, 90 F.3d at 1583 ("an analysis of the intrinsic evidence alone will resolve any <u>ambiguity</u> in a disputed claim term") (emphasis added).[8]  If the Court chooses to construe this term, however, Avocent believes "combining" and "combined" should be construed to mean "to take at least portions of two things and put them together, to merge them, or to unite them."  (McAlexander Decl., ¶¶ 208-213).  This definition is consistent with <u>Merriam-Webster's Collegiate Dictionary</u> definition of "combine."  (_See e.g._ Exh. 13, p. 228)).

Avocent's proposed construction also is supported by the intrinsic evidence.  For example, claim 1 of the '264 patent recites, in pertinent part:

> an analog video overlay circuit, … for <u>combining</u> (1) a portion of the analog video signals received by the analog video receiving circuit and (2) the analog overlay video signals generated internally to the switching system to form a <u>combined</u> analog signal that is output to the first monitor via the user-side interface.

The claim language itself makes it clear what the terms "combining" and "combined" mean.  At least part of the video signals from the computer and the video signals generated by the switching system are put together, merged or united by the analog video overlay circuit.  The resulting signal is labeled a "combined" signal that is output to the video monitor.

In Figure 12, tri-state buffers 352, 354, 356, 368, 370, 372 can be used to select either the video received from the computer, the video generated by on-screen programming circuit 364, or both.  The resulting signal is a combined signal.  Referring to Figure 12A, the specification

---

[8]   Because Rose and the other defendants put this term at issue in the Seattle action, Avocent submits that this Court should at least consider whether to construe this term to avoid having inconsistent results between this case and the Seattle action.

describes at least three types of combining video signals from an on-screen processor with

signals from a remote computer.

> [First] When the tri-state buffers 352, 354 and 356 are in their high
> impedance state, and the tri-state buffers 368, 370 and 372 are active, then
> the video screen will only display those signals produced by the onscreen
> processor. [Second] Conversely, if the tri-state buffers 368, 370 and 372 are
> in their high impedance state and the tri-state buffers 352, 354 and 356 are
> active then the monitor displays the video signals produced by the remote
> computer system. [Third] If both sets of tri-state buffers 368, 370, 372 and
> 352, 354 and 356 are both active, then the monitor will display the video
> signals produced by both the onscreen processor and the remote computer
> system.  ('264 patent, col. 12:26-37).

The table at the bottom of columns 11 and 12 of the '264 patent describes the different types of

combined signals that can be displayed as a result of the different types of "combining."

Avocent's proposed construction does not exclude the preferred embodiment described in the

table.  *See Vitronics*, 90 F.3d at 1583.

Avocent respectfully submits that the phrase "combined" is not ambiguous, and thus, the

does not need to be construed by the Court.  If any construction is adopted, however, Avocent

submits that "combined," and its variations, mean "to take at least portions of two things and put

them together, to merge them, or to unite them."

### 10.     "A portion of the analog video signals"

*Avocent's Proposed Construction:*  "some, but not necessarily all, of the analog video
   signals received by the analog video receiving circuit."

*Defendants' Proposed Construction:*  "some, but not all, of the analog video signals."[9]

The phrase "a portion of the analog video signals" is found in claims 1-17 of the '264

patent, and claims 1-26 of the '978 patent.  The dispute among the parties is over the meaning of

---

[9]   Defendants' proposed construction comes from Rose's August 6, 2009 letter.  In the
Seattle action, however, Rose argued that "a portion of the analog video signals" meant "a part of
the whole analog video signals received by the analog video receiving circuit."  Here, Rose has
changed its position, and argues a different meaning of this term.

the phrase "a portion of the analog video signals."  Having studied Rose's position and the expert reports of Dr. Eisenbarth from the Seattle action, however, Avocent submits that the dispute is actually over the meaning of the word "portion."

The word "portion" and the phrase "portion of the analog video signals" are not ambiguous, and therefore, do not need to be construed.  If the Court does construe this phrase, Avocent submits that "a portion of the analog video signals" means "some, but not necessarily all, of the analog video signals."  (McAlexander Decl., ¶¶ 215-220).

Claim 1 of the '264 patent recites an analog video overlay circuit for combining "a portion of the analog video signals received by the analog video receiver circuit" and the internally generated video signals.  ('264 patent, col. 13:60-67).  Avocent's proposed construction of "portion" is "some, but not necessarily all."  Avocent's construction reads on a combination including "some" of the received video signals, or "all" of the received video signals.  The claims, the specification, and the prosecution history do not exclude a combination involving "all" of the video signals received by the analog video receiving circuit.

