IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AVOCENT REDMOND CORP.

               Plaintiff,

   v.

THE UNITED STATES

               Defendant,

   and

ROSE ELECTRONICS

               Intervenor.

No. 08-69C

Judge Lawrence S. Margolis

(Filed August 21, 2009)

ROSE ELECTRONICS' OPENING CLAIM CONSTRUCTION BRIEF

**Table of Contents**

I.   INTRODUCTION ...................................................................................................1

II.  TECHNOLOGY BACKGROUND .........................................................................2

III. DISCUSSION .........................................................................................................3

    A.  The Legal Standard for Claim Construction ....................................................3

        1.   Claim Construction is a Question of Law.................................................3

        2.   A Court May Consider Both Intrinsic and Extrinsic Evidence in Claim Construction.............................................................................................4

        3.   The Claim Language Itself is The Starting Point to Construing Claim Terms. .......................................................................................................4

        4.   The Claims Must be Read in Light of the Specification...........................5

        5.   The Role of the File History in Claim Construction.................................6

        6.   Extrinsic Evidence ..................................................................................6

    B.  Rose's Proposed Construction of the Disputed Claim Terms ...........................7

        1.   "signal" ...................................................................................................7

        2.   "a portion of the analog video signal received by the [ . . . ] analog video receiving circuit"....................................................................................13

        3.   "remote/remotely located" .....................................................................15

        4.   "link"......................................................................................................17

        5.   "crosspoint switch" ...............................................................................19

IV. CONCLUSION.....................................................................................................27

## Table of Authorities

### Cases

*Apex Inc. v. Raritan Computer, Inc.*,
187 F. Supp. 2d 141 (S.D.N.Y. 2002) ............................................ 26

*Apex Inc. v. Raritan Computer, Inc.*,
325 F.3d 1364 (Fed. Cir. 2003) .......................................... 25, 26

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001) ............................................ 6

*Bicon, Inc. v. Staumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ........................................ 15, 20

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002) ............................................ 6

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
214 F.3d 1302 (Fed. Cir. 2000) ........................................... 15

*Home Diagnostics, Inc. v. Lifescan, Inc.*,
39 F.3d 1352 (Fed. Cir. 2004) ............................................. 5

*Innova/Pure Water, Inc. v. Safari Water Filtration*,
381 F.3d 1111 (Fed. Cir. 1994) ......................................... 4, 5

*Key Pharm. v. Hercon Lab. Corp.*,
161 F.3d 709 (Fed. Cir. 1998) ............................................. 7

*Markman v. Westview Instruments, Inc*,
52 F.3d 967 (Fed. Cir. 1995),
*aff'd*, 517 U.S. 370, 116 S. Ct. 1384 (1996) ......................... 1, 3, 4, 5

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998) ........................................... 5

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ...................................... 4, 5, 6, 7

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999) ........................................... 7

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ............................................ 6

*Vitronics Corp. v. Conceptronics, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ........................................ 4, 5, 6

Other Authorities

*Communications Standard Dictionary,* 3d ed. (1996) ...................................................... 21, 22, 24

*Microsoft Computer Dictionary*, 2d ed. (1994) ................................................................. 8, 17, 24

*Webster's Third New International Dictionary* (1986) ................................................. 8, 15, 19, 24

*Wiley Electrical and Electronics Engineering Dictionary*, (2004)........................................ 22, 24

**List of Exhibits**

| Exhibit A | U.S. Patent No. 5,884,096 |
|---|---|
| Exhibit B | U.S. Patent No. 6,112,264 |
| Exhibit C | U.S. Patent No. 6,345,323 |
| Exhibit D | U.S. Patent No. 7,113,978 |
| Exhibit E | Excerpts from *Microsoft Computer Dictionary*, 2d ed. (1994) |
| Exhibit F | Excerpts from *Webster's Third New Int'l Dictionary* (1986) |
| Exhibit G | Excerpts from McAlexander Claim Construction Expert Report, July 13, 2007, in Case No. C06-1711-MJP (W.D. Wash.) |
| Exhibit H | Apex's Suppl. Response to Cybex Interrogatory No. 1 and Rose Interrogatories Nos. 1 and 2, *Apex PC Solutions, Inc. v. Cybex Computer Products Corp. and Rose Electronics*, C98-246Z and C98-245Z (W.D. Wash., Seattle Division). |
| Exhibit I | 8/5/09 Letter from Dowler to Berquist |
| Exhibit J | Excerpts from *Communications Standard Dictionary,* 3d ed. (1996) |
| Exhibit K | Excerpts from *Wiley Electrical And Electronics Engineering Dictionary* (2004) |
| Exhibit L | Data Sheet for Harris/Intersil CD22M3494SQ |
| Exhibit M | Data Sheet for Siliconix/Vishay DG884DN |

## I.    INTRODUCTION

In this patent infringement action, plaintiff, Avocent Redmond Corp. ("Avocent"), has accused the United States of infringing U.S. Patent Nos. 5,884,096 ("the '096 patent," Exh. A),[1] 6,112,264 ("the '264 patent," Exh. B), 6,345,323 ("the '323 patent," Exh. C), and 7,113,978 ("the '978 patent," Exh. D) (collectively, "the patents-in-suit").  The United States has denied infringing the patents-in-suit, and has alleged, among other defenses, that each of the asserted patent claims is invalid.  While there are four patents at issue in this litigation, all four patents share the same specification and only differ in the scope of the claims.

