## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AVOCENT REDMOND CORP.,
        Plaintiff,

   v.

THE UNITED STATES,
        Defendant,
and

ROSE ELECTRONICS,
        Defendant-Intervenor.

No. 08-69C

Judge Lawrence S. Margolis

## AVOCENT REDMOND'S RESPONSIVE CLAIM
## CONSTRUCTION BRIEF

James D. Berquist
J. Scott Davidson
Donald L. Jackson
Grace K. Obermann
DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
4300 Wilson Blvd, Suite 700
Arlington, Virginia 22203
Tel. 703-894-6400
Fax. 703-894-6430

*Attorneys for Plaintiff Avocent Redmond Corp.*

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ...................................................................................................... 2

       A.   Rose and the U.S. Should Be Precluded from Offering Arguments and
            Evidence Regarding Terms Other than Those In Rose's Opening Brief ....................... 2

       B.   "Crosspoint switch" ........................................................................................ 3

       C.   "Signal" ......................................................................................................... 7

       D.   "Link" ........................................................................................................... 11

       E.   "A portion of the analog video signals" ......................................................... 13

       F.   "Remote" and "Remotely Located" ................................................................ 15

III.   CONCLUSION .................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Apex Inc. v. Raritan Computer, Inc.*,
  325 F.3d 1364 (Fed. Cir. 2003)..................................................................1, 4, 11

*Avocent Redmond Corp. v. Raritan Computer, Inc.*,
  2005 U.S. Dist. LEXIS 4017 (S.D. N.Y 2005).............................................1, 11

*Cias, Inc. v. Alliance Gaming Corp.*,
  504 F.3d 1356 (Fed. Cir. 2007).........................................................................14

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..................................................3, 12

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)....................................................................7, 8, 15

*Vivid Techs., Inc. v. American Science & Engr., Inc.*,
  200 F.3d 795 (Fed. Cir. 1999)...........................................................................14

Plaintiff Avocent Redmond Corp. ("Avocent") respectfully submits that the claim constructions provided in its opening claim construction brief should be adopted by the Court because they are consistent with the law and the intrinsic evidence. Defendant-Intervenor Rose Electronics' ("Rose's"), and thus Defendant the United States', claim constructions are inconsistent with the specifications of the patents-in-suit and controlling legal principles guiding claim construction analyses.

## I.    INTRODUCTION

Despite Rose's attempts to narrow the meaning of Avocent's patents, Avocent urges this Court to consider the long history of Avocent's patents. In *Apex Inc. v. Raritan Computer, Inc*., 325 F.3d 1364 (Fed. Cir. 2003), the Federal Circuit rejected the narrow constructions that had been adopted by the district court, adopted broad constructions for several terms, and remanded the remaining terms for broader construction by the district court. (*See* Exh. 5 (Dkt. No. 73-3)).[1] On remand, Judge Castel conducted his claim construction analyses in accordance with the Federal Circuit's ruling, and issued additional broad claim constructions. *See Avocent Redmond Corp. v. Raritan Computer, Inc*., 2005 U.S. Dist. LEXIS 4017 (S.D. N.Y 2005) (attached to Avocent's Opening Claim Construction Brief as Exh. 6 (Dkt. No. 73-3)). Later, in connection with the parallel Seattle action, Judge Pechman advised Rose that she would not re-litigate the constructions adopted in the earlier litigation. (*See* Exh. 14, pp. 30-31, 37-38). In addition, Rose used Avocent's, the Federal Circuit's, and Judge Castel's broad claim constructions to request reexamination of the patents-in-suit. (*See* Exhs. 15, 16, 17, 18). Using those broader constructions, the U.S. Patent and Trademark Office ("PTO") confirmed the patentability of all claims. (*See* Exhs. 19, 20, 21, 22). Rose now reverses course and presents different, narrower

---

[1]   Exhibits 1-13 are attached to Avocent's Opening Claim Construction Brief. (*See* Dkt. No. 73). Exhibits 14-25 are attached to this Responsive Claim Construction Brief.

constructions for these same claim terms.  But, as explained below, Rose's proposed

constructions are inconsistent with the patents themselves, the prior courts' claim construction

rulings, and the reexamination prosecution history.