Indeed, the specification discloses that at least one signal combination is created using all of the incoming analog video.  ('264 patent, col. 12:40-67 (table)).  The table at the bottom of column 12 of the '264 patent describes the different types of display appearances that can be generated using the preferred embodiment of the OSD circuitry.  The column labeled "display" describes the appearance that can be generated by selecting the appropriate control values for "HTone," "HBFK,", "H Tone Enable," etc.  The second entry from the bottom describes the display appearance as "active system video with opaque OSD characters and windows."  (Exh. 2, col. 12, lines 57-61).  Because the table separately uses the terms "solid" and "transparent," the reference to "opaque" refers to a display in which both the computer video and the OSD menu

appear on the screen such that the OSD menu appears to be semi-transparent and the computer video can be seen "underneath" the OSD menu. (McAlexander Decl., ¶ 219). In this semi-transparent mode, the "analog video overlay circuit" combines all of the computer video signals with the OSD menu video signals to create the display. Thus, in this mode, the "portion of the analog video signals" being combined is <u>all</u> of the analog video signals. Accordingly, the correct construction of "a portion of the analog video signals" must encompass the preferred embodiment including the semi-transparent mode in which all of the computer video signals are combined with the OSD video signals. *See Vitronics*, 90 F.3d at 1583.

Defendants' construction improperly imports a limitation into the claims that excludes the use of "all" of the received video signals. Defendants argue that "portion" means "some, but not all, of the analog video signals" thereby excluding any combination including "all" of the analog video signals from the scope of the claims. As explained above, this construction improperly excludes the embodiment disclosed in Figure 12A of the Beasley patents. *See Vitronics*, 90 F.3d at 1583. But it is also black-letter patent law that the claim recites the minimum that must be included in a device to find infringement, unless limited by the claim itself. *Vivid Techs., Inc. v. American Science & Engr., Inc.*, 200 F.3d 795, 812 (Fed. Cir. 1999) ("the signal 'comprising' accommodates additional variables, provided that all of the elements stated in the claim are present."); *Cias, Inc. v. Alliance Gaming Corp*., 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'"). Thus, even if the term "portion" meant "less that all," the claim would still read on a system that combined <u>all</u> of the analog video signals because the transitional term "comprising" means that the claim recite the minimum that must be found in the accused product to be covered by the claim.

Avocent respectfully requests that the Court construe the phrase "a portion of the analog video signals" to mean "some, but not necessarily all, of the analog video signals."

### 11.    "Remote" and "Remotely Located"

*Avocent's Proposed Construction:*  "a computer that is not directly connected to a corresponding workstation and that can be in a separate location."

*Defendants' Proposed Construction:*  "a computer that is not directly connected to a corresponding workstation and that is in a separate location."[10]

The term "remote" is found in claims 27-42 of the '978 patent, and claims 1-8 of the '323 patent.  The term "remotely located" is found in claim 10 of the '096 patent.  The terms "remote" and "remotely located" are used to describe the relationship between a computer and a corresponding workstation.  Avocent respectfully submits that, in that context, a "remote" computer or a "remotely located" computer is "a computer that is not directly connected to a corresponding workstation and that can be in a separate location."  (McAlexander Decl., ¶¶ 222-225).  The specific difference between Avocent's and the Defendants' proposed construction is whether the remote computers, (or the remotely located computers) are <u>required</u> to be in a separate location, as the Defendants' construction requires.  Avocent submits that there is nothing in the claims, the specification, or the prosecution history that reads this limitation into the claims.  Avocent's construction, on the other hand, allows (but does not require) the computers to be located in separate location.  Avocent's construction is focused on the fact that the KVM switch gives the user the functional ability to control the remote computer as if the user were directly connected to the computer, with actually being directly connected to the computer.

The patents describe a KVM switching system that allows a workstation to be separated

---

[10]   Defendants' proposed construction comes from Rose's August 6, 2009 letter.  In the Seattle action, however, Rose argued that "remote/remotely located" meant "separated by a distance greater than that which would normally cause intolerable signal degradation."  Here, Rose has changed its position, and proposes a different meaning of this term.

from a corresponding computer. The switching system is inserted in the electrical path between the computer and the workstation. By using a switching system like the preferred embodiment, the computer <u>can</u> be located in a physically separate location. But such physical separateness is <u>not required</u> by the invention or the claims.