As the Court is aware, a patent is a legal document that, like a deed, defines the metes and bounds of the patentee's invention.  A patent does this in the numbered claims at the end of the patent.  The determination of whether the patentee's invention as set forth in the claims has been violated, *i.e.*, infringement of the patent, is a two step process.  The interpretation or construction of the claims is the first step.  The second step, not considered here, is the comparison of the construed claims to the accused products.

The Court of Appeals for the Federal Circuit held in *Markman v. Westview Instruments, Inc.* that interpretation of the patentee's claims is to be performed by the Court rather than by a jury.  *See Markman*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384 (1996).  Following the guidance of the Federal Circuit's *Markman* decision, this Court has scheduled a hearing for October 1, 2009 to interpret the disputed terms of the relevant claims of the patents-in-suit.  This brief and accompanying evidence are intended to assist the Court in interpreting those disputed claim terms.

---

[1]    Unless otherwise noted, all exhibits referenced herein are attached to the Declaration of Brian L. Jackson filed concurrently herewith.

## II.     TECHNOLOGY BACKGROUND

The patents-in-suit describe a switching system for connecting one or more computers to a user workstation, where the "user workstation" is simply the combination of a keyboard, video display, and mouse. (*See* Exh. A, '096 patent, Abstract.) These types of switching systems are, in the industry, commonly referred to as KVM switches, with "KVM" being an acronym for **K**eyboard, **V**ideo and **M**ouse. With the use of a KVM switch, a user can interact with and control any of the connected computers from a single workstation (rather than each computer having its own dedicated keyboard, video display, and mouse as would otherwise be required). The benefit of such a system is that a user can interact with the multiple computers without having to travel from computer to computer, and without a complicated wiring scheme. (*See* Exh. A, '096 patent, col. 1 lines 49-52.)

A typical KVM switch arrangement is depicted in the figure below:



In this picture, the KVM switch is the box that sits between the four separate computers on the right and the user workstation on the left. Thus, in this arrangement, a person sitting at a workstation, i.e., in front of the keyboard, monitor and mouse, can use the KVM switch to

2

connect to any one of the four separate computer systems. This can be useful where the separate computer systems perform different functions, such as accounting, engineering, or human resources. In other words, if a user wanted to perform accounting functions, he or she would use the KVM switch to connect the workstation to the computer that handles accounting; and, if the user then wanted to switch to human resource tasks, he or she would use the KVM switch to switch the workstation to the computer that handles human resources. In effect, the KVM switch eliminates the need for the user to physically get up and move between separate workstations (each dedicated to a single computer) whenever he or she needs to connect to a different computer.

When using a KVM switch, the user must indicate to the switch which of the separate computers he or she wants to control (i.e., which computer will receive the input from the keyboard and mouse, and will in turn provide video to the video display). The user can choose which of the multiple computers will be controlled in a number of different ways, including by choosing the selected computer from menu on the video display screen (the subject of the patents-in-suit), by pushing a button on the KVM switch itself, or by pressing a defined set of keystrokes or key combinations on the keyboard (like Ctrl-1 to connect to computer one or Ctrl-2 to connect to computer two, and so forth).

## III. DISCUSSION

### A. The Legal Standard for Claim Construction

#### 1. Claim Construction is a Question of Law.

Claim construction is a question of law reserved exclusively for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*., 517 U.S. 370 (1996).

### 2. A Court May Consider Both Intrinsic and Extrinsic Evidence in Claim Construction.

To ascertain the meaning of a term in an asserted claim, a court should first look to "intrinsic" evidence, i.e., the language of the claim itself, the patent specification, and the file history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315, (Fed. Cir. 2005) (*en banc*), citing *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996) ("Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.") Ordinarily, intrinsic evidence should be sufficient to determine the meaning of any disputed claim terms. *Vitronics,* 90 F.3d at 1583.

When intrinsic evidence is insufficient, a court may use "extrinsic" evidence (e.g., expert testimony, dictionary definitions, inventor testimony, treatises and prior art references) to understand the meaning of claim terms. *Id*. at 1582-83. Extrinsic evidence is relevant to help the court understand the terminology of the art to which the patent relates and may properly assist the court in understanding the technical terms contained in the patent, so long as such evidence is not used to vary or contradict the terms in the claim. *Phillips*, 415 F.3d at 1322-23.

### 3. The Claim Language Itself is The Starting Point to Construing Claim Terms.

The Federal Circuit has said it is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312, *citing Innova/Pure Water, Inc. v. Safari Water Filtration*, 381 F.3d 1111, 1115 (Fed. Cir. 1994); and *Vitronics*, 90 F.3d at 1582 ("we look to the words of the claims themselves … to define the scope of the patented invention"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.")

The analysis begins by looking "to the words of the claims themselves … to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582-83; *see also Markman*, 52 F.3d at 980. The words of a claim are given their ordinary, or customary, meanings as understood from the perspective of "one of ordinary skill in the field of the invention." *Phillips,* 415 F.3d at 1313 (clarifying that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention"); *Home Diagnostics, Inc. v. Lifescan, Inc.*, 39 F.3d 1352, 1356 (Fed. Cir. 2004); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

In some cases, the ordinary meaning of a claim language as understood by a person of skill in the art may be readily apparent, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful. *Phillips,* 415 F.3d at 1314.

Because the context surrounding a claim term is often "highly instructive" in determining the ordinary and customary meaning of disputed terms, the "context in which a term is used in the asserted claim" and "the usage of a term in … other claims" must be considered to ascertain how the relevant technical terms should be understood. *See Phillips,* 415 F.3d at 1314-15; *see also Innova/Pure Water*, 381 F.3d at 1116. Other asserted and unasserted claims of the patent can provide "enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314, quoting *Vitronics*, 90 F.3d at 1582.