## II.    ARGUMENT

### A.    Rose and the U.S. Should Be Precluded from Offering Arguments and Evidence Regarding Terms Other than Those In Rose's Opening Brief

Both defendants refused to identify the claim terms it would ask this Court to construe for

months.  That issue is before this Court in Avocent's Motion to Compel a Response to Avocent's

Interrogatory No. 2.  (*See* Dkt. No. 59).

On August 5 and 6, 2009, the parties identified the claim terms that they would ask the

Court to construe as part of the claim construction process.  (Exhs. 23, 24).  Avocent identified

the ten terms briefed by the parties in the Seattle action, and by Avocent in this case in its

opening claim construction brief.  (Dkt. No. 73, pp. 13-24, 26-35).  Avocent also informed Rose

that it would ask the Court to adopt the constructions rendered by the Federal Circuit and Judge

Castel of the U.S. District Court of the Southern District of New York.  (Exh. 23).  Thus, Rose

and the U.S. were clearly on notice of the terms Avocent intended to brief.

Nevertheless, in its opening claim construction brief, Rose only briefed the five terms it

identified.  (*See* Dkt. No. 75, pp. 7-19).  The U.S. did not submit its own claim construction

brief.  Instead, it merely adopted Rose's claim construction brief.  (*See* Dkt. No. 74).  Thus, by

failing to brief the terms Avocent identified, Rose and the U.S. waived any right to make

arguments and submit evidence in support of constructions of those terms that differ from

Avocent's constructions.  Although Avocent does not know what Rose and/or the U.S. will say

in their responsive claim construction brief, the Court should not consider any arguments or

evidence from either party regarding terms other than "crosspoint switch," "signal," "link," "a

portion of the analog video signals," and "remote/remotely located" which were addressed in Rose's opening brief. By not addressing all of the claim terms Avocent identified in the defendants' opening *Markman* brief, the defendants have effectively denied Avocent the opportunity to respond to what ever constructions they might now present in their responsive brief and thus reduced the value of this briefing to the Court.

### B.     "Crosspoint switch"

*Avocent's Proposed Construction:* "a programmable device capable of forwarding packets from one computer/workstation/server to another."

*Defendants' Proposed Construction:* "a set of vertical and horizontal switches arranged in a matrix, and which serves to connect any vertical point with any horizontal point."

Rose's argument about the meaning of the term "crosspoint switch" is wrong because it *starts* with various dictionary definitions, and then resorts to the specification only for alleged support for the dictionary definitions. (Dkt. No. 75, pp. 20-24). This is the opposite approach mandated by the Federal Circuit. In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit criticized a claim construction methodology in which one starts with dictionaries, and then uses the specification as a "check" on the dictionary definitions to see if the dictionary definition should be altered because it exalts the extrinsic evidence over the intrinsic in terms of the weight that should be accorded each source of claim construction evidence. *See id.* at 1320.

By using dictionaries, Rose attempts to narrowly construe "crosspoint switch" to cover only a device that opens or closes a circuit to form a direct path between inputs and outputs. But this construction was the very construction rejected by the Federal Circuit in *Apex*. There, the Federal Circuit held that:

> The written description discloses one embodiment of this "crosspoint switch" or "programmable switch." ['176 patent] at col. 6, ll. 15-61. This switch includes a master CPU and a number of input and output cards for transmitting and receiving signals. <u>The written description does not limit the term switch to a device that opens or closes a circuit to form a *direct* path</u>. Nothing was identified in the prosecution history to suggest this direct path. Thus, properly construed, a "programmable switch" or "crosspoint switch" is a programmable device capable of forwarding packets from one computer/workstation/server to another. Therefore, we reverse the district court's claim construction of the term "switch."

*Apex*, 325 F.3d at 1377 (underlining added). As shown in the functional diagrams on page 21 of Rose's brief, Rose seeks a construction of "crosspoint switch" that requires a "direct path" between inputs and outputs. This construction was expressly rejected by the Federal Circuit. Contrary to Rose's arguments, this <u>*was*</u> the issue considered by the Federal Circuit in the *Apex* decision.