Claim 27 of the '978 patent states what it means to be "remote":

> A system <u>for connecting a workstation</u> … <u>to plural remote computer systems</u>, comprising: a first signal conditioning device … ; a first communication link … ; a crosspoint switch … ; a plurality of second communication links … ; a plurality of second signal conditioning devices … and an analog video link … .

Thus, the claimed KVM switch (including the signal conditioning devices, crosspoint switch, and communication links) separates the workstation from the "remote computer systems." This is what the patents mean when they recite "remote" or "remotely located" computers – *i.e.*, the computer and the workstation are not directly connected together as they normally would be.

Figure 1 also shows the preferred embodiment switching system interposed between the workstation and the "remote" computers. The specification also supports this construction.

> Referring now to FIG. 1, the computerized switching system or crosspoint switch according to the present invention allows a number of server computers 52, 54, 56 to be coupled to a number of workstations 62, 64, 66. ('978 patent, col. 3, lines 6-9).

There is nothing in the claims, the specification or the prosecution history that mandates the "remote" computers be anything other than computers separated by their respective workstations by a KVM switching system.

When describing the relationship between a computer and a workstation, Avocent submits that "remote" and "remotely located" mean "a computer that is not directly connected to a corresponding workstation and that can be in a separate location from the workstation."

12.        "In response to"

*Avocent's Proposed Construction:*  "in reply to, or in reaction to."

*Defendants' Proposed Construction:*  No construction being requested.

The phrase "in response to" is found in claims 1-32 of the '096 patent, and claims 16-17 of the '264 patent, and claim 16 of the '978 patent.  Once again, Avocent respectfully submits that the phrase "in response to" is not ambiguous, and thus, does not need to be construed. Nevertheless, if the Court does construe that phrase, Avocent believes that "in response to" means "in reply to, or in reaction to."[11]  (McAlexander Decl., ¶¶ 227-234).

Avocent's construction is consistent with the claim language.  Claim 1 of the '096 patent states, in part, that the "programmed logic circuit" operates "to control the programmable switch in response to the keyboard or cursor control device signals detected"  ('096 patent, col. 14:18-20; *see also* claims 11, 20, and 26 of the '096 patent).  Thus, the programmable switch is controlled as a reply to, or as a reaction to, the keyboard or cursor control device signals received by the switching system.  Similarly, claim 6 of the '096 patent recites a method of transmitting signals between a workstation and computer that includes the step of:

> "f) receiving keyboard or cursor control device signals entered at the workstation in response to the overlaid video signals on the video monitor" ('096 patent, col. 15:14-16).

The keyboard or cursor control device signals are received in reply to, or in reaction to, the overlaid video signals on the video monitor.  Claim 10 of the '096 patent reads:

> "b) generating a control signal in response to the video signals on the video monitor"  ('096 patent, col. 15:51-52).

The control signal is generated in reply to, or in reaction to, the video signals.

---

[11]    Because Rose and the other defendants put this term at issue in the Seattle action, Avocent submits that this Court should at least consider whether to construe this term to avoid inconsistent results between this case and the Seattle action.

Avocent's construction is also consistent with usage of the phrase "in response to" in the specification. For example, the '096 patent states:

> As indicated above, the present invention provides the capability of allowing a user to send commands from a workstation to the central crosspoint switch in response to prompts that are displayed on the video monitor. ('096 patent, col. 10, lines 63-66).

Avocent submits that the word actually recited in the claims (*i.e.*, "response") is more precise and accurate than the words that can be reasonably substituted for it. Consequently, the substitution of other words for "response" can only add ambiguity where none currently exists. If any construction is adopted, however, Avocent respectfully requests that the Court construe the phrase "in response to" to mean "in reply to, or in reaction to."

### C. Avocent Also Asks the Court to Adopt the Other Claim Constructions Rendered by the Federal Circuit and Judge Castel

As the Court is aware, the Federal Circuit and Judge Castel construed several terms during the Raritan action. One of those terms, "crosspoint switch," was put at issue (again) in this case by Rose. The construction of that term is briefed above. But common sense and judicial economy suggest that the Court should also adopt the other claim constructions handed down by the Federal Circuit and Judge Castel in the Raritan case. More importantly, however, based on the claim construction contentions here and in the Seattle case, it is clear that Rose is trying to wiggle around the Federal Circuit's and Judge Castel's claim construction rulings. For example, in this case, the defendants are offering constructions of "crosspoint switch," "signal," and "a portion of analog video signals" that undermine and contradict the earlier courts' rulings on "crosspoint switch," "programmable switch," and "overlay/overlaid." The adoption of these constructions now will minimize the need to revisit claim construction issues later when Rose presents non-infringement arguments which require a different or additional construction.