### 4.    The Claims Must be Read in Light of the Specification.

While the claims define the invention, they do not stand alone. *See Phillips*, 415 F.3d at 1315; and *Markman*, 52 F.3d 978 (claims are part of "a fully integrated written instrument"). For that reason, the claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979; *see also Phillips*, 415 F.3d at 1315; and *Vitronics*, 90 F.3d at 1582

("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). The specification "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In other cases, the specification could "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips*, 415 F.3d at 1316; *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).

### 5.    The Role of the File History in Claim Construction.

The file history, sometimes referred to as the prosecution history or file wrapper, is the official PTO record of the back-and-forth process that took place between the inventor and the PTO as the inventor sought a patent for his invention. This prosecution history of a patent is likewise an aid in construing claim terms. *Phillips*, 415 F.3d at 1317.

### 6.    Extrinsic Evidence

Finally, as noted above, if a review of the intrinsic evidence is not sufficient to determine the meaning of a claim term, a court may consider extrinsic evidence such as dictionary definitions and expert testimony. Judges "may … rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322-23, quoting *Vitronics*, 90 F.3d at 1584 n.6; *see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001) (stating that dictionaries hold a "special place" and may "be considered along with the intrinsic evidence when determining the ordinary meaning of claim terms").

A court may also consider the testimony of experts in the field. However, a court may not use expert testimony to "arrive at a claim construction that is clearly at odds with the … construction mandated by … the written record of the patent." *See Key Pharm. v. Hercon Lab. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998). But the court may use such testimony for a variety of other purposes: (1) "to provide background on the technology at issue," (2) "to explain how an invention works," (3) "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art," (4) to establish that a particular term in the patent . . . has a particular meaning in the pertinent field." *See Phillips*, 415 F.3d at 1318. *See also Key Pharm.*, 161 F.3d at 716 ("trial courts . . . can hear expert testimony for background and education on the technology implicated by the presented claim construction issues … and … have broad discretion in this regard"). The court may also consider such expert testimony "even when the patent document is itself clear." *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

### B.  Rose's Proposed Construction of the Disputed Claim Terms

Intervenor Rose Electronics ("Rose") present the following five terms to this Court for construction.

#### 1.  "signal"

*Rose's proposed construction*:  "any electrical quantity, such as voltage, current, or frequency, that can be used to transmit information"

*Avocent's proposed construction*:  "information content"

The term "signal" appears in the following claims of the four patents-in-suit:  '096 patent claims 1-32; '264 patent claims 1-4, 6-11, and 13-17; '323 patent claims 1-8; and '978 patent claims 1-2, 5, 7-16, 19, 21-27, 29-37, and 41-42.

Likewise, the term "signal" is used extensively throughout the patent specification. Although the patents do not give an express definition to the term, they appear to use the term in

its ordinary sense. (*See, e.g.*, Exh. A, '096 patent at col. 1 line 66 – col. 2 line 4.) There is a striking consistency among dictionary sources, both technical and non-technical, regarding the ordinary meaning of this term. (*See* Exh. E, *Microsoft Computer Dictionary*, 2d ed. (1994) ("any electrical quantity, such as voltage, current, or frequency, that can be used to transmit information"); Exh. F, *Webster's Third New Int'l Dictionary* (1986) ("a detectable physical quantity or impulse (as a voltage, current, magnetic field strength) by which messages or information can be transmitted").) Thus, Rose adopts the *Microsoft Computer Dictionary* definition as their construction. Under that construction, a signal is any electrical quantity (such as a voltage, current, or frequency) used to transmit information. While a signal must convey (or be able to convey) information, a signal contains electrical structure (e.g., voltage, current, or frequency) in addition to that information.

Avocent, on the other hand, has taken the position that a "signal" is the information itself, rather than the voltages or currents conveying that information during transmission. Avocent's construction is not only inconsistent with the overwhelming and uniform dictionary evidence cited above; it is also inconsistent with the way the term "signal" is used in the patents themselves.

A simple example illustrates the concepts of "signal" and "information content" and why they are different. As the Court is likely aware, in computer technologies, data is often represented in binary form, i.e., as a series of zeros (0) and ones (1). Suppose that one wants to transmit the following binary information: "0 1 0." This information could be represented in a number of different ways. For example, many computer chips use what is known as TTL logic. In the TTL logic system, a "0" can be represented by zero volts, and a "1" can be represented by five volts. Thus, the information "0 1 0" would be represented by the following TTL signal:



A second example is transmitting the "0 1 0" information using an RS-232 transmission protocol. In that protocol, a "0" can be represented by 12 volts, and a "1" can be represented by -12 volts. Importantly, the TTL voltage levels described above would not work in an RS-232 transmission, because the RS-232 protocol does not recognize zero volts as either a "0" or a "1." Thus, the information "0 1 0" would be represented by the following RS-232 signal:



The two examples above use different voltages to represent "0" and "1." However, as indicated by the dictionary definition provided above, different frequencies could also be used. In the following hypothetical oscillating signal, a low frequency (i.e., that part of a signal that varies

slowly) represents "0" and a high frequency (i.e., that part of a signal that varies rapidly) represents "1":



These illustrations demonstrate that a "signal" is not the same thing as "information content." In the each of the above examples, the same information content is represented: "0 1 0." But three radically different signals are used to carry that information. To equate the concept of "0 1 0" with the electrical structure represented by the graphs is simply incorrect.