Independent of the Federal Circuit's prior, *stare decisis* ruling, Rose is wrong on the merits. As Rose admits, "the patent specification refers to the <u>entire</u> switch network at the center of Figure 1 as a 'central crosspoint switch 60.'" (Dkt. No. 75, p. 22 (emphasis added)). Figure 1, reproduced below, shows that the crosspoint switch 60 is a device having multiple inputs and multiple outputs – that's it.



*Fig. 1.*

-4-

Figure 1 does not imply that the internal circuitry of the crosspoint switch 60 is "a set of vertical and horizontal switches arranged in a matrix, and which serves to connect any vertical point with any horizontal point" as Rose construes the term. On the contrary, the specification expressly states that the crosspoint switch 60 includes a master CPU 150, multiple input cards 152, multiple switch cards 154, and multiple output cards 156. (Exh. 1, '096 patent, col. 6, lines 15-19).

It is true that the specification discloses the use of Harris and Siliconix integrated circuits as part of the crosspoint switch 60, but there is no basis in the specification or the prosecution history to limit the meaning of the term "crosspoint switch" to those two subcomponents of the entire crosspoint switch disclosed as *part* of the preferred embodiment. Indeed, and by way of example, in Rose's reexamination request for the '323 patent, Rose based its reexamination request on Avocent's construction of "crosspoint switch." (*See* Exh. 17, pp. 13-14, 21-22). Rose alleged that the Gill reference's interfaces 0-9 and discriminator 200 (which includes interfaces 0-9 <u>and</u> controller 194) corresponded to the "crosspoint switch." (*See* Exh. 17, pp. 22-23; Exh. 25, Figs. 8 and 10). The PTO confirmed the patentability of claims 1 of the '323 patent using Avocent's broader construction of "crosspoint switch" – *i.e.*, the same construction adopted by the Federal Circuit. (*See* Exh. 17, pp. 13-14, 21-22).

Moreover, Rose's discussion of the extrinsic Siliconix data sheet is misleading. (Dkt. No. 75, p. 23). Rather than including the entire diagram in its discussion, Rose reproduced a *portion* of a figure from the Siliconix data sheet without including the critical title of that data figure. The title is "<u>*Functional*</u> Block Diagram." (*See* Rose's Exh. M (Dkt. No. 75-8), p. 2 (emphasis added)). Thus, the figure reproduced by Rose is not an actual circuit schematic, but instead is a "functional" representation of the semiconductor's circuitry. Every "crosspoint

switch" can be _functionally_ depicted as a switch with multiple inputs and outputs, in which the connection between an input and an output can be represented by a direct connection.  The crosspoint switch 60 in Avocent's Figure 1 has multiple inputs and outputs, and any input can be functionally connected to any output through intervening circuitry.  The Rose accused product having a "crosspoint switch" – _i.e._, the Xtensys product – has a central switch with multiple input and outputs, in which any input can be functionally connected to any output through intervening circuitry.  Neither device necessarily requires a direct path to do so.

Rose's proposed claim construction of "crosspoint switch," however, expressly excludes switches that can be _functionally_ depicted as a set of horizontal and vertical switches arranged in a matrix.  Instead, Rose's proposed construction requires an _actual_ set of horizontal and vertical switches arranged in a matrix through which a direct path is created.  That is not only contrary to the Federal Circuit's construction of this term, it is contrary to the teaching of the patent specification _and_ the Siliconix datasheet Rose purports to rely upon.  To compound the confusion, Rose admits that "the patent specification refers to the entire switch network at the center of Figure 1 as a 'central crosspoint switch 60,'" (Dkt. No. 75, p. 22 (emphasis added)), but then narrowly focuses its analysis on one just on subcomponent of that switch – a data sheet that provides a _functional representation_ of how the chip is constructed.  But the specification expressly states that the crosspoint switch 60 shown in Figure 1 includes a master CPU 150, multiple input cards 152, multiple switch cards 154, and multiple output cards 156.  (Exh. 1, '096 patent, col. 6, lines 15-19).  Those elements (like the Siliconix device) can be _functionally_ depicted as a horizontal and vertical matrix but fail to satisfy Rose's proposed construction requiring an _actual_ horizontal and vertical matrix.  Thus, Rose's construction improperly excludes the preferred embodiment taught by the patent.