The Federal Circuit has long held that claim construction is a matter of law. *See Cybor Corp. v. Fas Techs., Inc.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (*en banc*). Thus, claim construction is *not* dependent upon the infringement issues in a case. Indeed, claim construction is a *prerequisite* to an infringement analysis – not the other way around. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The scope of a claim does not change from case to case.

In its ruling, the Federal Circuit construed some of the disputed terms, and carefully explained how the district court was to construe the remaining terms on remand. *See Apex*, 325 F.3d 1364. Judge Castel followed those instructions, and construed the remaining terms. *See Avocent*, 2005 U.S. Dist. LEXIS 4017. The Federal Circuit's claim construction rulings are binding legal precedent on this Court under *stare decisis*. *See Amgen, Inc. v. Hoffmann-La Roche Ltd.*, 494 F. Supp. 2d 54, 61 (D. Mass. 2007). At a minimum, Judge Castel's claim construction rulings are "instructive" and deserve the deference this Court deems is appropriate. *See Lamps Plus, Inc. v. Dolan*, 2003 U.S. Dist. LEXIS 25545, *5-6 (N.D. Tex. 2003). The terms construed by the Federal Circuit and Judge Castel, and their respective constructions, are listed below.

### 1.    The '096 Patent Claim Constructions

#### i.    "Programmable Switch"

The Federal Circuit construed "programmable switch" as:

> "Programmable Switch" – "a programmable device capable of forwarding packets from one computer/workstation/server to another." *Apex*, 325 F.3d at 1377.

Judge Castel construed "programmable switch" slightly differently than the Federal Circuit construed that term. Judge Castel construed "programmable switch" as:

> "Programmable Switch" – "a programmable device capable of forwarding packets from one computer/workstation/server to another that permits the user to control the switch." *Avocent*, 2005 U.S. Dist. LEXIS at *10.

The difference between the two is of no significance. Judge Castel added the requirement that the "programmable switch" permit the user to control the switch. While Judge Castel's construction is more complete, other portions of the '096 claims require that this additional limitation. Thus, either construction is correct, and can be adopted by the Court.

### ii.    "Switch"

The Federal Circuit construed "switch" as:

> "Switch" – "a device capable of forwarding packets directly to the ports associated with particular network addresses." *Apex*, 325 F.3d at 1377.

### iii.    "Interface"

The Federal Circuit construed "interface" as:

> "Interface" – "the signal connection and associated control circuits that are used to connect devices." *Apex*, 325 F.3d at 1374.

### iv.    "Interface Circuit"

The Federal Circuit construed "interface circuit" as:

> "Interface circuit" – "a circuit that links one type of logic family with another or with analog circuitry." *Apex*, 325 F.3d at 1374.

### v.    "On-Screen Programming Circuit"

Judge Castel construed "on-screen programming circuit" as:

> "On-Screen Programming Circuit" – "a circuit that produces a display on a monitor that allows a user to control a switch." *Avocent*, 2005 U.S. Dist. LEXIS at *11.

### vi.    "Overlay" and "Overlaid"

The Federal Circuit construed "overlay" and "overlaid" as:

> "Overlay" and "Overlaid" – "to superimpose one graphic image over another. They do not require the two images to be present on the same spot on the monitor at the same time." *Apex*, 325 F.3d at 1377.

-37-

Judge Castel construed "overlay" slightly differently than the Federal Circuit construed that term. Judge Castel construed "overlay" as:

> "Overlay" – "the two-dimensional visual representation that has the appearance of being overlaid on top of another image." *Avocent*, 2005 U.S. Dist. LEXIS at *14.

The difference between the two is of no significance. Both constructions are centered on the idea that there must be an appearance that one image is on top of another. Neither construction requires that two images must be present on the same location on the monitor at the same time. Avocent submits that the Court could adopt either construction.

### 2.    The '264 Patent Claim Constructions

#### i.    "Interface"

The Federal Circuit construed "interface" as:

> "Interface" – "the signal connection and associated control circuits that are used to connect devices." *Apex*, 325 F.3d at 1374.