The patent claim language demonstrates that "signal" and "information content" cannot be the same thing as Avocent contends. For example, claim 27 of the '978 patent recites, in the first element, "receiving a first set of electronic **signals**" (emphasis added). (Exh. D, '978 patent at col. 16 lines 56-57.) In the third element, the claim then recites "transferring **information corresponding to the** received first set of electrical **signals**" (emphases added). (Exh. D, '978 patent at col. 16 lines 62-63.) If signals and information were indeed the same thing, it would make no sense for the claim to separately recite "signal" and "information corresponding to the … signals." Indeed, the entire concept of "information corresponding to . . . signals" would make little sense unless a "signal" contains some structure in addition to that information.

Likewise, the patent specification supports Rose's proposed construction.  As discussed in the background section above, the patents-in-suit are directed to a KVM switch, which is used to connect a user's workstation (having a keyboard, video monitor, and mouse) with a remotely located computer.  When a user types a particular letter on the keyboard, the KVM switch must ensure that the letter is properly delivered to the remote computer.  To use an example from Avocent's expert's report in the related Seattle litigation,[2] when the user types the letter "K" on the keyboard, the letter "K" is the information content that will be delivered to the computer. (Exh. G, McAlexander Expert Report at pp. 38-39.)  According to the patent specification, however, the signal representing that letter "K" can vary as it moves through the KVM switch. For instance, according to the patent specification, the "CPU 80 [in the KVM switch] then reads the digitally buffered keyboard and mouse signals from the keyboard/mouse interface 82 **and converts the signals into a data packet** that is transmitted to the remote computer."  (Exh. A, '096 patent at col. 3 lines 45-49 (emphasis added).)  If the keyboard signal were identical to the keyboard information being transmitted, as Avocent contends, then the KVM switch's conversion of the keyboard signal into a data packet would cause the loss of the underlying information, i.e., the letter "K."  As Avocent's own expert has acknowledged, however, this information is not lost during transmission through the KVM switch.  (Exh. G, McAlexander Expert Report at p. 39.)  It is merely the representation of the letter "K" (the signal) that is being converted from one form to another, not the letter "K" itself (the information).  Similar functionality is discussed elsewhere in the patent specification, where it describes that "keyboard

---

[2]    Avocent has asserted three of the patents-in-suit in this case in another lawsuit against Rose, *Avocent Redmond Corp. v. Rose Electronics et al.*, Case No. C06-1711-MJP (W.D. Wash.).

and mouse signals from the computer's keyboard and mouse connectors are . . . assembled into a pod to pod packet." (Exh. A, '096 patent at col. 5 lines 14-23.) Again, if the signal and the information were the same thing, changing the signal as described in the patent would cause the loss of the information, which would defeat the entire purpose of the KVM switch.

In further support of Rose's position, the patent specification states in blunt terms that a "signal" is merely an electrical representation of information. For example, according to the patent specification, "[t]he particular format of the signals applied to the keyboard and mouse connectors may vary with the type of the remote computer." (Exh. A, '096 patent at col. 5 lines 38-40.) Thus, the letter "K" is the same regardless of whether it is being sent to a Dell computer or an Apple computer, and yet, according to the patent, the "format of the signals" might change depending on the type of computer involved. This is because the signals are not the information itself, but a representation of the information. The patent again confirms that signals can be voltages when it states that "[t]he voltage on the capacitor 254 is equal to the average value of the horizontal sync signal." (Exh. A, '096 patent at col. 8 lines 49-51.) Another example of signals as voltages includes the following: "If the magnitude of the mode signal is between 0 and -0.15 volts, the H-mode signal will be low and the V-mode signal will be low. When the mode signal has a magnitude between -0.15 and -0.29 volts, the H-mode signal will be high and the V-mode signal will remain low." (Exh. A, '096 patent at col. 10 lines 23-27.) There is, therefore, no question that the patent specification is consistent in its usage of "signal" as an electrical representation of information, and not information itself. Rose's expert, Dr. Eisenbarth, confirms that Rose's proposed construction is the correct one. (*See* Eisenbarth Decl. at ¶¶ 9-18.)

Perhaps the most compelling evidence supporting the construction proposed by Rose is that Avocent itself took nearly the identical position in earlier patent litigation. During the 1998 litigation between Avocent (at the time called Apex PC Solutions) and Rose, Avocent had sued Rose on another patent in the same patent family at issue in this case. That patent had the identical patent specification to the patents-in-suit in this case. Importantly, that was the first case in which Avocent had asserted the patent family, and thus was not yet as knowledgeable about the non-infringement and invalidity positions that defendants like Rose would take. In response to an interrogatory, Avocent proposed the following construction of the term "signal," which is substantially identical to the construction now proposed by Rose: "a voltage or current by which information or images can be transmitted." (*See* Exh. H at p. 2 of Tab A.) Avocent's prior claim construction position diminishes the credibility of its new litigation-driven construction.

There is simply no basis for Avocent's assertion that "signal" and "information content" are the same. The construction proposed by Rose, on the other hand, is supported by the claim language, the patent specification, multiple dictionary sources, usage in the art, and Avocent's own contentions in another case. Avocent's construction in this case should therefore be rejected, and Rose's construction should be adopted.