Because the extrinsic data sheets relied upon by Rose do not disclose an *actual* arrangement of horizontal and vertical switches arranged in a matrix, the Siliconix and Harris data sheets do not support Rose's claim construction.   Avocent's construction of "crosspoint switch" is the only construction that is consistent with the specification because it allows for the inclusion of all elements of the central crosspoint switch 60.  Rose's arguments are inconsistent with the specification and the reexamination prosecution history which confirmed the patentability of claim 1 of the '323 patent based on Avocent's construction of "crosspoint switch."  (*See* Declaration of Joseph C. McAlexander, III in Support of Avocent's Responsive Claim Construction Brief filed herewith ("McAlexander Responsive Decl."), ¶¶ 10-22).

### C.     "Signal"

*Avocent's Proposed Construction:*  "information content."

*Defendants' Proposed Construction:*  "any electrical quantity, such as voltage, current, or frequency, that can be used to transmit information."

Rose argues that a "signal" is limited to "any electrical quantity, such as voltage, current or frequency, that can be used to transmit information."  The implication of this definition is that when the electrical quantity changes, you have a new signal.  Rose's overly narrow construction of "signal" should be disregarded as being inconsistent with the claims (which are the primary source of claim construction evidence), the specification, and the Federal Circuit's decision.  *See Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves, both asserted and unasserted, to define the scope of the patented invention.").

Claim 1 of the '096 patent, for example, states that the signals output by the keyboard and cursor control device (*e.g*., a mouse) pass through the entire KVM switching system and are delivered to the computers on the other end of the system.  The claim makes no mention of

voltage, current, or frequency.  Similarly, the video signals generated by the computer are passed

through the entire switching system to the workstation's video monitor.  Specifically, claim 1

recites a KVM switch system including:

> a programmable switch for routing <u>keyboard and cursor control
> signals from the workstation to a selected computer</u> and for routing
> <u>video signals from the selected computer to the video monitor of
> the workstation</u>; . . ..

The only way that claim language makes sense and reads on the preferred embodiment is if

"signal" means "information content," not some electrical characteristic of a signal.  Indeed, as

Rose admits in the following quote, the particular waveform (what they call the "signal") emitted

by the keyboard is <u>modified</u> as it passes through the preferred embodiment.

> According to the patent specification, however, the signal
> representing that letter "K" can vary as it moves through the KVM
> switch.  For instance, according to the patent specification, the
> "CPU 80 [in the KVM switch] then reads the digitally buffered
> keyboard and mouse signals from the keyboard/mouse interface 82
> <u>and converts the signals into a data packet</u> that is transmitted to the
> remote computer."

(Dkt. No. 75, p. 11 (quoting '096 patent, col. 3:45-49, emphasis in original)).  Rose is correct

that the electrical waveform from the keyboard is converted into a data packet (having a different

waveform or "electrical quantity") in the preferred embodiment.  But, as Rose also admits, the

same <u>information</u> is maintained throughout the entire KVM switch system regardless of how or

how many times the particular waveform is modified or converted.  (Dkt. No. 75, p. 11 ("As

Avocent's own expert has acknowledged, however, this information is not lost during

transmission through the KVM switch.")).  Contrary to Rose's argument, the <u>*only way*</u> that claim

1 can read on the preferred embodiment is if the claimed "signal" means "information content"

such that the information content moves through the switch (*e.g.*, the letter "K," in Rose's

example) even though the waveform carrying that information changes.  *See Vitronics*, 90 F.3d

at 1583 ("[A]n interpretation [that excludes a preferred embodiment] is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case.").

Rose points to claim 27 of the '978 patent as allegedly supporting its construction.  But Rose is incorrect.  Rose argues that the phrase "transferring information corresponding to the received first set of electrical signals" means that "signals" and "information" are two different things.  But the fact that the claim uses two different words to refer to the same concept (*i.e.*, the information content) does not mean that claim 27 supports Rose's narrow construction.  If anything, the use of different terms to refer to the same concept demonstrates the breadth of the term "signal."  This is especially true where other claims (*e.g*., claim 1 of the '096 patent) clearly use the term "signal" to refer to the "information content" being transmitted through the entire KVM switch system.