#### ii.    "Analog"

Judge Castel construed "analog" as:

> "Analog" – "that which is not digital; it means a continuously varying signal as distinguished from a binary one." *Avocent*, 2005 U.S. Dist. LEXIS at *14.

#### iii.    "Image Generating Circuit"

Judge Castel construed "image generating circuit" as:

> "Image Generating Circuit" – "a structure (i.e. a circuit) that produces the signals (e.g. red, blue, green) that form an image." *Avocent*, 2005 U.S. Dist. LEXIS at *14.

#### iv.    "Overlay" and "Overlaid"

The Federal Circuit construed "overlay" and "overlaid" as:

> "Overlay" and "Overlaid" – "to superimpose one graphic image over another. They do not require the two images to be present on the same spot on the monitor at the same time." *Apex*, 325 F.3d at 1377.

Judge Castel construed "overlay" slightly differently than the Federal Circuit construed that term. Judge Castel construed "overlay" as:

> "Overlay" – "the two-dimensional visual representation that has the appearance of being overlaid on top of another image." *Avocent*, 2005 U.S. Dist. LEXIS at *14.

The difference between the two is of no significance. Both constructions are centered around the idea that there must be an appearance that one image is on top of another. Neither construction requires that two images must be present on the same location on the monitor at the same time. Avocent submits that the Court could adopt either construction.

### v.     "Analog [Video] Overlay Image Generating Circuit"

Judge Castel construed "Analog [Video] Overlay Image Generating Circuit" as:

> "Analog [Video] Overlay Image Generating Circuit" – "a circuit that generates an analog video overlay image." *Avocent*, 2005 U.S. Dist. LEXIS at *14.

### vi.     "Analog Video Overlay Circuit"

Judge Castel construed "Analog Video Overlay Circuit" as:

> "Analog Video Overlay Circuit" – "a circuit that combines an overlaid image and an underlying image for display on a video screen." *Avocent*, 2005 U.S. Dist. LEXIS at *15.

### vii.     "Analog Video Receiving Circuit"

Judge Castel construed "Analog Video Receiving Circuit" as:

> "Analog Video Receiving Circuit" – "a structure (i.e. a circuit) that is adapted to receive video signals of the analog type." *Avocent*, 2005 U.S. Dist. LEXIS at *15-16.

### 3.     The Federal Circuit's and Judge Castel's Constructions for the '176 Patent Apply Equally to the '323 Patent and Should Be Adopted

Although the '323 patent was not at issue in the Raritan case, the terms "signal conditioning units," "data packet," and "serial data packet" construed by the Federal Circuit and Judge Castel from the '176 patent also appear in the '323 patent. Indeed, those terms are used in the same context in both patents. Thus, the constructions issued for the '176 patent apply equally

to the '323 patent, and should be adopted here.

### i.        **"Signal Conditioning Units"**

Judge Castel construed "signal conditioning units" as:

> "Signal Conditioning Units" – "a stand-alone entity or box that receives a signal input and translates (i.e. conditions) the signal into an output in a different format." *Avocent*, 2005 U.S. Dist. LEXIS at *12.

### ii.        **"Data Packet"**

The Federal Circuit construed "data packet" as:

> "Data Packet" – "a unit of information transmitted as a whole from one device to another on a network." *Apex*, 325 F.3d at 1375.

### iii.        **"Serial Data Packet"**

The Federal Circuit construed "serial data packet" as:

> "Serial Data Packet" – "a unit of information transmitted as a whole from one device to another on a network that includes a keyboard signal, a mouse signal, or both." *Apex*, 325 F.3d at 1375-76.

## III.    CONCLUSION

Avocent respectfully requests that the Court adopt each of Avocent's proposed

constructions which are supported by the intrinsic and extrinsic evidence.

DATED this 21st day of August, 2009.        Respectfully submitted,

PLAINTIFF AVOCENT REDMOND CORP.,
by and through its Attorneys

/s/James D. Berquist_____
James D. Berquist
J. Scott Davidson
Donald L. Jackson
Grace K. Obermann
DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
4300 Wilson Blvd, Suite 700
Arlington, Virginia 22203
Tel. 703-894-6400
Fax. 703-894-6430

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the counsel of record who are deemed to have

consented to electronic service are being served today with a copy of this document via the Court's

CM/ECF system per RCFC 5.2.  Any other counsel of record will be served by electronic mail,

facsimile transmission, and/or first class mail on this same date.


/s/ Donald L. Jackson_____
Donald L. Jackson