### 2. "a portion of the analog video signal received by the [ . . . ] analog video receiving circuit"

*Rose's proposed construction*: "some, but not all, of the analog video signals received by the analog video receiving circuit"

*Avocent's proposed construction*: No construction needed. But if the Court construes this phrase, Avocent's construction is: "some, but not necessarily all, of the analog video signals received by the analog video receiving circuit"

This claim language appears in the following claims of the four patents-in-suit: '264 patent claims 1 and 4; and '978 patent claims 1, 5, 14, 21-24, 37, 40, and 42.

The dispute with respect to this claim language is very narrow. The parties agree that the only dispute in this claim language relates to the construction of the term "portion," and that the patent does not ascribe any special meaning to the term. In order to make the source of the dispute between the parties abundantly clear, Rose has adopted the construction for this phrase proposed by Avocent, with the exception of the removal of one word. The significance of that one word is discussed below.

In its construction, Avocent takes the position that "portion" means "some, but not **necessarily** all" (emphasis added). Rose, on the other hand, has removed the word "necessarily," thereby construing the word "portion" to mean "some, but not all." By phrasing its construction with the negative limitation of "not **necessarily** all," Avocent is actually arguing that "portion" includes any amount up to <u>and including</u> "all." That construction is at odds with the patent claim language, the patent specification, and common English usage.

The common meaning of "portion" is something less than the whole. For example, if a mother told a child that he may have a "portion" of the chocolate cake, she would be quite angry if he ate the entire cake. The usage of the word "portion" in the claims of the patents-in-suit supports this common understanding. For example, claim 1 of the '264 patent recites "a portion of the analog video signals." (Exh. B, '264 patent at col. 13 line 62.) Claim 37 of the '978 patent, in contrast, recites "at least a portion of the video monitor" (emphasis added). (Exh. D, '978 patent at col. 18 lines 4-5.) If "portion" really could include "all" as Avocent contends, it would be superfluous to recite "at least a portion" because the word "portion" alone, without the "at least" modifier, would already include everything from a quantity less than the whole to the whole. Avocent's construction therefore renders the "at least" language from claim 37 of the '978 patent meaningless, and eviscerates any distinction between the "portion" language of the

'264 patent's claim 1 and the "at least a portion" language of the '978 patent's claim 37, which is improper. *See Bicon, Inc. v. Staumann Co*., 441 F.3d 945, 950-51 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim") (citing *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc*., 214 F.3d 1302, 1305, 1307 (Fed. Cir. 2000).) The construction proposed by the Rose gives every word in these claims meaning and prevents the "at least" language from being superfluous.

The usage of the term "portion" in the patent specification also supports Rose's construction. For example, the term "portion" is used in the patent specification in the context of the crosspoint switch, which is described as having both a digital backplane and an analog backplane. (*See, e.g*., Exh. A, '096 patent at col. 6 lines 28-32.) In describing this crosspoint switch, the specification states "FIG. 7 shows how the digital backplane portion of the 32x32 crosspoint switch is configured . . ." (Exh. A, '096 patent at col. 7 lines 33-34) (emphasis added). In this instance, the "portion" refers to less than all of the crosspoint switch, the digital backplane part, and excludes the analog backplane part.

The extrinsic evidence also supports the construction proposed by Rose. For example, "portion" is defined as "a part of a whole" by *Webster's Third New International Dictionary* (1986) (Exh. F).

For these reasons, Rose's proposed construction should be adopted.

### 3. "remote/remotely located"

*Rose's proposed construction*: "a computer that is not directly connected to a corresponding workstation and that is in a separate location"

*Avocent's proposed construction*: "a computer that is not directly connected to a corresponding workstation and that can be in a separate location"

The claim language "remote" or "remotely located" appears in the following claims of the four patents-in-suit: '096 patent claim 10; '323 patent claims 1 and 2; and '978 patent claims 27, 30, 33, and 41.

As it did for the prior claim term, Rose has adopted a construction for "remote" and "remotely located" that is almost identical to that proposed by Avocent, in order to make the nature of the dispute between the parties abundantly clear. The only change is that Rose has changed Avocent's words "can be" to "is."

Rose notes at the outset that Avocent's proposed construction is inconsistent with common usage. According to Avocent's construction, two things that are "remotely located" from one another "<u>can be</u> in a separate location" (emphasis added), which means that Avocent's "separate location" requirement is completely optional. By using this permissive language, Avocent's construction necessarily means that two remotely located things could also be in the very same location, even sitting on the same desk, which simply cannot be correct. The construction proposed by Rose, on the other hand, requires that a "remotely located" computer "<u>is</u> in a separate location" (emphasis added).

Rose's proposed construction is consistent with the intrinsic evidence, reliable extrinsic evidence, and common usage. The patent specification comes close to providing an express definition for the term "remote," discussing the need to send data over long distances. For instance, in the Summary of the Invention section, the patents state:

> The present invention provides a computerized switching system that allows centrally located network administrators to operate multiple server computers **over long distances** without requiring a complicated wiring scheme. In general, the switching system allows data transmission between a workstation and a **remotely located** server computer.

(Exh. A, '096 patent at col. 1 lines 49-52 (emphasis added).) Thus, in this passage, the patent effectively defines "remotely located" as something that is a "long distance" away. Later, the

patents even provide a numerical example of those long distances: "This allows the data to be transmitted along cables up to 500 feet in length without the use of additional amplifiers." (*Id.* at col. 4 lines 10-12.)  Clearly, this discussion from the patent specification does not support Avocent's position that a "remotely located" computer can be sitting right next to the user.