To conjure up support for its construction, Rose points to the specification's discussion of format changes.  (Dkt. No. 75, p. 12).  Rose quotes the portion of the specification which reads, "[t]he particular format of the signals applied to the keyboard and mouse connectors may vary with the type of the remote computer."  (*Id*. (quoting '096 patent, col. 5:38-40) (emphasis added)).  But this quote supports Avocent's definition – not Rose's.  The "particular format" is the particular waveform used to carry the underlying information (*e.g*., the "K").  The patent states that, while the format of the signal may change, the signal itself does not.  In other words, the information (*i.e*., the "K" signal) generated by the keyboard is faithfully delivered to the computer regardless of intervening format (*i.e*., waveform) changes.  But, if the Court adopts Defendants' construction, any time the format changes, the "signal" changes too – even when the information content remains identical.  That is not consistent with the claims or the specification.

Another of Rose's cites to the patent also undercuts its claim construction argument. Specifically, with regard to a "mode" signal (which is different than content carrying video or keyboard signals), Rose quoted the following passage:

> "If the magnitude of the mode signal is between 0 and -0.15 volts, the H-mode signal will be low and the V-mode signal will be low. When the mode signal has a magnitude between -0.15 and -0.29 volts, the H-mode signal will be high and the V-mode signal will remain low."

(Dkt. No. 75, p. 12 (*quoting* '096 patent, col. 10, lines 23-27)).   Under Rose's construction, the "signal" is the particular waveform or voltage used to carry the information.  But this portion of the specification explains that the H-mode "signal" will be low if the voltage is <u>anywhere</u> between 0 and -0.15 volts.  Thus, the waveform can change and it will still be considered to be the same H-mode "signal."  Likewise, the specification explains that the H-mode signal will be considered to be "high" if it is anywhere between -0.15 and -0.29 volts.  Again, the waveform can change and yet it will still be considered to be the same H-mode "signal."

Rose also mischaracterizes Avocent's 1998 interrogatory responses to accuse Avocent of taking inconsistent positions.  (Dkt. No. 75, p. 13).  Avocent, however, has never embraced Rose's proposed construction. Rather, Avocent has consistently focused on the information content.  Avocent's 1998 definition, which related to a patent that, though related, is not asserted here, was "a voltage or current <u>by which information</u> or images can be transmitted."  In electronics, all information is transmitted by voltages or currents.  That is not disputed.  What is disputed is whether a "signal" is defined by a <u>particular</u> voltage or current (as advocated by Rose) or by the information (as Avocent urges).  A single "signal" can be carried by any number of voltages, currents or frequencies by being converted along its path between the source and destination.  Indeed, signal voltage naturally drops during transmission.  For this reason, the preferred embodiments employ line drivers/receivers that themselves amplify (and thus change)

the voltage of the signal being transmitted.  (*See* Exh. 1, '096 patent, col. 3:67-4:12).  The specification also teaches conversions of the keyboard and mouse signals between the workstation and the remote computer.  (*See* Exh. 1, '096 patent, col. 3:45-49).

Further, as Avocent stated in its opening brief, Rose's "signal" construction is really a quiet attempt to reverse the Federal Circuit's construction of the term "switch."  By attempting to construe "signal" as a particular waveform, such as a particular voltage, current, or frequency, Rose implicitly requires the claimed "programmable switch" to pass the "signals" unaltered.  That is, if claim 1 of the '096 patent requires the keyboard and mouse signals generated at the workstation to be delivered to the remote computers, and if the "signals" cannot be altered (that is, they must be the same voltage, current or frequency), then the claimed "switch" must be "a device that opens or closes a circuit to form a <u>direct path</u> between inputs and outputs."  Rose's brief never disputes that that is its intended result.  Yet, this is precisely the construction of "switch" that the Federal Circuit and Judge Castel rejected in the Raritan litigation.  *See Apex*, 325 F.3d at 1377; *Avocent Redmond*, 2005 U.S. Dist. LEXIS at *10.