The extrinsic evidence also supports and corroborates Rose's proposed construction.  For example, a commonly-used dictionary of computer terms defines "remote" as "[n]ot in the immediate vicinity.  An adjective used to describe a computer or other device located in another place (room, building, or city) that is accessible through some type of cable or communications link." (Exh. E, *Microsoft Computer Dictionary*, 2d ed. (1994).)  Thus, this dictionary definition mandates the "separate location" requirement that Avocent's construction would make optional.

Avocent's proposed construction, which does not require a "remote" or "remotely located" computer to be at a separate location, is untenable.  For these reasons, the construction proposed by Rose should be adopted.

### 4.    "link"

*Rose's proposed construction*:  "cable"

*Avocent's proposed construction*:  unknown

The claim term "link" appears in the following claims of the four patents-in-suit:  '323 patent claims 1-2; and '978 patent claims 27 and 41.

Avocent refused to provide its proposed construction of the term "link" prior to the filing of the parties' opening briefs, and thus Rose cannot comment on Avocent's proposal.  (Exh. I, 8/5/09 letter from Dowler to Berquist.)  However, Rose construes the term "link" to mean "cable," as this is the construction plainly provided for that term in the patent specification itself.  When the patent specification is clear as to the meaning of a term, the Court need look no further for a construction.

Figure 1 of the patent specification depicts a number of cables 72 and 74:



Fig. 1.

Each of these cables is described in the patents as a "communication link":

> The pod transmits the keyboard and mouse signals over **a communication link 72** to a central crosspoint switch 60. After being routed through the crosspoint switch 60, the keyboard and mouse signals are retransmitted on **another communication link 74** to a pod 76, which is coupled to the remotely-located server computer.

(Exh. A, '096 patent at col. 3 lines 9-14 (emphases added).)  It is also important that the specification describes cables 72 and 74 as two separate links, and not as part of one continuous link.  If the term "link" were broad enough to encompass both cables and intervening or connected equipment or devices, there is no reason that the patent could not have described all the cables in Figure 1 as being one communication link 72.  However, the patent instead treats the cables on one side of the crosspoint switch as "a communication link 72," and the cables on the other side of the crosspoint switch as "<u>another</u> communication link 74" (emphasis added).  It is therefore clear from this discussion that the patent considers a "link" to be nothing more than the cable itself, excluding any equipment or devices that may be connected to that cable.

The patent specification goes on to provide further detail about the nature of "communication link 72."  In particular, in Figure 1 depicted above, which is a more high-level,

less detailed figure, communication link 72 is shown.  When the patent goes into the more detailed Figure 2A, however, it shows that communication link 72 is actually made up of "twisted pair **cables** 72a – 72e."  (Exh. A, '096 patent at col. 4 line 3 (emphasis added).)  Thus, the patent directly equates a "link" with a "cable."

Indeed, elsewhere in the patent specification, the words "link" and "cable" are actually used interchangeably in the same sentence:

> Although it is possible to run dedicated communication **links** to each server computer in order to allow a system administrator to operate the network from a central location, a large number of **cables** are required for anything other than a very simple network.

(Exh. A, '096 patent at col. 1 lines 42-46 (emphases added).)  The first part of the sentence refers to "dedicated communication links" and the second part of the sentence refers to "a large number of cables," and it is apparent from the context that the patent is referring to the same items with both phrases.  Another aspect of this passage confirms that a link is simply a cable:  the use of the verb "run."  The verb "run" is often applied to cable or wire (e.g., running a wire along the baseboard, or running a cable to the new television) to mean laying out the cable or wire for use.  (*See* Exh. F, *Webster's Third New International Dictionary* (1986) ("to cause to pass … <[run] a wire in from the antenna>")).   The use of the verb "run" in connection with "link" therefore further supports what is clear from the other usages identified above, that a link is a cable.  Rose's expert, Dr. Eisenbarth, confirms that this proposed construction is correct.   (*See* Eisenbarth Decl. at ¶¶ 19-23.).

For these reasons, Rose request that their construction be adopted.

### 5.    "crosspoint switch"

<u>Rose's proposed construction</u>:  "a set of vertical and horizontal switches arranged in a matrix, and which serves to connect any vertical point with any horizontal point"

<u>*Avocent's proposed construction*</u>:   "a programmable device capable of forwarding packets from one computer / workstation to another"

The claim term "crosspoint switch" appears in the following claims of the four patents-in-suit: '323 patent claim 1, and '978 patent claims 27, 32-33, and 41. The term "crosspoint switch" appears extensively throughout the patent specification, but the patents do not give an express definition to the term.

A brief illustration provides an understanding of what exactly a crosspoint switch is. Generally speaking, a typical switch has inputs and outputs, and can connect any one of the inputs to any one of the outputs. The number of inputs and outputs is not critical to construing this claim term, so for purposes of this illustration, we will use 2 inputs and 3 outputs. Such a switch would look like the following:



In a crosspoint switch, a signal entering on input 1 can be connected to either output 1, output 2, or output 3. The same goes for a signal entering on input 2. Thus, any input can be connected to any output. It is the means for accomplishing the signal connection that makes a crosspoint switch unique. The adjective "crosspoint" does imply some structural limitation to the word "switch." One cannot read out the word "crosspoint." *Bicon*, 441 F.3d at 950-51.