Rose's construction is inconsistent with the claims, the specification, and the Federal Circuit's and Judge Castel's claim construction rulings.  Avocent's construction is consistent with all four, and thus, should be adopted by the Court.  (*See* McAlexander Responsive Decl., ¶¶ 23-34).

   **D.    "Link"**

   *Avocent's Proposed Construction:*  "a communication channel, path, or circuit"

   *Defendants' Proposed Construction:*  "cable"

Rose's opening claim construction brief reveal that the real goal behind Rose's proposed construction of "link" is to read a negative limitation into the claims.  Rose states that, based on

its arguments, "a 'link' [is] nothing more than the cable itself, <u>excluding any equipment or devices that may be connected to that cable</u>."  (Dkt. No. 75, p. 18 (emphasis added)).  It is improper to import any limitations from the specification, including negative limitations, unless the specification or the prosecution history disavows the broader claim scope.  *See Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the clams to those embodiments.").  Rose has identified no statements evidencing Avocent's disavowal of a broader claim scope for the term "link."

Twice, Rose states that reference numerals 72 and 74 in Figure 1 refer to "cables."  (Dkt. No. 75, p. 18 ("Figure 1 of the patent specification depicts a number of cables 72 and 74." and "It is also important that the specification describes cables 72 and 74 as two separate links, ….")).  That is untrue.  Numerals 72 and 74 are described as "communication links," not as "cables."  Rose's misstatement is telling.  Because the specification does not expressly or implicitly limit "communication links" to "cables," Rose tries to supply that evidentiary gap by mischaracterizing the actual content of the specification.

Rose's arguments are also internally inconsistent on the meaning of "link."  Rose argues that Figure 2A "shows that communication link 72 is actually made up of 'twisted pair **cables** 72a-72e.'"  (Dkt. No. 75, p. 19 (*quoting* '096 patent, col. 4, line 3) (emphasis in original)).  First, Rose argues that "link" means the singular term "cable."  But then, in the next paragraph, Rose argues "link" (singular) means "cables" (plural).  This inconsistency demonstrates that Rose's narrow construction is incorrect.

The portion of the specification cited by Rose actually establishes that a "link" is <u>not</u> synonymous with a "cable."  It can be any "communication channel, path, or circuit" (as

-12-

Avocent asserts) including a communication channel, path, or circuit comprised of <u>multiple</u> "twisted pair cables." The extrinsic dictionary definitions cited by Avocent in its opening brief also support this broader construction. The relevant definitions in the <u>Modern Dictionary of Electronics</u> define "link" as "[a] transmitter-receiver system connecting two locations," "an interconnection," and "[i]n automatic switching, a path between two units of switching apparatus within a central office." (Exh. 9, p. 566). The <u>Modern Dictionary of Electronics</u> also identifies the term "channel" as a synonym for "link." (*Id.*). The Seventh Edition of the <u>Modern Dictionary of Electronics</u> also definies "link" as "[a] communication channel between two adjacent signaling points that provides a path for messages to travel." (Exh. 10, p. 429). The <u>Penguin Dictionary of Electronics</u> defines "link" as "[a] communication channel or circuit that is use to connect other channels or circuits," and "[a] path between two switches that form part of a central control system in automatic switching." (Exh. 11, p. 319). Finally, <u>Newton's Telecom Dictionary</u> defines "link" as "[a]nother name for a communications channel or circuit." (Exh. 12, p. 405). Each of these definitions comport with the use of the term "link" in the Beasley patent specification to mean "a communication channel, path, or circuit." (*See* McAlexander Responsive Decl., ¶¶ 35-40).

### E.    "A portion of the analog video signals"

<u>Avocent's Proposed Construction:</u>  "some, but not necessarily all, of the analog video signals received by the analog video receiving circuit."

<u>Defendants' Proposed Construction:</u>  "some, but not all, of the analog video signals."