A crosspoint switch does not encompass all methods of "switching," or connecting inputs and outputs. The term "crosspoint switch" originated in the telephony field, where it was originally part of what was called a crossbar switch. A crossbar switch used an internal matrix of

vertical and horizontal metal bars or wires to make the desired connections.  (*See* Exh. J,

*Communications Standard Dictionary*, 3d ed. (1996);[3] Eisenbarth Decl. at ¶ 25.)  Indeed, another

term for crossbar switch is matrix switch.  (*See* Eisenbarth Decl. at ¶ 25.)  This matrix of wires is

illustrated by the following more detailed diagram:



In this illustration, horizontal wires are associated with the inputs, and vertical wires are

associated with the outputs.  This is what the dictionary definition above means when it talks

about horizontal and vertical paths.  In order to connect input 1 to output 3, for example, the

horizontal wire associated with input 1 is connected internally to the vertical wire associated with

output 3, as indicated in the following diagram:



---

[3]    Defining "crossbar switch" as "A switch that has (a) a plurality of vertical paths, (b) a plurality of horizontal paths, and (c) electromagnet-operated mechanical means, i.e., electromechanical relays, for interconnecting one of the vertical paths with any one of the horizontal paths."

This will allow signals to flow from input 1 to output 3.  The signals on input 1 will not flow to output 1 or output 2 because there is no connection between the input 1 wire and either of those output wires.  The small switching mechanism at the intersection of input 1 and output 3 is what was called the "crosspoint."  (*See* Exh. J, *Communications Standard Dictionary*, 3d ed. (1996);[4] Eisenbarth Decl. at ¶ 25.)  Each wire intersection (six of them) in the diagram above would have a crosspoint associated with it, to make or break the electrical connection between the associated input and output.

Over time, the term "crosspoint switch" began to be loosely used to refer to an entire crossbar or matrix switch, instead of the "crosspoint" being just the small switch at the intersection of two wires inside of a crossbar or matrix switch.  (*See* Exh. K, *Wiley Electrical and Electronics Engineering Dictionary*, (2004);[5] Eisenbarth Decl. at ¶ 25.)

The patent specification uses this looser definition rather than the more correct definition above.  For example, the patent specification refers to the entire switch network at the center of Figure 1 as a "central crosspoint switch 60."  (Exh. A, '096 patent at col. 3 lines 10-11, 22.)  In discussing the operation of the central crosspoint switch 60, the patent specification actually provides manufacturer part numbers for the switches used in the described embodiment, the Harris CD22M3494SQ  (Exh. A, '096 patent at col. 8 line 10; Harris is now part of Intersil) and the Siliconix DG884DN (Exh. A, '096 patent at col. 8 lines 15-16; Siliconix is now part of Vishay).  Attached as Exhibits L and M are the data sheets for those two parts, in which the

---

[4]    Defining "crosspoint" as "In a switch a single element in the array of elements that compose the switch, consisting of a set of physical or logical contacts that operate together to extend the speech and signaling channels in a switched network."

[5]    Defining "crosspoint switch " as "crossbar switch," and defining "crossbar switch" as "A set of vertical and horizontal switches arranged in a matrix, and which serves to connect any vertical point with any horizontal point."

descriptions and illustrations are virtually identical to the illustrations above.  For example, the following is a diagram from the Siliconix/Vishay DG884DN data sheet:



(Exh. M at p. 1.)  The top part of the diagram shows the same horizontal and vertical wire array described by the dictionaries and illustrated above.  In the circular blow-up in the upper-lefthand corner of the diagram, it also shows the small "crosspoint" that resides at the intersection of the two wires, which would serve to make or break the connection between those two wires.

Indeed, the data sheet actually uses the term "crosspoint" to refer to this individual switch mechanism at the intersection of two wires, not to refer to the overall device as the patent

specification does.[6]  The Harris/Intersil data sheet does not include any diagrams at this level of detail, but does describe the product as "an array of 128 analog switches," confirming that the wire array concept applies to that product as well.  (Exh. L at p. 65.)

As is apparent above from the *Communications Standard Dictionary,* 3d ed. (1996) and the data sheets for the switch devices recited in the patent specification (and as confirmed by Dr. Eisenbarth), a "crosspoint" is traditionally and most correctly understood to mean an individual switch mechanism that resides at the intersection of two wires in a matrix or crossbar switch. However, the patent specification applied the looser definition to "crosspoint switch" that evolved in the industry over time, using it instead to refer to the entire switch array.  This is consistent with the *Wiley Electrical and Electronics Engineering Dictionary* (2004) definition given above.  Thus, in order to capture the patent's chosen meaning of "crosspoint switch," Rose adopts the definition from Exh. K, the *Wiley Electrical and Electronics Engineering Dictionary* (2004)) ("A set of vertical and horizontal switches arranged in a matrix, and which serves to connect any vertical point with any horizontal point").[7]  Dr. Eisenbarth confirms that this construction is correct.  (*See* Eisenbarth Decl. at ¶¶ 25-27.)

Avocent will likely oppose Rose's proposed construction on the grounds of the Federal Circuit ruling in a prior lawsuit involving this same patent family.  In 2001, Avocent (at the time

---

[6]    (*See* Exh. M at p. 1 ("The DG 884 contains a matrix of 32 T-switches."); p. 10 ("Each crosspoint is configured as a T-switch"; "This operation is repeated up to three more times if other crosspoint connections need to be changed."); p. 2 ("All crosspoints opened"); p. 9, Figure 10 ("All crosspoints open").