One of the critical problems with Rose's construction is that it again reads a negative limitation into the claims. Rose's construction of "portion" excludes the possibility that the claims could encompass all of the analog video signals. This construction is improper. All of Avocent's independent claims use the transitional term "comprising" between the preamble of

the claim, and the body of the claim.  It is a fundamental principle of patent law that a claim that

uses the "comprising" transitional term recites the *minimum* that must be included in a device to

find infringement.  *See Vivid Techs., Inc. v. American Science & Engr., Inc.*, 200 F.3d 795, 812

(Fed. Cir. 1999) ("the signal 'comprising' accommodates additional variables, provided that all

of the elements stated in the claim are present."); *Cias, Inc. v. Alliance Gaming Corp.*, 504 F.3d

1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well

understood to mean 'including but not limited to.'").  But, by asking the Court to adopt a

construction that that excludes "all" of the analog video signals, Rose is attempting to negate the

effect of the term "comprising."  No aspect of the claim requires this negative limitation.  Thus,

Rose's construction of "portion" is incorrect.[2]

Avocent's construction, on the other hand, allows the reception of any amount of analog

video signals, up to and including all of those signals.  This construction comports with the

"comprising" transitional term and the plain language of the claim element "a portion of the

analog video signals."

Moreover, during the reexamination of the '264 patent and the '978 patent, Rose based its

reexamination requests on Avocent's construction of "portion" as including up to and including

all of the analog video signals.  (*See* Exh. 16, p. 26; Exh. 18, p. 26).  The PTO confirmed the

patentability of those claims using Avocent's claim construction.  Thus, the prosecution history

supports Avocent's construction as well.

As explained in Avocent's opening brief, the specification discloses that at least one

signal combination is created using <u>all of the incoming analog video</u>.  ('264 patent, col. 12:40-67

---

[2]    Notably, Rose's expert, Dr. Eisenbarth, did not opine on the meaning of "a portion of
the analog video signals" in his declaration submitted with Rose's Opening Claim Construction
Brief.

(table)).  The table at the bottom of column 12 of the '264 patent describes the different types of display appearances that can be generated using the preferred embodiment of the OSD circuitry. The second entry from the bottom describes the display appearance as "active system video with opaque OSD characters and windows."  (Exh. 2, col. 12, lines 57-61).  Because the table separately uses the terms "solid" and "transparent," the reference to "opaque" refers to a display in which both the computer video and the OSD menu appear on the screen such that the OSD menu appears to be semi-transparent and the computer video can be seen "underneath" the OSD menu.  (Declaration of Joseph C. McAlexander in Support of Avocent's Opening Claim Construction Brief ("McAlexander Decl."), ¶ 219).  In this semi-transparent mode, the "analog video overlay circuit" combines all of the computer video signals with the OSD menu video signals to create the display.  Thus, in this mode, the "portion of the analog video signals" being combined is <u>all</u> of the analog video signals.  Accordingly, the correct construction of "a portion of the analog video signals" must be broad enough to encompass the preferred embodiment including the semi-transparent mode in which all of the computer video signals are combined with the OSD video signals.  *See Vitronics*, 90 F.3d at 1583.  (*See* McAlexander Responsive Decl., ¶¶ 41-51).

### F.     "Remote" and "Remotely Located"

> *Avocent's Proposed Construction:*  "a computer that is not directly connected to a
> corresponding workstation and that can be in a separate location."

> *Defendants' Proposed Construction:*  "a computer that is not directly connected to a
> corresponding workstation and that is in a separate location."

Rose has dramatically changed positions on the meaning of "remote/remotely" since it filed its claim construction briefs in the Seattle case.  There, Rose argued a construction that implicitly required the multi-unit, pod-switch-pod architecture that is depicted in Figure 1 of the

patents, and explicitly required the workstations and computers to be in physically separate locations. Now, Rose appears to have changed tactics by arguing a construction that no longer requires the pod-switch-pod architecture of Figure 1.[3] While that is progress, Rose's construction is still incorrect because it still requires a <u>physical</u> separation of the workstations and computers instead of an <u>electrical</u> separation. A key point of the patents is to describe a KVM switch that electrically separates the workstations and computers.