[7]    The term "crosspoint switch" is so specialized that it does not even appear in the other technical dictionary (Exh. E, *Microsoft Computer Dictionary*, 2d ed. (1994)) and the general purpose dictionary (Exh. F, *Webster's Third New Int'l Dictionary* (1986)) on which Rose relied for the remainder of their constructions.  Thus, Rose had to rely on more specialized dictionaries for this term.  However, they did so out of necessity, not for purposes of cherry-picking definitions to match a desired outcome.

called Apex Inc.) sued Raritan Computer, Inc. for patent infringement in the U.S. District Court for the Southern District of New York. That case involved three Avocent patents, including two from this case (the '096 and '264 patents) and third patent from the same family that is not involved in this case (U.S. Patent No. 5,937,176 ("the '176 patent")). After a trial in the district court (which Avocent lost), the case went up on appeal to the Federal Circuit, which provided constructions for a number of terms in the three patents at issue  *See Apex Inc. v. Raritan Computer, Inc*., 325 F.3d 1364 (Fed. Cir. 2003). Avocent has taken the position that the Federal Circuit has already construed the term "crosspoint switch."

There are a number of reasons why the Federal Circuit did not provide a controlling construction of "crosspoint switch." As an initial matter, the term "crosspoint switch" does not appear in the claims of the '096 and '264 patents. Of the patents at issue in the Raritan case, that term only appears in the claims of the '176 patent, which is not a part of this case. Likewise, "crosspoint switch" appears in the claims '323 and '978 patents, which were not at issue in the Raritan case. Thus, the Federal Circuit did not actually consider any of the claims or patents at issue in this case that use the claim term "crosspoint switch." In fact, the '978 patent-in-suit had not even issued while the Raritan case was pending. Thus, in construing the claims in that case, the Federal Circuit did not have the benefit of considering the '978 patent claims at issue in this case. Given that the first step of the claim construction process is an analysis of the claim language itself, the meaning of the '978 patent claims cannot be controlled by a construction that was entered before they even issued; those claims must be considered for a proper analysis.

The district court in the Raritan case construed the terms "programmable switch" and "crosspoint switch," giving them substantially similar constructions that both required "form[ing] a direct path between" inputs and outputs. *Apex Inc. v. Raritan Computer, Inc*., 187

F. Supp. 2d 141, 160-61 (S.D.N.Y. 2002). Thus, on appeal, the Federal Circuit focused exclusively on whether a "switch" in the context of the patents required "form[ing] a direct path." The court's discussion referred generically to a "switch" and considered this single issue:

- "The district court interpreted the term 'switch' in as a device that opens or closes a circuit to form a direct path between inputs and outputs." *Apex*, 325 F.3d at 1376.

- "the ordinary meaning of the term 'switch' … ." *Id.*

- "The written description does not limit the term switch to a device that opens or closes a circuit to form a *direct* path. Nothing was identified in the prosecution history to suggest this direct path." *Id.* at 1377 (emphasis original).

- "Therefore, we reverse the district court's claim construction of the term 'switch.'"' *Id.*

The Federal Circuit was not called upon to determine whether there is a difference between a crosspoint switch and a programmable switch in the context of the claims of the '176 patent, let alone the claims of the patents involved in this suit. The court did not even have any evidence before it about the meaning of a "**crosspoint** switch." All the evidence it considered related generically to a "switch, " and the court adopted that generic "switch" definition. *See id.* at 1376-77. Thus, the Federal Circuit was never given the opportunity to consider the highly specific meaning of "**crosspoint** switch."

As the evidence above demonstrates, a crosspoint switch is not the same as a generic switch, and this Court should have the opportunity to consider the distinction. In other words, whether "crosspoint switch" has a unique meaning beyond the more generic terms "switch" and "programmable switch" was not a question that the Federal Circuit was asked to decide in the prior case, and thus this Court is free to consider this new legal issue as to patents (the '323 and '978) the Federal Circuit has never reviewed or considered on the basis of the new evidence presented. Rose was not a party to the Raritan case, and thus did not have an opportunity to have

its arguments heard and evidence considered, which also weighs against applying the Federal Circuit ruling in the prior case.

For all these reasons, the Court should adopt the Rose's construction of "crosspoint switch."

## IV.    CONCLUSION

For the foregoing reasons, Rose respectfully requests that their proposed claim constructions be adopted by the Court.

Respectfully submitted,

Dated:  August 21, 2009

/s/ Bert C. Reiser
Bert C. Reiser
HOWREY LLP
1299 Pennsylvania Ave NW
Washington, DC 20004
Tel:.: 202.783.0800
Fax: 202.383.6610
reiserb@howrey.com

*Attorney for Intervenor*
Rose Electronics
10707 Stancliff Road
Houston, TX 77009

OF COUNSEL:

Michael S. Dowler
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Tel: 713.787.1400
Fax: 713.787.1440
dowlerm@howrey.com

Brian L. Jackson
Law Office of Brian L. Jackson
1302 Waugh Drive #582
Houston, TX 77019
Tel.: 713.522.5766
Fax: 713.583.5785
brian@brianjacksonlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the counsel of record who are deemed to have consented to electronic service are being served this 21st day of August, 2009 with a copy of this document via the Court's CM/ECF system per RCFC 5.2.  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

| | |
|---|---|
| James D. Berquist | Tony West |
| J. Scott Davidson |   Assistant Attorney General |
| Donald L. Jackson | John Fargo |
| Grace Obermann |   Director |
| DAVIDSON, BERQUIST JACKSON & | Robert Hilton |
| GOWDEY LLP |   Attorney |
| 4300 Wilson Blvd., Suite 700 | Commercial Litigation Branch |
| Arlington, VA 22203 | Civil Division |
| | DEPATMENT OF JUSTICE |
| | Washington, DC 20530 |

/s/ Michael S. Dowler
Michael S. Dowler