Without a KVM switch, the workstation is directly connected to a computer. With a KVM switch, the workstation and the computers are electrically separated by the KVM switch – *i.e.*, the KVM switch is interposed between the workstation and the computers. The KVM switch allows the workstation to be electrically connected to any one of the multiple computers. The patents-in-suit disclose a computerized switching system, and thus, the specification correctly describes the KVM switching system using <u>electrical</u> circuit and block diagrams. (*See* '096 patent, Figs. 1-12A). One of the points of the invention is to provide a KVM switch that separates the workstation from the computers while, at the same time, making it appear as though the two are directly connected from an operational standpoint. (*See* '096 patent, col. 2:59-67). In this context, it does not matter <u>physically</u> how far apart the workstation and switch are. What matters is that the KVM switch system <u>electrically</u> separates the two thereby making the computers remote from the workstation.

Claim 10 of the '096 patent recites a method of using a KVM switching system as follows:

> <u>In a system including a workstation</u> of the type that includes a
> keyboard, cursor control device <u>and</u> video monitor and a plurality

---

[3] Perhaps this explains why Rose's expert, Dr. Eisenbarth, did not opine on the meaning of "remote" or "remotely located" in his declaration submitted with Rose's Opening Claim Construction Brief.

> of <u>remotely located computers, a method of selectively connecting</u>
> <u>the workstation to the computers</u> for the transmission between
> them of keyboard and cursor control device signals, comprising:

('096 patent, col. 15:43-48). Claim 10 recites a workstation, a group of remotely located

computers, and a system that selectively connects the workstation and the computers for

transmission of signals between them. Claim 10 does <u>not</u> require that the workstation and

computers be "physically" separated. The only requirement is that the switching system

electrically separates the workstation from the remotely located computers by "selectively

connecting the workstation to the computers." That's it.

Rose cites to two portions of the specification, but makes too much of those quotations.

Rose quotes the Summary of the Invention section which reads, in part:

> The present invention provides a computerized switching system
> that <u>allows</u> centrally located network administrators to operate
> multiple server computers over long distances without requiring a
> complicated wiring scheme. In general, the switching system
> <u>allows</u> data transmission between a workstation and a remotely
> located server computer.

(Exh. 1, '096 patent, col. 48-54 (emphasis added)). There is no doubt that the Avocent

inventions "allow" workstations to be connected to computers over "long distances," but the

specification does not "require" those long distances. Rose also quotes the following sentence

from the specification:

> This <u>allows</u> the data to be transmitted along cables up to 500 feet
> in length without the use of additional amplifiers.

(Exh. 1, '096 patent, col. 4, lines 10-12 (emphasis added)). The key word in both passages is

"allows." The invention "allows" physically long distance communication. But importantly, the

specification does not state that the invention "requires" long distance communication. This

distinction is key. If physical separation was so critical to the invention that it should be read

into the claims, the specification would have disclosed long distance physical separation as a

-17-

critical requirement, not an added benefit, of the invention.  Instead, the claims – like claim 10 of

the '096 patent – recite a workstation and multiple computers being electrically separated by a

KVM switch.  Nothing more is required.  The Court should not read a requirement into the

claims that "remote" and "remotely located" require that the computer and workstation

physically be "in a separate location" as Rose asserts.  (*See* McAlexander Responsive Decl., ¶¶

52-63).

## III.    CONCLUSION

Rose ignores the long history of these patents and urges this Court to adopt unduly

narrow claim constructions to create a basis to argue that its KVM products do not infringe.

Rose's tactics should be recognized for what they are – a last ditch attempt to avoid an

infringement determination by this Court.  Avocent respectfully requests that the Court adopt

each of Avocent's proposed constructions which are supported by the intrinsic and extrinsic

evidence.

DATED this 11th day of September, 2009.    Respectfully submitted,

> PLAINTIFF AVOCENT REDMOND CORP.,
> by and through its Attorneys
>
> /s/James D. Berquist_____
> James D. Berquist
> J. Scott Davidson
> Donald L. Jackson
> Grace K. Obermann
> DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
> 4300 Wilson Blvd, Suite 700
> Arlington, Virginia 22203
> Tel. 703-894-6400
> Fax. 703-894-6430

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the counsel of record who are deemed to have

consented to electronic service are being served today with a copy of this document via the Court's

CM/ECF system per RCFC 5.2.  Any other counsel of record will be served by electronic mail,

facsimile transmission, and/or first class mail on this same date.


/s/ Donald L. Jackson_____
Donald L. Jackson